**Volume I of III, Pages A1 to A583**

Miscellaneous Docket No. _____

# United States Court of Appeals
# for the Federal Circuit

IN RE GOOGLE INC., SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC., AND
SAMSUNG TELECOMMUNICATIONS AMERICA, LLC

*Petitioners.*

*On Petition for a Writ of Mandamus to the U.S. District Court for the
Eastern District of Texas in Case Nos. 2:13-cv-894 and 2:13-cv-900
Judge Rodney Gilstrap*

## APPENDIX IN SUPPORT OF
## PETITION FOR WRIT OF MANDAMUS

Kathleen M. Sullivan
Patrick D. Curran
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
(212) 849-7100 facsimile

Charles K. Verhoeven
Sean S. Pak
Amy H. Candido
Matthew S. Warren
Kristin J. Madigan
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6600
415-875-6700 facsimile

*Attorneys for Petitioner
Google Inc.*

Charles K. Verhoeven
Sean S. Pak
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
415-875-6600
415-875-6700 facsimile

Kevin P.B. Johnson
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000
(650) 801-5100 facsimile

Joseph Milowic III
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
(212) 849-7100 facsimile

*Attorneys for Petitioners Samsung
Electronics Co., Ltd., Samsung
Electronics America, Inc., and
Telecommunications America, LLC*

August 14, 2014

## **TABLE OF CONTENTS**

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| 07/01/2014 | 070 | Memorandum Opinion and Order Denying Motion to Stay or Transfer | A1 |
| 10/31/2013 | 001 | Plaintiffs Rockstar Consortium US LP and Mobile Star Technologies LLC's Original Complaint, *Rockstar Consortium US LP v. Samsung Electronics Co., et al.*, No, 13-0900 (E.D. Tex.) | A12 |
| 12/23/2013 | 001 | Complaint for Declaratory Judgment of Non-Infringement of U.S. Patent Nos. 5,838,551; 6,037,937; 6,128,298; 6,333,973; 6,463,131; 6,765,591; and 6,937,572, *Google Inc. v. Rockstar Consortium US LP, et al.*, No. 13-5933 (N.D. Cal.) | A56 |
| 12/31/2013 | 019 | Plaintiffs Rockstar Consortium US LP and MobileStar Technologies LLC's First Amended Complaint, *Rockstar Consortium US LP v. Samsung Electronics Co., et al.*, No, 13-0900 (E.D. Tex.) | A69 |
| 03/10/2014 | 046 | Plaintiffs Rockstar Consortium US LP and MobileStar Technologies LLC's Second Amended Complaint, *Rockstar Consortium US LP v. Samsung Electronics Co., et al.*, No, 13-0900 (E.D. Tex.) | A136 |
| 07/21/2014 | 126 | Defendants Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America, LLC's Answer, Affirmative Defenses and Counterclaims to Second Amended Complaint | A221 |
| 07/22/2014 | 127 | Answer and Affirmative Defenses of Defendant Google Inc. to Claims for Patent Infringement of Rockstar Consortium US LP and MobileStar Technologies LLC | A259 |
| 04/21/2014 | 071 | Google's Notice of Order Denying Motion to Dismiss or in the Alternative, to Transfer | A298 |

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| 04/21/2014 | 071.1 | Exhibit A – Order Denying Motion to Dismiss or, in the Alternative, to Transfer, *Google Inc. v. Rockstar Consortium US LP, et al.*, No. 13-5933 (N.D. Cal.) | A300 |
| 03/21/2014 | 052 | Defendants' Motion to Stay or, in the Alternative, to Transfer to the Northern District of California | A329 |
| 03/21/2014 | 052.1 | Declaration of Kristin Madigan | A352 |
| 03/21/2014 | 052.2 | Exhibit 1 – Robert McMillan, *How Apple and Microsoft Armed 4,000 Patent Warheads*, Wired Enterprise, May 21, 2012 | A358 |
| 03/21/2014 | 052.3 | Exhibit 2 – Joff Wild, *Rockstar CEO says he would not bet against further suits to follow those issued last week*, IAM Magazine, November 4, 2013 | A370 |
| 03/21/2014 | 052.4 | Exhibit 3 – Order Authorizing and Approving (A) The Sale of Certain Patent and Related Assets Free And Clear of All Claims and Interests, (B) The Assumption and Assignment of Certain Executory Contracts, (C) The Rejection of Certain Patent Licenses and (D) The License Non-Assignment and Non-Renewal Protections, *In re Nortel Networks Inc., et al.*, No. 09-10138 (D. Del. July 11, 2011), Docket. No. 5935 | A374 |
| 03/21/2014 | 052.5 | Exhibit 4 – Apple Inc. Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the quarterly period ended June 25, 2011 | A412 |
| 03/21/2014 | 052.6 | Exhibit 5 – Certificate of Limited Partnership of Rockstar Bidco, LP | A467 |
| 03/21/2014 | 052.7 | Exhibit 6 – Certificate of Formation of Rockstar Consortium, LLC | A469 |
| 03/21/2014 | 052.8 | Exhibit 7 – Certificate of Limited Partnership of Rockstar Consortium US LP | A471 |

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| 03/21/2014 | 052.9 | Exhibit 8 – Certificate of Formation of MobileStar Technologies LLC | A473 |
| 03/21/2014 | 052.10 | Exhibit 9 – Robert McMillan, *Facebook Infringes My Patents Too, Says CEO Who Just Sued Google*, Wired Enterprise, November 1, 2013 | A475 |
| 03/21/2014 | 052.11 | Exhibit 10 – iprockstar.com website page titled "About Rockstar" | A483 |
| 03/21/2014 | 052.12 | Exhibit 11 – iprockstar.com website page titled "Innovation" | A485 |
| 03/21/2014 | 052.13 | Exhibit 12 – Patent assignment record Reel No. 031523, Frame No. 0182-90, from the United States Patent And Trademark Office | A489 |
| 03/21/2014 | 052.14 | Exhibit 13 – iprockstar.com website page titled "Grow together through innovation" | A499 |
| 03/21/2014 | 052.15 | Exhibit 14 – Rockstar Consortium LinkedIn Profile | A501 |
| 03/21/2014 | 052.16-17 | Exhibit 15 – LinkedIn Profiles | A503 |
| 03/21/2014 | 052.18 | Exhibit 16 – Joff Wild, *Star Man*, Intellectual Asset Management, July/August 2013 | A584 |
| 03/21/2014 | 052.19 | Exhibit 17 – Mark Wilson LinkedIn Profile I | A593 |
| 03/21/2014 | 052.20 | Exhibit 18 – Mark Wilson LinkedIn Profile II | A597 |
| 03/21/2014 | 052.21 | Exhibit 19 – Michael Dunleavy LinkedIn Profile | A601 |
| 03/21/2014 | 052.22 | Exhibit 20 – iprockstar.com website page titled "Corporate Leaders." | A604 |
| 03/21/2014 | 052.23 | Exhibit 21 Exhibits Q-U to Docket No. 1, *Charter Communications v. Rockstar et. al*., No. 14-0055 (D. Del. Jan. 17, 2014) | A612 |
| 03/21/2014 | 052.24 | Exhibit 22 – Don Lindsay LinkedIn Profile | A639 |
| 03/21/2014 | 052.25 | Exhibit 23 – Prosecuting Attorney Profiles | A644 |
| 03/21/2014 | 052.26 | Exhibit 24 – Joff Wild, *Rockstar getting ready to roll . . .*, Intellectual Asset | A657 |

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| | | Management, February 19, 2012 | |
| 03/21/2014 | 052.27 | Exhibit 25 – Chris Cianciolo LinkedIn Profile | A660 |
| 03/21/2014 | 052.28 | Exhibit 26 – Table C-5, "U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending June 30, 2013" | A664 |
| 03/21/2014 | 052.29 | Declaration of Abeer Dubey | A668 |
| 03/21/2014 | 052.30 | Declaration of B.J. Kang | A673 |
| 03/21/2014 | 052.31 | Declaration of Dale Jachlewski | A677 |
| 03/21/2014 | 052.32 | Proposed Order | A682 |
| 03/24/2014 | 053 | Certificate of Conference for Defendants' Motion to Stay or, in the Alternative, to Transfer to the Northern District of California | A683 |
| 04/14/2014 | 061 | Plaintiffs Rockstar Consortium US LP and MobileStar Technologies LLC's Response in Opposition to Defendants' Motion to Stay or, in the Alternative, to Transfer to the Northern District of California | A686 |
| 04/14/2014 | 061.1 | Declaration of William Colvin | A710 |
| 04/14/2014 | 061.2 | Declaration of Brian Egan | A713 |
| 04/14/2014 | 061.3 | Declaration of Erik Fako | A715 |
| 04/14/2014 | 061.4 | Declaration of Mark Hearn | A718 |
| 04/14/2014 | 061.5 | Declaration of Gillian McColgan | A721 |
| 04/14/2014 | 061.6 | Declaration of Matthew Poisson | A724 |
| 04/14/2014 | 061.7 | Declaration of Donald Powers | A727 |
| 04/14/2014 | 061.8 | Declaration of Marilyn French-St. George | A735 |
| 04/14/2014 | 061.9 | Declaration of Bernard Tiegerman | A736 |
| 04/14/2014 | 061.10 | Declaration of John Veschi | A739 |
| 04/14/2014 | 061.11 | Declaration of Bruce Anthony Wootton | A741 |

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| 04/14/2014 | 061.12 | Proposed Order | A744 |
| 04/14/2014 | 062 | Additional Attachments to Plaintiffs Rockstar Consortium US LP and MobileStar Technologies LLC's Response in Opposition to Defendants' Motion to Stay or, in the Alternative, to Transfer to the Northern District of California | A745 |
| 04/14/2014 | 062.1 | Declaration of Joshua Budwin | A748 |
| 04/14/2014 | 062.2 | Exhibit 1 | A759 |
| 04/14/2014 | 062.3 | Exhibit 2 | A761 |
| 04/14/2014 | 062.4 | Exhibit 3 | A775 |
| 04/14/2014 | 062.5 | Exhibit 4 | A777 |
| 04/14/2014 | 062.6 | Exhibit 5 | A780 |
| 04/14/2014 | 062.7 | Exhibit 6 | A783 |
| 04/14/2014 | 062.8 | Exhibit 7 | A785 |
| 04/14/2014 | 062.9 | Exhibit 8 | A787 |
| 04/14/2014 | 062.10 | Exhibit 9 | A789 |
| 04/14/2014 | 062.11 | Exhibit 10 | A795 |
| 04/14/2014 | 063 | Additional Attachments to Plaintiffs Rockstar Consortium US LP and MobileStar Technologies LLC's Response in Opposition to Defendants' Motion to Stay or, in the Alternative, to Transfer to the Northern District of California | A799 |
| 04/14/2014 | 063.1 | Exhibit 11 | A802 |
| 04/14/2014 | 063.2 | Exhibit 12 | A897 |
| 04/14/2014 | 063.3 | Exhibit 13 | A902 |
| 04/14/2014 | 063.4 | Exhibit 14 | A919 |
| 04/14/2014 | 063.5 | Exhibit 15 | A933 |
| 04/14/2014 | 063.6 | Exhibit 16 | A936 |
| 04/14/2014 | 063.7 | Exhibit 17 | A938 |

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| 04/14/2014 | 063.8-9 | Exhibit 18 | A942 |
| 04/14/2014 | 063.10 | Exhibit 19 | A963 |
| 04/14/2014 | 063.11 | Exhibit 20 | A971 |
| 04/14/2014 | 063.12 | Exhibit 21 | A977 |
| 04/14/2014 | 063.13 | Exhibit 22 | A984 |
| 04/14/2014 | 063.14 | Exhibit 23 | A987 |
| 04/14/2014 | 063.15 | Exhibit 24 | A992 |
| 04/14/2014 | 063.16 | Exhibit 25 | A1004 |
| 04/14/2014 | 063.17 | Exhibit 26 | A1024 |
| 04/14/2014 | 063.18 | Exhibit 27 | A1027 |
| 04/14/2014 | 063.19 | Exhibit 28 | A1030 |
| 04/14/2014 | 063.20 | Exhibit 29 | A1033 |
| 04/14/2014 | 063.21 | Exhibit 30 | A1036 |
| 04/14/2014 | 064 | Additional Attachments to Plaintiffs Rockstar Consortium US LP and MobileStar Technologies LLC's Response in Opposition to Defendants' Motion to Stay or, in the Alternative, to Transfer to the Northern District of California | A1040 |
| 04/14/2014 | 064.1 | Exhibit 31 | A1043 |
| 04/14/2014 | 064.2 | Exhibit 32 | A1046 |
| 04/14/2014 | 064.3 | Exhibit 33 | A1050 |
| 04/14/2014 | 064.4 | Exhibit 34 | A1052 |
| 04/14/2014 | 064.5 | Exhibit 35 | A1056 |
| 04/14/2014 | 064.6 | Exhibit 36 | A1060 |
| 04/14/2014 | 064.7 | Exhibit 37 | A1062 |
| 04/14/2014 | 064.8 | Exhibit 38 | A1065 |
| 04/14/2014 | 064.9 | Exhibit 39 | A1067 |
| 04/14/2014 | 064.10 | Exhibit 40 | A1070 |

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| 04/14/2014 | 064.11 | Exhibit 41 | A1073 |
| 04/14/2014 | 064.12 | Exhibit 42 | A1076 |
| 04/14/2014 | 064.13 | Exhibit 43 | A1080 |
| 04/14/2014 | 064.14 | Exhibit 44 | A1114 |
| 04/25/2014 | 066 | Defendants' Reply in Support of Motion to Transfer to the Northern District of California or, in the Alternative, to Stay | A1120 |
| 04/25/2014 | 066.1 | Declaration of Kristin Madigan | A1129 |
| 04/25/2014 | 066.2 | Exhibit 1 – Defendants' Motion to Dismiss, *Google Inc. v. Rockstar Consortium US LP, et al*., No. 13-5933 (N.D. Cal.) | A1132 |
| 04/25/2014 | 066.3 | Exhibit 2 – Defendants' Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss, *Google Inc. v. Rockstar Consortium US LP, et al.*, No. 13-5933 (N.D. Cal.) | A1166 |
| 04/25/2014 | 066.4 | Exhibit 3 – January 9, 2014 Letter from Joseph Milowic III to David Sochia | A1187 |
| 04/25/2014 | 066.5 | Exhibit 4 – February 18, 2014 Letter from Jared Hoggan to Joseph Milowic III | A1190 |
| 04/25/2014 | 066.6-7 | Exhibit 5 – Excerpt from Plaintiffs' Infringement Contentions for U.S. Patent No. 6,937,572 | A1193 |
| 05/08/2014 | 067 | Plaintiffs' Rockstar Consortium UP LP and MobileStar Technologies LLC's Sur-Reply In Opposition to Defendants' Motion to Stay or, in the Alternative, to Transfer | A1283 |
| 05/08/2014 | 067.1 | Supplemental Declaration of Joshua Budwin | A1291 |
| 05/08/2014 | 067.2 | Exhibit A | A1294 |
| 05/08/2014 | 067.3 | Exhibit B | A1303 |
| 05/08/2014 | 067.4 | Exhibit C | A1310 |
| 05/08/2014 | 067.5 | Exhibit D | A1314 |
| 05/08/2014 | 067.6 | Exhibit E | A1328 |

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| 05/08/2014 | 067.7 | Exhibit F | A1331 |
| 05/08/2014 | 067.8 | Exhibit G | A1334 |
| 05/08/2014 | 067.9 | Exhibit H | A1337 |
| 03/10/2014 | 045 | Rockstar Consortium US LP and MobileStar Technologies LLC's Motion for Leave to File a Second Amended Complaint | A1347 |
| 03/28/2014 | 056 | Google's Opposition to Plaintiffs' Motion for Leave to File a Second Amended Complaint | A1365 |
| 04/09/2014 | 059 | Rockstar Consortium US LP and MobileStar Technologies LLC's Reply in Support of Their Motion for Leave to File a Second Amended Complaint | A1377 |
| 04/24/2014 | 074 | Google's Sur-Reply in Opposition to Plaintiffs' Motion for Leave to File a Second Amended Complaint | A1386 |
| 07/01/2014 | 069 | Order Granting Plaintiffs' Motion for Leave to File a Second Amended Complaint | A1396 |
| 10/31/2013 | 001 | Original Complaint, *Rockstar Consortium US LP v. ASUSTek, et al.*, No. 13-894 (E.D. Tex.) | A1398 |
| 03/25/2014 | 041 | ASUS Defendants' Motion to Transfer or, in the Alternative, to Stay | A1436 |
| 03/25/2014 | 041.7 | Exhibit 4 to the Declaration of Harold H. Davis In Support of ASUS Defendants' Motion to Transfer or, in the Alternative, to Stay | A1456 |
| 03/28/2014 | 034 | Defendants HTC Corporation's and HTC America, Inc.'s Motion to Transfer or, in the Alternative, to Stay | A1458 |
| 03/25/2014 | 035 | LG Defendants' Motion to Stay or, in the Alternative, to Transfer This Action to the Northern District of California | A1479 |
| 04/08/2014 | 027 | Pantech Defendants' Motion to Stay or, in the Alternative, to Transfer This Action to the Northern District of California | A1503 |
| 03/28/2014 | 044 | ZTE (USA) Inc.'s Motion to Stay or, Alternatively, to Transfer to The Northern District | A1521 |

viii

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| | | of California | |
| 07/28/2014 | 129 | Memorandum Opinion and Order Denying ASUS' Motion to Transfer | A1538 |
| 07/30/2014 | 130 | Memorandum Opinion and Order Denying ZTE's Motion to Transfer | A1548 |
| 07/30/2014 | 131 | Memorandum Opinion and Order Denying LG's Motion to Transfer | A1554 |
| 07/29/2014 | 040 | Memorandum Opinion and Order Denying HTC's Motion to Transfer | A1564 |
| 08/01/2014 | 032 | Memorandum Opinion and Order Denying Pantech's Motion to Transfer | A1574 |
| | | Docket Sheet – *Rockstar Consortium US LP v. Samsung Electronics Co., et al.*, No, 13-0900 (E.D. Tex.) | A1580 |
| | | Docket Sheet – *Rockstar Consortium US LP v. ASUSTek et al.*, No. 13-894 (E.D. Tex.) | A1600 |
| | | Docket Sheet – *Google Inc. v. Rockstar Consortium US LP, et al.*, No. 13-5933 (N.D. Cal.) | A1642 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ROCKSTAR CONSORTIUM US LP, AND MOBILESTAR TECHOLOGIES, LLC, | § § § § | |
| *Plaintiff,* | § § | |
| *v.* | § § | CASE NO. 2:13-CV-00894-JRG |
| SAMSUNG ELECTRONICS CO., LTD., *et al.*, | § § § | **LEAD CASE** CASE NO. 2:13-CV-00900-JRG |
| *Defendants.* | § § § | **MEMBER CASE** |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Google, Inc.'s ("Google") and Samsung Electronics Co., Ltd.'s, Samsung Electronics America, Inc.'s, and Samsung Telecommunications America, LLC's (collectively, "Samsung") Motion to Stay or, in the Alternative, to Transfer to the Northern District of California (Dkt. No. 52), filed March 21, 2014. For the reasons set forth below, the Court finds that the motion should be **DENIED**.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs Rockstar Consortium US LP, Inc. and Mobilestar Technologies, LLC are entities arising out of the demise of Nortel, a Canadian telecommunications company with a substantial patent portfolio. When Nortel confronted bankruptcy in 2011, it held an auction for its patents. Five major technology companies—Apple, Blackberry, Ericsson, Microsoft, and Sony—pooled their resources into Rockstar Bidco LP for the purpose of bidding on the Nortel patent portfolio (Dkt. No. 61-4). Rockstar Bidco LP outbid Google for the patents. *Id.* Rockstar

Bidco LP then transferred the patents in suit here to the Rockstar Consortium US LP, a Delaware limited partnership with its headquarters in Plano, Texas and one of the plaintiffs in this case. *Id.* Rockstar Consortium US LP subsequently created a wholly-owned subsidiary, MobileStar Technologies, LLC, to which it assigned five of the seven patents-in-suit (Dkt. No. 61-7). Meanwhile, Rockstar Consortium Inc. was formed as a vehicle to hire certain of Nortel's former employees. *Id.* Rockstar Consortium US LP contracts with Rockstar Consortium, Inc. for "intellectual-property-support services." *Id.*

Rockstar Consortium US LP, Inc. and Mobilestar Technologies, LLC (hereinafter, collectively, "Rockstar") filed this suit against Samsung on October 31, 2013, alleging that Samsung infringes seven of Rockstar's patents, accusing certain mobile phones using a version of Google's Android operating system (Dkt. No. 1). On the same day, Rockstar separately sued six other mobile phone manufacturers, again accusing Android-based phones.

On December 23, 2013, Google filed an action for declaratory relief in the United States Court for the Northern District of California (NDCA), seeking a judgment that the Android operating system does not infringe the patents at issue in this case. *Google Inc. v. Rockstar Consortium U.S. LP*, No. C-13-5933-CW (Dkt. No. 1). On December 31, 2013, Rockstar amended its complaint in this Court, accusing Google of violating three of the seven patents in suit (Dkt. No. 19). Rockstar has since requested leave to file a Second Amended Complaint accusing Google of infringing all seven of the patents in suit (Dkt. No. 45). On April 17th, 2014, the NDCA issued an opinion denying Rockstar's motion to dismiss, finding that the California action was the first filed between Rockstar and Google (5933 Dkt. No. 58).

In this motion, Google asks the Court to stay the case pending resolution of the NDCA suit. In the alternative, Google asks the Court to transfer this case to the NDCA.

## II.   <u>LEGAL STANDARDS</u>

"The district court has the inherent power to control its own docket, including the power to stay proceedings." *Soverain Software LLC v. Amazon.com, Inc.*, 356 F. Supp. 2d 660, 662 (E.D. Tex. 2005). In deciding whether to stay litigation, courts typically consider "(1) whether a stay will unduly prejudice or present a clear tactical disadvantage to the nonmoving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set. *Id.*

When cases between the same parties present the same issues for resolution, the general rule favors the first-filed action. *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 904 (Fed. Cir. 2008). However, "trial courts have discretion to make exceptions to this general rule in the interest of justice or expediency . . . . These exceptions are not rare." *Id.* Reasons such as "the convenience and availability of witnesses, or absence of jurisdiction over all necessary or desirable parties, or the possibility of consolidation with related litigation, or considerations relating to the real party in interest" may trump the general first-filed rule. *Genentech, Inc. v. Eli Lilly 7 Co.*, 998 F.2d 931, 937-39 (Fed. Cir. 1998).

28 U.S.C. section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  The first inquiry when analyzing a case's eligibility for 1404(a) transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed."  *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) (*Volkswagen I*).

Once that threshold is met, the movant has the burden of proving that the transferee venue is "clearly more convenient" than the transferor venue.  *In re Nintendo*, 589 F.3d 1194,

1200 (Fed. Cir. 2009); *In re TS Tech*, 551 F.3d 1315, 1319 (Fed. Cir. 2008); *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (*Volkswagen II*).  In this regard, courts analyze both public and private factors relating to the convenience of parties and witnesses as well as the interests of particular venues in hearing the case.  *See Nintendo*, 589 F.3d at 1198; *TS Tech*, 551 F.3d 1319.  The private factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Nintendo*, 589 F.3d at 1198; *TS Tech*, 551 F.3d at 1319; *Volkswagen I*, 371 F.3d at 203.  The public factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Nintendo*, 589 F.3d at 1198; *TS Tech*, 551 F.3d at 1319; *Volkswagen I*, 371 F.3d at 203.  Though the private and public factors apply to most transfer cases, "they are not necessarily exhaustive or exclusive," and no single factor is dispositive.  *Volkswagen II*, 545 F.3d at 314-15.

### III.   ANALYSIS

Defendants request a stay of these proceedings as their preferred relief. Because the considerations involved in a decision to stay closely mirror those involved in a decision to transfer, however, the Court will combine its discussion of these issues.

### A. Availability of the Transferee Venue

The parties do not appear to dispute that this suit could originally have been brought in the Northern District of California, and this Court agrees that the case could have been originally brought in that district. *See In re Genentech, Inc.*, 566 F.3d 1338, 1346 (Fed. Cir. 2009).

B. <u>Private Interest Factors</u>

   1. *Relative Ease of Access to Sources of Proof*

It is likely that the bulk of the relevant evidence in this action will come from Google. *See In re Genentech*, 566 F.3d at 1345. Google avers that "all relevant documants and evidence are [sic] accessible from Google's headquarters in the Northern District," but is pointedly silent on the physical location where said documents are stored (Dkt. No. 52-29). Samsung, in contrast, maintains a US headquarters in Richardson, Texas—within the Eastern District of Texas (Dkt. No. 62-7). Samsung also maintains a laboratory in Dallas, Texas; the Dallas office appears to be significantly involved in the development of the accused products (Dkt. No. 62-9). Moreover, Rockstar's documentary evidence relating to the patents-in-suit is stored at its Plano, TX headquarters—also within the Eastern District (Dkt. Nos. 61-4, 61-7). Though Google suggests that this evidence was transported to the Eastern District explicitly to game the Court's transfer analysis, the Court finds that such a conclusion is unwarranted given the evidence presented.

The evidence supports the conclusion that a substantial body of relevant evidence exists in or near the Eastern District of Texas. In contrast, it is unclear whether and how much relevant information actually exists within the Northern District of California. The Court thus finds that this factor weighs against transfer. The Court notes, however, that given the ease in the modern era of transferring electronic data from one place to another, this factor is not dominant in its ultimate decision.

   2. *Availability of Compulsory Process*

Under Federal Rule of Civil Procedure 45 (as recently amended), this Court may enforce a subpoena issued to any nonparty witness in the State of Texas to appear at trial, provided the party does not incur substantial expense. Fed. R. Civ. P. 45(c)(1)(B). Similarly, the Court may

enforce any subpoena for a deposition to be taken within its boundaries, provided that the deposition is taken no more than 100 miles from a location where the person resides, is employed, or regularly transacts business in person. *See id.* at (a)(2), (c)(1)(A), (d)(3)(a); *Ingeniador, LLC v. Adobe Systems Inc.*, 2014 WL 105106, No. 2:12-cv-805-JRG (E.D. Tex. Jan. 9, 2014). Rule 45, however, makes compulsory process for deposition effectively nationwide. Moreover, party witnesses do not require compulsory process for trial and are not given much weight in this factor. *See Ingeniador*, *supra*. Rather, the focus of this factor is on witnesses for whom compulsory process to attend trial might be necessary.

Google suggests that "former employees of Google and Andrioid Inc. remain heavily concentrated in the Northern District. At least one named inventor resides in the Northern District . . . and dozens of relevant prior artists of record live in the Northern District" (Dkt. No. 52, at 11). They also suggest that employees of Apple, one of Rockstar's corporate owners, may be compelled to testify in the Northern District.

Google does not, however, identify any former employees who are expected to testify at trial. Nor does this Court give particular credence to the assertion that prior artists will be called to testify; this Court has previously noted that "inventors of prior art rarely, if ever, actually testify at trial." *PersonalWeb Techs., LLC v. Target Brands, Inc.*, No. 6:11-cv-655-LED, Dkt. No. 74, at 15 n.13 (E.D. Tex. Mar. 21, 2013). Finally, though the Court views Google's asserted interest in Apple's testimony with some skepticism, it notes that other Rockstar parents—notably Ericsson and Blackberry—maintain U.S. headquarters in Texas (Dkt. Nos. 63-17, 63-18).

In contrast, Rockstar specifically identifies two prosecuting attorneys, two former Nortel employees, and one former Samsung employee in or near the Eastern District of Texas whom it suggests might be called to testify (Dkt. No. 61, at 11). It also suggests that Samsung customers

such as AT&T and Verizon might be called to prove damages. *Id.* The Court is not convinced that any of these witnesses will likely be called to testify, but their appearance in the case is certainly plausible.

Weighing all considerations of available compulsory process, the Court finds that this factor is neutral. One inventor's presence in the Northern District of California weighs in favor of transfer, but is counterbalanced by the presence of several potential nonparty witnesses in Texas.

### 3.  *Cost of Attendance for Willing Witnesses*

A critical factor in this Court's analysis of this case is the cost of attendance for willing witnesses. As noted above, Google's headquarters is in Mountain View, California. Many of the Google employees who work on the Android operating system are located in or near the Northern District of California (Dkt. No. 52-29). Samsung is a Korean entity with its U.S. headquarters in the Eastern District of Texas; moreover, Samsung maintains a Dallas office that appears to do substantial work on its Android-based products (Dkt. No. 62-7, 62-9). Rockstar's headquarters is in Plano, Texas, and Rockstar has identified several potential witnesses who work at its Plano office.

Google employees from northern California would face substantial costs in traveling to the Eastern District of Texas for trial. However, if the court were to transfer this case, roughly equivalent costs would be imposed on Rockstar's witnesses, and also (potentially) some Samsung witnesses. Samsung witnesses located in Korea, by contrast, will be subjected to substantial costs in either venue.

Transferring this case would, at best, merely redistribute the inconvenience of travel among the parties; at worst, a transfer might substantially increase the cost of attendance for

willing witnesses. *Cf. Thomas Swan & Co., Ltd. v. Finisar Corp.*, 2014 WL 47343, No. 2:13-cv-178-JRG (E.D. Tex. Jan. 6, 2014). Having considered the evidence, the Court finds that this factor weighs slightly against transfer.

### 4.  *Other Practical Problems*

In this case, where multiple and parallel litigations in two different jurisdictions are possible, considerations of judicial economy bear heavily upon the Court's transfer analysis. *See In re Volkswagen of Am., Inc.*, 566 F.3d 1349, 1351 (Fed. Cir. 2009).

Google argues that its suit against Rockstar in California presents identical issues among identical parties, and that the Court should stay or transfer this litigation under the first-filed rule. It also argues that, even if this litigation is the first-filed (because of Rockstar's October complaint against Samsung and subsequent addition of Google as a defendant), the Court should stay or transfer this case because Rockstar's Texas suits are essentially "customer suits," whose major issues will be resolved in the California declaratory judgment action.

The Court need not resolve the formalistic question of whether Rockstar's October complaint makes this suit the first-filed case.  The decision to stay or transfer a case is contextual and multifaceted, and the Court may give weight to considerations beyond the simple race to the courthouse. *See Micron Tech.*, 518 F.3d at 904. This is particularly so in this case, where the merits of the "first filed" designation are by no means clear. The considerations of judicial economy that underlie the general first-filed rule, in this case, weigh against a transfer or stay.

First, the Court notes that there are six Rockstar litigations currently proceeding in the Eastern District of Texas, each suit alleging violations of the same patents. The Court has already consolidated these cases for all pre-trial purposes except venue (Dkt. No. 51). These cases will present common issues of claim construction and damages, and (most likely) validity. Moreover,

now that Google is a party to this litigation, Google will have every opportunity to participate fully in these proceedings.[1] Considerations of judicial economy weigh strongly in favor of consolidating all cases on these patents in the Eastern District of Texas, if possible.

Second, the Court does not expect the current California litigation to dispose of key issues in this case and the related Rockstar cases. *See Spread Spectrum Screening LLC v. Eastman Kodak*, 657 F/3d 1349, 1358 (Fed. Cir. 2011). Though the patents-in-suit in the Texas cases are the same, the suits' accused products are importantly different. Though each of the accused products uses some version of Android, a product driven primarily by Google, each defendant mobile phone manufacturer modifies and customizes the Android system to its own particular purposes (Dkt. Nos. 63-6, 63-11). It is by no means clear, then, that resolving infringement issues as to Android *proper* will resolve issues relating to other manufacturers' various *implementations* of the Android system.

The Texas actions also present issues relating to each phone manufacturer's devices and hardware, which the California litigation does not. One of the patents-in-suit claims only hardware (Dkt. No. 63-10). Rockstar alleges that the other patents-in-suit cover the interaction of the parties' Android implementations with hardware (Dkt. No. 61, at 4). Thus, only if the patents are *invalidated* completely in the California court will major issues in the Texas cases be resolved.

The Court finds that this factor weighs heavily against transfer. This factor also weighs against a stay of proceedings.

   C. Public Interest Factors

---

[1] An Order of this Court to be released contemporaneously grants Rockstar leave to amend its complaint to assert all seven patents-in-suit against Google.

*1. Local Interest*

Google argues that "[t]he Northern District of California has an interest in protecting intellectual property rights that stem from research and development in Silicon Valley" (Dkt. No. 52, at 15) (quoting *Affinity Labs of Tex. v. Samsung Elecs. Co., Ltd.*, 2013 WL 5508122, No. 1:12-cv-557-RC (E.D. Tex. Sept. 18, 2013). The Court has previously been highly skeptical of arguments that a particular jurisdiction has a "local interest" that amounts to a bias in its jury pool.    *See Ingeniador*, 2014 WL 105106, at *3-4. A predisposition toward one party, independent of the merits of the case, cannot be the kind of "local interest" cognized by the federal rules, and this Court gives this consideration no weight in its analysis. Also, the products here accused are so ubiquitous throughout the nation that no single community can establish an exceptional link that rightly makes any venue preferable to any other. The Court finds that this factor is neutral.

*2. Other Public Interest Factors*

Both parties agree that other public interest factors are neutral. The Court sees no reason to disagree with this conclusion.

**IV.    CONCLUSION**

The Court finds that a stay of proceedings would not serve the interests of justice, because major issues in this case and other pending cases will likely remain even after the California litigation is resolved. The Court also finds that the Northern District of California is not clearly a more convenient venue for this case.

Having considered the matter carefully, the Court finds that Defendants' motion (Dkt. No. 52) should be and hereby is **DENIED**.

**So ORDERED and SIGNED this 1st day of July, 2014.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **ROCKSTAR CONSORTIUM US LP, AND MOBILESTAR TECHNOLOGIES LLC** | § § § § | |
| **PLAINTIFFS** | § | |
| **v.** | § | **Civil Action No. 2:13-cv-900** |
| | § | |
| **SAMSUNG ELECTRONICS CO., LTD, SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC** | § § § § § | **JURY TRIAL REQUESTED** |
| **DEFENDANTS.** | | |

**PLAINTIFFS ROCKSTAR CONSORTIUM US LP AND MOBILESTAR
TECHNOLOGIES LLC'S ORIGINAL COMPLAINT**

Plaintiffs Rockstar Consortium US LP ("Rockstar") and MobileStar Technologies LLC ("MobileStar") file this Original Complaint for patent infringement under 35 U.S.C. § 271 and in support thereof would respectfully show the Court the following:

**PARTIES**

1.    Plaintiff Rockstar Consortium US LP ("Rockstar") is a limited partnership organized and existing under the laws of the State of Delaware, and maintains its principal place of business at Legacy Town Center 1, 7160 North Dallas Parkway Suite No. 250, Plano, TX 75024.

2.    Plaintiff MobileStar Technologies LLC ("MobileStar") is a subsidiary of Rockstar and is a limited liability corporation organized and existing under the laws of the State of Delaware, and maintains its principal place of business at Legacy Town Center 1, 7160 North Dallas Parkway Suite No. 250, Plano, TX 75024.

3.    Upon information and belief, Defendant Samsung Electronics Co., Ltd. ("SEC") is a corporation organized and existing under the laws of the Republic of Korea with its principal place of business at 416, Maetan 3-dong, Yeongtong-gu, Suwon-si, Gyeonggi-do 443-742, South Korea.

4.    Upon information and belief, Defendant Samsung Electronics America, Inc. ("SEA") is a subsidiary of SEC and is a corporation organized and existing under the laws of the State of New York.   Samsung Electronics America, Inc. maintains its principal place of business at 85 Challenger Road, Ridgefield Park, NJ 07660.

5.    Upon information and belief, Defendant Samsung Telecommunications America, LLC is a subsidiary of SEC and is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business at 1301 East Lookout Drive, Richardson TX 75082.

## JURISDICTION AND VENUE

6.    This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 271.  This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. § 1338.

7.    Venue is proper in this Court pursuant to 28 U S.C. §§ 1391 and 1400(b).

8.    This Court has personal jurisdiction over Defendants Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung"). Samsung has conducted and does conduct business within the State of Texas.   Samsung, directly or through subsidiaries or intermediaries (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and advertises (including the provision of an interactive web page) its products

2

(including its infringing products) and/or services in the United States, the State of Texas, and the Eastern District of Texas.  Samsung, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that they will be purchased and used by consumers in the Eastern District of Texas.  These infringing products and/or services have been and continue to be purchased and used by consumers in the Eastern District of Texas.  Samsung has committed acts of patent infringement within the State of Texas and, more particularly, within the Eastern District of Texas.

## **ASSERTED PATENTS**

9.    On November 17, 1998, U.S. Patent No. 5,838,551 ("the '551 Patent") entitled "Electronic Package Carrying an Electronic Component and Assembly of Mother Board and Electronic Package" was duly and legally issued with Yee-Ning Chan as the named inventor after full and fair examination.  Rockstar owns all rights, title, and interest in and to the '551 Patent and possesses all rights of recovery under the '551 Patent.  MobileStar is the exclusive licensee of the '551 Patent.

10.    On March 14, 2000, U.S. Patent No. 6,037,937 ("the '937 Patent") entitled "Navigation Tool for Graphical User Interface" was duly and legally issued with Brian Finlay Beaton, Colin Donald Smith, and Bruce Dale Stalkie as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '937 Patent and possesses all rights of recovery under the '937 Patent.

11.    On October 3, 2000, U.S. Patent No. 6,128,298 ("the '298 Patent") entitled "Internet Protocol Filter" was duly and legally issued with Bruce Anthony

3

Wootton and William G. Colvin as the named inventors after full and fair examination. Rockstar owns all rights, title, and interest in and to the '298 Patent and possesses all rights of recovery under the '298 Patent.  MobileStar is the exclusive licensee of the '298 Patent.

12.    On December 25, 2001, U.S. Patent No. 6,333,973 ("the '973 Patent") entitled "Integrated Message Center" was duly and legally issued with Colin Donald Smith and Brian Finlay Beaton as the named inventors after full and fair examination. MobileStar owns all rights, title, and interest in and to the '973 Patent and possesses all rights of recovery under the '973 Patent.

13.    On October 8, 2002, U.S. Patent No. 6,463,131 ("the '131 Patent") entitled "System and Method for Notifying a User of an Incoming Communication Event" was duly and legally issued with Marilyn French-St. George, Mitch A. Brisebois and Laura A. Mahan as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '131 Patent and possesses all rights of recovery under the '131 Patent.

14.    On July 20, 2004, U.S. Patent No. 6,765,591 ("the '591 Patent") entitled "Managing a Virtual Private Network" was duly and legally issued with Matthew W. Poisson, Melissa L. Desroches, and James M. Milillo as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '591 Patent and possesses all rights of recovery under the '591 Patent.

15.    On August 30, 2005, U.S. Patent No. 6,937,572 ("the '572 Patent") entitled "Call Trace on a Packet Switched Network" was duly and legally issued with Brian B. Egan and Milos Vodsedalek as the named inventors after full and fair

4

examination.  Rockstar owns all rights, title, and interest in and to the '572 Patent and possesses all rights of recovery under the '572 Patent.

## GENERAL ALLEGATIONS

16.    Samsung has directly and indirectly infringed and continues to directly and indirectly infringe each of the '551, '937, '298, '973, '131, '591, and '572 Patents by engaging in acts constituting infringement under 35 U.S.C. § 271(a), (b), (c), and/or (f), including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into this District and elsewhere in the United States, certain mobile communication devices having a version (or an adaption thereof) of Android operating system ("Samsung Mobile Communication Devices").

17.    Samsung is doing business in the United States and, more particularly, in the Eastern District of Texas by making, using, selling, importing, and/or offering for sale Samsung Mobile Communication Devices, including but not limited to Samsung's Galaxy family of smart phones, including the Galaxy S III and Captivate (Galaxy S), and its Galaxy family of tablets, including the Galaxy Tab 8.9, and other products that infringe the patent claims involved in this action or by transacting other business in this District.

## COUNT ONE
## PATENT INFRINGEMENT BY SAMSUNG

18.    Plaintiffs incorporate by reference paragraphs 1-17 as if fully set forth herein.  As described below, Samsung has infringed and/or continues to infringe the '551, '937, '298, '973, '131, '591, and '572 Patents.

McKool 939622v5

19.    At least the Samsung Mobile Communication Devices infringe at least claim 1 of the '551 Patent.  Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these products and thus directly infringes one or more claims of the '551 Patent, including at least claim 1.

20.    Samsung indirectly infringes the '551 patent by inducing infringement by others, such as resellers, of at least claim 1 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and/or end-users of the Samsung Mobile Communication Devices.  Samsung had actual notice of the '551 Patent at least by October 15, 2012, in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

21.    Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured and distributed, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use Samsung Mobile Communication Devices in their normal and customary way to infringe the '551 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '551 patent; further, Samsung was aware that these normal and customary activities would infringe the '551 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '551 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

McKool 939622v5

**– A17 –**

22.    Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '551 Patent in the United States because Samsung has knowledge of the '551 Patent and Samsung actually induces others, such as resellers and end-use customers, to directly infringe the '551 patent, by using, selling, exporting, supplying and/or distributing, within the United States, Samsung Mobile Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

23.    Samsung indirectly infringes the '551 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices.  Samsung had actual notice of the '551 Patent at least by October 15, 2012, in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

24.    Samsung Mobile Communication Devices include at least one electronic package comprising a component that is located between an EMI shield and a ground member for performing shielding operations.  The EMI shield is incorporated into the electronic package, which is then mounted to a circuit board in Samsung Mobile Communication Devices, and on information and belief, the electronic component does not function in an acceptable manner absent the EMI shielding.  Furthermore, the electronic package incorporating the EMI shield does not operate in isolation, but is designed to operate within the Mobile Communication Device, and absent the EMI

shielding of the electronic component, Samsung Mobile Communication Devices would not function in an acceptable manner.

25.     A reasonable inference to be drawn from the facts set forth is that the EMI shielded electronic package in Samsung Mobile Communication Devices is especially made or especially adapted to operate in a Samsung Mobile Communication Device as an EMI shield.

26.     A reasonable inference to be drawn from the facts set forth is that the EMI shielded electronic package is not a staple article or commodity of commerce and that the use of the EMI shielded electronic package is required for operation of Samsung Mobile Communication Devices.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

27.     The EMI shielded electronic package in Samsung Mobile Communication Devices are each a material part of the invention of the '551 patent and are especially made for the infringing manufacture, sale, and use of Samsung Mobile Communication Devices.   Samsung Mobile Communication Devices, including the EMI shielded electronic package, are especially made or adapted as an electronic package that infringes the '551 patent.  Because the sales and manufacture of Samsung Mobile Communication Devices including the EMI shielded electronic package infringe the '551 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

28.     Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or

8

especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.  Samsung provides to others Samsung Mobile Communication Devices with distinct and separate components, including hardware components, which have no substantial non-infringing use.

29.    At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps and Browser functionality, infringe at least claim 13 of the '937 Patent.  Samsung makes, uses, tests, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 13 of the '937 Patent.

30.    Samsung indirectly infringes the '937 patent by inducing infringement by others of at least claim 13, such as resellers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '937 Patent at least by September 3, 2009 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

31.    Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '937 patent.

9

Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '937 patent; further, Samsung was aware that these normal and customary activities would infringe the '937 patent. Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

32.     Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '937 patent in the United States because Samsung has knowledge of the '937 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers. Samsung knew or should have known that such actions would induce actual infringement.

33.     The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps and Browser functionality as intended by Samsung infringes at least method claim 1 of the '937 Patent. Samsung uses these products and thus directly infringes at least method claim 1 of the '937 Patent.

34.     In addition, Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps, and Browser functionality to others, such as resellers and end-use

customers, in the United States who, in turn, use these products to infringe at least method claim 1 of the '937 Patent.

35.     Samsung indirectly infringes the '937 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '937 Patent at least by September 3, 2009 in view of a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

36.     Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps and Browser functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe the '937 Patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '937 patent.

37.     Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '937 Patent in the United States. For example, Samsung provides instructions to resellers and end-use customers regarding the use and operation of Samsung's products in an infringing way.  Such instructions include at least "Samsung Captivate Mobile Phone User Manual" (available at http://downloadcenter.samsung.com/content/UM/201201/20120117231631844/ATT_i89 7_Captivate_English_User_Manual.pdf).  When resellers and end-use customers follow

11

such instructions, they directly infringe the '937 Patent.   Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '937 Patent.   Samsung thus knows that its actions induce the infringement.

38.      Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

39.      Samsung indirectly infringes the '937 patent, by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices.   Samsung received actual notice of the '937 Patent at least by September 3, 2009 in view of a communication from Rockstar and/or its predecessors-in-interest to Samsung, and also received knowledge as of the date this lawsuit was filed.

40.      Samsung Mobile Communication Devices include functionality that, inter alia, displays a navigable graphical user interface ("navigable GUI") that permits a user to manipulate and control the contents of the display to maximize the use of display real estate.   This navigable GUI is included in Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support at least the Gallery, Email, Maps, and Browser functionalities.    On information and belief, these functionalities cannot operate in an acceptable manner absent the navigable GUI, as it is included in every Samsung Mobile Communication Device.

McKool 939622v5

41.    A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in Samsung Mobile Communication Devices is especially made or especially adapted to operate on a Samsung Mobile Communication Device as a navigable GUI that permits a user to manipulate or control the contents of the display to maximize the use of display real estate on the user's Samsung Mobile Communication Devices.

42.    A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in the Mobile Communication Device is not a staple article or commodity of commerce and that the use of the navigable GUI in Samsung Mobile Communication Devices is required for the operation of Samsung Mobile Communication Devices.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

43.    Samsung Mobile Communication Devices with the navigable GUI are each a material part of the invention of the '937 patent and are especially made for the infringing manufacture, sale, and use of Samsung Mobile Communication Devices. Samsung Mobile Communication Devices with the navigable GUI are especially made or adapted as a navigable GUI that infringes the '937 patent.   Because the sales and manufacture of Samsung Mobile Communication Devices with a navigable GUI infringes the '937 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

44.    Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '937 patent,

– A24 –

constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.  Samsung provides to others, Samsung Mobile Communication Devices with distinct and separate components, including software components, which have no substantial non-infringing use.

45.     At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support the Mobile Hotspot functionality infringe at least claims 27 and 31 of the '298 Patent.  Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claims 27 and 31 of the '298 Patent.

46.     Samsung indirectly infringes the '298 patent by inducing infringement by others of at least claims 27 and 31, such as resellers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '298 Patent at least by July 29, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

47.     Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile

14

Communication Devices in their normal and customary way to infringe the '298 patent. Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '298 patent; further, Samsung was aware that these normal and customary activities would infringe the '298 patent. Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '298 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

48.    Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '298 patent in the United States because Samsung has knowledge of the '298 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers. Samsung knew or should have known that such actions would induce actual infringement.

49.    The use of at least Samsung Mobile Communication Devices that support the Mobile Hotspot functionality as intended by Samsung infringes at least method claims 14 and 24 of the '298 Patent. Samsung uses these products and thus directly infringes at least method claims 14 and 24 of the '298 Patent.

50.    In addition, Samsung provides at least Samsung Mobile Communication Devices that support the Mobile Hotspot functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claims 14 and 24 of the '298 Patent.

15

McKool 939622v5

51.    Samsung indirectly infringes the '298 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities of the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Mobile Hotspot functionality.  Samsung received actual notice of the '298 Patent at least by July 29, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

52.    Samsung's affirmative acts of selling its Samsung Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '298 patent at least through using Mobile Hotspot functionality.  Samsung also provides instructions, including at least "Verizon User Manual Samsung Galaxy S III" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW, for using the Mobile Hotspot functionality.  Through its sales of Samsung Mobile Communication Devices with Mobile Hotspot functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '298 patent; further, Samsung was aware that the normal and customary use of Mobile Hotspot functionality would infringe the '298 patent.  Samsung also enticed its end-users to use the Mobile Hotspot functionality by providing instruction manuals and also providing Mobile Hotspot functionality.  Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '298

16

patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

53.    Accordingly, a reasonable inference is that Samsung actively induces infringement of the '298 Patent by others, such as resellers and end-use customers. Samsung specifically intends for others, including such as resellers and end-use customers, to directly infringe one or more claims of the '298 Patent in the United States because Samsung had knowledge of the '298 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung Mobile Communication Devices in an infringing way. Such instructions include at least "Verizon User Manual Samsung Galaxy S III" available at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW.    When resellers and end-use customers follow such instructions, they directly infringe the '298 Patent.    Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '298 Patent.    Samsung thus knows that its actions induce the infringement.

54.    Samsung indirectly infringes the '298 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.    Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Mobile Hotspot functionality.    Samsung received actual notice of the '298 Patent at least by July 29, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

17

55.    Samsung Mobile Communication Devices with the Mobile Hotspot functionality allow wireless devices from a first, or private, network to connect to a second, or public, network such as the Internet.  The Mobile Hotspot functionality is designed to route data packets between wireless devices tethered to the Mobile Hotspot to nodes on a public network such as the Internet, and cannot function in a manner that does not utilize the Mobile Hotspot functionality available to Samsung Mobile Communication Devices.  Upon information and belief, the Mobile Hotspot functionality is designed to entice a user to access nodes in a second, or public, network such as the Internet.

56.    A reasonable inference to be drawn from the facts set forth is that the Mobile Hotspot functionality is especially made or especially adapted to operate on a mobile communication device for providing access for wireless devices in a first, or private, network to nodes in a second, or public, network.

57.    A reasonable inference to be drawn from the facts set forth is that the Mobile Hotspot functionality is not a staple article or commodity of commerce and that the use of the Mobile Hotspot functionality of Samsung Mobile Communication Devices is for interfacing first and second data communications networks, e.g., a private network and a public network such as the Internet.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

58.    Samsung Mobile Communication Devices with Mobile Hotspot functionality are each a material part of the '298 patent and especially made for the infringing use of the Mobile Hotspot functionality for interfacing private and public data communication networks.  Samsung Mobile Communication Devices with the Mobile

18

Hotspot functionality are especially made or adapted to provide access for wireless devices in a first, or private, network through the Mobile Communication Device, to nodes in a second, or public, network that perform or facilitate performance of the steps that infringe the '298 patent.  Furthermore, Samsung provides user manuals describing the uses of Samsung Mobile Communication Devices that infringe the '298 patent.  Because the sales and manufacture of Samsung Mobile Communication Devices with Mobile Hotspot functionality infringes the '298 patent, Samsung's sales of its infringement products have no substantial non-infringing uses.

59.    Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.  Samsung provides to others, Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Mobile Hotspot functionality.  Samsung installs and configures Samsung Mobile Communication Devices with distinct and separate components, including software components, which are used only to perform the infringing method claims.

60.    At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support an integrated notification message center functionality infringe at least claims 1 and 21 of the '973 Patent.  Samsung makes, uses, sells, tests, uses, offers for sale, imports, exports, supplies and/or

distributes within the United States these devices and thus directly infringes one or more claims of the '973 patent, including at least claims 1 and 21.

61.     Samsung indirectly infringes the '973 patent by inducing infringement by others, such as resellers, of at least claims 1 and 21 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '973 Patent at least by March 12, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

62.     Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '973 patent. Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '973 patent; further, Samsung was aware that these normal and customary activities would infringe the '973 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '973 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

63.     Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more

claims of the '973 patent in the United States because Samsung has knowledge of the '973 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

64.    The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support an integrated notification message center functionality as intended by Samsung infringes at least method claim 8 of the '973 Patent.  Samsung uses these devices within the United States and thus directly infringes one or more claims of the '973 patent, including at least claim 8.

65.    Samsung indirectly infringes the '973 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices.  Samsung received actual notice of the '973 Patent at least by March 12, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

66.    Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support integrated notification message center functionality to others, such as resellers and end-use customers, in the United States who, in turn, use Samsung Mobile Communication

21

Devices to infringe at least method claim 8 of the '973 Patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '973 patent.

67.    Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '973 Patent in the United States. For example, Samsung provides instructions to resellers and end-use customers regarding the use and operation of Samsung Mobile Communication Devices in an infringing way. Such instructions include at least "Samsung Captivate Mobile Phone User Manual" (available                                                                                                    at http://downloadcenter.samsung.com/content/UM/201201/20120117231631844/ATT_i89 7_Captivate_English_User_Manual.pdf, accessed October 30, 2013).  When resellers and end-use customers follow such instructions, they directly infringe the '973 Patent. Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '973 Patent.  Samsung thus knows that its actions induce the infringement.

68.    Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '973 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

69.    Samsung indirectly infringes the '973 patent, by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices.  Samsung received actual notice of the '973

22

Patent at least by March 12, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

70.    Samsung Mobile Communication Devices include functionality that, inter alia, displays an integrated notification message center contained in a single list.  The notification message center is designed to provide a user with a single list of notifications regardless of the types of messages (e.g., email, text, etc) on the user's Mobile Communication Device.  On information and belief, this functionality cannot operate in an acceptable manner absent the integrated notification message center, as it is included in every Samsung Mobile Communication Device.

71.    A reasonable inference to be drawn from the facts set forth is that the integrated message center in Samsung Mobile Communication Devices is especially made or especially adapted to operate on a Samsung Mobile Communication Device as an integrated notification message center that provides a user with notifications concerning different types of messages on the user's Mobile Communication Device.

72.    A reasonable inference to be drawn from the facts set forth is that the integrated notification message center in the Mobile Communication Device is not a staple article or commodity of commerce and that the use of the integrated notification message center in Samsung Mobile Communication Devices is required for operation of Samsung Mobile Communication Devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

73.    Samsung Mobile Communication Devices with the integrated notification message center are each a material part of the invention of the '973 patent and are especially made for the infringing manufacture, sale, and use of Samsung Mobile

Communication Devices.   Samsung Mobile Communication Devices, including the integrated notification message center, are especially made or adapted as an integrated notification message center that infringes the '973 patent.   Because the sales and manufacture of Samsung Mobile Communication Devices with an integrated notification message center infringes the '973 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

74.     Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.   Samsung provides to others, Samsung Mobile Communication Devices with distinct and separate components, including software components, which have no substantial non-infringing use.

75.     At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Message and Notification functionality infringe at least claim 1 of the '131 Patent.   Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 1 of the '131 Patent.

76.     Samsung indirectly infringes the '131 patent by inducing infringement by others, such as resellers, of at least claim 1 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.   Direct infringement is the result of activities

24

performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '131 Patent at least by November 30, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

77.    Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '131 patent. Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '973 patent; further, Samsung was aware that these normal and customary activities would infringe the '131 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

78.    Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 patent in the United States because Samsung has knowledge of the '131 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

25

79.     The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Message and Notification functionality as intended by Samsung infringes at least method claim 5 of the '131 Patent.  Samsung uses these products and thus directly infringes at least method claim 5 of the '131 Patent.

80.     In addition, Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Message functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 5 of the '131 Patent.

81.     Samsung indirectly infringes the '131 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Message and Notifications functionality.  Samsung received actual notice of the '131 Patent at least by November 30, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

82.     Samsung's affirmative acts of selling Samsung Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '131 patent at least through using Message and Notifications functionality.  Samsung also provides instructions, including at least

26

"Verizon Samsung Galaxy S III User Guide" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW, for using the Messaging and Notifications functionality.  Through its sales of Mobile Communication Devices with Messaging and Notifications functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '131 patent; further, Samsung was aware that the normal and customary use of the Message and Notifications functionality would infringe the '131 patent.  Samsung also enticed its end-users to use the Messaging and Notifications functionality by providing instruction manuals.  Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

83.     Accordingly, a reasonable inference is that Samsung actively induces infringement of the '131 Patent by others, such as resellers and end-use customers. Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 Patent in the United States because Samsung had knowledge of the '131 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung Mobile Communication Devices in an infringing way.   Such instructions include at least "Verizon Samsung Galaxy S III User Guide" available at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW.         When resellers and end-use customers follow such instructions, they directly infringe the '131 Patent.   Samsung knows that by providing such instructions, resellers and end-use

27

customers follow those instructions, and directly infringe the '131 Patent.  Samsung thus knows that its actions induce the infringement.

84.    Samsung indirectly infringes the '131 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Messaging and Notification functionality.  Samsung received actual notice of the '131 Patent at least by November 30, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

85.    Samsung's Message and Notification functionality receives and displays message of different types, such as a phone call, voice mail, text message, or email.  The Message and Notification Services functionality is designed to notify the user of an incoming communication and to select the format of the message received and cannot function in a manner that does not utilize the messaging functionality available to Samsung Mobile Communication Devices.  Upon information and belief, the Message and Notifications functionality is designed to entice a user to receive notifications of an incoming communication.

86.    A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality especially made or especially adapted to operate on Samsung Mobile Communication Devices for notifying a user of an incoming communication.

87.    A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality is not a staple article or commodity of commerce and that the use of the Messaging and Notifications functionality of the Samsung Mobile Communication Devices is for notifying a user of an incoming communication.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

88.    Samsung Mobile Communication Devices with Messaging and Notifications functionality are each a material part of the '131 patent and especially made for the infringing use of the Messaging and Notification functionality to receive and display messages.  Samsung Mobile Communication Devices including the Messaging and Notification functionality, are especially made or adapted to notify a user of an incoming communication that perform or facilitate performance of the steps that infringe the '131 patent.  Furthermore, Samsung provides user manuals describing the uses of its Mobile Communication Devices that infringe the '131 patent.  Because the functionality provided by Samsung's Messaging and Notification to notify a user of an incoming communication infringes the '131 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

89.    Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.  Samsung provides

to others, Mobile Communication Devices with an operating system configured and installed by Samsung to support Message and Notification functionality.   Samsung installs and configures on these products distinct and separate components, including software components, which are used only to perform the infringing method claims.

90.    At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN management functionality, including the Samsung Galaxy S III, infringe at least claims 1 and 8 of the '591 Patent. Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claims 1 and 8 of the '591 Patent.

91.    The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN management functionality as specified and intended by Samsung infringes at least claims 1 and 8 of the '591 Patent.  Samsung uses these products and thus directly infringes at least claims 1 and 8 of the '591 Patent.

92.    Samsung indirectly infringes the '591 patent by inducing infringement by others, such as resellers, of at least claims 1 and 8 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '591 Patent at least by October 15, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

McKool 939622v5

93.     Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '591 patent. Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '591 patent; further, Samsung was aware that these normal and customary activities would infringe the '591 patent. Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

94.     Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '591 patent in the United States because Samsung has knowledge of the '591 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers. Samsung knew or should have known that such actions would induce actual infringement.

95.     In addition, Samsung provides at least its Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN management functionality to others, such as resellers and end-use customers, in the

31

United States who, in turn, use these products to infringe at least claims 1 and 8 of the '591 Patent.

96.    Samsung indirectly infringes the '591 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality.  Samsung received actual notice of the '591 Patent at least by October 15, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

97.    Samsung's affirmative acts of selling its Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '591 patent at least through using VPN management functionality.  Samsung also provides instructions, including at least "Verizon Samsung Galaxy    S    III    User    Manual"    available    on    Samsung's    website    at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW, for using the VPN management functionality.  Through its sales of Samsung Mobile Communication Devices with VPN management functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '591 patent; further, Samsung was aware that the normal and customary use of VPN management functionality would infringe the '591 patent.  Samsung also enticed its end-users to use the VPN management functionality by providing instruction manuals.  Samsung

McKool 939622v5

performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

98.    Accordingly, it is a reasonable inference that Samsung actively induces infringement of the '591 Patent by others, such as resellers and end-use customers. Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '591 Patent in the United States because Samsung had knowledge of the '591 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung's products in an infringing way.  Such instructions include at least "Verizon Samsung Galaxy S III User Manual" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW.        When resellers and end-use customers follow such instructions, they directly infringe the '591 Patent.    Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '591 Patent.  Samsung thus knows that its actions induce the infringement.

99.    Samsung indirectly infringes the '591 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality.  Samsung received actual notice of the '591

33

Patent at least by October 15, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

100.    Samsung's VPN management functionality facilitates management of VPNs.  The VPN management functionality is designed for management of VPNs and cannot function in a manner that does not utilize the VPN management functionality available to Samsung Mobile Communication Devices.    The VPN management functionality is designed upon information and belief to entice a user to manage VPNs.

101.    A reasonable inference to be drawn from the facts set forth is that the VPN functionality is especially made or especially adapted to operate on Samsung Mobile Communication Devices for providing VPN management functionality.

102.    A reasonable inference to be drawn from the facts set forth is that the VPN management functionality is not a staple article or commodity of commerce and that the use of the VPN management functionality of Samsung Mobile Communication Devices is for managing VPNs.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

103.    Samsung Mobile Communication Devices with VPN management functionality are each a material part of the invention of the '591 patent and especially made for the infringing use of the VPN functionality to receive call trace information. Samsung Mobile Communication Devices including the VPN management functionality, are especially made or adapted to provide VPN management functionality that perform or facilitate performance of the steps that infringe the '591 patent.  Furthermore, Samsung provides user manuals describing the uses of its Mobile Communication Devices that infringe the '591 patent.    Because the functionality provided by Samsung's VPN

34

management functionality infringes the '591 patent, Samsung's sales of its infringing Mobile Communication Devices have no substantial non-infringing uses.

104.    Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.  Samsung provides to others, Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN management functionality.  Samsung installs and configures on these products distinct and separate components, including software components, which are used only to infringe the '591 Patent.

105.    The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Location Services functionality, as intended by Samsung infringes at least method claim 17 of the '572 Patent.  Samsung uses these Mobile Communication Devices and thus directly infringes at least method claim 17 of the '572 Patent.

106.    In addition, Samsung provides at least its Mobile Communication Devices with an operating system configured and installed by Samsung to support Location Services functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 17 of the '572 Patent.

35

107.    Samsung indirectly infringes by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Location Services functionality.  Samsung received actual notice of the '572 Patent at least by May 2, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

108.    Samsung's affirmative acts of selling its Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '572 patent at least through using Location Services functionality.  Samsung also provides instructions, including at least "GT-P7300 User Manual"          available          on          Samsung's          website          at http://downloadcenter.samsung.com/content/UM/201209/20120922095036620/GT-P7300_UM_Open_HongKong_Icecream_Eng_Rev.1.0_120817_Screen.pdf,   for   using the   Location   Services   functionality.    Through   its   sales   of   Samsung   Mobile Communication Devices with Location Services functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '572 patent; further, Samsung was aware that the normal and customary use of Location Services would infringe the '572 patent.  Samsung also enticed its end-users to use the Location Services by providing instruction manuals.  Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the

36

knowledge of the '572 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

109.    Accordingly, a reasonable inference is that Samsung actively induces infringement of the '572 Patent by others, such as resellers and end-use customers. Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '572 Patent in the United States because Samsung had knowledge of the '572 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung's products in an infringing way.  Such instructions include at least "GT-P7300    User    Manual"    available    on    Samsung's    website    at http://downloadcenter.samsung.com/content/UM/201209/20120922095036620/GT-P7300_UM_Open_HongKong_Icecream_Eng_Rev.1.0_120817_Screen.pdf.        When resellers and end-use customers follow such instructions, they directly infringe the '572 Patent.    Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '572 Patent.  Samsung thus knows that its actions induce the infringement.

110.    Samsung indirectly infringes the '572 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Locations Services functionality.  Samsung received actual notice of the '572

Patent at least by May 2, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

111.     Samsung's Location Services functionality provides call trace information, i.e., a geographic location of Samsung Mobile Communication Devices.  The Location Services functionality is designed to notify the user of Samsung Mobile Communication Devices of call trace information, i.e., a geographic location of the Mobile Communication Devices, and cannot function in a manner that does not utilize the Location Services functionality available to the Mobile Communication Devices.  Upon information and belief, the Location Services functionality is designed to entice a user to access call trace information.

112.     A reasonable inference to be drawn from the facts set forth is that the Location Services functionality is especially made or especially adapted to operate on Samsung Mobile Communication Devices for obtaining call trace information, i.e., a geographic location of the Mobile Communication Devices.

113.     A reasonable inference to be drawn from the facts set forth is that the Location Services functionality is not a staple article or commodity of commerce and that the use of the Location Services functionality of Samsung Mobile Communication Devices is for providing call trace information.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

114.     Samsung Mobile Communication Devices with Location Services functionality are each a material part of the '572 patent and especially made for the infringing use of the Location Services functionality to receive call trace information, i.e., a geographic location of the Mobile Communication Devices.   The Mobile

38

Communication Devices including the Location Services functionality are especially made or adapted to provide call trace information that perform or facilitate performance of the steps that infringe the '572 patent. Furthermore, Samsung provides user manuals describing the uses of its products that infringe the '572 patent. Because the functionality provided by Samsung's Location Services to obtain call trace information, i.e., a geographic location of the Mobile Communication Devices, infringes the '572 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

115.    Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use. Samsung provides to others, Mobile Communication Devices with an operating system configured and installed by Samsung to support Location Services functionality. Samsung installs and configures on these products distinct and separate components, including software components, which are used only to perform the infringing method claims.

116.    Samsung's acts of infringement have caused damage to Rockstar and MobileStar. Rockstar and MobileStar are entitled to recover from Samsung the damages sustained by Rockstar and MobileStar as a result of Samsung's wrongful acts in an amount subject to proof at trial. In addition, the infringing acts and practices of Samsung have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to Rockstar and MobileStar for

which there is no adequate remedy at law, and for which Rockstar and MobileStar are entitled to injunctive relief under 35 U.S.C. § 283.

117.    Samsung received actual notice of its infringement of the '551, '937, '298, '973, '131, '591, and '572 Patents through at least letters sent by Rockstar and/or its predecessors-in-interest, Nortel Networks Ltd. and/or Nortel Networks, Inc., to Samsung, and through meetings between employees of Rockstar and/or its predecessors-in-interest, Nortel Networks Ltd., or Nortel Networks Inc. and Samsung.  Samsung also has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

118.    Samsung has willfully infringed and/or does willfully infringe the '551, '937, '298, '973, '131, '591, and '572 Patents.

## DEMAND FOR JURY TRIAL

Rockstar and MobileStar hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Rockstar and MobileStar pray for the following relief:

1.    A judgment that Samsung has directly infringed the '551 Patent, contributorily infringed the '551 Patent, and/or induced the infringement of the '551 Patent.

2.    A judgment that Samsung has directly infringed the '937 Patent, contributorily infringed the '937 Patent, and/or induced the infringement of the '937 Patent.

3.    A judgment that Samsung has directly infringed the '298 Patent, contributorily infringed the '298 Patent, and/or induced the infringement of the '298 Patent.

40

4.     A judgment that Samsung has directly infringed the '973 Patent, contributorily infringed the '973 Patent, and/or induced the infringement of the '973 Patent.

5.     A judgment that Samsung has directly infringed the '131 Patent, contributorily infringed the '131 Patent, and/or induced the infringement of the '131 Patent.

6.     A judgment that Samsung has directly infringed the '591 Patent, contributorily infringed the '591 Patent, and/or induced the infringement of the '591 Patent.

7.     A judgment that Samsung has directly infringed the '572 Patent, contributorily infringed the '572 Patent, and/or induced the infringement of the '572 Patent.

8.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '551 Patent;

9.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '937 patent;

10.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and

41

those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '298 patent;

11.    A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '973 patent;

12.    A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '131 patent;

13.    A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '591 patent;

14.    A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '572 patent;

15.    A judgment that Samsung's infringement of the '551, '937, '298, '973, '131, '591, and '572 Patents has been willful;

16.    A ruling that this case be found to be exceptional under 35 U.S.C. § 285, and a judgment awarding Rockstar and MobileStar to its attorneys' fees incurred in prosecuting this action;

McKool 939622v5

17.     A judgment and order requiring Samsung to pay Rockstar and MobileStar damages under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed, and treble damages for willful infringement as provided by 35 U.S.C. § 284;

18.     A judgment and order requiring Samsung to pay Rockstar and MobileStar the costs of this action (including all disbursements);

19.     A judgment and order requiring Samsung to pay Rockstar and MobileStar pre-judgment and post-judgment interest on the damages awarded;

20.     A judgment and order requiring that in the event a permanent injunction preventing future acts of infringement is not granted, that Rockstar and MobileStar be awarded a compulsory ongoing licensing fee; and

21.     Such other and further relief as the Court may deem just and proper.

DATED:  October 31, 2013.

Respectfully submitted,
**MCKOOL SMITH, P.C.**

*/s/ Theodore Stevenson, III*
Mike McKool, Jr.
Texas Bar No. 13732100
mmckool@mckoolsmith.com
Douglas A. Cawley
Texas Bar No. 0403550
dcawley@mckoolsmith.com
Theodore Stevenson, III
Lead Attorney
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
David Sochia
Texas State Bar No. 00797470
dsochia@mckoolsmith.com
**MCKOOL SMITH P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

**ATTORNEYS FOR PLAINTIFFS
ROCKSTAR CONSORTIUM US,
LP AND MOBILESTAR
TECHNOLOGIES LLC**

44

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Sean Pak (Cal. Bar No. 219032)
2      seanpak@quinnemanuel.com
      Amy H. Candido (Cal. Bar No. 237829)
3      amycandido@quinnemanuel.com
      Matthew S. Warren (Cal. Bar No. 230565)
4      matthewwarren@quinnemanuel.com
    50 California Street, 22nd Floor
5   San Francisco, California  94111
    (415) 875-6600
6   (415) 875-6700 (facsimile)

7   Attorneys for Plaintiff GOOGLE INC.

8                       UNITED STATES DISTRICT COURT

9                     NORTHERN DISTRICT OF CALIFORNIA

10

11  GOOGLE INC.,                          CASE NO.  3:13-cv-5933

12          Plaintiff,                    **COMPLAINT FOR DECLARATORY
                                          JUDGMENT OF NON-INFRINGEMENT
13          v.                            OF U.S. PATENT NOS. 5,838,551;
                                          6,037,937; 6,128,298; 6,333,973; 6,463,131;
14  ROCKSTAR CONSORTIUM US LP and         6,765,591; AND 6,937,572**
    MOBILESTAR TECHNOLOGIES LLC,
15                                        **DEMAND FOR JURY TRIAL**
            Defendants.
16

17

18          Plaintiff Google Inc. ("Google") seeks a declaration that Google does not directly or

19  indirectly infringe United States Patent Nos. 5,838,551, 6,037,937, 6,128,298, 6,333,973,

20  6,463,131, 6,765,591, and 6,937,572, as follows:

21

22

23

24

25

26

27

28

**NATURE OF THE ACTION**

1.      This is an action for a declaratory judgment of non-infringement arising under the patent laws of the United States, Title 35 of the United States Code.  Google requests this relief because Defendants Rockstar Consortium US LP and MobileStar Technologies LLC (collectively, "Rockstar") have filed seven lawsuits claiming that Google's customers infringe some or all of United States Patent Nos. 5,838,551, 6,037,937, 6,128,298, 6,333,973, 6,463,131, 6,765,591, and 6,937,572 (the "patents in suit") by making, using, selling, offering for sale, importing, exporting, supplying, or distributing "certain mobile communication devices having a version (or an adaption thereof) of [the] Android operating system" developed by Google.  Rockstar's litigation campaign has placed a cloud on Google's Android platform; threatened Google's business and relationships with its customers and partners, as well as its sales of Nexus-branded Android devices; and created a justiciable controversy between Google and Rockstar.

**THE PARTIES**

2.      Plaintiff Google Inc. ("Google") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California, 94043.  Google's mission is to organize the world's information and make it universally accessible and useful.  As part of that mission, Google produces Android, an open-source mobile platform that has been adopted by original equipment manufacturers ("OEMs") worldwide.

3.      Defendant Rockstar Consortium US LP ("Rockstar Consortium") is a limited partnership organized and existing under the laws of the state of Delaware.  Rockstar Consortium claims that its principal place of business is at Legacy Town Center 1, 7160 North Dallas Parkway, Suite No. 250, Plano, Texas, 75024, but the substantial majority of its employees, including senior management, are based in Ontario, Canada.  Rockstar Consortium is admittedly a "patent licensing business" that produces no products, and instead exists solely to assert its patents.  (http://www.ip-rockstar.com/about.)

4.      Defendant MobileStar Technologies LLC ("MobileStar") is a limited liability corporation organized and existing under the laws of the state of Delaware, and also claims that its

COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT

**– A57 –**

1    principal place of business is at Legacy Town Center 1, 7160 North Dallas Parkway,

2    Suite No. 250, Plano, Texas, 75024.  MobileStar claims to be a subsidiary of Rockstar.

3    MobileStar was formed for litigation one day before Rockstar filed its lawsuits against Google's

4    customers.

5                              **JURISDICTIONAL STATEMENT**

6            5.      This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and

7    under the patent laws of the United States, 35 U.S.C. §§ 1-390.

8            6.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331,

9    1338(a), and 2201(a).

10           7.      This Court has personal jurisdiction over Rockstar.  Among other things, Rockstar

11   has continuous and systematic business contacts with California.  As Rockstar executives have

12   explained to the media, once Rockstar identifies commercially successful products, it approaches

13   the companies behind those products in person and through other means to seek licenses to

14   Rockstar's patents.  Rockstar conducts this business extensively throughout California, including

15   through personnel located in the San Francisco Bay Area.  Rockstar's CEO has publicly stated that

16   Facebook (based in Menlo Park) and LinkedIn (based in Mountain View) infringe Rockstar's

17   patents.  (http://www.wired.com/wiredenterprise/2013/11/veschi/.)  In fact, Rockstar's CEO has

18   stated that it would be difficult to imagine that any tech companies—legions of which call

19   California home—do not infringe Rockstar's patents.  On information and belief, Rockstar's

20   licensing and enforcement efforts in California have generated substantial revenues.

21           8.      On information and belief, Rockstar's shareholders direct and participate in

22   Rockstar's licensing and enforcement efforts against companies in California.  For example, Apple

23   Inc. ("Apple") is a large shareholder in closely-held Rockstar, and maintains a seat on Rockstar's

24   board of directors.  Rockstar's CEO has publicly stated that Rockstar maintains regular contact

25   with its shareholders.  Apple's headquarters are in Cupertino, California.

26           9.      In addition, this Court has personal jurisdiction over Rockstar for another reason:

27   Rockstar has purposefully directed into California its enforcement activities regarding the patents

28   in suit.  As part of this enforcement campaign, Rockstar contacted and met with a series of

1   California-based companies, accusing their devices that use Google's Android platform.  On

2   information and belief, Rockstar contacted and met with these California-based companies in

3   order to discourage them from continuing to use Google's Android platform in their devices, and

4   to interfere with Google's business relationships.

5       10.     Venue is proper in this District under 28 U.S.C. §§ 1391(b), (c), because a

6   substantial part of the events giving rise to Google's claim occurred in this district, and because

7   Rockstar Consortium and MobileStar are subject to personal jurisdiction here.

8       11.     An immediate, real, and justiciable controversy exists between Google and

9   Rockstar as to whether Google is infringing or has infringed United States Patent Nos. 5,838,551

10   (the "'551 patent), 6,037,937 (the "'937 patent"), 6,128,298 (the "'298 patent"), 6,333,973 (the

11   "'973 patent), 6,463,131 (the "'131 patent"), 6,765,591 (the "'591 patent"), and 6,937,572 (the

12   "'572 patent").

## INTRADISTRICT ASSIGNMENT

13

14      12.     For purposes of intradistrict assignment under Civil Local Rules 3-2(c) and 3-5(b),

15   this Intellectual Property Action will be assigned on a district-wide basis.

## ROCKSTAR'S HISTORY AND BUSINESS

16

17      13.     In June 2011, five of the world's largest technology companies—including Google

18   competitors Apple, Research In Motion, and Microsoft—joined forces to obtain a portfolio of

19   patents auctioned during the bankruptcy of Nortel Networks.  Bankrolled by these companies, a

20   manufactured entity called "Rockstar Bidco" placed the winning bid of $4.5 billion.  According to

21   Apple's June 2011 Form 10-Q filed with the Securities and Exchange Commission, Apple

22   contributed "approximately $2.6 billion" of that sum.

23      14.     Following its acquisition of Nortel's portfolio, Rockstar Bidco transferred

24   ownership of thousands of patents to its owners, whom it calls the "founding licensees."  Rockstar

25   Bidco transferred ownership of over 1,000 patents to Apple alone.  On information and belief,

26   Rockstar Bidco was then reorganized into Rockstar Consortium.

27      15.     Rockstar produces no products and practices no patents.  Instead, Rockstar employs

28   a staff of engineers in Ontario, Canada, who examine other companies' successful products to find

1  anything that Rockstar might use to demand and extract licenses to its patents under threat of

2  litigation.

3        16.    Public reports confirm that in the first two months following its purchase of

4  Nortel's portfolio, Rockstar sought licenses from as many as 100 companies.  On information and

5  belief, Rockstar has since sought licenses from many additional companies.

6  **ROCKSTAR'S CAMPAIGN AGAINST ANDROID**

7        17.    Among the myriad companies ensnared in Rockstar's patent dragnet are customers

8  and partners of Google who use the Android platform in their devices, including ASUS, HTC,

9  Huawei, LG, Pantech, Samsung, and ZTE.

10        18.    On October 31, 2013, Rockstar brought patent infringement actions against ASUS,

11  HTC, Huawei, LG, Pantech, Samsung, and ZTE in the Marshall Division of the United States

12  District Court for the Eastern District of Texas.  *Rockstar Consortium US LP v. ASUSTek*

13  *Computer, Inc.*, No. 2:13-cv-894; *Rockstar Consortium US LP v. HTC Corp.*, No. 2:13-cv-895;

14  *Rockstar Consortium US LP v. Huawei Investment & Holding Co.*, No. 2:13-cv-896; *Rockstar*

15  *Consortium US LP v. LG Electronics Inc.*, No. 2:13-cv-898; *Rockstar Consortium US LP v.*

16  *Pantech Co.*, No. 2:13-cv-899; *Rockstar Consortium US LP v. Samsung Electronics Co.*,

17  No. 2:13-cv-900; and *Rockstar Consortium US LP v. ZTE Corp.*, No. 2:13-cv-901 (collectively,

18  the "Android OEM Actions" against the "Android OEM Defendants").

19        19.    In the Android OEM Actions, Rockstar alleges that each Android OEM Defendant

20  infringes some or all of the '551, '937, '298, '973, '131, '591, and '572 patents by making, using,

21  selling, offering for sale, importing, exporting, supplying, or distributing "certain mobile

22  communication devices having a version (or an adaption thereof) of [the] Android operating

23  system" developed by Google.

24        20.    In the Android OEM Actions, Rockstar accuses Android features including

25  "Mobile Hotspot functionality" which is "designed to route data packets between wireless devices

26  tethered to the Mobile Hotspot to nodes on a public network such as the Internet," allegedly

27  infringing the '298 patent; "VPN management functionality," allegedly infringing the '591 patent;

28  "Messaging and Notification functionality," allegedly infringing the '131 patent; a "navigable

COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT

1  graphical user interface ('navigable GUI') that permits a user to manipulate and control the

2  contents of the display to maximize the use of display real estate," allegedly infringing the '937

3  patent; "integrated notification message center," allegedly infringing the '973 patent; and

4  "Location Services functionality," allegedly infringing the '572 patent.

5      21.    Rockstar further accuses devices incorporating Android of infringing the '551

6  patent by "includ[ing] at least one electronic package comprising a component that is located

7  between an EMI shield and a ground member for performing shielding operations" where "[t]he

8  EMI shield is incorporated into the electronic package, which is then mounted to a circuit board"

9  in the accused devices.

10     22.    As Rockstar's complaints admit, in the Android OEM Actions Rockstar has

11 asserted its patents only against "certain mobile communication devices having a version (or an

12 adaption thereof) of [the] Android operating system" developed by Google—although each of the

13 Android OEM Defendants also makes other products that do not use Google's Android platform.

14 Rockstar has further asserted patent infringement by the Nexus 7, a device offered for sale by

15 Google and built by ASUS, one of the Android OEM Defendants.

16     23.    On information and belief, Rockstar intends the Android OEM Actions to harm

17 Google's Android platform and disrupt Google's relationships with the Android OEM Defendants.

18 This is an open secret:  industry media immediately observed that in filing the Android OEM

19 Actions, Rockstar "launch[ed] an all-out patent attack on Google and Android."

20 (http://arstechnica.com/tech-policy/2013/10/patent-war-goes-nuclear-microsoft-apple-owned-

21 rockstar-sues-google/.)

22     24.    For all these reasons, an actual controversy exists between Google and Rockstar

23 regarding the alleged infringement of any claim of the '551, '937, '298, '973, '131, '591, and

24 '572 patents.

25         **GOOGLE DOES NOT INFRINGE THE PATENTS IN SUIT**

26     25.    Neither any version of Google's Android platform nor any of the Nexus 5,

27 Nexus 7, or Nexus 10 devices sold by Google directly or indirectly infringe any claim of the '551,

28 '937, '298, '973, '131, '591, and '572 patents.

26.    To the best of Google's knowledge, no third party infringes any claim of the '551, '937, '298, '973, '131, '591, or '572 patents by using Nexus devices or Google's Android platform in other devices.  Google has not caused, directed, requested, or facilitated any such infringement, much less with specific intent to do so.  Neither the Nexus devices nor Google's Android platform are designed for use in any combination which infringes any claim of the '551, '937, '298, '973, '131, '591, or '572 patents.  To the contrary, each is a product with substantial uses that do not infringe any claim of these patents.

## FIRST COUNT

### (Declaration of Non-Infringement of the '551 Patent)

27.    Google restates and incorporates by reference the allegations in paragraphs 1 through 26 of this Complaint as if fully set forth herein.

28.    Rockstar Consortium claims to own all rights, title, and interest in United States Patent No. 5,838,551 (the "'551 patent").  MobileStar claims to be the exclusive licensee of the '551 patent.  A true and correct copy of the '551 patent is attached hereto as Exhibit A.

29.    In the Android OEM Actions, Rockstar accuses Android OEM defendants ASUS, HTC, Huawei, LG, Pantech, and Samsung of infringing the '551 patent in that each "makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States" devices incorporating Google's Android platform, which devices allegedly include "at least one electronic package comprising a component that is located between an EMI shield and a ground member for performing shielding operations" where "[t]he EMI shield is incorporated into the electronic package, which is then mounted to a circuit board" in the accused devices.  In its complaint against ASUS, which manufactures the Nexus 7, Rockstar specifically accuses the Nexus 7, a device offered for sale by Google.

30.    A substantial, immediate, and real controversy therefore exists between Google and Rockstar regarding whether the Android platform or any of these Nexus devices infringe or have infringed the '551 patent.  A judicial declaration is necessary to determine the parties' respective rights regarding the '551 patent.

31.     Google seeks a judgment declaring that Google's Android platform and the Nexus 5, Nexus 7, and Nexus 10 devices do not directly or indirectly infringe any claim of the '551 patent.

## SECOND COUNT

### (Declaration of Non-Infringement of the '937 Patent)

32.     Google restates and incorporates by reference the allegations in paragraphs 1 through 31 of this Complaint as if fully set forth herein.

33.     MobileStar claims to own all rights, title, and interest in United States Patent No. 6,037,937 (the "'937 patent"). Rockstar Consortium claims no interest in the '937 patent, yet seeks a judgment of infringement against the Android OEM Defendants in the Android OEM Actions. A true and correct copy of the '937 patent is attached hereto as Exhibit B.

34.     In the Android OEM Actions, Rockstar accuses Android OEM Defendants ASUS, HTC, Huawei, LG, Pantech, Samsung, and ZTE of infringing the '937 patent in that each "makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States" devices incorporating a version of Google's Android platform that supports a "navigable graphical user interface ('navigable GUI') that permits a user to manipulate and control the contents of the display to maximize the use of display real estate." In its complaint against ASUS, which manufactures the Nexus 7, Rockstar specifically accuses the Nexus 7, a device offered for sale by Google.

35.     The Nexus 5, Nexus 7, and Nexus 10 devices use Google's Android platform.

36.     A substantial, immediate, and real controversy therefore exists between Google and Rockstar regarding whether the Android platform or any of these Nexus devices infringe or have infringed the '937 patent. A judicial declaration is necessary to determine the parties' respective rights regarding the '937 patent.

37.     Google seeks a judgment declaring that Google's Android platform and the Nexus 5, Nexus 7, and Nexus 10 devices do not directly or indirectly infringe any claim of the '937 patent.

## THIRD COUNT

### (Declaration of Non-Infringement of the '298 Patent)

38.     Google restates and incorporates by reference the allegations in paragraphs 1 through 37 of this Complaint as if fully set forth herein.

39.     Rockstar Consortium claims to own all rights, title, and interest in United States Patent No. 6,128,298 (the "'298 patent").  MobileStar claims to be the exclusive licensee of '298 patent.  A true and correct copy of the '298 patent is attached hereto as Exhibit C.

40.     In the Android OEM Actions, Rockstar accuses Android OEM Defendants ASUS, HTC, Huawei, LG, Pantech, Samsung, and ZTE of infringing the '298 patent in that each "makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States" devices incorporating a version of Google's Android platform that supports "Mobile Hotspot functionality [which] is designed to route data packets between wireless devices tethered to the Mobile Hotspot to nodes on a public network such as the Internet."  In its complaint against ASUS, which manufactures the Nexus 7, Rockstar specifically accuses the Nexus 7, a device offered for sale by Google.

41.     The Nexus 5, Nexus 7, and Nexus 10 devices use Google's Android platform.

42.     A substantial, immediate, and real controversy therefore exists between Google and Rockstar regarding whether the Android platform or any of these Nexus devices infringe or have infringed the '298 patent.  A judicial declaration is necessary to determine the parties' respective rights regarding the '298 patent.

43.     Google seeks a judgment declaring that Google's Android platform and the Nexus 5, Nexus 7, and Nexus 10 devices do not directly or indirectly infringe any claim of the '298 patent.

## FOURTH COUNT

### (Declaration of Non-Infringement of the '973 Patent)

44.     Google restates and incorporates by reference the allegations in paragraphs 1 through 43 of this Complaint as if fully set forth herein.

COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT

45.    MobileStar claims to own all rights, title, and interest in United States Patent No. 6,333,973 (the "'973 patent"). Rockstar Consortium claims no interest in the '973 patent, yet seeks a judgment of infringement against the Android OEM Defendants in the Android OEM Actions. A true and correct copy of the '973 patent is attached hereto as Exhibit D.

46.    In the Android OEM Actions, Rockstar accuses Android OEM Defendants ASUS, HTC, Huawei, LG, Pantech, Samsung, and ZTE of infringing the '973 patent in that each "makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States" devices incorporating a version of Google's Android platform that supports an "integrated notification message center." In its complaint against ASUS, which manufactures the Nexus 7, Rockstar specifically accuses the Nexus 7, a device offered for sale by Google.

47.    The Nexus 5, Nexus 7, and Nexus 10 devices use Google's Android platform.

48.    A substantial, immediate, and real controversy therefore exists between Google and Rockstar regarding whether the Android platform or any of these Nexus devices infringe or have infringed the '973 patent. A judicial declaration is necessary to determine the parties' respective rights regarding the '973 patent.

49.    Google seeks a judgment declaring that Google's Android platform and the Nexus 5, Nexus 7, and Nexus 10 devices do not directly or indirectly infringe any claim of the '973 patent.

## FIFTH COUNT

### (Declaration of Non-Infringement of the '131 Patent)

50.    Google restates and incorporates by reference the allegations in paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51.    MobileStar claims to own all rights, title, and interest in United States Patent No. 6,463,131 (the "'131 patent"). Rockstar Consortium claims no interest in the '131 patent, yet seeks a judgment of infringement against the Android OEM Defendants in the Android OEM Actions. A true and correct copy of the '131 patent is attached hereto as Exhibit E.

52.    In the Android OEM Actions, Rockstar accuses Android OEM Defendants ASUS, HTC, Huawei, LG, Pantech, Samsung, and ZTE of infringing the '131 patent in that each "makes,

1  uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States"

2  devices incorporating a version of Google's Android platform that supports "Messaging and

3  Notification functionality."  In its complaint against ASUS, which manufactures the Nexus 7,

4  Rockstar specifically accuses the Nexus 7, a device offered for sale by Google.

5       53.    The Nexus 5, Nexus 7, and Nexus 10 devices use Google's Android platform.

6       54.    A substantial, immediate, and real controversy therefore exists between Google and

7  Rockstar regarding whether the Android platform or any of these Nexus devices infringe or have

8  infringed the '131 patent.  A judicial declaration is necessary to determine the parties' respective

9  rights regarding the '131 patent.

10       55.    Google seeks a judgment declaring that Google's Android platform and the

11  Nexus 5, Nexus 7, and Nexus 10 devices do not directly or indirectly infringe any claim of the

12  '131 patent.

13  **SIXTH COUNT**

14  **(Declaration of Non-Infringement of the '591 Patent)**

15       56.    Google restates and incorporates by reference the allegations in paragraphs 1

16  through 55 of this Complaint as if fully set forth herein.

17       57.    MobileStar claims to own all rights, title, and interest in United States Patent

18  No. 6,765,591 (the "'591 patent").  Rockstar Consortium claims no interest in the '591 patent, yet

19  seeks a judgment of infringement against the Android OEM Defendants in the Android OEM

20  Actions.  A true and correct copy of the '591 patent is attached hereto as Exhibit F.

21       58.    In the Android OEM Actions, Rockstar accuses Android OEM Defendants ASUS,

22  HTC, Huawei, LG, Pantech, Samsung, and ZTE of infringing the '591 patent in that each "makes,

23  uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States"

24  devices incorporating a version of Google's Android platform that supports "VPN management

25  functionality."  In its complaint against ASUS, which manufactures the Nexus 7, Rockstar

26  specifically accuses the Nexus 7, a device offered for sale by Google.

27       59.    The Nexus 5, Nexus 7, and Nexus 10 devices use Google's Android platform.

28

60. A substantial, immediate, and real controversy therefore exists between Google and Rockstar regarding whether the Android platform or any of these Nexus devices infringe or have infringed the '591 patent. A judicial declaration is necessary to determine the parties' respective rights regarding the '591 patent.

61. Google seeks a judgment declaring that Google's Android platform and the Nexus 5, Nexus 7, and Nexus 10 devices do not directly or indirectly infringe any claim of the '591 patent.

## SEVENTH COUNT

### (Declaration of Non-Infringement of the '572 Patent)

62. Google restates and incorporates by reference the allegations in paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63. Rockstar Consortium claims to own all rights, title, and interest in United States Patent No. 6,937,572 (the "'572 patent"). MobileStar claims no interest in the '572 patent, yet seeks a judgment of infringement against the Android OEM Defendants in the Android OEM Actions. A true and correct copy of the '572 patent is attached hereto as Exhibit G.

64. In the Android OEM Actions, Rockstar accuses Android OEM Defendants ASUS, HTC, Huawei, LG, Pantech, Samsung, and ZTE of infringing the '572 patent in that each "makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States" devices incorporating a version of Google's Android platform that supports "Location Services functionality." In its complaint against ASUS, which manufactures the Nexus 7, Rockstar specifically accuses the Nexus 7, a device offered for sale by Google.

65. The Nexus 5, Nexus 7, and Nexus 10 devices use Google's Android platform.

66. A substantial, immediate, and real controversy therefore exists between Google and Rockstar regarding whether the Android platform or any of these Nexus devices infringe or have infringed the '572 patent. A judicial declaration is necessary to determine the parties' respective rights regarding the '572 patent.

1    67.    Google seeks a judgment declaring that Google's Android platform and the

2    Nexus 5, Nexus 7, and Nexus 10 devices do not directly or indirectly infringe any claim of the

3    '572 patent.

4                                    **PRAYER FOR RELIEF**

5    WHEREFORE, Google prays for judgment and relief as follows:

6        A.    Declaring that Google's Android platform and the Nexus 5, Nexus 7, and Nexus 10

7    do not infringe any of the '551, '937, '298, '973, '131, '591, or '572 patents;

8        B.    Declaring that judgment be entered in favor of Google and against Rockstar

9    Consortium and MobileStar on each of Google's claims;

10       C.    Finding that this an exceptional case under 35 U.S.C. § 285;

11       D.    Awarding Google its costs and attorneys' fees in connection with this action; and

12       E.    Such further and additional relief as the Court deems just and proper.

13                                    **JURY DEMAND**

14   Google demands a jury trial on all issues and claims so triable.

15   DATED: December 23, 2013            Respectfully submitted,

16                                       QUINN EMANUEL URQUHART & SULLIVAN, LLP

17                                       By  /s Matthew S. Warren
                                           Matthew S. Warren
18                                          *Attorneys for Google Inc.*

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **ROCKSTAR CONSORTIUM US LP, AND MOBILESTAR TECHNOLOGIES LLC** §<br>§<br>§<br>§<br>**PLAINTIFFS** §<br>**v.** §<br>§<br>**SAMSUNG ELECTRONICS CO., LTD,** §<br>**SAMSUNG ELECTRONICS AMERICA,** §<br>**INC., SAMSUNG** §<br>**TELECOMMUNICATIONS AMERICA,** §<br>**LLC** §<br>§ | **Civil Action No. 2:13-cv-00900-JRG**<br><br>**JURY TRIAL REQUESTED** |

**DEFENDANTS.**

**PLAINTIFFS ROCKSTAR CONSORTIUM US LP AND MOBILESTAR**
**TECHNOLOGIES LLC'S (First) AMENDED COMPLAINT**

Plaintiffs Rockstar Consortium US LP ("Rockstar") and MobileStar Technologies LLC ("MobileStar") file this Amended Complaint for patent infringement under 35 U.S.C. § 271 and in support thereof would respectfully show the Court the following:

**PARTIES**

1.      Plaintiff Rockstar Consortium US LP ("Rockstar") is a limited partnership organized and existing under the laws of the State of Delaware, and maintains its principal place of business at Legacy Town Center 1, 7160 North Dallas Parkway Suite No. 250, Plano, TX 75024.

2.      Plaintiff MobileStar Technologies LLC ("MobileStar") is a subsidiary of Rockstar and is a limited liability corporation organized and existing under

the laws of the State of Delaware, and maintains its principal place of business at Legacy Town Center 1, 7160 North Dallas Parkway Suite No. 250, Plano, TX 75024.

3.        Upon information and belief, Defendant Samsung Electronics Co., Ltd. ("SEC") is a corporation organized and existing under the laws of the Republic of Korea with its principal place of business at 416, Maetan 3-dong, Yeongtong-gu, Suwon-si, Gyeonggi-do 443-742, South Korea.

4.        Upon information and belief, Defendant Samsung Electronics America, Inc. ("SEA") is a subsidiary of SEC and is a corporation organized and existing under the laws of the State of New York.  Samsung Electronics America, Inc. maintains its principal place of business at 85 Challenger Road, Ridgefield Park, NJ 07660.

5.        Upon information and belief, Defendant Samsung Telecommunications America, LLC is a subsidiary of SEC and is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business at 1301 East Lookout Drive, Richardson TX 75082.

6.        Upon information and belief, Defendant Google, Inc. ("Google") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

## **BACKGROUND FACTS**

7.          Nortel Networks, a previous assignee of the patents-in-suit, conducted an auction for Nortel's patent portfolio.. The auction included the patents asserted herein.

8.          During the various auction dates Google, among others, bid for Nortel's portfolio.

9.          Google made its first bid for the Nortel patent portfolio on April 4, 2011. (*See* http://googleblog.blogspot.com/2011/04/patents-and-innovation.html).

10.          Google was aware of the patents asserted herein at the time of its initial bid.

11.          Google placed an initial bid of $900,000,000 for the patents-in-suit and the rest of the Nortel portfolio. Google subsequently increased its bid multiple times, ultimately bidding as high as $4.4 billion. That price was insufficient to win the auction, as a group led by the current shareholders of Rockstar purchased the portfolio for $4.5 billion.

12.          Despite losing in its attempt to acquire the patents-in-suit at auction, Google has infringed and continues to infringe the patents-in-suit, including, but not limited to, the sale and offer for sale of its "Google Nexus" line of devices in the United States, including in this District.

13.        The Nexus devices include, but are not limited to, the Nexus 5, Nexus 7, Nexus 10, and Galaxy Nexus.  On information and belief, the Nexus 10 and Galaxy Nexus are manufactured by Samsung.

## JURISDICTION AND VENUE

14.        This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 271.  This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. § 1338.

15.        Venue is proper in this Court pursuant to 28 U S.C. §§ 1391 and 1400(b).

16.        This Court has personal jurisdiction over Defendants Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung"). Samsung has conducted and does conduct business within the State of Texas.  Samsung, directly or through subsidiaries or intermediaries (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and advertises (including the provision of an interactive web page) its products (including its infringing products) and/or services in the United States, the State of Texas, and the Eastern District of Texas.  Samsung, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that they will be purchased and used by consumers in the Eastern District of Texas.  These

4

infringing products and/or services have been and continue to be purchased and used by consumers in the Eastern District of Texas.  Samsung has committed acts of patent infringement within the State of Texas and, more particularly, within the Eastern District of Texas.

17.        This Court has personal jurisdiction over Defendant Google. Google has conducted and does conduct business within the State of Texas.  Google, directly or through subsidiaries or intermediaries (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and advertises (including the provision of an interactive web page) its products (including its "Nexus" line of products) and/or services in the United States, the State of Texas, and the Eastern District of Texas. Google, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that they will be purchased and used by consumers in the Eastern District of Texas.  These infringing products and/or services have been and continue to be purchased and used by consumers in the Eastern District of Texas.  Google has committed acts of patent infringement within the State of Texas and, more particularly, within the Eastern District of Texas.

## ASSERTED PATENTS

18.        On November 17, 1998, U.S. Patent No. 5,838,551 ("the '551 Patent") entitled "Electronic Package Carrying an Electronic Component and Assembly of Mother Board and Electronic Package" was duly and legally issued with Yee-Ning Chan as the named inventor after full and fair examination.  Rockstar owns all rights,

5

title, and interest in and to the '551 Patent and possesses all rights of recovery under the '551 Patent.  MobileStar is the exclusive licensee of the '551 Patent.

19.      On March 14, 2000, U.S. Patent No. 6,037,937 ("the '937 Patent") entitled "Navigation Tool for Graphical User Interface" was duly and legally issued with Brian Finlay Beaton, Colin Donald Smith, and Bruce Dale Stalkie as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '937 Patent and possesses all rights of recovery under the '937 Patent.

20.      On October 3, 2000, U.S. Patent No. 6,128,298 ("the '298 Patent") entitled "Internet Protocol Filter" was duly and legally issued with Bruce Anthony Wootton and William G. Colvin as the named inventors after full and fair examination.  Rockstar owns all rights, title, and interest in and to the '298 Patent and possesses all rights of recovery under the '298 Patent.  MobileStar is the exclusive licensee of the '298 Patent.

21.      On December 25, 2001, U.S. Patent No. 6,333,973 ("the '973 Patent") entitled "Integrated Message Center" was duly and legally issued with Colin Donald Smith and Brian Finlay Beaton as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '973 Patent and possesses all rights of recovery under the '973 Patent.

22.      On October 8, 2002, U.S. Patent No. 6,463,131 ("the '131 Patent") entitled "System and Method for Notifying a User of an Incoming Communication Event" was duly and legally issued with Marilyn French-St. George, Mitch A. Brisebois and Laura A. Mahan as the named inventors after full and fair examination.  MobileStar

owns all rights, title, and interest in and to the '131 Patent and possesses all rights of recovery under the '131 Patent.

23.         On July 20, 2004, U.S. Patent No. 6,765,591 ("the '591 Patent") entitled "Managing a Virtual Private Network" was duly and legally issued with Matthew W. Poisson, Melissa L. Desroches, and James M. Milillo as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '591 Patent and possesses all rights of recovery under the '591 Patent.

24.         On August 30, 2005, U.S. Patent No. 6,937,572 ("the '572 Patent") entitled "Call Trace on a Packet Switched Network" was duly and legally issued with Brian B. Egan and Milos Vodsedalek as the named inventors after full and fair examination.  Mobilestar owns all rights, title, and interest in and to the '572 Patent and possesses all rights of recovery under the '572 Patent.

## GENERAL ALLEGATIONS

25.         Samsung has directly and indirectly infringed and continues to directly and indirectly infringe each of the '551, '937, '298, '973, '131, '591, and '572 Patents by engaging in acts constituting infringement under 35 U.S.C. § 271(a), (b), (c), and/or (f), including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into this District and elsewhere in the United States, certain mobile communication devices having a version (or an adaption thereof) of Android operating system ("Samsung Mobile Communication Devices").

26.         Samsung is doing business in the United States and, more particularly, in the Eastern District of Texas by making, using, selling, importing, and/or

7

offering for sale Samsung Mobile Communication Devices, including but not limited to Samsung's Galaxy family of smart phones, including the Galaxy S III and Captivate (Galaxy S), and its Galaxy family of tablets, including the Galaxy Tab 8.9, and other products that infringe the patent claims involved in this action or by transacting other business in this District.

27.    Google has directly and indirectly infringed and continues to directly and indirectly infringe each of the '937, '131, and '591 Patents by engaging in acts constituting infringement under 35 U.S.C. § 271(a), (b), (c), and/or (f), including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into this District and elsewhere in the United States, certain mobile communication devices having a version (or an adaption thereof) of Android operating system ("Google Mobile Communication Devices"), including Google's Nexus 5, Nexus 7, Nexus 10, and Galaxy Nexus devices ("Google Nexus Devices").  .

28.    Google is doing business in the United States and, more particularly, in the Eastern District of Texas by making, using, selling, importing, and/or offering for sale Google Mobile Communication Devices, including but not limited to the Google Nexus Devices and other products that infringe the patent claims involved in this action or by transacting other business in this District.

29.    On information and belief, Google is a customer of one or more of one or more of Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC.

30.       More specifically, and on information and belief, one or more of Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC serve as a manufacturer of the Google Nexus 10 and Galaxy Nexus tablet.

31.       On information and belief, Google uses, sells, and offers for sale at least Nexus 10 devices in the United States, including in this District.  The Nexus 10 and Galaxy Nexus device include the Android operating system.

32.       Google also uses, sells, and offers for sale Nexus 5 and Nexus 7 devices in the United States, including in this District.[1]  The Nexus 5 and Nexus 7 include the Android operating system.

## COUNT ONE
## PATENT INFRINGEMENT BY SAMSUNG

33.       Plaintiffs incorporate by reference paragraphs 1-32 as if fully set forth herein.  As described below, Samsung has infringed and/or continues to infringe the '551, '937, '298, '131, '591, and '572 Patents.

34.       At least the Samsung Mobile Communication Devices infringe at least claim 1 of the '551 Patent.  Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these products and thus directly infringes one or more claims of the '551 Patent, including at least claim 1.

---

[1] On information and belief, one or more of LG Electronics Inc.,LG Electronics U.S.A., Inc., and LG Electronics MobileComm U.S.A., Inc.  (collectively "LGE") is an OEM for Google's Nexus 5 device, and one or both of ASUSTeK Computer, Inc. and ASUS Computer International, Inc. (collectively, "ASUS") is an OEM for Google's Nexus 7 device.  Rockstar has brought actions for patent infringement against LGE and Asus in this District on the '551, '937, '298, '973, '131, '591, and '572 Patents.

9

35.         Samsung indirectly infringes the '551 patent by inducing infringement by others, such as resellers, of at least claim 1 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and/or end-users of the Samsung Mobile Communication Devices.  Samsung had actual notice of the '551 Patent at least by October 15, 2012, in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

36.         Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured and distributed, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use Samsung Mobile Communication Devices in their normal and customary way to infringe the '551 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '551 patent; further, Samsung was aware that these normal and customary activities would infringe the '551 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '551 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

37.         Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '551 Patent in the United States because Samsung has knowledge of the '551 Patent and Samsung actually induces others, such as resellers and end-use

10

customers, to directly infringe the '551 patent, by using, selling, exporting, supplying and/or distributing, within the United States, Samsung Mobile Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

38.        Samsung indirectly infringes the '551 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices.  Samsung had actual notice of the '551 Patent at least by October 15, 2012, in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

39.        Samsung Mobile Communication Devices include at least one electronic package comprising a component that is located between an EMI shield and a ground member for performing shielding operations.  The EMI shield is incorporated into the electronic package, which is then mounted to a circuit board in Samsung Mobile Communication Devices, and on information and belief, the electronic component does not function in an acceptable manner absent the EMI shielding.  Furthermore, the electronic package incorporating the EMI shield does not operate in isolation, but is designed to operate within the Mobile Communication Device, and absent the EMI shielding of the electronic component, Samsung Mobile Communication Devices would not function in an acceptable manner.

40.        A reasonable inference to be drawn from the facts set forth is that the EMI shielded electronic package in Samsung Mobile Communication Devices is

especially made or especially adapted to operate in a Samsung Mobile Communication Device as an EMI shield.

41.        A reasonable inference to be drawn from the facts set forth is that the EMI shielded electronic package is not a staple article or commodity of commerce and that the use of the EMI shielded electronic package is required for operation of Samsung Mobile Communication Devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

42.        The EMI shielded electronic package in Samsung Mobile Communication Devices are each a material part of the invention of the '551 patent and are especially made for the infringing manufacture, sale, and use of Samsung Mobile Communication Devices.  Samsung Mobile Communication Devices, including the EMI shielded electronic package, are especially made or adapted as an electronic package that infringes the '551 patent.  Because the sales and manufacture of Samsung Mobile Communication Devices including the EMI shielded electronic package infringe the '551 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

43.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others Samsung Mobile Communication Devices with distinct and separate

components, including hardware components, which have no substantial non-infringing uses.

44.     At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps and Browser functionality, infringe at least claim 13 of the '937 Patent.  Samsung makes, uses, tests, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 13 of the '937 Patent.

45.     Samsung indirectly infringes the '937 patent by inducing infringement by others of at least claim 13, such as resellers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '937 Patent at least by September 3, 2009 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

46.     Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '937 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '937 patent;

13

further, Samsung was aware that these normal and customary activities would infringe the '937 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

47.     Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '937 patent in the United States because Samsung has knowledge of the '937 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

48.     The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps and Browser functionality as intended by Samsung infringes at least method claim 1 of the '937 Patent.  Samsung uses these products and thus directly infringes at least method claim 1 of the '937 Patent.

49.     In addition, Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps, and Browser functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 1 of the '937 Patent.

50.        Samsung indirectly infringes the '937 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '937 Patent at least by September 3, 2009 in view of a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

51.        Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps and Browser functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe the '937 Patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '937 patent.

52.        Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '937 Patent in the United States.  For example, Samsung provides instructions to resellers and end-use customers regarding the use and operation of Samsung's products in an infringing way.  Such instructions include at least "Samsung Captivate Mobile Phone User Manual" (available at http://downloadcenter.samsung.com/content/UM/201201/20120117231631844/ATT_i897_Captivate_English_User_Manual.pdf).  When resellers and end-use customers follow such instructions, they directly infringe the '937 Patent.  Samsung knows that by

15

providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '937 Patent.  Samsung thus knows that its actions induce the infringement.

53.        Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

54.        Samsung indirectly infringes the '937 patent, by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices.  Samsung received actual notice of the '937 Patent at least by September 3, 2009 in view of a communication from Rockstar and/or its predecessors-in-interest to Samsung, and also received knowledge as of the date this lawsuit was filed.

55.        Samsung Mobile Communication Devices include functionality that, inter alia, displays a navigable graphical user interface ("navigable GUI") that permits a user to manipulate and control the contents of the display to maximize the use of display real estate.    This navigable GUI is included in Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support at least the Gallery, Email, Maps, and Browser functionalities.  On information and belief, these functionalities cannot operate in an acceptable manner absent the navigable GUI, as it is included in every Samsung Mobile Communication Device.

56.        A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in Samsung Mobile Communication Devices is especially made or especially adapted to operate on a Samsung Mobile Communication Device as a navigable GUI that permits a user to manipulate or control the contents of the display to maximize the use of display real estate on the user's Samsung Mobile Communication Devices.

57.        A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in the Mobile Communication Device is not a staple article or commodity of commerce and that the use of the navigable GUI in Samsung Mobile Communication Devices is required for the operation of Samsung Mobile Communication Devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

58.        Samsung Mobile Communication Devices with the navigable GUI are each a material part of the invention of the '937 patent and are especially made for the infringing manufacture, sale, and use of Samsung Mobile Communication Devices. Samsung Mobile Communication Devices with the navigable GUI are especially made or adapted as a navigable GUI that infringes the '937 patent.  Because the sales and manufacture of Samsung Mobile Communication Devices with a navigable GUI infringes the '937 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

59.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '937

17

patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others, Samsung Mobile Communication Devices with distinct and separate components, including software components, which have no substantial non-infringing uses.

60.      At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support the Mobile Hotspot functionality infringe at least claims 27 and 31 of the '298 Patent.  Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claims 27 and 31 of the '298 Patent.

61.      Samsung indirectly infringes the '298 patent by inducing infringement by others of at least claims 27 and 31, such as resellers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '298 Patent at least by July 29, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

62.      Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung

18

Mobile Communication Devices in their normal and customary way to infringe the '298 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '298 patent; further, Samsung was aware that these normal and customary activities would infringe the '298 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '298 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

63.       Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '298 patent in the United States because Samsung has knowledge of the '298 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

64.       The use of at least Samsung Mobile Communication Devices that support the Mobile Hotspot functionality as intended by Samsung infringes at least method claims 14 and 24 of the '298 Patent.  Samsung uses these products and thus directly infringes at least method claims 14 and 24 of the '298 Patent.

65.       In addition, Samsung provides at least Samsung Mobile Communication Devices that support the Mobile Hotspot functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claims 14 and 24 of the '298 Patent.

19

66.        Samsung indirectly infringes the '298 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities of the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Mobile Hotspot functionality.  Samsung received actual notice of the '298 Patent at least by July 29, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

67.        Samsung's affirmative acts of selling its Samsung Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '298 patent at least through using Mobile Hotspot functionality.  Samsung also provides instructions, including at least "Verizon User Manual Samsung Galaxy S III" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW, for using the Mobile Hotspot functionality.  Through its sales of Samsung Mobile Communication Devices with Mobile Hotspot functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '298 patent; further, Samsung was aware that the normal and customary use of Mobile Hotspot functionality would infringe the '298 patent.  Samsung also enticed its end-users to use the Mobile Hotspot functionality by providing instruction manuals and also providing Mobile Hotspot functionality.    Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '298

20

patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

68.        Accordingly, a reasonable inference is that Samsung actively induces infringement of the '298 Patent by others, such as resellers and end-use customers.  Samsung specifically intends for others, including such as resellers and end-use customers, to directly infringe one or more claims of the '298 Patent in the United States because Samsung had knowledge of the '298 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung Mobile Communication Devices in an infringing way.  Such instructions include at least "Verizon User Manual Samsung Galaxy S III" available at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW. When resellers and end-use customers follow such instructions, they directly infringe the '298 Patent.  Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '298 Patent.  Samsung thus knows that its actions induce the infringement.

69.        Samsung indirectly infringes the '298 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Mobile Hotspot functionality.  Samsung received actual notice of the '298 Patent at least by July 29, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

21

70.         Samsung Mobile Communication Devices with the Mobile Hotspot functionality allow wireless devices from a first, or private, network to connect to a second, or public, network such as the Internet.  The Mobile Hotspot functionality is designed to route data packets between wireless devices tethered to the Mobile Hotspot to nodes on a public network such as the Internet, and cannot function in a manner that does not utilize the Mobile Hotspot functionality available to Samsung Mobile Communication Devices.  Upon information and belief, the Mobile Hotspot functionality is designed to entice a user to access nodes in a second, or public, network such as the Internet.

71.         A reasonable inference to be drawn from the facts set forth is that the Mobile Hotspot functionality is especially made or especially adapted to operate on a mobile communication device for providing access for wireless devices in a first, or private, network to nodes in a second, or public, network.

72.         A reasonable inference to be drawn from the facts set forth is that the Mobile Hotspot functionality is not a staple article or commodity of commerce and that the use of the Mobile Hotspot functionality of Samsung Mobile Communication Devices is for interfacing first and second data communications networks, e.g., a private network and a public network such as the Internet.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

73.         Samsung Mobile Communication Devices with Mobile Hotspot functionality are each a material part of the '298 patent and especially made for the infringing use of the Mobile Hotspot functionality for interfacing private and public data communication networks.  Samsung Mobile Communication Devices with the Mobile

22

Hotspot functionality are especially made or adapted to provide access for wireless devices in a first, or private, network through the Mobile Communication Device, to nodes in a second, or public, network that perform or facilitate performance of the steps that infringe the '298 patent.  Furthermore, Samsung provides user manuals describing the uses of Samsung Mobile Communication Devices that infringe the '298 patent.  Because the sales and manufacture of Samsung Mobile Communication Devices with Mobile Hotspot functionality infringes the '298 patent, Samsung's sales of its infringement products have no substantial non-infringing uses.

74.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others, Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Mobile Hotspot functionality.  Samsung installs and configures Samsung Mobile Communication Devices with distinct and separate components, including software components, which are used only to perform the infringing method claims.

75.        At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support an integrated notification message center functionality infringe at least claims 1 and 21 of the '973 Patent.  Samsung makes, uses, sells, tests, uses, offers for sale, imports, exports, supplies

23

and/or distributes within the United States these devices and thus directly infringes one or more claims of the '973 patent, including at least claims 1 and 21.

76.         Samsung indirectly infringes the '973 patent by inducing infringement by others, such as resellers, of at least claims 1 and 21 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '973 Patent at least by March 12, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

77.         Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '973 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '973 patent; further, Samsung was aware that these normal and customary activities would infringe the '973 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '973 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

78.         Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or

24

more claims of the '973 patent in the United States because Samsung has knowledge of the '973 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers. Samsung knew or should have known that such actions would induce actual infringement.

79.        The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support an integrated notification message center functionality as intended by Samsung infringes at least method claim 8 of the '973 Patent. Samsung uses these devices within the United States and thus directly infringes one or more claims of the '973 patent, including at least claim 8.

80.        Samsung indirectly infringes the '973 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices. Samsung received actual notice of the '973 Patent at least by March 12, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

81.        Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support integrated notification message center functionality to others, such as resellers and end-use customers, in the United States who, in turn, use Samsung Mobile Communication

25

Devices to infringe at least method claim 8 of the '973 Patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '973 patent.

82.        Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '973 Patent in the United States.  For example, Samsung provides instructions to resellers and end-use customers regarding the use and operation of Samsung Mobile Communication Devices in an infringing way.  Such instructions include at least "Samsung Captivate Mobile Phone User          Manual"          (available          at http://downloadcenter.samsung.com/content/UM/201201/20120117231631844/ATT_i89 7_Captivate_English_User_Manual.pdf, accessed October 30, 2013).  When resellers and end-use customers follow such instructions, they directly infringe the '973 Patent.  Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '973 Patent.  Samsung thus knows that its actions induce the infringement.

83.        Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '973 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

84.        Samsung indirectly infringes the '973 patent, by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices.  Samsung received actual notice of the '973

26

Patent at least by March 12, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

85.         Samsung Mobile Communication Devices include functionality that, inter alia, displays an integrated notification message center contained in a single list.  The notification message center is designed to provide a user with a single list of notifications regardless of the types of messages (e.g., email, text, etc) on the user's Mobile Communication Device.  On information and belief, this functionality cannot operate in an acceptable manner absent the integrated notification message center, as it is included in every Samsung Mobile Communication Device.

86.         A reasonable inference to be drawn from the facts set forth is that the integrated message center in Samsung Mobile Communication Devices is especially made or especially adapted to operate on a Samsung Mobile Communication Device as an integrated notification message center that provides a user with notifications concerning different types of messages on the user's Mobile Communication Device.

87.         A reasonable inference to be drawn from the facts set forth is that the integrated notification message center in the Mobile Communication Device is not a staple article or commodity of commerce and that the use of the integrated notification message center in Samsung Mobile Communication Devices is required for operation of Samsung Mobile Communication Devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

88.         Samsung Mobile Communication Devices with the integrated notification message center are each a material part of the invention of the '973 patent and are especially made for the infringing manufacture, sale, and use of Samsung Mobile

27

Communication Devices.   Samsung Mobile Communication Devices, including the integrated notification message center, are especially made or adapted as an integrated notification message center that infringes the '973 patent.   Because the sales and manufacture of Samsung Mobile Communication Devices with an integrated notification message center infringes the '973 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

89.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.   Samsung provides to others, Samsung Mobile Communication Devices with distinct and separate components, including software components, which have no substantial non-infringing uses.

90.        At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Message and Notification functionality infringe at least claim 1 of the '131 Patent.   Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 1 of the '131 Patent.

91.        Samsung indirectly infringes the '131 patent by inducing infringement by others, such as resellers, of at least claim 1 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.   Direct infringement is the

result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '131 Patent at least by November 30, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

92.         Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '131 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '973 patent; further, Samsung was aware that these normal and customary activities would infringe the '131 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

93.         Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 patent in the United States because Samsung has knowledge of the '131 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers

and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

94.        The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Message and Notification functionality as intended by Samsung infringes at least method claim 5 of the '131 Patent.  Samsung uses these products and thus directly infringes at least method claim 5 of the '131 Patent.

95.        In addition, Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Message functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 5 of the '131 Patent.

96.        Samsung indirectly infringes the '131 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Message and Notifications functionality.  Samsung received actual notice of the '131 Patent at least by November 30, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

97.        Samsung's affirmative acts of selling Samsung Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication

30

Devices in their normal and customary way to infringe the '131 patent at least through using Message and Notifications functionality.  Samsung also provides instructions, including at least "Verizon Samsung Galaxy S III User Guide" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW, for using the Messaging and Notifications functionality.  Through its sales of Mobile Communication Devices with Messaging and Notifications functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '131 patent; further, Samsung was aware that the normal and customary use of the Message and Notifications functionality would infringe the '131 patent.  Samsung also enticed its end-users to use the Messaging and Notifications functionality by providing instruction manuals.  Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

98.    Accordingly, a reasonable inference is that Samsung actively induces infringement of the '131 Patent by others, such as resellers and end-use customers.  Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 Patent in the United States because Samsung had knowledge of the '131 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung Mobile Communication Devices in an infringing way. Such instructions include at least "Verizon Samsung Galaxy S III User Guide" available at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW.    When

31

resellers and end-use customers follow such instructions, they directly infringe the '131 Patent.   Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '131 Patent.   Samsung thus knows that its actions induce the infringement.

99.         Samsung indirectly infringes the '131 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Messaging and Notification functionality.   Samsung received actual notice of the '131 Patent at least by November 30, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

100.        Samsung's Message and Notification functionality receives and displays message of different types, such as a phone call, voice mail, text message, or email.  The Message and Notification Services functionality is designed to notify the user of an incoming communication and to select the format of the message received and cannot function in a manner that does not utilize the messaging functionality available to Samsung Mobile Communication Devices.   Upon information and belief, the Message and Notifications functionality is designed to entice a user to receive notifications of an incoming communication.

101.        A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality especially made or especially adapted to

operate on Samsung Mobile Communication Devices for notifying a user of an incoming communication.

102.        A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality is not a staple article or commodity of commerce and that the use of the Messaging and Notifications functionality of the Samsung Mobile Communication Devices is for notifying a user of an incoming communication.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

103.        Samsung Mobile Communication Devices with Messaging and Notifications functionality are each a material part of the '131 patent and especially made for the infringing use of the Messaging and Notification functionality to receive and display messages.   Samsung Mobile Communication Devices including the Messaging and Notification functionality, are especially made or adapted to notify a user of an incoming communication that perform or facilitate performance of the steps that infringe the '131 patent.   Furthermore, Samsung provides user manuals describing the uses of its Mobile Communication Devices that infringe the '131 patent.   Because the functionality provided by Samsung's Messaging and Notification to notify a user of an incoming communication infringes the '131 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

104.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially

33

made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others, Mobile Communication Devices with an operating system configured and installed by Samsung to support Message and Notification functionality.  Samsung installs and configures on these products distinct and separate components, including software components, which are used only to perform the infringing method claims.

105.     At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN management functionality, including the Samsung Galaxy S III, infringe at least claims 1 and 8 of the '591 Patent.  Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claims 1 and 8 of the '591 Patent.

106.     The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN management functionality as specified and intended by Samsung infringes at least claims 1 and 8 of the '591 Patent.  Samsung uses these products and thus directly infringes at least claims 1 and 8 of the '591 Patent.

107.     Samsung indirectly infringes the '591 patent by inducing infringement by others, such as resellers, of at least claims 1 and 8 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '591 Patent at least by October 15, 2012 from a communication from Rockstar, and/or its

34

predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

108.       Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '591 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '591 patent; further, Samsung was aware that these normal and customary activities would infringe the '591 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

109.       Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '591 patent in the United States because Samsung has knowledge of the '591 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

110.       In addition, Samsung provides at least its Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN

35

**– A103 –**

management functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least claims 1 and 8 of the '591 Patent.

111.        Samsung indirectly infringes the '591 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality.  Samsung received actual notice of the '591 Patent at least by October 15, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

112.        Samsung's affirmative acts of selling its Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '591 patent at least through using VPN management functionality.  Samsung also provides instructions, including at least "Verizon Samsung Galaxy S III User Manual" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW, for using the VPN management functionality.  Through its sales of Samsung Mobile Communication Devices with VPN management functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '591 patent; further, Samsung was aware that the normal and customary use of VPN management functionality would infringe the '591 patent.  Samsung also enticed its end-users to use

36

the VPN management functionality by providing instruction manuals.  Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

113.        Accordingly, it is a reasonable inference that Samsung actively induces infringement of the '591 Patent by others, such as resellers and end-use customers.  Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '591 Patent in the United States because Samsung had knowledge of the '591 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung's products in an infringing way.  Such instructions include at least "Verizon Samsung Galaxy S III User Manual" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW.        When resellers and end-use customers follow such instructions, they directly infringe the '591 Patent.  Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '591 Patent.  Samsung thus knows that its actions induce the infringement.

114.        Samsung indirectly infringes the '591 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality.  Samsung received actual notice of the '591

37

Patent at least by October 15, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

115.       Samsung's VPN management functionality facilitates management of VPNs.  The VPN management functionality is designed for management of VPNs and cannot function in a manner that does not utilize the VPN management functionality available to Samsung Mobile Communication Devices.  The VPN management functionality is designed upon information and belief to entice a user to manage VPNs.

116.       A reasonable inference to be drawn from the facts set forth is that the VPN functionality is especially made or especially adapted to operate on Samsung Mobile Communication Devices for providing VPN management functionality.

117.       A reasonable inference to be drawn from the facts set forth is that the VPN management functionality is not a staple article or commodity of commerce and that the use of the VPN management functionality of Samsung Mobile Communication Devices is for managing VPNs.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

118.       Samsung Mobile Communication Devices with VPN management functionality are each a material part of the invention of the '591 patent and especially made for the infringing use of the VPN functionality.  Samsung Mobile Communication Devices including the VPN management functionality, are especially made or adapted to provide VPN management functionality that perform or facilitate performance of the steps that infringe the '591 patent.  Furthermore, Samsung provides user manuals describing the uses of its Mobile Communication Devices that infringe the '591 patent.  Because the functionality provided by Samsung's VPN management functionality

38

infringes the '591 patent, Samsung's sales of its infringing Mobile Communication Devices have no substantial non-infringing uses.

119.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others, Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN management functionality.  Samsung installs and configures on these products distinct and separate components, including software components, which are used only to infringe the '591 Patent.

120.        The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Location Services functionality, as intended by Samsung infringes at least method claim 17 of the '572 Patent.  Samsung uses these Mobile Communication Devices and thus directly infringes at least method claim 17 of the '572 Patent.

121.        In addition, Samsung provides at least its Mobile Communication Devices with an operating system configured and installed by Samsung to support Location Services functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 17 of the '572 Patent.

122.         Samsung indirectly infringes by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Location Services functionality.  Samsung received actual notice of the '572 Patent at least by May 2, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

123.         Samsung's affirmative acts of selling its Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '572 patent at least through using Location Services functionality.  Samsung also provides instructions, including at least "GT-P7300 User Manual"        available        on        Samsung's        website        at http://downloadcenter.samsung.com/content/UM/201209/20120922095036620/GT-P7300_UM_Open_HongKong_Icecream_Eng_Rev.1.0_120817_Screen.pdf,   for   using the Location Services functionality.   Through its sales of Samsung Mobile Communication Devices with Location Services functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '572 patent; further, Samsung was aware that the normal and customary use of Location Services would infringe the '572 patent.  Samsung also enticed its end-users to use the Location Services by providing instruction manuals.  Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the

40

knowledge of the '572 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

124.        Accordingly, a reasonable inference is that Samsung actively induces infringement of the '572 Patent by others, such as resellers and end-use customers.  Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '572 Patent in the United States because Samsung had knowledge of the '572 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung's products in an infringing way.  Such instructions include at least "GT-P7300 User Manual" available on Samsung's website at http://downloadcenter.samsung.com/content/UM/201209/20120922095036620/GT-P7300_UM_Open_HongKong_Icecream_Eng_Rev.1.0_120817_Screen.pdf.        When resellers and end-use customers follow such instructions, they directly infringe the '572 Patent.  Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '572 Patent.  Samsung thus knows that its actions induce the infringement.

125.        Samsung indirectly infringes the '572 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Locations Services functionality.  Samsung received actual notice of the '572

Patent at least by May 2, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

126.       Samsung's Location Services functionality provides call trace information, i.e., a geographic location of Samsung Mobile Communication Devices. The Location Services functionality is designed to notify the user of Samsung Mobile Communication Devices of call trace information, i.e., a geographic location of the Mobile Communication Devices, and cannot function in a manner that does not utilize the Location Services functionality available to the Mobile Communication Devices. Upon information and belief, the Location Services functionality is designed to entice a user to access call trace information.

127.       A reasonable inference to be drawn from the facts set forth is that the Location Services functionality is especially made or especially adapted to operate on Samsung Mobile Communication Devices for obtaining call trace information, i.e., a geographic location of the Mobile Communication Devices.

128.       A reasonable inference to be drawn from the facts set forth is that the Location Services functionality is not a staple article or commodity of commerce and that the use of the Location Services functionality of Samsung Mobile Communication Devices is for providing call trace information.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

129.       Samsung Mobile Communication Devices with Location Services functionality are each a material part of the '572 patent and especially made for the infringing use of the Location Services functionality to receive call trace information, i.e., a geographic location of the Mobile Communication Devices.   The Mobile

42

Communication Devices including the Location Services functionality are especially made or adapted to provide call trace information that perform or facilitate performance of the steps that infringe the '572 patent.  Furthermore, Samsung provides user manuals describing the uses of its products that infringe the '572 patent.  Because the functionality provided by Samsung's Location Services to obtain call trace information, i.e., a geographic location of the Mobile Communication Devices, infringes the '572 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

130.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others Mobile Communication Devices with an operating system configured and installed by Samsung to support Location Services functionality.  Samsung installs and configures on these products distinct and separate components, including software components, which are used only to perform the infringing method claims.

131.        Samsung's acts of infringement have caused damage to Rockstar and MobileStar.  Rockstar and MobileStar are entitled to recover from Samsung the damages sustained by Rockstar and MobileStar as a result of Samsung's wrongful acts in an amount subject to proof at trial.  In addition, the infringing acts and practices of Samsung have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to Rockstar and

43

MobileStar for which there is no adequate remedy at law, and for which Rockstar and MobileStar are entitled to injunctive relief under 35 U.S.C. § 283.

132.        Samsung received actual notice of its infringement of the '551, '937, '298, '973, '131, '591, and '572 Patents through at least letters sent by Rockstar and/or its predecessors-in-interest, Nortel Networks Ltd. and/or Nortel Networks, Inc., to Samsung, and through meetings between employees of Rockstar and/or its predecessors-in-interest, Nortel Networks Ltd., or Nortel Networks Inc. and Samsung.  Samsung also has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

133.        Samsung has willfully infringed and/or does willfully infringe the '551, '937, '298, '973, '131, '591, and '572 Patents.

134.        Samsung's acts of infringement have caused damage to Rockstar and MobileStar.  Rockstar and MobileStar are entitled to recover from Samsung the damages sustained by Rockstar and MobileStar as a result of Samsung's wrongful acts in an amount subject to proof at trial.   In addition, the infringing acts and practices of Samsung have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to Rockstar and MobileStar for which there is no adequate remedy at law, and for which Rockstar and MobileStar are entitled to injunctive relief under 35 U.S.C. § 283.

## COUNT TWO
## PATENT INFRINGEMENT BY GOOGLE

135.        Plaintiffs incorporate by reference paragraphs 1-134 as if fully set forth herein.  As described below, Google has infringed and/or continues to infringe the '937, '131, and '591 Patents.

44

136.        At least Google Mobile Communication Devices with an operating system configured and installed by Google to support Gallery, Email, Maps and Browser functionality, infringe at least claim 13 of the '937 Patent.  Google makes, uses, tests, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 13 of the '937 Patent.

137.        Google indirectly infringes the '937 patent by inducing infringement by others of at least claim 13, such as resellers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices.  Google received actual notice of the '937 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

138.        Google's    affirmative    acts    of    selling    Google    Mobile Communication Devices, causing the Google Mobile Communication Devices to be manufactured, and providing instruction manuals for Google Mobile Communication Devices induced Google's manufacturers and resellers to make or use the Google Mobile Communication Devices in their normal and customary way to infringe the '937 patent. Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '937 patent; further, Google was aware that these normal and customary activities would infringe the '937 patent.   Google performed the acts that constitute induced infringement, and would

45

induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

139.        Accordingly, a reasonable inference is that Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '937 patent in the United States because Google has knowledge of the '937 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Google Communication Devices for resale to others, such as resellers and end-use customers.  Google knew or should have known that such actions would induce actual infringement.

140.        The use of at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Gallery, Email, Maps and Browser functionality as intended by Google infringes at least method claim 1 of the '937 Patent.  Google uses these products and thus directly infringes at least method claim 1 of the '937 Patent.

141.        In addition, Google provides at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Gallery, Email, Maps, and Browser functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 1 of the '937 Patent.

142.        Google indirectly infringes the '937 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is

46

the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices.  Google received actual notice at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

143.        Google provides at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Gallery, Email, Maps and Browser functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe the '937 Patent.  Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '937 patent.

144.        Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '937 Patent in the United States.  For example, Google provides instructions to resellers and end-use customers regarding the use and operation of Google's products in an infringing way.  Such instructions include at least "Google Nexus Help" (available at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518l).    When resellers and end-use customers follow such instructions, they directly infringe the '937 Patent.  Google knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '937 Patent.  Google thus knows that its actions induce the infringement.

145.         Google performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

146.         Google indirectly infringes the '937 patent, by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices.  Google received actual notice of the '937 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint as of the date this lawsuit was filed.

147.         Google Mobile Communication Devices include functionality that, inter alia, displays a navigable graphical user interface ("navigable GUI") that permits a user to manipulate and control the contents of the display to maximize the use of display real estate.  This navigable GUI is included in Google Mobile Communication Devices with an operating system configured and installed by Google to support at least the Gallery, Email, Maps, and Browser functionalities.  On information and belief, these functionalities cannot operate in an acceptable manner absent the navigable GUI, as it is included in every Google Mobile Communication Device.

148.         A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in Google Mobile Communication Devices is especially made or especially adapted to operate on a Google Mobile Communication Device as a

48

navigable GUI that permits a user to manipulate or control the contents of the display to maximize the use of display real estate on the user's Google Mobile Communication Devices.

149.    A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in the Mobile Communication Device is not a staple article or commodity of commerce and that the use of the navigable GUI in Google Mobile Communication Devices is required for the operation of Google Mobile Communication Devices.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

150.    Google Mobile Communication Devices with the navigable GUI are each a material part of the invention of the '937 patent and are especially made for the infringing manufacture, sale, and use of Google Mobile Communication Devices. Google Mobile Communication Devices with the navigable GUI are especially made or adapted as a navigable GUI that infringes the '937 patent.   Because the sales and manufacture of Google Mobile Communication Devices with a navigable GUI infringes the '937 patent, Google's sales of its infringing products have no substantial non-infringing uses.

151.    Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '937 patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Google

49

provides to others, Google Mobile Communication Devices with distinct and separate components, including software components, which have no substantial non-infringing uses.

152.    At least Google Mobile Communication Devices with an operating system configured and installed to support Message and Notification functionality infringe at least claim 1 of the '131 Patent.  Google makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 1 of the '131 Patent.

153.    Google indirectly infringes the '131 patent by inducing infringement by others, such as resellers, of at least claim 1 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices.  Google received actual notice of the '131 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

154.    Google's    affirmative    acts    of    selling    Google    Mobile Communication Devices, causing the Google Mobile Communication Devices to be manufactured, and providing instruction manuals for Google Mobile Communication Devices induced Google's manufacturers and resellers to make or use the Google Mobile Communication Devices in their normal and customary way to infringe the '131 patent. Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '131 patent; further,

50

Google was aware that these normal and customary activities would infringe the '131 patent.  Google performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

155.        Accordingly, a reasonable inference is that Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 patent in the United States because Google has knowledge of the '131 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Google Communication Devices for resale to others, such as resellers and end-use customers.  Google knew or should have known that such actions would induce actual infringement.

156.        The use of at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Message and Notification functionality as intended by Google infringes at least method claim 5 of the '131 Patent.  Google uses these products and thus directly infringes at least method claim 5 of the '131 Patent.

157.        In    addition,    Google    provides    at    least    Google    Mobile Communication Devices with an operating system configured and installed by Google to support Message functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 5 of the '131 Patent.

158.    Google indirectly infringes the '131 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the Message and Notifications functionality.  Google received actual notice of the '131 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

159.    Google's affirmative acts of selling Google Mobile Communication Devices and providing instruction manuals induced the end-users of Google Mobile Communication Devices to use Google Mobile Communication Devices in their normal and customary way to infringe the '131 patent at least through using Message and Notifications functionality.  Google also provides instructions, including at least "Google Nexus Help" available on Google's website at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518, for using the Messaging and Notifications functionality.  Through its sales of Mobile Communication Devices with Messaging and Notifications functionality, Google specifically intended the end-users of Google Mobile Communication Devices to infringe the '131 patent; further, Google was aware that the normal and customary use of the Message and Notifications functionality would infringe the '131 patent.  Google also enticed its end-users to use the Messaging and Notifications functionality by providing instruction manuals.  Google performed the acts that constituted induced infringement, and would induce actual

52

infringement, with the knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

160.    Accordingly, a reasonable inference is that Google actively induces infringement of the '131 Patent by others, such as resellers and end-use customers.  Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 Patent in the United States because Google had knowledge of the '131 Patent, and Google actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Google Mobile Communication Devices in an infringing way.  Such instructions include at least "Google Nexus Help" available at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518.    When resellers and end-use customers follow such instructions, they directly infringe the '131 Patent.  Google knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '131 Patent.  Google thus knows that its actions induce the infringement.

161.    Google indirectly infringes the '131 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the Messaging and Notification functionality.  Google received actual notice of the '131 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent

portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

162.        Google's Message and Notification functionality receives and displays message of different types, such as a phone call, voice mail, text message, or email.  The Message and Notification Services functionality is designed to notify the user of an incoming communication and to select the format of the message received and cannot function in a manner that does not utilize the messaging functionality available to Google Mobile Communication Devices.  Upon information and belief, the Message and Notifications functionality is designed to entice a user to receive notifications of an incoming communication.

163.        A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality especially made or especially adapted to operate on Google Mobile Communication Devices for notifying a user of an incoming communication.

164.        A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality is not a staple article or commodity of commerce and that the use of the Messaging and Notifications functionality of the Google Mobile Communication Devices is for notifying a user of an incoming communication.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

165.        Google Mobile Communication Devices with Messaging and Notifications functionality are each a material part of the '131 patent and especially made for the infringing use of the Messaging and Notification functionality to receive and

54

display messages.  Google Mobile Communication Devices including the Messaging and Notification functionality, are especially made or adapted to notify a user of an incoming communication that perform or facilitate performance of the steps that infringe the '131 patent.  Furthermore, Google provides user manuals describing the uses of its Mobile Communication Devices that infringe the '131 patent.  Because the functionality provided by Google's Messaging and Notification to notify a user of an incoming communication infringes the '131 patent, Google's sales of its infringing products have no substantial non-infringing uses.

166.    Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Google provides to others, Mobile Communication Devices with an operating system configured and installed by Google to support Message and Notification functionality.  Google installs and configures on these products distinct and separate components, including software components, which are used only to perform the infringing method claims.

167.    At least Google Mobile Communication Devices with an operating system configured and installed by Google to support VPN management functionality, including the Google Galaxy S III, infringe at least claims 1 and 8 of the '591 Patent.  Google makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes

within the United States these devices and thus directly infringes at least claims 1 and 8 of the '591 Patent.

168.    The use of at least Google Mobile Communication Devices with an operating system configured and installed by Google to support VPN management functionality as specified and intended by Google infringes at least claims 1 and 8 of the '591 Patent. Google uses these products and thus directly infringes at least claims 1 and 8 of the '591 Patent.

169.    Google indirectly infringes the '591 patent by inducing infringement by others, such as resellers, of at least claims 1 and 8 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices. Google received actual notice of the '591 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

170.    Google's affirmative acts of selling Google Mobile Communication Devices, causing the Google Mobile Communication Devices to be manufactured, and providing instruction manuals for Google Mobile Communication Devices induced Google's manufacturers and resellers to make or use the Google Mobile Communication Devices in their normal and customary way to infringe the '591 patent. Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '591 patent; further, Google was aware that these normal and customary activities would infringe the '591

56

patent.  Google performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

171.         Accordingly, a reasonable inference is that Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '591 patent in the United States because Google has knowledge of the '591 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Google Communication Devices for resale to others, such as resellers and end-use customers.  Google knew or should have known that such actions would induce actual infringement.

172.         In addition, Google provides at least its Mobile Communication Devices with an operating system configured and installed by Google to support VPN management functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least claims 1 and 8 of the '591 Patent.

173.         Google indirectly infringes the '591 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality.  Google received actual notice of the '591 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing

each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

174.        Google's affirmative acts of selling its Mobile Communication Devices and providing instruction manuals induced the end-users of Google Mobile Communication Devices to use Google Mobile Communication Devices in their normal and customary way to infringe the '591 patent at least through using VPN management functionality.  Google also provides instructions, including at least "Google Nexus Help" available        on        Google's        website        at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518, for using the VPN management functionality.  Through its sales of Google Mobile Communication Devices with VPN management functionality, Google specifically intended the end-users of Google Mobile Communication Devices to infringe the '591 patent; further, Google was aware that the normal and customary use of VPN management functionality would infringe the '591 patent.  Google also enticed its end-users to use the VPN management functionality by providing instruction manuals.  Google performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

175.        Accordingly, it is a reasonable inference that Google actively induces infringement of the '591 Patent by others, such as resellers and end-use customers.  Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '591 Patent in the United States because Google had knowledge of the '591 Patent, and Google actually induces

58

infringement by providing instructions to resellers and end-use customers regarding the use and operation of Google's products in an infringing way.  Such instructions include at least "Google Nexus Help" available on Google's website at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518.     When resellers and end-use customers follow such instructions, they directly infringe the '591 Patent.  Google knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '591 Patent.  Google thus knows that its actions induce the infringement.

176.     Google indirectly infringes the '591 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality.  Google received actual notice of the '591 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.  Google's VPN management functionality facilitates management of VPNs.  The VPN management functionality is designed for management of VPNs and cannot function in a manner that does not utilize the VPN management functionality available to Google Mobile Communication Devices.  The VPN management functionality is designed upon information and belief to entice a user to manage VPNs.

177.      A reasonable inference to be drawn from the facts set forth is that the VPN functionality is especially made or especially adapted to operate on Google Mobile Communication Devices for providing VPN management functionality.

178.      A reasonable inference to be drawn from the facts set forth is that the VPN management functionality is not a staple article or commodity of commerce and that the use of the VPN management functionality of Google Mobile Communication Devices is for managing VPNs.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

179.      Google Mobile Communication Devices with VPN management functionality are each a material part of the invention of the '591 patent and especially made for the infringing use of the VPN functionality.  Google Mobile Communication Devices including the VPN management functionality, are especially made or adapted to provide VPN management functionality that perform or facilitate performance of the steps that infringe the '591 patent.  Furthermore, Google provides user manuals describing the uses of its Mobile Communication Devices that infringe the '591 patent. Because the functionality provided by Google's VPN management functionality infringes the '591 patent, Google's sales of its infringing Mobile Communication Devices have no substantial non-infringing uses.

180.      Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple

60

article or commodity of commerce suitable for substantial non-infringing uses.  Google

provides to others, Mobile Communication Devices with an operating system configured

and installed by Google to support VPN management functionality.  Google installs and

configures on these products distinct and separate components, including software

components, which are used only to infringe the '591 Patent.

181.     Google's acts of infringement have caused damage to Rockstar and

MobileStar.  Rockstar and MobileStar are entitled to recover from Google the damages

sustained by Rockstar and MobileStar as a result of Google's wrongful acts in an amount

subject to proof at trial.  In addition, the infringing acts and practices of Google have

caused, are causing, and, unless such acts and practices are enjoined by the Court, will

continue to cause immediate and irreparable harm to Rockstar and MobileStar for which

there is no adequate remedy at law, and for which Rockstar and MobileStar are entitled to

injunctive relief under 35 U.S.C. § 283.

182.     Google received actual notice of its infringement of the '937, '131,

and '591 Patents through at its April 4, 2011 bid for the  Nortel patent portfolio.  Google

also has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

183.     Google has willfully infringed and/or does willfully infringe the

'937, '131, and '591 Patents.

## DEMAND FOR JURY TRIAL

Rockstar and MobileStar hereby demand a jury trial for all issues so

triable.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Rockstar prays for the following relief:

1.       A judgment that Samsung has directly infringed the '551 Patent, contributorily infringed the '551 Patent, and/or induced the infringement of the '551 Patent.

2.       A judgment that Samsung has directly infringed the '937 Patent, contributorily infringed the '937 Patent, and/or induced the infringement of the '937 Patent.

3.       A judgment that Samsung has directly infringed the '298 Patent, contributorily infringed the '298 Patent, and/or induced the infringement of the '298 Patent.

4.       A judgment that Samsung has directly infringed the '973 Patent, contributorily infringed the '973 Patent, and/or induced the infringement of the '973 Patent.

5.       A judgment that Samsung has directly infringed the '131 Patent, contributorily infringed the '131 Patent, and/or induced the infringement of the '131 Patent.

6.       A judgment that Samsung has directly infringed the '591 Patent, contributorily infringed the '591 Patent, and/or induced the infringement of the '591 Patent.

7.       A judgment that Samsung has directly infringed the '572 Patent, contributorily infringed the '572 Patent, and/or induced the infringement of the '572 Patent.

8.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '551 Patent;

9.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '937 patent;

10.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '298 patent;

11.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '973 patent;

12.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '131 patent;

13.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and

those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '591 patent;

14.    A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '572 patent;

15.    A judgment that Samsung's infringement of the '551, '937, '298, '973, '131, '591, and '572 Patents has been willful;

16.    A ruling that this case be found to be exceptional under 35 U.S.C. § 285, and a judgment awarding Rockstar and MobileStar to their attorneys' fees incurred in prosecuting this action;

17.    A judgment and order requiring Samsung to pay Rockstar and MobileStar damages under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed, and treble damages for willful infringement as provided by 35 U.S.C. § 284;

18.    A judgment and order requiring Samsung to pay Rockstar and MobileStar the costs of this action (including all disbursements);

19.    A judgment and order requiring Samsung to pay Rockstar and MobileStar pre-judgment and post-judgment interest on the damages awarded;

20.    A judgment and order requiring that in the event a permanent injunction preventing future acts of infringement is not granted, that Rockstar and MobileStar be awarded a compulsory ongoing licensing fee against Samsung;

21.     A judgment that Google has directly infringed the '937 Patent, contributorily infringed the '937 Patent, and/or induced the infringement of the '937 Patent.

22.     A judgment that Google has directly infringed the '131 Patent, contributorily infringed the '131 Patent, and/or induced the infringement of the '131 Patent.

23.     A judgment that Google has directly infringed the '591 Patent, contributorily infringed the '591 Patent, and/or induced the infringement of the '591 Patent.

24.     A judgment that Google's infringement of the '937, '131, and '591 Patents has been willful;

25.     A ruling that this case be found to be exceptional under 35 U.S.C. § 285, and a judgment awarding Rockstar and MobileStar to their attorneys' fees incurred in prosecuting this action;

26.     A judgment and order requiring Google to pay Rockstar and MobileStar damages under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed, and treble damages for willful infringement as provided by 35 U.S.C. § 284;

27.     A judgment and order requiring Google to pay Rockstar and MobileStar the costs of this action (including all disbursements);

28.     A judgment and order requiring Google to pay Rockstar and MobileStar pre-judgment and post-judgment interest on the damages awarded;

29.     A judgment and order requiring that Rockstar and MobileStar be awarded a compulsory ongoing licensing fee as to Google; and

30.     Such other and further relief as the Court may deem just and proper.


DATED:  December 31, 2013.                    Respectfully submitted,
                                              **MCKOOL SMITH, P.C.**

                                              _/s/ Theodore Stevenson, III_
                                              Mike McKool, Jr.
                                              Texas Bar No. 13732100
                                              mmckool@mckoolsmith.com
                                              Douglas A. Cawley
                                              Texas Bar No. 0403550
                                              dcawley@mckoolsmith.com
                                              Theodore Stevenson, III
                                              Lead Attorney
                                              Texas State Bar No. 19196650
                                              tstevenson@mckoolsmith.com
                                              David Sochia
                                              Texas State Bar No. 00797470
                                              dsochia@mckoolsmith.com
                                              **MCKOOL SMITH P.C.**
                                              300 Crescent Court, Suite 1500
                                              Dallas, Texas 75201
                                              Telephone: (214) 978-4000
                                              Facsimile: (214) 978-4044

                                              **ATTORNEYS FOR PLAINTIFFS
                                              ROCKSTAR CONSORTIUM US,
                                              LP AND MOBILESTAR
                                              TECHNOLOGIES LLC**

## CERTIFICATE OF SERVICE

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per L.R. CV-5(a)(3) on December 31, 2013. Any other counsel of record will be served via first-class mail.

*/s/ Theodore Stevenson, III*
Theodore Stevenson, III

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **ROCKSTAR CONSORTIUM US LP and MOBILESTAR TECHNOLOGIES LLC,** § § § | |
| **Plaintiffs,** § | **Civil Action No. 2:13-cv-00900-JRG** |
| **v.** § § | **JURY TRIAL REQUESTED** |
| **SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., and SAMSUNG TELECOMMUNICATIONS AMERICA, LLC** § § § § § | |
| **Defendants.** § | |

**PLAINTIFFS ROCKSTAR CONSORTIUM US LP and MOBILESTAR
TECHNOLOGIES LLC'S SECOND AMENDED COMPLAINT**

Plaintiffs Rockstar Consortium US LP ("Rockstar") and MobileStar Technologies

LLC ("MobileStar") file this Second Amended Complaint for patent infringement under

35 U.S.C. § 271 and in support thereof would respectfully show the Court the following:

**PARTIES**

1.          Plaintiff Rockstar Consortium US LP ("Rockstar") is a limited

partnership organized and existing under the laws of the State of Delaware, and maintains

its principal place of business at Legacy Town Center 1, 7160 North Dallas Parkway

Suite No. 250, Plano, TX 75024.

2.          Plaintiff MobileStar Technologies LLC ("MobileStar") is a

subsidiary of Rockstar and is a limited liability corporation organized and existing under

the laws of the State of Delaware, and maintains its principal place of business at Legacy

Town Center 1, 7160 North Dallas Parkway Suite No. 250, Plano, TX 75024.

3.          Upon information and belief, Defendant Samsung Electronics Co., Ltd. ("SEC") is a corporation organized and existing under the laws of the Republic of Korea with its principal place of business at 416, Maetan 3-dong, Yeongtong-gu, Suwon-si, Gyeonggi-do 443-742, South Korea.

4.          Upon information and belief, Defendant Samsung Electronics America, Inc. ("SEA") is a subsidiary of SEC and is a corporation organized and existing under the laws of the State of New York.  Samsung Electronics America, Inc. maintains its principal place of business at 85 Challenger Road, Ridgefield Park, NJ 07660.

5.          Upon information and belief, Defendant Samsung Telecommunications America, LLC is a subsidiary of SEC and is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business at 1301 East Lookout Drive, Richardson TX 75082.

6.          Upon information and belief, Defendant Google, Inc. ("Google") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

## BACKGROUND FACTS

7.          Nortel Networks, a previous assignee of the patents-in-suit, conducted an auction for Nortel's patent portfolio. The auction included the patents asserted herein.

8.          During the various auction dates Google, among others, bid for Nortel's portfolio.

9.      Google made its first bid for the Nortel patent portfolio on April 4, 2011.  (*See* http://googleblog.blogspot.com/2011/04/patents-and-innovation.html).

10.     Google was aware of the patents asserted herein at the time of its initial bid.

11.     Google placed an initial bid of $900,000,000 for the patents-in-suit and the rest of the Nortel portfolio. Google subsequently increased its bid multiple times, ultimately bidding as high as $4.4 billion. That price was insufficient to win the auction, as a group led by the current shareholders of Rockstar purchased the portfolio for $4.5 billion.

12.     Despite losing in its attempt to acquire the patents-in-suit at auction, Google has infringed and continues to infringe the patents-in-suit, including, but not limited to, the sale and offer for sale of its "Google Nexus" line of devices in the United States, including in this District.

13.     The Nexus devices include, but are not limited to, the Nexus 5, Nexus 7, Nexus 10, and Galaxy Nexus.  On information and belief, the Nexus 10 and Galaxy Nexus are manufactured by Samsung.

### **JURISDICTION AND VENUE**

14.     This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 271.  This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. § 1338.

15.     Venue is proper in this Court pursuant to 28 U S.C. §§ 1391 and 1400(b).

16.        This Court has personal jurisdiction over Defendants Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC (collectively, "Samsung"). Samsung has conducted and does conduct business within the State of Texas.  Samsung, directly or through subsidiaries or intermediaries (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and advertises (including the provision of an interactive web page) its products (including its infringing products) and/or services in the United States, the State of Texas, and the Eastern District of Texas.  Samsung, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that they will be purchased and used by consumers in the Eastern District of Texas.  These infringing products and/or services have been and continue to be purchased and used by consumers in the Eastern District of Texas.  Samsung has committed acts of patent infringement within the State of Texas and, more particularly, within the Eastern District of Texas.

17.        This Court has personal jurisdiction over Defendant Google. Google has conducted and does conduct business within the State of Texas.  Google, directly or through subsidiaries or intermediaries (including distributors, retailers, and others), ships, distributes, offers for sale, sells, and advertises (including the provision of an interactive web page) its products (including its "Nexus" line of products) and/or services in the United States, the State of Texas, and the Eastern District of Texas.  Google, directly and through subsidiaries or intermediaries (including distributors,

retailers, and others), has purposefully and voluntarily placed one or more of its infringing products and/or services, as described below, into the stream of commerce with the expectation that they will be purchased and used by consumers in the Eastern District of Texas.  These infringing products and/or services have been and continue to be purchased and used by consumers in the Eastern District of Texas.   Google has committed acts of patent infringement within the State of Texas and, more particularly, within the Eastern District of Texas.

### ASSERTED PATENTS

18.        On November 17, 1998, U.S. Patent No. 5,838,551 ("the '551 Patent") entitled "Electronic Package Carrying an Electronic Component and Assembly of Mother Board and Electronic Package" was duly and legally issued with Yee-Ning Chan as the named inventor after full and fair examination.  Rockstar owns all rights, title, and interest in and to the '551 Patent and possesses all rights of recovery under the '551 Patent.  MobileStar is the exclusive licensee of the '551 Patent.

19.        On March 14, 2000, U.S. Patent No. 6,037,937 ("the '937 Patent") entitled "Navigation Tool for Graphical User Interface" was duly and legally issued with Brian Finlay Beaton, Colin Donald Smith, and Bruce Dale Stalkie as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '937 Patent and possesses all rights of recovery under the '937 Patent.

20.        On October 3, 2000, U.S. Patent No. 6,128,298 ("the '298 Patent") entitled "Internet Protocol Filter" was duly and legally issued with Bruce Anthony Wootton and William G. Colvin as the named inventors after full and fair examination. Rockstar owns all rights, title, and interest in and to the '298 Patent and possesses all

McKool 969192v1

rights of recovery under the '298 Patent.  MobileStar is the exclusive licensee of the '298 Patent.

21.         On December 25, 2001, U.S. Patent No. 6,333,973 ("the '973 Patent") entitled "Integrated Message Center" was duly and legally issued with Colin Donald Smith and Brian Finlay Beaton as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '973 Patent and possesses all rights of recovery under the '973 Patent.

22.         On October 8, 2002, U.S. Patent No. 6,463,131 ("the '131 Patent") entitled "System and Method for Notifying a User of an Incoming Communication Event" was duly and legally issued with Marilyn French-St. George, Mitch A. Brisebois and Laura A. Mahan as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '131 Patent and possesses all rights of recovery under the '131 Patent.

23.         On July 20, 2004, U.S. Patent No. 6,765,591 ("the '591 Patent") entitled "Managing a Virtual Private Network" was duly and legally issued with Matthew W. Poisson, Melissa L. Desroches, and James M. Milillo as the named inventors after full and fair examination.  MobileStar owns all rights, title, and interest in and to the '591 Patent and possesses all rights of recovery under the '591 Patent.

24.         On August 30, 2005, U.S. Patent No. 6,937,572 ("the '572 Patent") entitled "Call Trace on a Packet Switched Network" was duly and legally issued with Brian B. Egan and Milos Vodsedalek as the named inventors after full and fair examination.  Mobilestar owns all rights, title, and interest in and to the '572 Patent and possesses all rights of recovery under the '572 Patent.

6

## **GENERAL ALLEGATIONS**

25.         Samsung has directly and indirectly infringed and continues to directly and indirectly infringe each of the '551, '937, '298, '973, '131, '591 and '572 Patents by engaging in acts constituting infringement under 35 U.S.C. § 271(a), (b), (c), and/or (f), including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into this District and elsewhere in the United States, certain mobile communication devices having a version (or an adaption thereof) of Android operating system ("Samsung Mobile Communication Devices").

26.         Samsung is doing business in the United States and, more particularly, in the Eastern District of Texas by making, using, selling, importing, and/or offering for sale Samsung Mobile Communication Devices, including but not limited to Samsung's Galaxy family of smart phones, including the Galaxy S III and Captivate (Galaxy S), and its Galaxy family of tablets, including the Galaxy Tab 8.9, and other products that infringe the patent claims involved in this action or by transacting other business in this District.

27.         Google has directly and indirectly infringed and continues to directly and indirectly infringe each of the '551, '937, '298, '973, '131, '591 and '572 Patents by engaging in acts constituting infringement under 35 U.S.C. § 271(a), (b), (c), and/or (f), including but not necessarily limited to one or more of making, using, selling and offering to sell, in this District and elsewhere in the United States, and importing into this District and elsewhere in the United States, certain mobile communication devices having a version (or an adaption thereof) of Android operating system ("Google Mobile

McKool 969192v1

Communication Devices"), including Google's Nexus 5, Nexus 7, Nexus 10, and Galaxy Nexus devices ("Google Nexus Devices").

28.        Google is doing business in the United States and, more particularly, in the Eastern District of Texas by making, using, selling, importing, and/or offering for sale Google Mobile Communication Devices, including but not limited to the Google Nexus Devices and other products that infringe the patent claims involved in this action or by transacting other business in this District.

29.        On information and belief, Google is a customer of one or more of Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC.

30.        More specifically, and on information and belief, one or more of Samsung Electronics Co., Ltd, Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC serve as a manufacturer of the Google Nexus 10 and Galaxy Nexus tablet.

31.        On information and belief, Google uses, sells, and offers for sale at least Nexus 10 devices in the United States, including in this District.  The Nexus 10 and Galaxy Nexus device include the Android operating system.

32.        Google also uses, sells, and offers for sale Nexus 5 and Nexus 7 devices in the United States, including in this District.[1]  The Nexus 5 and Nexus 7 include the Android operating system.

---

[1] On information and belief, one or more of LG Electronics Inc., LG Electronics U.S.A., Inc., and LG Electronics MobileComm U.S.A., Inc.  (collectively "LGE") is an OEM for Google's Nexus 5 device, and one or both of ASUSTeK Computer, Inc. and ASUS Computer International, Inc. (collectively, "ASUS") is an OEM for Google's Nexus 7

## COUNT ONE
## PATENT INFRINGEMENT BY SAMSUNG

33.        Plaintiffs incorporate by reference paragraphs 1-32 as if fully set forth herein.  As described below, Samsung has infringed and/or continues to infringe the '551, '937, '298, '131, '591 and '572 Patents.

34.        At least the Samsung Mobile Communication Devices infringe at least claim 1 of the '551 Patent.  Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these products and thus directly infringes one or more claims of the '551 Patent, including at least claim 1.

35.        Samsung indirectly infringes the '551 patent by inducing infringement by others, such as resellers, of at least claim 1 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and/or end-users of the Samsung Mobile Communication Devices.  Samsung had actual notice of the '551 Patent at least by October 15, 2012, in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

36.        Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured and distributed, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use Samsung Mobile Communication Devices in their normal and customary way to infringe the '551 patent.  Through its manufacture and sales of Samsung Mobile Communication

---

device.  Rockstar has brought actions for patent infringement against LGE and Asus in this District on the '551, '937, '298, '973, '131, '591 and '572 Patents.

McKool 969192v1

Devices, Samsung specifically intended its resellers and manufacturers to infringe the '551 patent; further, Samsung was aware that these normal and customary activities would infringe the '551 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '551 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

37.    Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '551 Patent in the United States because Samsung has knowledge of the '551 Patent and Samsung actually induces others, such as resellers and end-use customers, to directly infringe the '551 patent, by using, selling, exporting, supplying and/or distributing, within the United States, Samsung Mobile Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

38.    Samsung indirectly infringes the '551 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices.  Samsung had actual notice of the '551 Patent at least by October 15, 2012, in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

39.    Samsung Mobile Communication Devices include at least one electronic package comprising a component that is located between an EMI shield and a

ground member for performing shielding operations.  The EMI shield is incorporated into the electronic package, which is then mounted to a circuit board in Samsung Mobile Communication Devices, and on information and belief, the electronic component does not function in an acceptable manner absent the EMI shielding.  Furthermore, the electronic package incorporating the EMI shield does not operate in isolation, but is designed to operate within the Mobile Communication Device, and absent the EMI shielding of the electronic component, Samsung Mobile Communication Devices would not function in an acceptable manner.

40.        A reasonable inference to be drawn from the facts set forth is that the EMI shielded electronic package in Samsung Mobile Communication Devices is especially made or especially adapted to operate in a Samsung Mobile Communication Device as an EMI shield.

41.        A reasonable inference to be drawn from the facts set forth is that the EMI shielded electronic package is not a staple article or commodity of commerce and that the use of the EMI shielded electronic package is required for operation of Samsung Mobile Communication Devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant or experimental.

42.        The EMI shielded electronic package in Samsung Mobile Communication Devices are each a material part of the invention of the '551 patent and are especially made for the infringing manufacture, sale, and use of Samsung Mobile Communication Devices.  Samsung Mobile Communication Devices, including the EMI shielded electronic package, are especially made or adapted as an electronic package that infringes the '551 patent.   Because the sales and manufacture of Samsung Mobile

McKool 969192v1

Communication Devices including the EMI shielded electronic package infringe the '551 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

43.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses. Samsung provides to others Samsung Mobile Communication Devices with distinct and separate components, including hardware components, which have no substantial non-infringing uses.

44.        At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps and Browser functionality, infringe at least claim 13 of the '937 Patent. Samsung makes, uses, tests, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 13 of the '937 Patent.

45.        Samsung indirectly infringes the '937 patent by inducing infringement by others of at least claim 13, such as resellers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices. Samsung received actual notice of the '937 Patent at least by September 3, 2009 from a communication from Rockstar, and/or its

predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

46.        Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '937 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '937 patent; further, Samsung was aware that these normal and customary activities would infringe the '937 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

47.        Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '937 patent in the United States because Samsung has knowledge of the '937 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

48.        The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email,

Maps and Browser functionality as intended by Samsung infringes at least method claim 1 of the '937 Patent.  Samsung uses these products and thus directly infringes at least method claim 1 of the '937 Patent.

49.         In addition, Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps, and Browser functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 1 of the '937 Patent.

50.         Samsung indirectly infringes the '937 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '937 Patent at least by September 3, 2009 in view of a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

51.         Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Gallery, Email, Maps and Browser functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe the '937 Patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '937 patent.

52.         Samsung specifically intends for others, such as resellers and end-

14

use customers, to directly infringe one or more claims of the '937 Patent in the United States. For example, Samsung provides instructions to resellers and end-use customers regarding the use and operation of Samsung's products in an infringing way. Such instructions include at least "Samsung Captivate Mobile Phone User Manual" (available at http://downloadcenter.samsung.com/content/UM/201201/20120117231631844/ATT_i897_Captivate_English_User_Manual.pdf). When resellers and end-use customers follow such instructions, they directly infringe the '937 Patent. Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '937 Patent. Samsung thus knows that its actions induce the infringement.

53.        Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

54.        Samsung indirectly infringes the '937 patent, by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices. Samsung received actual notice of the '937 Patent at least by September 3, 2009 in view of a communication from Rockstar and/or its predecessors-in-interest to Samsung, and also received knowledge as of the date this lawsuit was filed.

55.        Samsung Mobile Communication Devices include functionality that, inter alia, displays a navigable graphical user interface ("navigable GUI") that

permits a user to manipulate and control the contents of the display to maximize the use of display real estate.   This navigable GUI is included in Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support at least the Gallery, Email, Maps, and Browser functionalities.  On information and belief, these functionalities cannot operate in an acceptable manner absent the navigable GUI, as it is included in every Samsung Mobile Communication Device.

56.      A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in Samsung Mobile Communication Devices is especially made or especially adapted to operate on a Samsung Mobile Communication Device as a navigable GUI that permits a user to manipulate or control the contents of the display to maximize the use of display real estate on the user's Samsung Mobile Communication Devices.

57.      A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in the Mobile Communication Device is not a staple article or commodity of commerce and that the use of the navigable GUI in Samsung Mobile Communication Devices is required for the operation of Samsung Mobile Communication Devices.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

58.      Samsung Mobile Communication Devices with the navigable GUI are each a material part of the invention of the '937 patent and are especially made for the infringing manufacture, sale, and use of Samsung Mobile Communication Devices. Samsung Mobile Communication Devices with the navigable GUI are especially made or adapted as a navigable GUI that infringes the '937 patent.   Because the sales and

16

manufacture of Samsung Mobile Communication Devices with a navigable GUI infringes the '937 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

59.         Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '937 patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others, Samsung Mobile Communication Devices with distinct and separate components, including software components, which have no substantial non-infringing uses.

60.         At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support the Mobile Hotspot functionality infringe at least claims 27 and 31 of the '298 Patent.  Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claims 27 and 31 of the '298 Patent.

61.         Samsung indirectly infringes the '298 patent by inducing infringement by others of at least claims 27 and 31, such as resellers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '298 Patent at least by July 29, 2012 from a communication from Rockstar, and/or

its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

62.        Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '298 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '298 patent; further, Samsung was aware that these normal and customary activities would infringe the '298 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '298 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

63.        Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '298 patent in the United States because Samsung has knowledge of the '298 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

64.        The use of at least Samsung Mobile Communication Devices that support the Mobile Hotspot functionality as intended by Samsung infringes at least

method claims 14 and 24 of the '298 Patent.  Samsung uses these products and thus directly infringes at least method claims 14 and 24 of the '298 Patent.

65.      In addition, Samsung provides at least Samsung Mobile Communication Devices that support the Mobile Hotspot functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claims 14 and 24 of the '298 Patent.

66.      Samsung indirectly infringes the '298 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities of the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Mobile Hotspot functionality.  Samsung received actual notice of the '298 Patent at least by July 29, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

67.      Samsung's affirmative acts of selling its Samsung Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '298 patent at least through using Mobile Hotspot functionality.  Samsung also provides instructions, including at least "Verizon User Manual Samsung Galaxy S III" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW, for using the Mobile Hotspot functionality.  Through its sales of Samsung Mobile Communication Devices with Mobile Hotspot functionality, Samsung specifically intended the end-users

McKool 969192v1

of Samsung Mobile Communication Devices to infringe the '298 patent; further, Samsung was aware that the normal and customary use of Mobile Hotspot functionality would infringe the '298 patent.  Samsung also enticed its end-users to use the Mobile Hotspot functionality by providing instruction manuals and also providing Mobile Hotspot functionality.    Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '298 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

68.        Accordingly, a reasonable inference is that Samsung actively induces infringement of the '298 Patent by others, such as resellers and end-use customers.  Samsung specifically intends for others, including such as resellers and end-use customers, to directly infringe one or more claims of the '298 Patent in the United States because Samsung had knowledge of the '298 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung Mobile Communication Devices in an infringing way.  Such instructions include at least "Verizon User Manual Samsung Galaxy S III" available at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW. When resellers and end-use customers follow such instructions, they directly infringe the '298 Patent.  Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '298 Patent.  Samsung thus knows that its actions induce the infringement.

69.        Samsung indirectly infringes the '298 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35

U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Mobile Hotspot functionality.  Samsung received actual notice of the '298 Patent at least by July 29, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

70.        Samsung Mobile Communication Devices with the Mobile Hotspot functionality allow wireless devices from a first, or private, network to connect to a second, or public, network such as the Internet.  The Mobile Hotspot functionality is designed to route data packets between wireless devices tethered to the Mobile Hotspot to nodes on a public network such as the Internet, and cannot function in a manner that does not utilize the Mobile Hotspot functionality available to Samsung Mobile Communication Devices.  Upon information and belief, the Mobile Hotspot functionality is designed to entice a user to access nodes in a second, or public, network such as the Internet.

71.        A reasonable inference to be drawn from the facts set forth is that the Mobile Hotspot functionality is especially made or especially adapted to operate on a mobile communication device for providing access for wireless devices in a first, or private, network to nodes in a second, or public, network.

72.        A reasonable inference to be drawn from the facts set forth is that the Mobile Hotspot functionality is not a staple article or commodity of commerce and that the use of the Mobile Hotspot functionality of Samsung Mobile Communication Devices is for interfacing first and second data communications networks, e.g., a private

network and a public network such as the Internet.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

73.        Samsung Mobile Communication Devices with Mobile Hotspot functionality are each a material part of the '298 patent and especially made for the infringing use of the Mobile Hotspot functionality for interfacing private and public data communication networks.  Samsung Mobile Communication Devices with the Mobile Hotspot functionality are especially made or adapted to provide access for wireless devices in a first, or private, network through the Mobile Communication Device, to nodes in a second, or public, network that perform or facilitate performance of the steps that infringe the '298 patent.  Furthermore, Samsung provides user manuals describing the uses of Samsung Mobile Communication Devices that infringe the '298 patent.  Because the sales and manufacture of Samsung Mobile Communication Devices with Mobile Hotspot functionality infringes the '298 patent, Samsung's sales of its infringement products have no substantial non-infringing uses.

74.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others, Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Mobile Hotspot functionality.  Samsung installs and configures Samsung Mobile Communication Devices with distinct and

separate components, including software components, which are used only to perform the infringing method claims.

75.     At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support an integrated notification message center functionality infringe at least claims 1 and 21 of the '973 Patent.  Samsung makes, uses, sells, tests, uses, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes one or more claims of the '973 patent, including at least claims 1 and 21.

76.     Samsung indirectly infringes the '973 patent by inducing infringement by others, such as resellers, of at least claims 1 and 21 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '973 Patent at least by March 12, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

77.     Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '973 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '973 patent;

further, Samsung was aware that these normal and customary activities would infringe the '973 patent. Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '973 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

78.        Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '973 patent in the United States because Samsung has knowledge of the '973 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers. Samsung knew or should have known that such actions would induce actual infringement.

79.        The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support an integrated notification message center functionality as intended by Samsung infringes at least method claim 8 of the '973 Patent. Samsung uses these devices within the United States and thus directly infringes one or more claims of the '973 patent, including at least claim 8.

80.        Samsung indirectly infringes the '973 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices. Samsung received actual notice of the '973

Patent at least by March 12, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

81.        Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support integrated notification message center functionality to others, such as resellers and end-use customers, in the United States who, in turn, use Samsung Mobile Communication Devices to infringe at least method claim 8 of the '973 Patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '973 patent.

82.        Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '973 Patent in the United States.  For example, Samsung provides instructions to resellers and end-use customers regarding the use and operation of Samsung Mobile Communication Devices in an infringing way.  Such instructions include at least "Samsung Captivate Mobile Phone User                    Manual"                    (available                    at http://downloadcenter.samsung.com/content/UM/201201/20120117231631844/ATT_i89 7_Captivate_English_User_Manual.pdf, accessed October 30, 2013).  When resellers and end-use customers follow such instructions, they directly infringe the '973 Patent.  Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '973 Patent.  Samsung thus knows that its actions induce the infringement.

McKool 969192v1

83.        Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '973 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

84.        Samsung indirectly infringes the '973 patent, by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices.  Samsung received actual notice of the '973 Patent at least by March 12, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

85.        Samsung Mobile Communication Devices include functionality that, inter alia, displays an integrated notification message center contained in a single list.  The notification message center is designed to provide a user with a single list of notifications regardless of the types of messages (e.g., email, text, etc) on the user's Mobile Communication Device.  On information and belief, this functionality cannot operate in an acceptable manner absent the integrated notification message center, as it is included in every Samsung Mobile Communication Device.

86.        A reasonable inference to be drawn from the facts set forth is that the integrated message center in Samsung Mobile Communication Devices is especially made or especially adapted to operate on a Samsung Mobile Communication Device as an integrated notification message center that provides a user with notifications concerning different types of messages on the user's Mobile Communication Device.

87.        A reasonable inference to be drawn from the facts set forth is that the integrated notification message center in the Mobile Communication Device is not a staple article or commodity of commerce and that the use of the integrated notification message center in Samsung Mobile Communication Devices is required for operation of Samsung Mobile Communication Devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

88.        Samsung Mobile Communication Devices with the integrated notification message center are each a material part of the invention of the '973 patent and are especially made for the infringing manufacture, sale, and use of Samsung Mobile Communication Devices.   Samsung Mobile Communication Devices, including the integrated notification message center, are especially made or adapted as an integrated notification message center that infringes the '973 patent.   Because the sales and manufacture of Samsung Mobile Communication Devices with an integrated notification message center infringes the '973 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

89.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others, Samsung Mobile Communication Devices with distinct and separate

components, including software components, which have no substantial non-infringing uses.

90.        At least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Message and Notification functionality infringe at least claim 1 of the '131 Patent. Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 1 of the '131 Patent.

91.        Samsung indirectly infringes the '131 patent by inducing infringement by others, such as resellers, of at least claim 1 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices. Samsung received actual notice of the '131 Patent at least by November 30, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

92.        Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '131 patent. Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '973 patent; further, Samsung was aware that these normal and customary activities would infringe

the '131 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

93.        Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 patent in the United States because Samsung has knowledge of the '131 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

94.        The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Message and Notification functionality as intended by Samsung infringes at least method claim 5 of the '131 Patent.  Samsung uses these products and thus directly infringes at least method claim 5 of the '131 Patent.

95.        In addition, Samsung provides at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Message functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 5 of the '131 Patent.

96.        Samsung indirectly infringes the '131 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35

McKool 969192v1

U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Message and Notifications functionality.  Samsung received actual notice of the '131 Patent at least by November 30, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

97.     Samsung's affirmative acts of selling Samsung Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '131 patent at least through using Message and Notifications functionality.  Samsung also provides instructions, including at least "Verizon Samsung Galaxy S III User Guide" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW, for using the Messaging and Notifications functionality.  Through its sales of Mobile Communication Devices with Messaging and Notifications functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '131 patent; further, Samsung was aware that the normal and customary use of the Message and Notifications functionality would infringe the '131 patent.  Samsung also enticed its end-users to use the Messaging and Notifications functionality by providing instruction manuals.  Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

30

98.    Accordingly, a reasonable inference is that Samsung actively induces infringement of the '131 Patent by others, such as resellers and end-use customers. Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 Patent in the United States because Samsung had knowledge of the '131 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung Mobile Communication Devices in an infringing way. Such instructions include at least "Verizon Samsung Galaxy S III User Guide" available at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW. When resellers and end-use customers follow such instructions, they directly infringe the '131 Patent. Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '131 Patent. Samsung thus knows that its actions induce the infringement.

99.    Samsung indirectly infringes the '131 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Messaging and Notification functionality. Samsung received actual notice of the '131 Patent at least by November 30, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

100.    Samsung's Message and Notification functionality receives and displays message of different types, such as a phone call, voice mail, text message, or

McKool 969192v1

email.  The Message and Notification Services functionality is designed to notify the user of an incoming communication and to select the format of the message received and cannot function in a manner that does not utilize the messaging functionality available to Samsung Mobile Communication Devices.  Upon information and belief, the Message and Notifications functionality is designed to entice a user to receive notifications of an incoming communication.

101.      A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality especially made or especially adapted to operate on Samsung Mobile Communication Devices for notifying a user of an incoming communication.

102.      A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality is not a staple article or commodity of commerce and that the use of the Messaging and Notifications functionality of the Samsung Mobile Communication Devices is for notifying a user of an incoming communication.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

103.      Samsung Mobile Communication Devices with Messaging and Notifications functionality are each a material part of the '131 patent and especially made for the infringing use of the Messaging and Notification functionality to receive and display messages.  Samsung Mobile Communication Devices including the Messaging and Notification functionality, are especially made or adapted to notify a user of an incoming communication that perform or facilitate performance of the steps that infringe the '131 patent.  Furthermore, Samsung provides user manuals describing the uses of its

32

Mobile Communication Devices that infringe the '131 patent.  Because the functionality

provided by Samsung's Messaging and Notification to notify a user of an incoming

communication infringes the '131 patent, Samsung's sales of its infringing products have

no substantial non-infringing uses.

104.        Accordingly, a reasonable inference is that Samsung offers to sell,

or sells within the United States a component of a patented machine, manufacture,

combination, or composition, or a material or apparatus for use in practicing a patented

process, constituting a material part of the invention, knowing the same to be especially

made or especially adapted for use in an infringement of such patent, and not a staple

article or commodity of commerce suitable for substantial non-infringing uses.  Samsung

provides to others, Mobile Communication Devices with an operating system configured

and installed by Samsung to support Message and Notification functionality.  Samsung

installs and configures on these products distinct and separate components, including

software components, which are used only to perform the infringing method claims.

105.        At least Samsung Mobile Communication Devices with an

operating system configured and installed by Samsung to support VPN management

functionality, including the Samsung Galaxy S III, infringe at least claims 1 and 8 of the

'591 Patent.  Samsung makes, uses, sells, offers for sale, imports, exports, supplies and/or

distributes within the United States these devices and thus directly infringes at least

claims 1 and 8 of the '591 Patent.

106.        The use of at least Samsung Mobile Communication Devices with

an operating system configured and installed by Samsung to support VPN management

functionality as specified and intended by Samsung infringes at least claims 1 and 8 of

the '591 Patent.  Samsung uses these products and thus directly infringes at least claims 1 and 8 of the '591 Patent.

107.       Samsung indirectly infringes the '591 patent by inducing infringement by others, such as resellers, of at least claims 1 and 8 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Samsung Mobile Communication Devices.  Samsung received actual notice of the '591 Patent at least by October 15, 2012 from a communication from Rockstar, and/or its predecessors-in-interest, to Samsung, and also received knowledge as of the date this lawsuit was filed.

108.       Samsung's affirmative acts of selling Samsung Mobile Communication Devices, causing the Samsung Mobile Communication Devices to be manufactured, and providing instruction manuals for Samsung Mobile Communication Devices induced Samsung's manufacturers and resellers to make or use the Samsung Mobile Communication Devices in their normal and customary way to infringe the '591 patent.  Through its manufacture and sales of Samsung Mobile Communication Devices, Samsung specifically intended its resellers and manufacturers to infringe the '591 patent; further, Samsung was aware that these normal and customary activities would infringe the '591 patent.  Samsung performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

109.       Accordingly, a reasonable inference is that Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or

more claims of the '591 patent in the United States because Samsung has knowledge of the '591 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Samsung Communication Devices for resale to others, such as resellers and end-use customers.  Samsung knew or should have known that such actions would induce actual infringement.

110.    In addition, Samsung provides at least its Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN management functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least claims 1 and 8 of the '591 Patent.

111.    Samsung indirectly infringes the '591 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality.  Samsung received actual notice of the '591 Patent at least by October 15, 2012 from a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

112.    Samsung's affirmative acts of selling its Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '591 patent at least through using VPN management

functionality.  Samsung also provides instructions, including at least "Verizon Samsung Galaxy S III User Manual" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW, for using the VPN management functionality.  Through its sales of Samsung Mobile Communication Devices with VPN management functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '591 patent; further, Samsung was aware that the normal and customary use of VPN management functionality would infringe the '591 patent.  Samsung also enticed its end-users to use the VPN management functionality by providing instruction manuals.  Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

113.    Accordingly, it is a reasonable inference that Samsung actively induces infringement of the '591 Patent by others, such as resellers and end-use customers.  Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '591 Patent in the United States because Samsung had knowledge of the '591 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung's products in an infringing way.  Such instructions include at least "Verizon Samsung Galaxy S III User Manual" available on Samsung's website at http://www.samsung.com/us/support/owners/product/SCH-I535MBCVZW.    When resellers and end-use customers follow such instructions, they directly infringe the '591 Patent.  Samsung knows that by providing such instructions, resellers and end-use

customers follow those instructions, and directly infringe the '591 Patent. Samsung thus knows that its actions induce the infringement.

114.     Samsung indirectly infringes the '591 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality. Samsung received actual notice of the '591 Patent at least by October 15, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

115.     Samsung's VPN management functionality facilitates management of VPNs. The VPN management functionality is designed for management of VPNs and cannot function in a manner that does not utilize the VPN management functionality available to Samsung Mobile Communication Devices. The VPN management functionality is designed upon information and belief to entice a user to manage VPNs.

116.     A reasonable inference to be drawn from the facts set forth is that the VPN functionality is especially made or especially adapted to operate on Samsung Mobile Communication Devices for providing VPN management functionality.

117.     A reasonable inference to be drawn from the facts set forth is that the VPN management functionality is not a staple article or commodity of commerce and that the use of the VPN management functionality of Samsung Mobile Communication Devices is for managing VPNs. Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

118.        Samsung Mobile Communication Devices with VPN management functionality are each a material part of the invention of the '591 patent and especially made for the infringing use of the VPN functionality.  Samsung Mobile Communication Devices including the VPN management functionality, are especially made or adapted to provide VPN management functionality that perform or facilitate performance of the steps that infringe the '591 patent.   Furthermore, Samsung provides user manuals describing the uses of its Mobile Communication Devices that infringe the '591 patent.  Because the functionality provided by Samsung's VPN management functionality infringes the '591 patent, Samsung's sales of its infringing Mobile Communication Devices have no substantial non-infringing uses.

119.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others, Mobile Communication Devices with an operating system configured and installed by Samsung to support VPN management functionality.  Samsung installs and configures on these products distinct and separate components, including software components, which are used only to infringe the '591 Patent.

120.        The use of at least Samsung Mobile Communication Devices with an operating system configured and installed by Samsung to support Location Services functionality, as intended by Samsung infringes at least method claim 17 of the '572

Patent.  Samsung uses these Mobile Communication Devices and thus directly infringes at least method claim 17 of the '572 Patent.

121.     In addition, Samsung provides at least its Mobile Communication Devices with an operating system configured and installed by Samsung to support Location Services functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 17 of the '572 Patent.

122.     Samsung indirectly infringes by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Location Services functionality.  Samsung received actual notice of the '572 Patent at least by May 2, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

123.     Samsung's affirmative acts of selling its Mobile Communication Devices and providing instruction manuals induced the end-users of Samsung Mobile Communication Devices to use Samsung Mobile Communication Devices in their normal and customary way to infringe the '572 patent at least through using Location Services functionality.  Samsung also provides instructions, including at least "GT-P7300 User Manual"          available          on          Samsung's          website          at http://downloadcenter.samsung.com/content/UM/201209/20120922095036620/GT-P7300_UM_Open_HongKong_Icecream_Eng_Rev.1.0_120817_Screen.pdf,   for   using

McKool 969192v1

the Location Services functionality.   Through its sales of Samsung Mobile Communication Devices with Location Services functionality, Samsung specifically intended the end-users of Samsung Mobile Communication Devices to infringe the '572 patent; further, Samsung was aware that the normal and customary use of Location Services would infringe the '572 patent.   Samsung also enticed its end-users to use the Location Services by providing instruction manuals.   Samsung performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '572 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

124.        Accordingly, a reasonable inference is that Samsung actively induces infringement of the '572 Patent by others, such as resellers and end-use customers.   Samsung specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '572 Patent in the United States because Samsung had knowledge of the '572 Patent, and Samsung actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Samsung's products in an infringing way.   Such instructions include at least "GT-P7300 User Manual" available on Samsung's website at http://downloadcenter.samsung.com/content/UM/201209/20120922095036620/GT-P7300_UM_Open_HongKong_Icecream_Eng_Rev.1.0_120817_Screen.pdf.        When resellers and end-use customers follow such instructions, they directly infringe the '572 Patent.   Samsung knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '572 Patent.   Samsung thus knows that its actions induce the infringement.

125.        Samsung indirectly infringes the '572 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Samsung Mobile Communication Devices in their intended use, including a customer's use of the Locations Services functionality.  Samsung received actual notice of the '572 Patent at least by May 2, 2012 in view of a Rockstar communication to Samsung, and also received knowledge as of the date this lawsuit was filed.

126.        Samsung's Location Services functionality provides call trace information, i.e., a geographic location of Samsung Mobile Communication Devices. The Location Services functionality is designed to notify the user of Samsung Mobile Communication Devices of call trace information, i.e., a geographic location of the Mobile Communication Devices, and cannot function in a manner that does not utilize the Location Services functionality available to the Mobile Communication Devices. Upon information and belief, the Location Services functionality is designed to entice a user to access call trace information.

127.        A reasonable inference to be drawn from the facts set forth is that the Location Services functionality is especially made or especially adapted to operate on Samsung Mobile Communication Devices for obtaining call trace information, i.e., a geographic location of the Mobile Communication Devices.

128.        A reasonable inference to be drawn from the facts set forth is that the Location Services functionality is not a staple article or commodity of commerce and that the use of the Location Services functionality of Samsung Mobile Communication

McKool 969192v1

Devices is for providing call trace information.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

129.        Samsung Mobile Communication Devices with Location Services functionality are each a material part of the '572 patent and especially made for the infringing use of the Location Services functionality to receive call trace information, i.e., a geographic location of the Mobile Communication Devices.    The Mobile Communication Devices including the Location Services functionality are especially made or adapted to provide call trace information that perform or facilitate performance of the steps that infringe the '572 patent.  Furthermore, Samsung provides user manuals describing the uses of its products that infringe the '572 patent.  Because the functionality provided by Samsung's Location Services to obtain call trace information, i.e., a geographic location of the Mobile Communication Devices, infringes the '572 patent, Samsung's sales of its infringing products have no substantial non-infringing uses.

130.        Accordingly, a reasonable inference is that Samsung offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Samsung provides to others Mobile Communication Devices with an operating system configured and installed by Samsung to support Location Services functionality.  Samsung installs and configures on these products distinct and separate components, including software components, which are used only to perform the infringing method claims.

McKool 969192v1

131.      Samsung's acts of infringement have caused damage to Rockstar and MobileStar.  Rockstar and MobileStar are entitled to recover from Samsung the damages sustained by Rockstar and MobileStar as a result of Samsung's wrongful acts in an amount subject to proof at trial.  In addition, the infringing acts and practices of Samsung have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to Rockstar and MobileStar for which there is no adequate remedy at law, and for which Rockstar and MobileStar are entitled to injunctive relief under 35 U.S.C. § 283.

132.      Samsung received actual notice of its infringement of the '551, '937, '298, '973, '131, '591 and '572 Patents through at least letters sent by Rockstar and/or its predecessors-in-interest, Nortel Networks Ltd. and/or Nortel Networks, Inc., to Samsung, and through meetings between employees of Rockstar and/or its predecessors-in-interest, Nortel Networks Ltd., or Nortel Networks Inc. and Samsung.  Samsung also has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

133.      Samsung has willfully infringed and/or does willfully infringe the '551, '937, '298, '973, '131, '591 and '572 Patents.

134.      Samsung's acts of infringement have caused damage to Rockstar and MobileStar.  Rockstar and MobileStar are entitled to recover from Samsung the damages sustained by Rockstar and MobileStar as a result of Samsung's wrongful acts in an amount subject to proof at trial.  In addition, the infringing acts and practices of Samsung have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to Rockstar and

McKool 969192v1

MobileStar for which there is no adequate remedy at law, and for which Rockstar and

MobileStar are entitled to injunctive relief under 35 U.S.C. § 283.

## COUNT TWO
## PATENT INFRINGEMENT BY GOOGLE

135.     Plaintiffs incorporate by reference paragraphs 1-134 as if fully set

forth herein.  As described below, Google has infringed and/or continues to infringe the

'551, '937, '298, '973, '131, '591 and '572 Patents.

136.     At least the Google Mobile Communication Devices infringe at

least claim 1 of the '551 Patent.  Google makes, uses, sells, offers for sale, imports,

exports, supplies and/or distributes within the United States these products and thus

directly infringes one or more claims of the '551 Patent, including at least claim 1.

137.     Google indirectly infringes the '551 patent by inducing

infringement by others, such as resellers, of at least claim 1 in accordance with 35 U.S.C.

§ 271(b) in this District and elsewhere in the United States.  Direct infringement is the

result of activities performed by the manufacturers, resellers, and/or end-users of the

Google Mobile Communication Devices.  Google had actual notice of the '551 Patent at

least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio

containing each of the patents asserted herein, and further has knowledge of its

infringement of the Patents-in-Suit by way of this Complaint.

138.     Google's affirmative acts of selling Google Mobile

Communication Devices, causing the Google Mobile Communication Devices to be

manufactured and distributed, and providing instruction manuals for Google Mobile

Communication Devices induced Google's manufacturers and resellers to make or use

Google Mobile Communication Devices in their normal and customary way to infringe

McKool 969192v1

the '551 patent.  Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '551 patent; further, Google was aware that these normal and customary activities would infringe the '551 patent.  Google performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '551 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

139.    Accordingly, a reasonable inference is that Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '551 Patent in the United States because Google has knowledge of the '551 Patent and Google actually induces others, such as resellers and end-use customers, to directly infringe the '551 patent, by using, selling, exporting, supplying and/or distributing, within the United States, Google Mobile Communication Devices for resale to others, such as resellers and end-use customers.  Google knew or should have known that such actions would induce actual infringement.

140.    Google indirectly infringes the '551 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices.  Google had actual notice of the '551 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

45

141.        Google Mobile Communication Devices include at least one electronic package comprising a component that is located between an EMI shield and a ground member for performing shielding operations.  The EMI shield is incorporated into the electronic package, which is then mounted to a circuit board in Google Mobile Communication Devices, and on information and belief, the electronic component does not function in an acceptable manner absent the EMI shielding.  Furthermore, the electronic package incorporating the EMI shield does not operate in isolation, but is designed to operate within the Mobile Communication Device, and absent the EMI shielding of the electronic component, Google Mobile Communication Devices would not function in an acceptable manner.

142.        A reasonable inference to be drawn from the facts set forth is that the EMI shielded electronic package in Google Mobile Communication Devices is especially made or especially adapted to operate in a Google Mobile Communication Device as an EMI shield.

143.        A reasonable inference to be drawn from the facts set forth is that the EMI shielded electronic package is not a staple article or commodity of commerce and that the use of the EMI shielded electronic package is required for operation of Google Mobile Communication Devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

144.        The EMI shielded electronic package in Google Mobile Communication Devices are each a material part of the invention of the '551 patent and are especially made for the infringing manufacture, sale, and use of Google Mobile Communication Devices.  Google Mobile Communication Devices, including the EMI

McKool 969192v1

shielded electronic package, are especially made or adapted as an electronic package that infringes the '551 patent.  Because the sales and manufacture of Google Mobile Communication Devices including the EMI shielded electronic package infringe the '551 patent, Google's sales of its infringing products have no substantial non-infringing uses.

145.        Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Google provides to others Google Mobile Communication Devices with distinct and separate components, including hardware components, which have no substantial non-infringing uses.

146.        At least Google Mobile Communication Devices with an operating system configured and installed by Google to support Gallery, Email, Maps and Browser functionality, infringe at least claim 13 of the '937 Patent.  Google makes, uses, tests, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 13 of the '937 Patent.

147.        Google indirectly infringes the '937 patent by inducing infringement by others of at least claim 13, such as resellers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices.  Google received actual notice of the '937

McKool 969192v1

Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

148.    Google's    affirmative    acts    of    selling    Google    Mobile Communication Devices, causing the Google Mobile Communication Devices to be manufactured, and providing instruction manuals for Google Mobile Communication Devices induced Google's manufacturers and resellers to make or use the Google Mobile Communication Devices in their normal and customary way to infringe the '937 patent. Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '937 patent; further, Google was aware that these normal and customary activities would infringe the '937 patent.  Google performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

149.    Accordingly, a reasonable inference is that Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '937 patent in the United States because Google has knowledge of the '937 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Google Communication Devices for resale to others, such as resellers and end-use customers.  Google knew or should have known that such actions would induce actual infringement.

McKool 969192v1

150.     The use of at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Gallery, Email, Maps and Browser functionality as intended by Google infringes at least method claim 1 of the '937 Patent.  Google uses these products and thus directly infringes at least method claim 1 of the '937 Patent.

151.     In addition, Google provides at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Gallery, Email, Maps, and Browser functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 1 of the '937 Patent.

152.     Google indirectly infringes the '937 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices.  Google received actual notice at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

153.     Google provides at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Gallery, Email, Maps and Browser functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe the '937 Patent.  Through its

McKool 969192v1

manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '937 patent.

154.    Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '937 Patent in the United States.  For example, Google provides instructions to resellers and end-use customers regarding the use and operation of Google's products in an infringing way.  Such instructions include at least "Google Nexus Help" (available at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518l).    When resellers and end-use customers follow such instructions, they directly infringe the '937 Patent.  Google knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '937 Patent.  Google thus knows that its actions induce the infringement.

155.    Google performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '937 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

156.    Google indirectly infringes the '937 patent, by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices.  Google received actual notice of the '937 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its

infringement of the Patents-in-Suit by way of this Complaint as of the date this lawsuit was filed.

157.    Google Mobile Communication Devices include functionality that, inter alia, displays a navigable graphical user interface ("navigable GUI") that permits a user to manipulate and control the contents of the display to maximize the use of display real estate.  This navigable GUI is included in Google Mobile Communication Devices with an operating system configured and installed by Google to support at least the Gallery, Email, Maps, and Browser functionalities.  On information and belief, these functionalities cannot operate in an acceptable manner absent the navigable GUI, as it is included in every Google Mobile Communication Device.

158.    A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in Google Mobile Communication Devices is especially made or especially adapted to operate on a Google Mobile Communication Device as a navigable GUI that permits a user to manipulate or control the contents of the display to maximize the use of display real estate on the user's Google Mobile Communication Devices.

159.    A reasonable inference to be drawn from the facts set forth is that the navigable GUI as included in the Mobile Communication Device is not a staple article or commodity of commerce and that the use of the navigable GUI in Google Mobile Communication Devices is required for the operation of Google Mobile Communication Devices.   Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

McKool 969192v1

160.        Google Mobile Communication Devices with the navigable GUI are each a material part of the invention of the '937 patent and are especially made for the infringing manufacture, sale, and use of Google Mobile Communication Devices. Google Mobile Communication Devices with the navigable GUI are especially made or adapted as a navigable GUI that infringes the '937 patent.   Because the sales and manufacture of Google Mobile Communication Devices with a navigable GUI infringes the '937 patent, Google's sales of its infringing products have no substantial non-infringing uses.

161.        Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing the '937 patent, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.   Google provides to others, Google Mobile Communication Devices with distinct and separate components, including software components, which have no substantial non-infringing uses.

162.        At least Google Mobile Communication Devices with an operating system configured and installed by Google to support portable hotspot functionality infringe at least claims 27 and 31 of the '298 Patent.   Google makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claims 27 and 31 of the '298 Patent.

McKool 969192v1

163.     Google indirectly infringes the '298 patent by inducing infringement by others of at least claims 27 and 31, such as resellers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.   Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices.  Google received actual notice of the '298 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

164.     Google's affirmative acts of selling Google Mobile Communication Devices, causing the Google Mobile Communication Devices to be manufactured, and providing instruction manuals for Google Mobile Communication Devices induced Google's manufacturers and resellers to make or use the Google Mobile Communication Devices in their normal and customary way to infringe the '298 patent. Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '298 patent; further, Google was aware that these normal and customary activities would infringe the '298 patent.   Google performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '298 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

165.     Accordingly, a reasonable inference is that Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '298 patent in the United States because Google has knowledge of the '298 patent and actually induces others, such as resellers and end-use customers, to

directly infringe, by using, selling, exporting, supplying and/or distributing within the United States Google Communication Devices for resale to others, such as resellers and end-use customers.  Google knew or should have known that such actions would induce actual infringement.

166.        The use of at least Google Mobile Communication Devices that support the portable hotspot functionality as intended by Google infringes at least method claims 14 and 24 of the '298 Patent.  Google uses these products and thus directly infringes at least method claims 14 and 24 of the '298 Patent.

167.        In addition, Google provides at least Google Mobile Communication Devices that support the portable hotspot functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claims 14 and 24 of the '298 Patent.

168.        Google indirectly infringes the '298 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities of the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the portable hotspot functionality.  Google received actual notice of the '298 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

169.        Google's affirmative acts of selling its Google Mobile Communication Devices and providing instruction manuals induced the end-users of

54

Google Mobile Communication Devices to use Google Mobile Communication Devices in their normal and customary way to infringe the '298 patent at least through using Mobile Hotspot functionality.  Google also provides instructions, including at least "Google Nexus Help" (available at https://support.google.com/nexus/#topic=3415518), for using portable hotspot functionality.  Through its sales of Google Mobile Communication Devices with portable hotspot functionality, Google specifically intended the end-users of Google Mobile Communication Devices to infringe the '298 patent; further, Google was aware that the normal and customary use of portable hotspot functionality would infringe the '298 patent.  Google also enticed its end-users to use portable hotspot functionality by providing instruction manuals and also providing portable hotspot functionality.  Google performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '298 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

170.    Accordingly, a reasonable inference is that Google actively induces infringement of the '298 Patent by others, such as resellers and end-use customers.  Google specifically intends for others, including such as resellers and end-use customers, to directly infringe one or more claims of the '298 Patent in the United States because Google had knowledge of the '298 Patent, and Google actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Google Mobile Communication Devices in an infringing way.  Such instructions include at least "Google Nexus Help" (available at https://support.google.com/nexus/#topic=3415518).  When resellers and end-use

McKool 969192v1

customers follow such instructions, they directly infringe the '298 Patent.  Google knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '298 Patent.  Google thus knows that its actions induce the infringement.

171.    Google indirectly infringes the '298 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the portable hotspot functionality.  Google received actual notice of the '298 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

172.    Google Mobile Communication Devices with portable hotspot functionality allow wireless devices from a first, or private, network to connect to a second, or public, network such as the Internet.  The portable hotspot functionality is designed to route data packets between wireless devices tethered to the portable hotspot to nodes on a public network such as the Internet, and cannot function in a manner that does not utilize the portable hotspot functionality available to Google Mobile Communication Devices.  Upon information and belief, the portable hotspot functionality is designed to entice a user to access nodes in a second, or public, network such as the Internet.

56

173.         A reasonable inference to be drawn from the facts set forth is that the portable hotspot functionality is especially made or especially adapted to operate on a mobile communication device for providing access for wireless devices in a first, or private, network to nodes in a second, or public, network.

174.         A reasonable inference to be drawn from the facts set forth is that the portable hotspot functionality is not a staple article or commodity of commerce and that the use of the portable hotspot functionality of Google Mobile Communication Devices is for interfacing first and second data communications networks, e.g., a private network and a public network such as the Internet. Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

175.         Google Mobile Communication Devices with portable hotspot functionality are each a material part of the '298 patent and especially made for the infringing use of the portable hotspot functionality for interfacing private and public data communication networks. Google Mobile Communication Devices with the portable hotspot functionality are especially made or adapted to provide access for wireless devices in a first, or private, network through the Mobile Communication Device, to nodes in a second, or public, network that perform or facilitate performance of the steps that infringe the '298 patent. Furthermore, Google provides user manuals describing the uses of Google Mobile Communication Devices that infringe the '298 patent. Because the sales and manufacture of Google Mobile Communication Devices with portable hotspot functionality infringes the '298 patent, Google's sales of its infringing products have no substantial non-infringing uses.

McKool 969192v1

176.        Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Google provides to others Google Mobile Communication Devices with an operating system configured and installed by Google to support portable hotspot functionality.  Google installs and configures Google Mobile Communication Devices with distinct and separate components, including software components, which are used only to perform the infringing method claims.

177.        At least Google Mobile Communication Devices with an operating system configured and installed by Google to support an integrated notification message center functionality infringe at least claims 1 and 21 of the '973 Patent.  Google makes, uses, sells, tests, uses, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes one or more claims of the '973 patent, including at least claims 1 and 21.

178.        Google indirectly infringes the '973 patent by inducing infringement by others, such as resellers, of at least claims 1 and 21 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices.  Google received actual notice of the '973 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent

portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

179.      Google's affirmative acts of selling Google Mobile Communication Devices, causing the Google Mobile Communication Devices to be manufactured, and providing instruction manuals for Google Mobile Communication Devices induced Google's manufacturers and resellers to make or use the Google's Mobile Communication Devices in their normal and customary way to infringe the '973 patent.  Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '973 patent; further, Google was aware that these normal and customary activities would infringe the '973 patent.  Google performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '973 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

180.      Accordingly, a reasonable inference is that Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '973 patent in the United States because Google has knowledge of the '973 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Google Communication Devices for resale to others, such as resellers and end-use customers.  Google knew or should have known that such actions would induce actual infringement.

181.      The use of at least Google Mobile Communication Devices with an operating system configured and installed by Google to support an integrated notification

message center functionality as intended by Google infringes at least method claim 8 of the '973 Patent.  Google uses these devices within the United States and thus directly infringes one or more claims of the '973 patent, including at least claim 8.

182.        Google indirectly infringes the '973 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices.  Google received actual notice of the '973 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

183.        Google provides at least Google Mobile Communication Devices with an operating system configured and installed by Google to support integrated notification message center functionality to others, such as resellers and end-use customers, in the United States who, in turn, use Google Mobile Communication Devices to infringe at least method claim 8 of the '973 Patent.  Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '973 patent.

184.        Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '973 Patent in the United States.  For example, Google provides instructions to resellers and end-use customers regarding the use and operation of Google Mobile Communication Devices in an infringing way.  Such instructions include at least "Google Nexus Help" (available at

https://support.google.com/nexus/#topic=3415518).    When  resellers  and  end-use customers follow such instructions, they directly infringe the '973 Patent.  Google knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '973 Patent.  Google thus knows that its actions induce the infringement.

185.    Google performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the '973 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

186.    Google indirectly infringes the '973 patent, by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices.  Google received actual notice of the '973 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

187.    Google Mobile Communication Devices include functionality that, inter alia, displays an integrated notification message center contained in a single list. The notification message center is designed to provide a user with a single list of notifications regardless of the types of messages (e.g., email, text, etc) on the user's Mobile Communication Device.  On information and belief, this functionality cannot operate in an acceptable manner absent the integrated notification message center, as it is included in every Google Mobile Communication Device.

McKool 969192v1

188.        A reasonable inference to be drawn from the facts set forth is that the integrated message center in Google Mobile Communication Devices is especially made or especially adapted to operate on a Google Mobile Communication Device as an integrated notification message center that provides a user with notifications concerning different types of messages on the user's Mobile Communication Device.

189.        A reasonable inference to be drawn from the facts set forth is that the integrated notification message center in the Mobile Communication Device is not a staple article or commodity of commerce and that the use of the integrated notification message center in Google Mobile Communication Devices is required for operation of Google Mobile Communication Devices.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

190.        Google Mobile Communication Devices with the integrated notification message center are each a material part of the invention of the '973 patent and are especially made for the infringing manufacture, sale, and use of Google Mobile Communication Devices.  Google Mobile Communication Devices, including the integrated notification message center, are especially made or adapted as an integrated notification message center that infringes the '973 patent.  Because the sales and manufacture of Google Mobile Communication Devices with an integrated notification message center infringes the '973 patent, Google's sales of its infringing products have no substantial non-infringing uses.

191.        Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented

process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Google provides to others Google Mobile Communication Devices with distinct and separate components, including software components, which have no substantial non-infringing uses.

192.     At least Google Mobile Communication Devices with an operating system configured and installed to support Message and Notification functionality infringe at least claim 1 of the '131 Patent.  Google makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes within the United States these devices and thus directly infringes at least claim 1 of the '131 Patent.

193.     Google indirectly infringes the '131 patent by inducing infringement by others, such as resellers, of at least claim 1 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices.  Google received actual notice of the '131 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

194.     Google's    affirmative    acts    of    selling    Google    Mobile Communication Devices, causing the Google Mobile Communication Devices to be manufactured, and providing instruction manuals for Google Mobile Communication Devices induced Google's manufacturers and resellers to make or use the Google Mobile

McKool 969192v1

Communication Devices in their normal and customary way to infringe the '131 patent. Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '131 patent; further, Google was aware that these normal and customary activities would infringe the '131 patent. Google performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

195.       Accordingly, a reasonable inference is that Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 patent in the United States because Google has knowledge of the '131 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Google Communication Devices for resale to others, such as resellers and end-use customers. Google knew or should have known that such actions would induce actual infringement.

196.       The use of at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Message and Notification functionality as intended by Google infringes at least method claim 5 of the '131 Patent. Google uses these products and thus directly infringes at least method claim 5 of the '131 Patent.

197.       In addition, Google provides at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Message functionality to others, such as resellers and end-use customers, in the

United States who, in turn, use these products to infringe at least method claim 5 of the '131 Patent.

198.    Google indirectly infringes the '131 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the Message and Notifications functionality.  Google received actual notice of the '131 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

199.    Google's affirmative acts of selling Google Mobile Communication Devices and providing instruction manuals induced the end-users of Google Mobile Communication Devices to use Google Mobile Communication Devices in their normal and customary way to infringe the '131 patent at least through using Message and Notifications functionality.  Google also provides instructions, including at least "Google Nexus Help" available on Google's website at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518, for using the Messaging and Notifications functionality.  Through its sales of Mobile Communication Devices with Messaging and Notifications functionality, Google specifically intended the end-users of Google Mobile Communication Devices to infringe the '131 patent; further, Google was aware that the normal and customary use of the Message and Notifications functionality would infringe the '131 patent.  Google also enticed its end-users to use the

Messaging and Notifications functionality by providing instruction manuals.  Google performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '131 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

200.        Accordingly, a reasonable inference is that Google actively induces infringement of the '131 Patent by others, such as resellers and end-use customers.  Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '131 Patent in the United States because Google had knowledge of the '131 Patent, and Google actually induces infringement by providing instructions to resellers and end-use customers regarding the use and operation of Google Mobile Communication Devices in an infringing way.  Such instructions include at least "Google Nexus Help" available at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518.        When resellers and end-use customers follow such instructions, they directly infringe the '131 Patent.  Google knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '131 Patent.  Google thus knows that its actions induce the infringement.

201.        Google indirectly infringes the '131 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the Messaging and Notification functionality.  Google received actual notice of the '131

McKool 969192v1

Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

202.     Google's Message and Notification functionality receives and displays message of different types, such as a phone call, voice mail, text message, or email.  The Message and Notification Services functionality is designed to notify the user of an incoming communication and to select the format of the message received and cannot function in a manner that does not utilize the messaging functionality available to Google Mobile Communication Devices.  Upon information and belief, the Message and Notifications functionality is designed to entice a user to receive notifications of an incoming communication.

203.     A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality is especially made or especially adapted to operate on Google Mobile Communication Devices for notifying a user of an incoming communication.

204.     A reasonable inference to be drawn from the facts set forth is that the Message and Notifications functionality is not a staple article or commodity of commerce and that the use of the Messaging and Notifications functionality of the Google Mobile Communication Devices is for notifying a user of an incoming communication.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

205.     Google Mobile Communication Devices with Messaging and Notifications functionality are each a material part of the '131 patent and especially made

for the infringing use of the Messaging and Notification functionality to receive and display messages.  Google Mobile Communication Devices including the Messaging and Notification functionality, are especially made or adapted to notify a user of an incoming communication that perform or facilitate performance of the steps that infringe the '131 patent.  Furthermore, Google provides user manuals describing the uses of its Mobile Communication Devices that infringe the '131 patent.  Because the functionality provided by Google's Messaging and Notification to notify a user of an incoming communication infringes the '131 patent, Google's sales of its infringing products have no substantial non-infringing uses.

206.     Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Google provides to others, Mobile Communication Devices with an operating system configured and installed by Google to support Message and Notification functionality.  Google installs and configures on these products distinct and separate components, including software components, which are used only to perform the infringing method claims.

207.     At least Google Mobile Communication Devices with an operating system configured and installed by Google to support VPN management functionality, including the Google Galaxy S III, infringe at least claims 1 and 8 of the '591 Patent.  Google makes, uses, sells, offers for sale, imports, exports, supplies and/or distributes

within the United States these devices and thus directly infringes at least claims 1 and 8 of the '591 Patent.

208.    The use of at least Google Mobile Communication Devices with an operating system configured and installed by Google to support VPN management functionality as specified and intended by Google infringes at least claims 1 and 8 of the '591 Patent.  Google uses these products and thus directly infringes at least claims 1 and 8 of the '591 Patent.

209.    Google indirectly infringes the '591 patent by inducing infringement by others, such as resellers, of at least claims 1 and 8 in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of the Google Mobile Communication Devices.  Google received actual notice of the '591 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

210.    Google's affirmative acts of selling Google Mobile Communication Devices, causing the Google Mobile Communication Devices to be manufactured, and providing instruction manuals for Google Mobile Communication Devices induced Google's manufacturers and resellers to make or use the Google Mobile Communication Devices in their normal and customary way to infringe the '591 patent. Through its manufacture and sales of Google Mobile Communication Devices, Google specifically intended its resellers and manufacturers to infringe the '591 patent; further, Google was aware that these normal and customary activities would infringe the '591

McKool 969192v1

patent.  Google performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

211.    Accordingly, a reasonable inference is that Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '591 patent in the United States because Google has knowledge of the '591 patent and actually induces others, such as resellers and end-use customers, to directly infringe, by using, selling, exporting, supplying and/or distributing within the United States, Google Communication Devices for resale to others, such as resellers and end-use customers.  Google knew or should have known that such actions would induce actual infringement.

212.    In addition, Google provides at least its Mobile Communication Devices with an operating system configured and installed by Google to support VPN management functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least claims 1 and 8 of the '591 Patent.

213.    Google indirectly infringes the '591 patent by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality.  Google received actual notice of the '591 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing

70

each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

214.        Google's affirmative acts of selling its Mobile Communication Devices and providing instruction manuals induced the end-users of Google Mobile Communication Devices to use Google Mobile Communication Devices in their normal and customary way to infringe the '591 patent at least through using VPN management functionality.  Google also provides instructions, including at least "Google Nexus Help" available              on              Google's              website              at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518, for using the VPN management functionality.  Through its sales of Google Mobile Communication Devices with VPN management functionality, Google specifically intended the end-users of Google Mobile Communication Devices to infringe the '591 patent; further, Google was aware that the normal and customary use of VPN management functionality would infringe the '591 patent.  Google also enticed its end-users to use the VPN management functionality by providing instruction manuals.  Google performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '591 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

215.        Accordingly, it is a reasonable inference that Google actively induces infringement of the '591 Patent by others, such as resellers and end-use customers.  Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '591 Patent in the United States because Google had knowledge of the '591 Patent, and Google actually induces

McKool 969192v1

infringement by providing instructions to resellers and end-use customers regarding the use and operation of Google's products in an infringing way. Such instructions include at least "Google Nexus Help" available on Google's website at https://support.google.com/nexus/?hl=en&topic=2765972#topic=3415518.        When resellers and end-use customers follow such instructions, they directly infringe the '591 Patent. Google knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '591 Patent. Google thus knows that its actions induce the infringement.

216.        Google indirectly infringes the '591 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States. Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the VPN management functionality. Google received actual notice of the '591 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint. Google's VPN management functionality facilitates management of VPNs. The VPN management functionality is designed for management of VPNs and cannot function in a manner that does not utilize the VPN management functionality available to Google Mobile Communication Devices. The VPN management functionality is designed upon information and belief to entice a user to manage VPNs.

217.          A reasonable inference to be drawn from the facts set forth is that the VPN functionality is especially made or especially adapted to operate on Google Mobile Communication Devices for providing VPN management functionality.

218.          A reasonable inference to be drawn from the facts set forth is that the VPN management functionality is not a staple article or commodity of commerce and that the use of the VPN management functionality of Google Mobile Communication Devices is for managing VPNs.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

219.          Google Mobile Communication Devices with VPN management functionality are each a material part of the invention of the '591 patent and especially made for the infringing use of the VPN functionality.  Google Mobile Communication Devices including the VPN management functionality, are especially made or adapted to provide VPN management functionality that perform or facilitate performance of the steps that infringe the '591 patent.  Furthermore, Google provides user manuals describing the uses of its Mobile Communication Devices that infringe the '591 patent. Because the functionality provided by Google's VPN management functionality infringes the '591 patent, Google's sales of its infringing Mobile Communication Devices have no substantial non-infringing uses.

220.          Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple

McKool 969192v1

article or commodity of commerce suitable for substantial non-infringing uses.  Google provides to others, Mobile Communication Devices with an operating system configured and installed by Google to support VPN management functionality.  Google installs and configures on these products distinct and separate components, including software components, which are used only to infringe the '591 Patent.

221.     The use of at least Google Mobile Communication Devices with an operating system configured and installed by Google to support Location Services functionality, as intended by Google infringes at least method claim 17 of the '572 Patent.  Google uses these Mobile Communication Devices and thus directly infringes at least method claim 17 of the '572 Patent.

222.     In addition, Google provides at least its Mobile Communication Devices with an operating system configured and installed by Google to support Location Services functionality to others, such as resellers and end-use customers, in the United States who, in turn, use these products to infringe at least method claim 17 of the '572 Patent.

223.     Google indirectly infringes by inducing infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(b) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the Location Services functionality.  Google received actual notice of the '572 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the

patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

224.    Google's affirmative acts of selling its Mobile Communication Devices and providing instruction manuals induced the end-users of Google Mobile Communication Devices to use Google Mobile Communication Devices in their normal and customary way to infringe the '572 patent at least through using Location Services functionality. Google also provides instructions, including at least "Google Nexus Help," available at https://support.google.com/nexus/topic/3416294?hl=en&ref_topic=3415468, for using the Location Services functionality. Through its sales of Google Mobile Communication Devices with Location Services functionality, Google specifically intended the end-users of Google Mobile Communication Devices to infringe the '572 patent; further, Google was aware that the normal and customary use of Location Services would infringe the '572 patent. Google also enticed its end-users to use the Location Services by providing instruction manuals. Google performed the acts that constituted induced infringement, and would induce actual infringement, with the knowledge of the '572 patent and with the knowledge or willful blindness that the induced acts would constitute infringement.

225.    Accordingly, a reasonable inference is that Google actively induces infringement of the '572 Patent by others, such as resellers and end-use customers. Google specifically intends for others, such as resellers and end-use customers, to directly infringe one or more claims of the '572 Patent in the United States because Google had knowledge of the '572 Patent, and Google actually induces infringement by providing instructions to resellers and end-use customers regarding the

McKool 969192v1

use and operation of Google's products in an infringing way.  Such instructions include at least "Google Nexus Help," available at https://support.google.com/nexus/topic/3416294?hl=en&ref_topic=3415468.  When resellers and end-use customers follow such instructions, they directly infringe the '572 Patent.  Google knows that by providing such instructions, resellers and end-use customers follow those instructions, and directly infringe the '572 Patent.  Google thus knows that its actions induce the infringement.

226.    Google indirectly infringes the '572 Patent by contributing to infringement by others, such as resellers and end-use customers, in accordance with 35 U.S.C. § 271(c) in this District and elsewhere in the United States.  Direct infringement is the result of activities performed by the manufacturers, resellers, and end-users of Google Mobile Communication Devices in their intended use, including a customer's use of the Locations Services functionality.  Google received actual notice of the '572 Patent at least by April 4, 2011, when it placed its initial bid for the Nortel patent portfolio containing each of the patents asserted herein, and further has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

227.    Google's Location Services functionality provides call trace information, i.e., a geographic location of Google Mobile Communication Devices.  The Location Services functionality is designed to notify the user of Google Mobile Communication Devices of call trace information, i.e., a geographic location of the Mobile Communication Devices, and cannot function in a manner that does not utilize the Location Services functionality available to the Mobile Communication Devices.

Upon information and belief, the Location Services functionality is designed to entice a user to access call trace information.

228.        A reasonable inference to be drawn from the facts set forth is that the Location Services functionality is especially made or especially adapted to operate on Google Mobile Communication Devices for obtaining call trace information, i.e., a geographic location of the Mobile Communication Devices.

229.        A reasonable inference to be drawn from the facts set forth is that the Location Services functionality is not a staple article or commodity of commerce and that the use of the Location Services functionality of Google Mobile Communication Devices is for providing call trace information.  Any other use would be unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.

230.        Google Mobile Communication Devices with Location Services functionality are each a material part of the '572 patent and especially made for the infringing use of the Location Services functionality to receive call trace information, i.e., a geographic location of the Mobile Communication Devices.   The Mobile Communication Devices including the Location Services functionality are especially made or adapted to provide call trace information that perform or facilitate performance of the steps that infringe the '572 patent.  Furthermore, Google provides user manuals describing the uses of its products that infringe the '572 patent.  Because the functionality provided by Google's Location Services to obtain call trace information, i.e., a geographic location of the Mobile Communication Devices, infringes the '572 patent, Google's sales of its infringing products have no substantial non-infringing uses.

McKool 969192v1

231.    Accordingly, a reasonable inference is that Google offers to sell, or sells within the United States a component of a patented machine, manufacture, combination, or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses.  Google provides to others Mobile Communication Devices with an operating system configured and installed by Google to support Location Services functionality.  Google installs and configures on these products distinct and separate components, including software components, which are used only to perform the infringing method claims.

232.    Google's acts of infringement have caused damage to Rockstar and MobileStar.  Rockstar and MobileStar are entitled to recover from Google the damages sustained by Rockstar and MobileStar as a result of Google's wrongful acts in an amount subject to proof at trial.  In addition, the infringing acts and practices of Google have caused, are causing, and, unless such acts and practices are enjoined by the Court, will continue to cause immediate and irreparable harm to Rockstar and MobileStar for which there is no adequate remedy at law, and for which Rockstar and MobileStar are entitled to injunctive relief under 35 U.S.C. § 283.

233.    Google received actual notice of its infringement of the '551, '937, '298, '973, '131, '591 and '572 Patents through at its April 4, 2011 bid for the  Nortel patent portfolio.  Google also has knowledge of its infringement of the Patents-in-Suit by way of this Complaint.

McKool 969192v1

234.        Google has willfully infringed and/or does willfully infringe the '551, '937, '298, '973, '131, '591 and '572 Patents.

## DEMAND FOR JURY TRIAL

Rockstar and MobileStar hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Rockstar prays for the following relief:

1.        A judgment that Samsung has directly infringed the '551 Patent, contributorily infringed the '551 Patent, and/or induced the infringement of the '551 Patent;

2.        A judgment that Samsung has directly infringed the '937 Patent, contributorily infringed the '937 Patent, and/or induced the infringement of the '937 Patent;

3.        A judgment that Samsung has directly infringed the '298 Patent, contributorily infringed the '298 Patent, and/or induced the infringement of the '298 Patent;

4.        A judgment that Samsung has directly infringed the '973 Patent, contributorily infringed the '973 Patent, and/or induced the infringement of the '973 Patent;

5.        A judgment that Samsung has directly infringed the '131 Patent, contributorily infringed the '131 Patent, and/or induced the infringement of the '131 Patent;

McKool 969192v1

6.     A judgment that Samsung has directly infringed the '591 Patent, contributorily infringed the '591 Patent, and/or induced the infringement of the '591 Patent;

7.     A judgment that Samsung has directly infringed the '572 Patent, contributorily infringed the '572 Patent, and/or induced the infringement of the '572 Patent;

8.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '551 Patent;

9.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '937 Patent;

10.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '298 Patent;

11.     A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '973 Patent;

12.    A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '131 Patent;

13.    A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '591 Patent;

14.    A permanent injunction preventing Samsung and its respective officers, directors, agents, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from directly infringing, contributorily infringing, and/or inducing the infringement of the '572 Patent;

15.    A judgment that Samsung's infringement of the '551, '937, '298, '973, '131, '591 and '572 Patents has been willful;

16.    A ruling that this case be found to be exceptional under 35 U.S.C. § 285, and a judgment awarding Rockstar and MobileStar to their attorneys' fees incurred in prosecuting this action;

17.    A judgment and order requiring Samsung to pay Rockstar and MobileStar damages under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed, and treble damages for willful infringement as provided by 35 U.S.C. § 284;

18.    A judgment and order requiring Samsung to pay Rockstar and MobileStar the costs of this action (including all disbursements);

81

19.     A judgment and order requiring Samsung to pay Rockstar and MobileStar pre-judgment and post-judgment interest on the damages awarded;

20.     A judgment and order requiring that in the event a permanent injunction preventing future acts of infringement is not granted, that Rockstar and MobileStar be awarded a compulsory ongoing licensing fee against Samsung;

21.     A judgment that Google has directly infringed the '551 Patent, contributorily infringed the '551 Patent, and/or induced the infringement of the '551 Patent;

22.     A judgment that Google has directly infringed the '937 Patent, contributorily infringed the '937 Patent, and/or induced the infringement of the '937 Patent;

23.     A judgment that Google has directly infringed the '298 Patent, contributorily infringed the '298 Patent, and/or induced the infringement of the '298 Patent;

24.     A judgment that Google has directly infringed the '973 Patent, contributorily infringed the '973 Patent, and/or induced the infringement of the '973 Patent;

25.     A judgment that Google has directly infringed the '131 Patent, contributorily infringed the '131 Patent, and/or induced the infringement of the '131 Patent;

26.     A judgment that Google has directly infringed the '591 Patent, contributorily infringed the '591 Patent, and/or induced the infringement of the '591 Patent;

McKool 969192v1

27.    A judgment that Google has directly infringed the '572 Patent, contributorily infringed the '572 Patent, and/or induced the infringement of the '572 Patent;

28.    A judgment that Google's infringement of the '551, '937, '298, '973, '131, '591 and '572 Patents has been willful;

29.    A ruling that this case be found to be exceptional under 35 U.S.C. § 285, and a judgment awarding Rockstar and MobileStar to their attorneys' fees incurred in prosecuting this action;

30.    A judgment and order requiring Google to pay Rockstar and MobileStar damages under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed, and treble damages for willful infringement as provided by 35 U.S.C. § 284;

31.    A judgment and order requiring Google to pay Rockstar and MobileStar the costs of this action (including all disbursements);

32.    A judgment and order requiring Google to pay Rockstar and MobileStar pre-judgment and post-judgment interest on the damages awarded;

33.    A judgment and order requiring that Rockstar and MobileStar be awarded a compulsory ongoing licensing fee as to Google; and

34.    Such other and further relief as the Court may deem just and proper.

McKool 969192v1

DATED:  March 10, 2014.

Respectfully submitted,
**MCKOOL SMITH, P.C.**

*/s/ Theodore Stevenson, III*
Mike McKool, Jr.
Texas Bar No. 13732100
mmckool@mckoolsmith.com
Douglas A. Cawley
Texas Bar No. 0403550
dcawley@mckoolsmith.com
Theodore Stevenson, III
Lead Attorney
Texas State Bar No. 19196650
tstevenson@mckoolsmith.com
David Sochia
Texas State Bar No. 00797470
dsochia@mckoolsmith.com
**MCKOOL SMITH P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Joshua W. Budwin
Texas State Bar No. 24050347
jbudwin@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

**ATTORNEYS FOR PLAINTIFFS
ROCKSTAR CONSORTIUM US LP and
MOBILESTAR TECHNOLOGIES LLC**

84

**CERTIFICATE OF SERVICE**

This is to certify that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per L.R. CV-5(a)(3) on March 10, 2014.  Any other counsel of record will be served via first-class mail.

/s/ Josh Budwin
Joshua W. Budwin

McKool 969192v1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| **ROCKSTAR CONSORTIUM US LP, AND MOBILESTAR TECHNOLOGIES LLC**<br><br>**PLAINTIFFS**<br><br>v.<br><br>**SAMSUNG ELECTRONICS CO., LTD, SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, AND GOOGLE INC.**<br><br>**DEFENDANTS.** | **Civil Action No. 2:13-cv-00900-JRG**<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANTS SAMSUNG ELECTRONICS CO., LTD, SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO SECOND AMENDED COMPLAINT**

Defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc.

("SEA"), and Samsung Telecommunications America, LLC ("STA") (collectively, the

"Samsung Defendants") hereby submit this Answer and Affirmative Defenses in response to

Rockstar Consortium US LP and Mobilestar Technologies LLC's Second Amended Complaint

("Complaint").  The Samsung Defendants state as follows:

**PARTIES**

1.    The Samsung Defendants admit that Rockstar Consortium US LP is a limited

liability partnership organized and existing under the laws of Delaware.  Rockstar Consortium

US LP's principal place of business is in Ottawa, Canada.  Except as expressly admitted, the

Samsung Defendants deny the remaining allegations of paragraph 1.

2.      The Samsung Defendants admit that MobileStar Technologies LLC is a limited liability corporation organized and existing under the laws of Delaware.  MobileStar Technologies LLC's principal place of business is in Ottawa, Canada.  Except as expressly admitted, the Samsung Defendants deny the remaining allegations of paragraph 2.

3.      The Samsung Defendants admit that SEC is a Korean corporation whose principal offices are at the location specified in paragraph 3 of the Complaint.

4.      The Samsung Defendants admit that SEA is a New York corporation and is a subsidiary of SEC.  The Samsung Defendants admit that SEA's principal offices are located at 85 Challenger Road, Ridgefield Park, NJ, 07660.

5.      The Samsung Defendants admit that STA is wholly owned subsidiary of SEA. The Samsung Defendants admit that STA is a Delaware limited liability company with its principal place of business at 1301 East Lookout Drive, Richardson, Texas 75082.

6.      The allegations of paragraph 6 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 6, and therefore deny them.

## BACKGROUND FACTS

7.      The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7, and therefore deny them.

8.      The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 8, and therefore deny them.

9.      The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9, and therefore deny them.

10.     The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 10, and therefore deny them.

11.     The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11, and therefore deny them.

12.     The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 12, and therefore deny them.

13.     The Samsung Defendants admit that Samsung manufactures the Nexus 10 and Galaxy Nexus.  The Samsung Defendants admit that the Nexus 5, Nexus 7, Nexus 10, and Galaxy Nexus are devices.  Except as expressly admitted, the Samsung Defendants deny the remaining allegations of paragraph 13.

## JURISDICTION AND VENUE

14.     The Samsung Defendants admit that the Complaint purports to allege claims for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 271.  The Samsung Defendants admit that the Complaint purports to allege claims over which this Court has subject matter jurisdiction under 28 U.S.C. § 1338.  Except as expressly admitted, the Samsung Defendants deny the remaining allegations of paragraph 14 of the Complaint.

15.     The Samsung Defendants deny the allegations of paragraph 15 of the Complaint.

16.     For purposes of this action only, the Samsung Defendants will not challenge personal jurisdiction and admits to conducting business in Texas.  Except as expressly admitted, the Samsung Defendants deny the remaining allegations of paragraph 16 of the Complaint.

17.     The allegations of paragraph 17 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 17, and therefore deny them.

## ASSERTED PATENTS

18.    The Samsung Defendants admit that U.S. Patent No. 5,838,551 (the "'551

patent") is entitled "Electronic Package Carrying an Electronic Component and Assembly of

Mother Board and Electronic Package."  The Samsung Defendants admit that, on its face, the

'551 patent was issued on November 17, 1998.  The Samsung Defendants admit that, on its face,

the '551 patent lists Yee-Ning Chan as inventor.  The Samsung Defendants deny that the '551

patent was duly and legally issued and further deny that the claims of the '551 patent are valid.

The Samsung Defendants are without knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of paragraph 18, and therefore deny them.

19.    The Samsung Defendants admit that U.S. Patent No. 6,037,937 (the "'937

patent") is entitled "Navigation Tool for Graphical User Interface."  The Samsung Defendants

admit that, on its face, the '937 patent was issued on March 14, 2000.  The Samsung Defendants

admit that, on its face, the '937 patent lists Brian Finlay Beaton, Colin Donald Smith, and Bruce

Dale Stalkie as inventors.  The Samsung Defendants deny that the '937 patent was duly and

legally issued and further deny that the claims of the '937 patent are valid.   The Samsung

Defendants are without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of paragraph 19, and therefore deny them.

20.    The Samsung Defendants admit that U.S. Patent No. 6,128,298 (the "'298

patent") is entitled "Internet Protocol Filter."  The Samsung Defendants admit that, on its face,

the '298 patent was issued on October 3, 2000.  The Samsung Defendants admit that, on its face,

the '298 patent lists Bruce Anthony Wootton and William G. Colvin as inventors.  The Samsung

Defendants deny that the '298 patent was duly and legally issued and further deny that the claims

of the '298 patent are valid.   The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of paragraph 20, and therefore deny them.

21.     The Samsung Defendants admit that U.S. Patent No. 6,333,973 (the "'973 patent") is entitled "Integrated Message Center." The Samsung Defendants admit that, on its face, the '973 patent was issued on December 25, 2001. The Samsung Defendants admit that, on its face, the '973 patent lists Colin Donald Smith and Brian Finlay Beaton as inventors. The Samsung Defendants deny that the '973 patent was duly and legally issued and further deny that the claims of the '973 patent are valid. The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 21, and therefore deny them.

22.     The Samsung Defendants admit that U.S. Patent No. 6,463,131 (the "'131 patent") is entitled "System and Method for Notifying a User of an Incoming Communication Event." The Samsung Defendants admit that, on its face, the '131 patent was issued on October 8, 2002. The Samsung Defendants admit that, on its face, the '131 patent lists Marilyn French-St. George, Mitch A. Brisebois and Laura A. Mahan as inventors. The Samsung Defendants deny that the '131 patent was duly and legally issued and further deny that the claims of the '131 patent are valid. The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 22, and therefore deny them.

23.     The Samsung Defendants admit that U.S. Patent No. 6,765,591 (the "'591 patent") is entitled "Managing a Virtual Private Network." The Samsung Defendants admit that, on its face, the '591 patent was issued on July 20, 2004. The Samsung Defendants admit that, on its face, the '591 patent lists Matthew W. Poisson, Melissa L. Desroches, and James M. Milillo

as inventors.  The Samsung Defendants deny that the '591 patent was duly and legally issued and further deny that the claims of the '591 patent are valid.    The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 23, and therefore deny them.

24.      The Samsung Defendants admit that U.S. Patent No. 6,937,572 (the "'572 patent") is entitled "Call Trace on a Packet Switched Network."  The Samsung Defendants admit that, on its face, the '572 patent was issued on August 30, 2005.  The Samsung Defendants admit that, on its face, the '572 patent lists Brian B. Egan and Milos Vodsedalek as inventors.  The Samsung Defendants deny that the '572 patent was duly and legally issued and further deny that the claims of the '572 patent are valid.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 24, and therefore deny them.

## GENERAL ALLEGATIONS

25.      Denied.

26.      For purposes of this action only, the Samsung Defendants admit to doing business in the United States and in the District.  The Samsung Defendants further admit to having sold phones that include the Galaxy S III and Captivate (Galaxy S), as well as tablets that include the Galaxy Tab 8.9.  Except as expressly admitted, the Samsung Defendants deny the remaining allegations of paragraph 26 of the Complaint.

27.      The allegations of paragraph 27 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 27, and therefore deny them.

28.    The allegations of paragraph 28 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 28, and therefore deny them.

29.    The Samsung Defendants admit that SEC makes and sells certain devices having Android software to Google Inc., including mobile phones under the trade name Galaxy Nexus. Except as expressly admitted, the Samsung Defendants deny the remaining allegations of paragraph 29 of the Complaint.

30.    The Samsung Defendants admit that SEC makes and sells certain devices having Android software to Google Inc., including mobile phones under the trade name Galaxy Nexus.  Except as expressly admitted, the Samsung Defendants deny the remaining allegations of paragraph 30 of the Complaint.

31.    The allegations of paragraph 31 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 31, and therefore deny them.

32.    The allegations of paragraph 32 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 32, and therefore deny them.

**COUNT ONE**

**PATENT INFRINGEMENT BY SAMSUNG**

33.     The Samsung Defendants repeat and incorporate the admissions and denials of paragraphs 1 through 32 above as if fully set forth herein.  Except as expressly admitted, the Samsung Defendants deny the remaining allegations of paragraph 33 of the Complaint.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     Denied.

56.     Denied.

57.     Denied.

58.     Denied.

59.     Denied.

60.     Denied.

61.     Denied.

62.     Denied.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Denied.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied.

79.     Denied.

80.     Denied.

81.     Denied.

82.     Denied.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied.

88.     Denied.

89.     Denied.

90.     Denied.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied.

104.    Denied.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

109.    Denied.

110.    Denied.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.    Denied.

116.    Denied.

117.    Denied.

118.    Denied.

119.    Denied.

120.    Denied.

121.    Denied.

122.    Denied.

123.    Denied.

124.    Denied.

125.    Denied.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Denied.

130.    Denied.

131.    Denied.

132.    Denied.

133.    Denied.

134.    Denied.

## COUNT TWO

## PATENT INFRINGEMENT BY GOOGLE

135.    The Samsung Defendants repeat and incorporate the admissions and denials of paragraphs 1 through 134 above as if fully set forth herein.  Except as expressly admitted, the Samsung Defendants deny the remaining allegations of paragraph 135 of the Complaint.

136.    The allegations of paragraph 136 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 136, and therefore deny them.

137.    The allegations of paragraph 137 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 137, and therefore deny them.

138.    The allegations of paragraph 138 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 138, and therefore deny them.

139.    The allegations of paragraph 139 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 139, and therefore deny them.

140.    The allegations of paragraph 140 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 140, and therefore deny them.

141.    The allegations of paragraph 141 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 141, and therefore deny them.

142.    The allegations of paragraph 142 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 142, and therefore deny them.

143.    The allegations of paragraph 143 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 143, and therefore deny them.

144.    The allegations of paragraph 144 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 144, and therefore deny them.

145.    The allegations of paragraph 145 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 145, and therefore deny them.

146.    The allegations of paragraph 146 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 146, and therefore deny them.

147.    The allegations of paragraph 147 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 147, and therefore deny them.

148.    The allegations of paragraph 148 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 148, and therefore deny them.

149.    The allegations of paragraph 149 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 149, and therefore deny them.

150.    The allegations of paragraph 150 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 150, and therefore deny them.

151.    The allegations of paragraph 151 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 151, and therefore deny them.

152.    The allegations of paragraph 152 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 152, and therefore deny them.

153.    The allegations of paragraph 153 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 153, and therefore deny them.

154.    The allegations of paragraph 154 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 154, and therefore deny them.

155.    The allegations of paragraph 155 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 155, and therefore deny them.

156.    The allegations of paragraph 156 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 156, and therefore deny them.

157.    The allegations of paragraph 157 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 157, and therefore deny them.

158.    The allegations of paragraph 158 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 158, and therefore deny them.

159.    The allegations of paragraph 159 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 159, and therefore deny them.

160.    The allegations of paragraph 160 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 160, and therefore deny them.

161.    The allegations of paragraph 161 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 161, and therefore deny them.

162.    The allegations of paragraph 162 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 162, and therefore deny them.

163.    The allegations of paragraph 163 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 163, and therefore deny them.

164.    The allegations of paragraph 164 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 164, and therefore deny them.

165.    The allegations of paragraph 165 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 165, and therefore deny them.

166.    The allegations of paragraph 166 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 166, and therefore deny them.

167.    The allegations of paragraph 167 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 167, and therefore deny them.

168.    The allegations of paragraph 168 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 168, and therefore deny them.

169.    The allegations of paragraph 169 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 169, and therefore deny them.

170.    The allegations of paragraph 170 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 170, and therefore deny them.

171.    The allegations of paragraph 171 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 171, and therefore deny them.

172.    The allegations of paragraph 172 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 172, and therefore deny them.

173.    The allegations of paragraph 173 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 173, and therefore deny them.

174.    The allegations of paragraph 174 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 174, and therefore deny them.

175.    The allegations of paragraph 175 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 175, and therefore deny them.

176.    The allegations of paragraph 176 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 176, and therefore deny them.

177.    The allegations of paragraph 177 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 177, and therefore deny them.

178.    The allegations of paragraph 178 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 178, and therefore deny them.

179.    The allegations of paragraph 179 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 179, and therefore deny them.

180.    The allegations of paragraph 180 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 180, and therefore deny them.

181.    The allegations of paragraph 181 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 181, and therefore deny them.

182.    The allegations of paragraph 182 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 182, and therefore deny them.

183.    The allegations of paragraph 183 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 183, and therefore deny them.

184.    The allegations of paragraph 184 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 184, and therefore deny them.

185.    The allegations of paragraph 185 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 185, and therefore deny them.

186.    The allegations of paragraph 186 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 186, and therefore deny them.

187.    The allegations of paragraph 187 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 187, and therefore deny them.

188.    The allegations of paragraph 188 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 188, and therefore deny them.

189.    The allegations of paragraph 189 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 189, and therefore deny them.

190.    The allegations of paragraph 190 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 190, and therefore deny them.

191.    The allegations of paragraph 191 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 191, and therefore deny them.

192.    The allegations of paragraph 192 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 192, and therefore deny them.

193.    The allegations of paragraph 193 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 193, and therefore deny them.

194.    The allegations of paragraph 194 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 194, and therefore deny them.

195.    The allegations of paragraph 195 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 195, and therefore deny them.

196.    The allegations of paragraph 196 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 196, and therefore deny them.

197.    The allegations of paragraph 197 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 197, and therefore deny them.

198.     The allegations of paragraph 198 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 198, and therefore deny them.

199.     The allegations of paragraph 199 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 199, and therefore deny them.

200.     The allegations of paragraph 200 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 200, and therefore deny them.

201.     The allegations of paragraph 201 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 201, and therefore deny them.

202.     The allegations of paragraph 202 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 202, and therefore deny them.

203.     The allegations of paragraph 203 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 203, and therefore deny them.

204.    The allegations of paragraph 204 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 204, and therefore deny them.

205.    The allegations of paragraph 205 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 205, and therefore deny them.

206.    The allegations of paragraph 206 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 206, and therefore deny them.

207.    The allegations of paragraph 207 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 207, and therefore deny them.

208.    The allegations of paragraph 208 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 208, and therefore deny them.

209.    The allegations of paragraph 209 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 209, and therefore deny them.

210.    The allegations of paragraph 210 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 210, and therefore deny them.

211.    The allegations of paragraph 211 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 211, and therefore deny them.

212.    The allegations of paragraph 212 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 212, and therefore deny them.

213.    The allegations of paragraph 213 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 213, and therefore deny them.

214.    The allegations of paragraph 214 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 214, and therefore deny them.

215.    The allegations of paragraph 215 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 215, and therefore deny them.

216.    The allegations of paragraph 216 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 216, and therefore deny them.

217.    The allegations of paragraph 217 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 217, and therefore deny them.

218.    The allegations of paragraph 218 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 218, and therefore deny them.

219.    The allegations of paragraph 219 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 219, and therefore deny them.

220.   The allegations of paragraph 220 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 220, and therefore deny them.

221.   The allegations of paragraph 221 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 221, and therefore deny them.

222.   The allegations of paragraph 222 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 222, and therefore deny them.

223.   The allegations of paragraph 223 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 223, and therefore deny them.

224.   The allegations of paragraph 224 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 224, and therefore deny them.

225.   The allegations of paragraph 225 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information

sufficient to form a belief as to the truth of the allegations of paragraph 225, and therefore deny them.

226.    The allegations of paragraph 226 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 226, and therefore deny them.

227.    The allegations of paragraph 227 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 227, and therefore deny them.

228.    The allegations of paragraph 228 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 228, and therefore deny them.

229.    The allegations of paragraph 229 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 229, and therefore deny them.

230.    The allegations of paragraph 230 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 230, and therefore deny them.

231.    The allegations of paragraph 231 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 231, and therefore deny them.

232.    The allegations of paragraph 232 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 232, and therefore deny them.

233.    The allegations of paragraph 233 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 233, and therefore deny them.

234.    The allegations of paragraph 234 are not directed to the Samsung Defendants, and therefore no answer is required.  The Samsung Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 234, and therefore deny them.

## DEMAND FOR JURY TRIAL

No response is required for Plaintiffs' demand for a jury trial.

## <u>ROCKSTAR'S PRAYER FOR RELIEF</u>

The Samsung Defendants deny that Plaintiffs are entitled to the judgment sought, set forth in paragraphs 1-34 on pages 79-83 of the Complaint.

## AFFIRMATIVE DEFENSES

235.     By alleging the Affirmative Defenses set forth below, the Samsung Defendants do not agree or concede that they bear the burden of proof or the burden of persuasion on any of these issues, whether in whole or in part.  For their Affirmative Defenses to the Complaint, the Samsung Defendants allege as follows:

### FIRST AFFIRMATIVE DEFENSE

(Non-Infringement)

236.     The Samsung Defendants does not and has not infringed directly, indirectly, literally, or under the doctrine of equivalents, any valid and enforceable claim of the '551, '937, '298, '973, '131, '591, or '572 patents.

### SECOND AFFIRMATIVE DEFENSE

(Invalidity)

237.     One or more of the claims of the '551, '937, '298, '973, '131, '591, or '572 patents are invalid, unenforceable, and/or void due to failure to meet the requirements of the United States patent laws,  35 U.S.C. §§ 100 et seq., including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, and for double patenting.

### THIRD AFFIRMATIVE DEFENSE

(Limitation on Patent Damages)

238.     Plaintiffs' claim for damages, if any, against the Samsung Defendants for alleged infringement of the Patents-in-Suit is limited by 35 U.S.C. §§ 286, 287, and/or 288.

### FOURTH AFFIRMATIVE DEFENSE

(Prosecution History Estoppel)

239.     By reason of statements, representations, concessions, admissions, arguments, and/or amendments, whether explicit or implicit, made by or on behalf of the applicants during

the prosecution of the patent applications that led to the issuance of the Patents-in-Suit,

Plaintiffs' claims of patent infringement are barred in whole or in part by the doctrine of

prosecution history estoppel.

## FIFTH AFFIRMATIVE DEFENSE

### (Estoppel)

240.    On information and belief, Plaintiffs' claims are barred, in whole or in part, by the

doctrine of laches, estoppel, disclaimer, patent misuse, and/or waiver.

## SIXTH AFFIRMATIVE DEFENSE

### (License and/or Patent Exhaustion)

241.    To the extent that any of the Samsung Defendants' suppliers have a license

(express or implied), Plaintiffs' claims for relief are barred or exhausted.

## SEVENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

242.    Plaintiffs' claims against the Samsung Defendants are barred under the doctrine

of unclean hands.

## ADDITIONAL DEFENSES

243.    The Samsung Defendants reserve the right to assert additional defenses based on

information learned or obtained during discovery.

## DEMAND FOR JURY TRIAL

244.    Pursuant to Rule 38(b) of the Federal Rule of Civil Procedure, the Samsung

Defendants hereby demand a trial by jury as to all issues so triable.

## COUNTERCLAIMS

1.      SEC, SEA and STA (collectively, the "Samsung Counterclaimants"), by and through their undersigned counsel, also seek declarations the '551, '937, '298, '973, '131, '591, and '572 patents (the "patents-in-suit") are invalid and have not been and are not infringed by them.

## THE PARTIES

2.      Counterclaimant SEC is a corporation organized under the laws of Korea, with its principal place of business at 416 Maetan-3dong, Yeongtong-gu, Suwon-City, Gyeonggi-do, Korea 443-742.

3.      Counterclaimant SEA is a New York corporation, with its principal place of business at 85 Challenger Road, Ridgefield Park, NJ, 07660.

4.      Counterclaimant STA is a limited liability company organized under the laws of Delaware, with its principal place of business at 1301 East Lookout Drive, Richardson, Texas 75082.

5.      According to the allegations in the Complaint, Rockstar Consortium US LP ("Rockstar") is a limited liability partnership organized and existing under the laws of the State of Delaware, and maintains its principal place of business at Legacy Town Center 1, 7160 North Dallas Parkway Suite No. 250, Plano, TX 75024.

6.      According to the allegations in the Complaint, MobileStar Technologies LLC ("MobileStar") is a subsidiary of Rockstar and is a limited liability corporation organized and existing under the laws of Delaware, and maintains its principal place of business at Legacy Town Center 1, 7160 North Dallas Parkway Suite No. 250, Plano, TX 75024.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over these Counterclaims pursuant to, without

limitation, 28 U.S.C. §§ 1331, 1337, 1338(a), 2201, and 2202.

8.      Rockstar and MobileStar have consented to jurisdiction and venue in this District

by filing its Complaint against the Samsung Counterclaimants in this Court.

9.      To the extent venue is deemed proper in this judicial district for the resolution of

Rockstar and MobileStar's claims, venue is proper with respect to the Samsung

Counterclaimants' Counterclaims pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## FACTUAL BACKGROUND

10.     In the Complaint, Rockstar and MobileStar assert that the Samsung

Counterclaimants have infringed the patents-in-suit.  The Samsung Counterclaimants deny

Rockstar and MobileStar's allegations of infringement, whether direct or indirect, literal or by

doctrine of equivalents, and further deny that any of the claims of the patents-in-suit are valid.

11.     Consequently, there is an actual case or controversy between the parties over the

non-infringement, invalidity and unenforceability of the patents-in-suit.

## COUNT ONE

## DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF PATENTS-IN-SUIT

12.     The Samsung Counterclaimants restate and reincorporate by reference their

allegations in paragraphs 1 through 11 of their Counterclaims.

13.     An actual case or controversy exists between the Samsung Counterclaimants and

Rockstar and MobileStar as to whether the patents-in-suit are not infringed by the Samsung

Counterclaimants.

14.     The Samsung Counterclaimants seek a judicial declaration finding that the Samsung Counterclaimants have not infringed and do not infringe, directly or indirectly, literally or by doctrine of equivalents, any valid and enforceable claim of the patents-in-suit.

## COUNT TWO

## DECLARATORY JUDGMENT OF INVALIDITY OF PATENTS-IN-SUIT

15.     The Samsung Counterclaimants restate and reincorporate by reference their allegations in paragraphs 1 through 14 of their Counterclaims.

16.     An actual case or controversy exists between the Samsung Counterclaimants and Rockstar and MobileStar as to whether the patents-in-suit invalid.

17.     The Samsung Counterclaimants seek a judicial declaration finding that the patents-in-suit are invalid for failure to meet the conditions of patentability and/or otherwise comply with the requirements of Title 35, including without limitation §§ 101, 102, 103, 112, 116 and 132 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, the Samsung Counterclaimants request that the Court enter judgment in their favor and against Rockstar and MobileStar as follows:

a.     Denying all relief that Rockstar and MobileStar seek in their Complaint;

b.     Dismissing Rockstar and MobileStar's Complaint against the Samsung Counterclaimants with prejudice;

c.     Declaring that the Samsung Counterclaimants have not infringed, contributed to the infringement of, or induced others to infringe, either directly or indirectly, the patents-in-suit;

d.     Declaring that the claims of the patents-in-suit are invalid;

e.     Enjoining Rockstar and Mobilestar, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual

notice by personal service or otherwise, from asserting or threatening to assert against the

Samsung Counterclaimants, or against any customers or potential customers of the Samsung

Counterclaimants, or against any users or potential users of the Samsung Counterclaimants

products and services, any charge of infringement of any claim of the patents-in-suit;

      f.     Finding this case to be exceptional under 35 U.S.C. § 285 and awarding the

Samsung Counterclaimants their attorneys' fees and costs;

      g.     Awarding any other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Rule 38 of the Federal Rules of Civil Procedure, the Samsung

Counterclaimants request a jury trial of all issues that may be tried to a jury.

Dated:  July 21, 2014                     Respectfully submitted,

                                          /s/  *J. Mark Mann* (with permission)
                                          J. Mark Mann (State Bar No. 12926150)
                                          mark@themannfirm.com
                                          G. Blake Thompson (State Bar No. 24042033)
                                          blake@themannfirm.com
                                          MANN | TINDEL | THOMPSON
                                          300 West Main Street
                                          Henderson, Texas  75652
                                          (903) 657-8540
                                          (903) 657-6003 facsimile

                                          Charles K. Verhoeven (Cal. Bar. No. 170151)
                                          Sean Pak (Cal. Bar No. 219032)
                                          quinn-samsung-e.d.tex.-13-0900
                                              @quinnemanuel.com
                                          QUINN EMANUEL URQUHART
                                              & SULLIVAN, LLP
                                          50 California Street, 22nd Floor
                                          San Francisco, California  94111
                                          (415) 875-6600
                                          (415) 875-6700 facsimile

                                          Kevin P.B. Johnson (Cal. Bar No. 177129)
                                          QUINN EMANUEL URQUHART
                                              & SULLIVAN, LLP
                                          555 Twin Dolphin Dr., 5th Floor
                                          Redwood Shores, California  94065
                                          (650) 801-5000
                                          (650) 801-5100 facsimile

                                          Joseph Milowic III (NY Bar. No. 4622221)
                                          QUINN EMANUEL URQUHART
                                              & SULLIVAN, LLP
                                          51 Madison Avenue, 22nd Floor
                                          New York, New York  10010
                                          (212) 849-7000
                                          (212) 849-7100 facsimile

                                          *Attorneys for Defendants Samsung Electronics,*
                                          *Co., Ltd., Samsung Electronics America, Inc., and*
                                          *Samsung Telecommunications America, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2014, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, Marshall Division, using the electronic case filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ J. Mark Mann*
J. Mark Mann

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ROCKSTAR CONSORTIUM US LP AND MOBILESTAR TECHNOLOGIES, LLC | § § § | Civil Action No. 13-cv-0894-JRG LEAD CASE |
| Plaintiffs, | § § | **JURY TRIAL DEMANDED** |
| v. | § § | |
| ASUSTEK COMPUTER, INC. AND ASUS COMPUTER INTERNATIONAL, INC. | § § § | |
| Defendants. | § § | |
| | § | |
| ROCKSTAR CONSORTIUM US LP AND MOBILESTAR TECHNOLOGIES, LLC | § § § | Civil Action No. 13-cv-0900-JRG CONSOLIDATED CASE |
| Plaintiffs, | § § | **JURY TRIAL DEMANDED** |
| v. | § § | |
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, GOOGLE INC., | § § § § § § | |
| Defendants. | § § § | |

## ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT GOOGLE INC. TO CLAIMS FOR PATENT INFRINGEMENT OF ROCKSTAR CONSORTIUM US LP AND MOBILESTAR TECHNOLOGIES LLC

Defendant Google Inc. ("Google") hereby submits this Answer and Affirmative Defenses in response to Rockstar Consortium US LP and MobileStar Technologies, LLC's Second Amended Complaint ("Complaint").  Google states as follows:

## PARTIES

1.      Google admits that Rockstar Consortium US LP is a limited partnership organized and existing under the laws of Delaware.  Rockstar Consortium US LP's principal place of business is in Ottawa, Canada.  Google therefore denies the remaining allegations of this paragraph.

2.      Google admits that MobileStar Technologies LLC is a limited liability corporation organized and existing under the laws of Delaware.  MobileStar Technologies LLC's principal place of business is in Ottawa, Canada.  Google therefore denies the remaining allegations of this paragraph.

3.      The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies them.

4.      The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

5.      The allegations of this paragraph  are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

6.      Google's correct name is "Google Inc."  Google otherwise admits the allegations of this paragraph.

## BACKGROUND FACTS

7.      Google admits that after a number of entities filed for bankruptcy protection under the laws of Canada and the United States, the United States Bankruptcy Court for the District of

1

Delaware approved procedures for an auction of a patent portfolio of more than 6,000 patents.  *In re Nortel Networks Inc., et al.*, Case No. 09-10138, Docket No. 5935 (July 11, 2011).  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies them.

8.      Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware, and placed bids in that auction.  Google denies the remaining allegations of this paragraph.

9.      Google admits that, on April 4, 2011, one of its subsidiaries offered to purchase a portfolio of more than 6,000 patents under the supervision of the United States Bankruptcy Court for the District of Delaware.  Google denies the remaining allegations of this paragraph.

10.      Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware, and placed bids in that auction.  Google denies the remaining allegations of this paragraph, and specifically denies that it was put on notice, or otherwise aware, of any alleged infringement of the patents Rockstar has asserted in this action.

11.      Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware, and placed a bid of $900,000,000 to purchase a portfolio of more than 6,000 patents under the supervision of that Court.  Google is without knowledge or information sufficient to form a belief as to the truth of whether "a group led by the current shareholders of Rockstar Consortium purchased the portfolio for $4.5 billion," and therefore denies these allegations of this paragraph.  Google admits that its subsidiary placed additional bids and that the winning bid at the auction was $4.5 billion.  Google denies the remaining allegations of this paragraph.

12.     Google admits that it offers for sale and sells certain devices bearing the "Nexus" brand.  Google denies the remaining allegations of this paragraph, and specifically denies that it has committed any acts of infringement.

13.     Google admits that devices bearing the "Nexus" brand include the Nexus 5, Nexus 7, Nexus 10, and Galaxy Nexus.  Google denies the remaining allegations of this paragraph.

## JURISDICTION AND VENUE

14.     Google admits that this action invokes the United States patent laws, and that this Court has subject matter jurisdiction over patent law claims.  Google denies the remaining allegations in this paragraph.

15.     Google denies the allegations in this paragraph.

16.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

17.     Google does not contest personal jurisdiction in this action.  Google denies the remaining allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## ASSERTED PATENTS

18.     Google admits that on its face, U.S. Patent No. 5,838,551 ("the '551 Patent") is entitled "Electronic package carrying an electronic component and assembly of mother board and electronic package," identifies Yee-Ning Chan as the named inventor, and bears an issue date of November 17, 1998.  Google denies that the '551 Patent was duly and legally issued.

Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies them.

19.    Google admits that on its face, U.S. Patent No. 6,037,937 ("the '937 Patent") is entitled "Navigation tool for graphical user interface," identifies Brian Finlay Beaton, Colin Donald Smith, and Bruce Dale Stalkie as the named inventors, bears an issue date of March 14, 2000.  Google denies that the '937 Patent was duly and legally issued.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies them.

20.    Google admits that on its face, U.S. Patent No. 6,128,298 ("the '298 Patent") is entitled "Internet protocol filter," identifies Bruce Anthony Wootton and William G. Colvin as the named inventors, and bears an issue date of October 3, 2000.  Google denies that the '298 Patent was duly and legally issued.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies them.

21.    Google admits that on its face, U.S. Patent No. 6,333,973 ("the '973 Patent") is entitled "Integrated message center," identifies Colin Donald Smith and Brian Finlay Beaton as the named inventors, and bears an issue date of December 25, 2001.  Google denies that the '973 Patent was duly and legally issued.  Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies them.

22.    Google admits that on its face, U.S. Patent No. 6,463,131 ("the '131 Patent") is entitled "System and method for notifying a user of an incoming communication event," identifies Marilyn French-St. George, Mitch A. Brisebois, and Laura A. Mahan as the named

inventors, and bears an issue date of October 8, 2002.  Google denies that the '131 Patent was

duly and legally issued.  Google is without knowledge or information sufficient to form a belief

as to the truth of the remaining allegations of this paragraph, and therefore denies them.

23.    Google admits that on its face, U.S. Patent No. 6,765,591 ("the '591 Patent") is

entitled "Managing a virtual private network," identifies Matthew W. Poisson, Melissa L.

Desroches, and James M. Milillo as the named inventors, and bears an issue date of July 20,

2004.  Google denies that the '591 Patent was duly and legally issued.  Google is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

of this paragraph, and therefore denies them.

24.    Google admits that on its face, U.S. Patent No. 6,937,572 ("the '572 Patent") is

entitled "Call trace on a packet switched network," identifies Brian B. Egan and Milos

Vodsedalek as the named inventors, and bears an issue date of August 30, 2005.  Google denies

that the '572 Patent was duly and legally issued.  Google is without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and

therefore denies them.

## <u>GENERAL ALLEGATIONS</u>

25.    The allegations of this paragraph are not directed to Google, and therefore no

answer is required.  Google is without knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of this paragraph, and therefore denies them.

26.    The allegations of this paragraph are not directed to Google, and therefore no

answer is required.  Google is without knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of this paragraph, and therefore denies them.

27.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

28.    Google admits that it offers for sale and sells Nexus 5, Nexus 7 and Nexus 10 devices through its website play.google.com, which is accessible from anywhere in the United States.  Google admits that it previously offered for sale and sold Galaxy Nexus devices through its website play.google.com, which is accessible from anywhere in the United States.  Google denies the remaining allegations in this paragraph.

29.    Google admits that it purchases certain mobile device hardware from companies affiliated with Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC.  Google admits that it made software for the Galaxy Nexus and makes software for the Nexus 10.  Google denies the remaining allegations in this paragraph.

30.    Google admits that it purchases certain mobile device hardware from companies affiliated with Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC.  Google admits that it made software for the Galaxy Nexus and makes software for the Nexus 10.  Google denies the remaining allegations in this paragraph.

31.    Google admits that it offers for sale and sells Nexus 10 devices through its website play.google.com, which is accessible from anywhere in the United States.  Google admits that it made software for the Galaxy Nexus, and makes software for the Nexus 10.  Google denies the remaining allegations in this paragraph.

32.    Google admits that it offers for sale and sells Nexus 5 and Nexus 7 devices through its website play.google.com, which is accessible from anywhere in the United States.  Google admits that it makes software for the Nexus 5 and Nexus 7.  Google denies the remaining allegations in this paragraph.

## ROCKSTAR'S INFRINGEMENT ALLEGATIONS AGAINST SAMSUNG

33.    Google incorporates by reference its responses to the prior paragraphs.  The allegations of this paragraph are not directed to Google, and therefore no answer is required. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

34.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

35.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

36.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

37.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

38.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

39.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

40.      The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

41.      The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

42.      The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

43.      The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

44.      The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

45.      The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

46.      The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

47.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

48.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

49.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

50.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

51.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

52.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

53.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

54.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

55.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

56.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

57.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

58.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

59.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

60.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

61.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

62.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

63.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

64.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

65.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

66.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

67.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

68.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

69.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

70.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

71.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

72.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

73.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

74.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

75.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

76.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

77.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

78.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

79.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

80.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

81.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

82.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

83.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

84.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

85.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

86.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

87.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

88.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

89.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

90.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

91.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

92.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

93.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

94.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

95.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

96.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

97.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

98.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

99.     The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

100.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

101.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

102.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

103.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

104.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

105.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

106.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

107.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

108.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

109.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

110.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

111.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

112.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

113.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

114.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

115.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

116.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

117.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

118.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

119.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

120.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

121.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

122.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

123.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

124.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

125.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

126.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

127.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

128.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

129.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

130.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

131.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

132.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

133.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

134.    The allegations of this paragraph are not directed to Google, and therefore no answer is required.  Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

## PATENT INFRINGEMENT ALLEGATIONS AGAINST GOOGLE

135.    Google incorporates by reference its responses to the prior paragraphs.  Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## I.    The '551 Patent

136.    Google admits that it offers for sale and sells Nexus 5, Nexus 7 and Nexus 10 devices in the United States.  Google admits that it previously offered for sale and sold Galaxy Nexus devices in the United States.  Google admits that it made software for the Galaxy Nexus, and makes software for the Nexus 5, Nexus 7 and Nexus 10.  Google denies the remaining allegations in this paragraph.

137.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

138.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

139.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

140.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

141.    Google denies the allegations in this paragraph.

142.    Google denies the allegations in this paragraph.

143.    Google denies the allegations in this paragraph.

144.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

145.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## II.    The '937 Patent

146.    Google admits that it offers for sale and sells Nexus 5, Nexus 7 and Nexus 10 devices in the United States.  Google admits that it previously offered for sale and sold Galaxy Nexus devices in the United States.  Google admits that it made software for the Galaxy Nexus, and makes software for the Nexus 5, Nexus 7 and Nexus 10.   Google denies the remaining allegations in this paragraph.

147.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

148.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

149.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

150.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

151.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

152.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

153.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

154.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

155.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

156.    Google admits that one of its wholly owned subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware, and placed a bid in that auction on April 4, 2011.  Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that it was put on notice, or was otherwise aware, at that time, of any alleged infringement of the patents Rockstar has asserted in this action.

157.    Google denies the allegations in this paragraph.

158.    Google denies the allegations in this paragraph.

159.    Google denies the allegations in this paragraph.

160.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

161.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## III.    The '298 Patent

162.    Google admits that it offers for sale and sells Nexus 5, Nexus 7 and Nexus 10 devices in the United States.  Google admits that it previously offered for sale and sold Galaxy Nexus devices in the United States.  Google admits that it made software for the Galaxy Nexus, and makes software for the Nexus 5, Nexus 7 and Nexus 10.  Google denies the remaining allegations in this paragraph.

163.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

164.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

165.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

166.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

167.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

168.     Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

169.     Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

170.     Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

171.     Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

172.     Google denies the allegations in this paragraph.

173.     Google denies the allegations in this paragraph.

174.     Google denies the allegations in this paragraph.

175.     Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

176.     Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## IV.    The '973 Patent

177.    Google admits that it offers for sale and sells Nexus 5, Nexus 7 and Nexus 10

devices in the United States.  Google admits that it previously offered for sale and sold Galaxy

Nexus devices in the United States.  Google admits that it made software for the Galaxy Nexus,

and makes software for the Nexus 5, Nexus 7 and Nexus 10.  Google denies the remaining

allegations in this paragraph.

178.    Google admits that one of its subsidiaries participated in the auction approved by

the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a

bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court.

Google denies the remaining allegations in this paragraph, specifically denies that it has

committed any acts of infringement, and specifically denies that by April 4, 2011, Google was

put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

179.    Google denies the allegations in this paragraph, and specifically denies that it has

committed any acts of infringement.

180.    Google denies the allegations in this paragraph, and specifically denies that it has

committed any acts of infringement.

181.    Google denies the allegations in this paragraph, and specifically denies that it has

committed any acts of infringement.

182.    Google admits that one of its subsidiaries participated in the auction approved by

the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a

bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court.

Google denies the remaining allegations in this paragraph, specifically denies that it has

committed any acts of infringement, and specifically denies that by April 4, 2011, Google was

put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

183.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

184.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

185.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

186.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

187.    Google denies the allegations in this paragraph.

188.    Google denies the allegations in this paragraph.

189.    Google denies the allegations in this paragraph.

190.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

191.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## V.    The '131 Patent

192.    Google admits that it offers for sale and sells Nexus 5, Nexus 7 and Nexus 10 devices in the United States.  Google admits that it previously offered for sale and sold Galaxy Nexus devices in the United States.  Google admits that it made software for the Galaxy Nexus,

and makes software for the Nexus 5, Nexus 7 and Nexus 10.  Google denies the remaining allegations in this paragraph.

193.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

194.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

195.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

196.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

197.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

198.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

199.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

200.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

201.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

202.    Google denies the allegations in this paragraph.

203.    Google denies the allegations in this paragraph.

204.    Google denies the allegations in this paragraph.

205.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

206.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## VI.    The '591 Patent

207.    Google admits that it offers for sale and sells Nexus 5, Nexus 7 and Nexus 10 devices in the United States.  Google admits that it previously offered for sale and sold Galaxy Nexus devices in the United States.  Google admits that it made software for the Galaxy Nexus, and makes software for the Nexus 5, Nexus 7 and Nexus 10.  Google denies the remaining allegations in this paragraph.

208.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

209.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

210.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

211.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

212.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

213.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

214.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

31

215.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

216.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

217.    Google denies the allegations in this paragraph.

218.    Google denies the allegations in this paragraph.

219.    Google denies the allegations in this paragraph.

220.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## VII.    The '572 Patent

221.    Google admits that it offers for sale and sells Nexus 5, Nexus 7 and Nexus 10 devices in the United States.  Google admits that it previously offered for sale and sold Galaxy Nexus devices in the United States.  Google admits that it made software for the Galaxy Nexus, and makes software for the Nexus 5, Nexus 7 and Nexus 10.  Google denies the remaining allegations in this paragraph.

222.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

223.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court.

Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

224.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

225.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

226.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

227.    Google denies the allegations in this paragraph.

228.    Google denies the allegations in this paragraph.

229.    Google denies the allegations in this paragraph.

230.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

231.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## ROCKSTAR'S REQUEST FOR DAMAGES AND OTHER RELIEF

232.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.  Google specifically denies that Rockstar Consortium and MobileStar are entitled to injunctive relief.

233.    Google admits that one of its subsidiaries participated in the auction approved by the United States Bankruptcy Court for the District of Delaware and, on April 4, 2011, placed a bid to purchase a portfolio of more than 6,000 patents under the supervision of that Court. Google denies the remaining allegations in this paragraph, specifically denies that it has committed any acts of infringement, and specifically denies that by April 4, 2011, Google was put on notice, or was otherwise aware, of any alleged infringement of the patents in this action.

234.    Google denies the allegations in this paragraph, and specifically denies that it has committed any acts of infringement.

## DEMAND FOR JURY TRIAL

235.    Rockstar's demand for a trial by jury for all issues triable to a jury does not state any allegation, and Google is not required to respond.  To the extent that any allegations are included in the demand, Google denies these allegations.

## PRAYER FOR RELIEF

236.    These paragraphs set forth the statement of relief requested by Rockstar to which no response is required.  Google denies that Rockstar is entitled to any of the requested relief and denies any allegations.

## AFFIRMATIVE DEFENSES

237.    Subject to the responses above, Google alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed

affirmative defenses by law, regardless of how such defenses are denominated herein.  In addition to the affirmative defenses described below, subject to its responses above, Google specifically reserves all rights to allege additional affirmative defenses that become known through the course of discovery.

### FIRST DEFENSE—NON-INFRINGEMENT

238.    Google does not infringe and has not infringed (not directly, contributorily, or by inducement), either literally or under the doctrine of equivalents, and is not liable for infringement of any valid and enforceable claim of the '551, '937, '298, '973, '131, '591, or '572 Patents (collectively, the "Patents-in-Suit").

### SECOND DEFENSE—INVALIDITY

239.    The claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 101 because the claims are directed to abstract ideas or other non-statutory subject matter.

240.    The claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 102 because the claims lack novelty, and are taught and suggested by the prior art.

241.    The claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 103 because the claims are obvious in view of the prior art.

242.    The claims of the Patents-in-Suit are invalid and unenforceable for failure satisfy the conditions set forth in 35 U.S.C. § 112, including failure of written description, lack of enablement, and claim indefiniteness.

### THIRD DEFENSE—LIMITATIONS ON PATENT DAMAGES

243.    Rockstar's claim for damages, if any, against Google for alleged infringement of the Patents-in-Suit is limited by 35 U.S.C. §§ 286, 287 & 288.

## FOURTH DEFENSE—PROSECUTION HISTORY ESTOPPEL

244.     By reason of statements, representations, concessions, admissions, arguments, or amendments, whether explicit or implicit, made by or on behalf of the applicants during the prosecution of the patent applications that led to the issuance of the Patents-in-Suit, Rockstar's claims of patent infringement are barred in whole or in part by the doctrine of prosecution history estoppel.

## FIFTH DEFENSE—ESTOPPEL

245.     On information and belief, Rockstar's claims are barred, in whole or in part, by the doctrines of estoppel, laches, disclaimer, patent misuse, and waiver.

## SIXTH DEFENSE—PATENT UNENFORCEABILITY (UNCLEAN HANDS)

246.    Rockstar's claims against Google are barred under the doctrine of unclean hands.

## PRAYER FOR RELIEF

WHEREFORE, Google prays for judgment and relief as follows:

A.      Dismissing, with prejudice, Rockstar's claims against Google;

B.      Denying all relief that Rockstar seeks against Google;

C.      Finding that this an exceptional case under 35 U.S.C. § 285;

D.      Awarding Google its costs and attorneys' fees in connection with this action; and

E.      Such further and additional relief as the Court deems just and proper.

**JURY DEMAND**

Google demands a jury trial on all issues and claims so triable.

Dated:  July 22, 2014                     Respectfully submitted,

                                          /s/ *J. Mark Mann*
Charles K. Verhoeven (Cal. Bar. No. 170151)   J. Mark Mann (State Bar No. 12926150)
Sean Pak (Cal. Bar. No. 2190323)              mark@themannfirm.com
Amy H. Candido (Cal. Bar No. 237829)          G. Blake Thompson (State Bar No. 24042033)
Matthew S. Warren (Cal. Bar. No. 230565)      blake@themannfirm.com
quinn-samsung-e.d.tex.-13-0900@               MANN | TINDEL | THOMPSON
    quinnemanuel.com                          300 West Main Street
QUINN EMANUEL URQUHART                        Henderson, Texas  75652
    & SULLIVAN, LLP                           (903) 657-8540
50 California Street, 22nd Floor              (903) 657-6003 facsimile
San Francisco, California 94111
(415) 875-6600                                *Attorneys for Defendant Google Inc.*
(415) 875-6700 facsimile

37

**– A296 –**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on July 22, 2014.

/s/ *J. Mark Mann*
J. Mark Mann

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| ROCKSTAR CONSORTIUM US LP AND MOBILESTAR TECHNOLOGIES, LLC | § § § | Civil Action No. 13-cv-0894-JRG |
| Plaintiffs, | § § | **LEAD CASE** |
| v. | § § § | |
| ASUSTEK COMPUTER, INC. AND ASUS COMPUTER INTERNATIONAL, INC. | § § § | |
| Defendants. | § § § | |

## GOOGLE'S NOTICE OF ORDER DENYING MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER

Defendant Google Inc. respectfully submits this Notice of Order Denying Motion to

Dismiss or, in the Alternative, to Transfer, issued on April 17, 2014, in *Google Inc. v. Rockstar*

*Consortium US LP and MobileStar Technologies, LLC*, No. 13-5933-CW (N.D. Cal.) (Docket

No. 58).  Attached hereto as Exhibit A is a true and correct copy of the Order.

Dated:  April 21, 2014

Charles K. Verhoeven (Cal. Bar. No. 170151)
Sean Pak (Cal. Bar. No. 219032)
Amy H. Candido (Cal. Bar. No. 237829)
Matthew S. Warren (Cal. Bar. No. 230565)
quinn-google-e.d.tex.-13-00900@
    quinnemanuel.com
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California  94111
(415) 875-6600
(415) 875-6700 facsimile

Respectfully submitted,

/s/ J. Mark Mann
J. Mark Mann (State Bar No. 12926150)
G. Blake Thompson (State Bar No. 24042033)
mark@themannfirm.com
blake@themannfirm.com
MANN | TINDEL | THOMPSON
300 West Main Street
Henderson, Texas  75652
(903) 657-8540
(903) 657-6003 facsimile

*Attorneys for Defendant Google Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record have consented to electronic service and are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on April 21, 2014.

/s/ *J. Mark Mann*
J. Mark Mann

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GOOGLE INC.,                                    No. C 13-5933 CW

          Plaintiff,                            ORDER DENYING
                                                MOTION TO DISMISS
     v.                                         OR, IN THE
                                                ALTERNATIVE, TO
ROCKSTAR CONSORTIUM U.S. LP,                    TRANSFER
MOBILESTAR TECHNOLOGIES, LLC,
                                                (Docket No. 20)
          Defendants.

_____/

     Google Inc. filed this declaratory judgment action for non-
infringement of seven patents owned by Defendants Rockstar
Consortium U.S. LP (Rockstar) and MobileStar Technologies, LLC
(MobileStar).  Defendants now move to dismiss or, in the
alternative, to transfer the action to the Eastern District of
Texas, where the action could be consolidated with several other
actions filed by Defendants against Google's customers.  Google
opposes the motion or, in the alternative, requests jurisdictional
discovery.  The Court held oral argument on March 13, 2014.  After
considering the papers and the arguments of counsel, the Court
DENIES the motion to dismiss or transfer.

                              BACKGROUND

     Google is a corporation located in Mountain View, California.
Docket No. 1 ¶ 2.  Google produces the Android mobile platform, an
open-source operating system that is used by many original
equipment manufacturers around the world.  Id. at ¶¶ 1-2.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Nortel Networks was a prominent Canadian telecommunications

2 provider headquartered in Ottawa, Canada.  See Madigan Decl., Exs.

3 1-2.  Nortel had offices throughout the United States, including

4 one in Santa Clara, California.  See id., Ex. 2.  On January 14,

5 2009, Nortel filed for bankruptcy.  Id., Exs. 3-4.  The bankruptcy

6 court ordered an auction of Nortel's patent licensing operations,

7 including a portfolio of over 6,000 patents "spanning wireless,

8 wireless 4G, data networking, optical, voice, internet, service

9 provider, semiconductors" and many other aspects of

10 telecommunications and Internet search.  Id., Exs. 4-6.  Around

11 the same time, five of the world's largest technology companies --

12 Apple, Microsoft, Research in Motion, Sony, and Ericsson --

13 jointly created and funded an entity called "Rockstar Bidco LP," a

14 Delaware limited liability partnership.  See id., Exs. 7-8.  Apple

15 contributed approximately $2.6 million to Rockstar Bidco.  Id.,

16 Ex. 9 at 34.  Both Google and Rockstar Bidco bid on the Nortel

17 patent licensing operation at the June 2011 auction, but Rockstar

18 Bidco ultimately prevailed with a bid of $4.5 billion.  Id.,

19 Ex. 7.

20    Rockstar Bidco transferred around 2,000 patents to its

21 owners, with at least 1,147 going to Apple.  Id., Exs. 7, 14.

22 Rockstar Bidco then reorganized itself into Rockstar, a Delaware

23 limited partnership which claims a principal place of business in

24

25

26

27

28

2

United States District Court
For the Northern District of California

1   Plano, Texas.  Id., Exs. 7, 15.[1]  Led by former Nortel executive

2   and current Rockstar CEO John Veschi, Nortel's patent portfolio

3   and licensing team of about forty employees immediately moved to

4   Rockstar.  Id., Exs. 10-12.  Rockstar's CFO and CTO had also been

5   executives at Nortel.  Id.  Veschi and the rest of his team remain

6   in Nortel's old headquarters in Ottawa, Canada.  Id., Ex. 12.

7   According to its own website, Rockstar produces no products, but

8   operates a "patent licensing business that owns and manages a

9   portfolio of more than 4,000 patents developed by" Nortel.  Id.,

10  Ex. 13.

11      Rockstar has worked with Mark Wilson, an independent

12  contractor in California who provides Rockstar with "licensing

13  consulting services."  Dean Decl. ¶ 34.  In Rockstar organization

14  charts appearing in a news article to which Rockstar contributed

15  and which it featured on its own website, Wilson was named as a

16  "licensing executive" in senior management.  Madigan Decl., Exs.

17  12-13.  This suggestion of an employee relationship has now been

18  deleted from the website and Wilson has removed "Rockstar

19  Consortium" from his professional profile.  See id., Exs. 12-13,

20

21

22      [1] Although Defendants assert that they both have principal
    places of business in Texas, they have not named any executives or
23  employees who reside or work there.  Rockstar's website and the
    declaration of Afzal Dean, Rockstar Vice President and President
24  of MobileStar, identifies officers and board members who represent
    both Defendants and who are almost all based in Canada, except one
25  in Colorado.  See, generally, Dean Decl; see also Madigan Decl.,
    Exs. 10, 19, 23.  Rockstar's "nerve center," or the place where
26  its "officers direct, control, and coordinate the corporation's
    activities," thus appears to be in Ottawa, Canada.  Hertz Corp. v.
27  Friend, 559 U.S. 77, 92-93 (2010).

28

3

United States District Court
For the Northern District of California

37.  Defendants assert that Wilson's patent licensing duties do not encompass enforcement of the patents-in-suit.

On October 30, 2013, Rockstar created MobileStar, a wholly-owned subsidiary and Delaware limited liability corporation claiming a principal place of business in Plano, Texas.  Dean Decl. ¶ 5.  A day later, on October 31, 2013, Defendants filed suit in the Eastern District of Texas against ASUS, HTC, Huawei, LG, Pantech, Samsung, and ZTE, alleging each company infringes seven patents: U.S. Patent Nos. 6,037,937 (the '937 patent), 6,463,131 (the '131 patent), 6,765,591 (the '591 patent), 5,838,551 (the '551 patent), 6,128,298 (the '298 patent), 6,333,973 (the '973 patent), and 6,937,572 (the '572 patent). (the Halloween actions).  In each of the Halloween actions, Rockstar and MobileStar alleged infringement by "certain mobile communication devices having a version (or adaptation thereof) of Android operating system," which is developed by Google.  See Dean Decl., Exs. A-H.  Rockstar owns two of the seven patents-in-suit and transferred the remaining five patents to MobileStar shortly before filing litigation, but retained an exclusive license to those patents.  See Dean Decl. ¶¶ 5, 15, 24.

On December 23, 2013, Google filed the present action in the Northern District of California.  In this action, Google seeks a declaration that its Android platform and products (the Nexus 5, Nexus 7, and Nexus 10) do not infringe the seven patents held by Defendants that were asserted in the Halloween actions.  See Docket No. 1.

On December 31, 2013, Defendants responded with a New Year's Eve amendment to one of the Halloween actions to include

4

allegations that Google infringes three of the asserted patents at issue in this case: the '937, '131, and '591 patents. <u>Rockstar v. Samsung</u>, Case No. 13-0900 (E.D. Tex.), Docket No. 19. Defendants did not, however, assert that Google infringed the four additional patents at issue in the Halloween actions and in this case: the '551, '298, '973, and '572 patents. <u>See id.</u> On March 10, 2014, Defendants moved to amend their complaint in the Texas case to allege that Google infringed these four additional patents. Case No. 13-0900, Docket Nos. 45-46.

LEGAL STANDARDS

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of personal jurisdiction.

In a declaratory action for non-infringement, because the jurisdictional issue is intimately connected with substance of patent laws, Federal Circuit law applies. <u>Avocent Huntsville Corp. v. Aten Int'l Co., Ltd.</u>, 552 F.3d 1324, 1328 (Fed. Cir. 2008).

Where the court decides the personal jurisdiction question based on affidavits and other written materials, and without an evidentiary hearing, a plaintiff need only make a prima facie showing that a defendant is subject to personal jurisdiction. <u>Nuance Commc'ns, Inc. v. Abbyy Software House</u>, 626 F.3d 1222, 1231 (Fed. Cir. 2010); <u>Electronics For Imaging, Inc. v. Coyle</u>, 340 F.3d 1344, 1349 (Fed. Cir. 2003). Uncontroverted allegations in the complaint must be taken as true. <u>Id.</u> If both the plaintiff and the defendant submit admissible evidence, conflicts in the evidence must be resolved in the plaintiff's favor. <u>Trintec</u>

1  Indus., Inc. v. Pedre Promotional Products, Inc., 395 F.3d 1275,

2  1282 (Fed. Cir. 2005).

3      There are two independent limitations on a court's power to

4  exercise personal jurisdiction over a non-resident defendant: the

5  applicable state personal jurisdiction rule and constitutional

6  principles of due process.  Electronics For Imaging, Inc., 340

7  F.3d at 1349.  Because California's jurisdictional statute is co-

8  extensive with federal due process requirements, jurisdictional

9  inquiries under state law and federal due process standards merge

10  into one analysis.  Id.

11      The "constitutional touchstone" for the exercise of personal

12  jurisdiction "remains whether the defendant purposefully

13  established minimum contacts" in the forum state such that

14  "maintenance of the suit does not offend traditional notions of

15  fair play and substantial justice."  Burger King Corp. v.

16  Rudzewicz, 471 U.S. 462, 474 (1985); Int'l Shoe Co. v. Washington,

17  326 U.S. 310, 316 (1945).  Although the application of this

18  doctrine has evolved to keep pace with the increasingly national

19  and international nature of modern business affairs, the Supreme

20  Court has repeatedly stressed that there must always be "some act

21  by which the defendant purposefully avails itself of the privilege

22  of conducting activities within the forum state, thus invoking the

23  benefits and protections of its laws."  Avocent Huntsville Corp.,

24  552 F.3d at 1329 (quoting Hanson v. Denckla, 357 U.S. 235, 253

25  (1958)).  "This purposeful availment requirement ensures that a

26  defendant will not be haled into a jurisdiction solely as a result

27  of random, fortuitous, or attenuated contacts, or of the

28

United States District Court
For the Northern District of California

6

**– A306 –**

United States District Court
For the Northern District of California

1    unilateral activity of another party or a third person."  Id.

2    (quoting Burger King Corp., 471 U.S. at 475).

3        Personal jurisdiction may be either general or specific.

4    General jurisdiction exists when the defendant maintains

5    "continuous and systematic" contacts with the forum state, even if

6    the cause of action is unrelated to those contacts.  Helicopteros

7    Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984).

8    Specific jurisdiction is satisfied where the defendant has

9    "purposefully directed his activities at residents of the forum,

10   and the litigation results from alleged injuries that 'arise out

11   of or relate to' those activities."  Burger King Corp., 471 U.S.

12   at 472.

13   I.   Personal Jurisdiction over Rockstar through MobileStar

14       As a preliminary matter, Defendants argue that jurisdiction

15   over Rockstar and MobileStar should be assessed independently

16   because they are separate corporate entities.  Google disagrees,

17   contending that Rockstar's contacts should be imputed to

18   MobileStar.

19       The Court must begin from "the general rule that the

20   corporate entity should be recognized and upheld, unless specific,

21   unusual circumstances call for an exception."  3D Sys., Inc. v.

22   Aarotech Labs., Inc., 160 F.3d 1373, 1380 (Fed. Cir. 1998).  One

23   exception is where the parent and subsidiary are not really

24   separate entities and are alter egos of each other.  Doe v. Unocal

25   Corp., 248 F.3d 915, 926 (9th Cir. 2001); see also Danjaq, S.A. v.

26   Pathe Commc'ns Corp., 979 F.2d 772, 775 (9th Cir. 1992) (finding

27   that many courts have discussed whether a parent's citizenship can

28   be imputed to the subsidiary and recognized that it can where the

7

subsidiary is the alter ego of the parent).  Courts have invoked

this exception where the plaintiff makes a prima facie case that

(1) there is a unity of interest and ownership such that the

separate personalities of the two entities no longer exist and

(2) failure to disregard the separate identities "would result in

fraud or injustice."  Doe, 248 F.3d at 926.

     In a similar situation, the Federal Circuit found that the

parent-subsidiary relationship between a parent company and its

wholly-owned subsidiary holding company justified imputing the

parent company's California contacts to the subsidiary.  Dainippon

Screen Mfg. Co., Ltd. v. CFMT, Inc., 142 F.3d 1266, 1271 (Fed.

Cir. 1998).  The court observed:

> Stripped to its essentials, CFM contends that a parent
> company can incorporate a holding company in another state,
> transfer its patents to the holding company, arrange to have
> those patents licensed back to itself by virtue of its
> complete control over the holding company, and threaten its
> competitors with infringement without fear of being a
> declaratory judgment defendant, save perhaps in the state of
> incorporation of the holding company.  This argument
> qualifies for one of our "chutzpah" awards.  See Refac Int'l,
> Ltd. v. Lotus Dev. Corp., 81 F.3d 1576, 1584, 38 USPQ2d 1665,
> 1671 (Fed. Cir. 1996); Checkpoint Sys., Inc. v. United States
> Int'l Trade Comm'n, 54 F.3d 756, 763 n. 7, 35 USPQ2d 1042,
> 1048 n.7 (Fed. Cir. 1995) (noting that "chutzpah" describes
> "the behavior of a person who kills his parents and pleads
> for the court's mercy on the ground of being an orphan").

Id. (reversing district court's finding that it lacked personal

jurisdiction because of CFMT, the newly-formed subsidiary).  With

these observations in mind, the Federal Circuit determined that it

would be "reasonable and fair" to find jurisdiction over both CFM

and CFMT because of their parent-subsidiary relationship.  Id.

The court reasoned that, while a "patent holding subsidiary is a

United States District Court
For the Northern District of California

8

United States District Court
For the Northern District of California

legitimate creature . . . , it cannot fairly be used to insulate patent owners from defending declaratory judgment actions in those fora where its parent company operates under the patent and engages in activities sufficient to create personal jurisdiction and declaratory judgment jurisdiction." Id.[2]

The facts in this case are at least as strong as those in Dainippon. As in Dainippon, MobileStar here had some contact with the forum state: it met with Google in California to attempt to negotiate a license. See id. ("Moreover, CFMT's attempts to negotiation a sublicense with Dainippon in California further strengthen CFMT's contacts with that state."). More fundamentally, as in Dainippon, the circumstances here strongly suggest that Rockstar formed MobileStar as a sham entity for the sole purpose of avoiding jurisdiction in all other fora except MobileStar's state of incorporation (Delaware) and claimed principal place of business (Texas). A mere day before it initiated litigation against Google's customers, Rockstar freshly minted MobileStar, with no California contacts, and assigned the

---

[2] Defendants initially attempted to argue that Dainippon's holding was based "first and foremost" on its determination "that the subsidiary itself had minimum contacts with the forum, and those contacts (not the parent's contacts) justified the imposition of personal jurisdiction," insinuating the rest was dicta. Defendants' Reply at 3 (internal quotation marks and italics omitted). However, Defendants later conceded that Dainippon stood for the proposition that one valid ground for setting aside corporate formalities for purposes of assessing the interests of fair play and substantial justice was if the defendants engaged in "a deliberate attempt to manipulate jurisdiction." Id. at 4.

9

asserted patents to that subsidiary.  Dean Decl. ¶ 15.  Other
evidence suggesting MobileStar maintains no independent identity
is the fact that all MobileStar employees also work for Rockstar.
MobileStar has three officers (President Afzal Dean, Vice
President Chad Hilyard, and Corporate Secretary Mike Dunleavy) and
one board member (Director of the Board John Veschi); all serve on
Rockstar's board as well.  Dean Decl. ¶ 10.  MobileStar
purportedly operates out of the same office suite listed for
Rockstar.  Dean Decl. ¶¶ 5, 15.  Although Rockstar asserts that
"there is no hint whatsoever of <u>any</u> manipulation" and that
"MobileStar was created for legitimate reasons having nothing to
do with personal jurisdiction," Rockstar does not actually provide
any evidence supporting this point.  Defendants' Reply at 4.
Because the evidence presented supports Google's allegation that
Rockstar created MobileStar solely to dodge jurisdiction, the
traditional notions of fair play and justice would not be offended
if the Court considers the two entities jointly for purposes of
jurisdiction and imputes Rockstar's contacts to the forum state to
MobileStar.[3]

---

[3] <u>Cf.</u> <u>In re Microsoft</u>, 630 F.3d 1361, 1364-65 (Fed. Cir.
2011) (for purposes of a motion to transfer, ignoring the impact
of litigation-driven incorporation under the laws of Texas, which
occurred sixteen days before filing suit); <u>In re Zimmer Holdings,
Inc.</u>, 609 F.3d at 1381 (rejecting connections to Texas as "recent,
ephemeral, and an artifact of litigation").

United States District Court
For the Northern District of California

II.   General Jurisdiction

General, or "all-purpose" personal jurisdiction, subjects a defendant to suit in a forum only where a defendant's contacts with that forum "are so continuous and systematic as to render them essentially at home in the forum State." Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011)). The "paradigm bases for general jurisdiction" for a corporation are its place of incorporation and principal place of business. Id. at 760.

Both Rockstar and MobileStar are incorporated in Delaware and claim to have principal places of business in Plano, Texas. Dean Decl. ¶ 5, 15. Neither Defendant is licensed to do business in California, nor do they own real or personal property, pay taxes, maintain offices, or file lawsuits in California. Dean Decl. ¶¶ 6-9, 16, 22-24, 29-33.

Google nevertheless contends that Rockstar has stepped in the shoes of its predecessor, Nortel, and assumed its jurisdictional position.[4] Although Nortel was a Canadian company, it maintained

---

[4] See Doe, 248 F.3d at 926 (explaining requirements for alter ego theory and agency theory for imputing contacts of one corporation to another). See also Katzir's Floor & Home Design, Inc. v. M-MLS.com, 394 F.3d 1143, 1150 (9th Cir. 2004) ("The general rule of successor liability is that a corporation that purchases all of the assets of another corporation is not liable for the former corporation's liabilities unless, among other theories, the purchasing corporation is a mere continuation of the selling corporation.").

11

its primary United States campus in Santa Clara and designated a

registered agent for service of process in California.  See

Madigan Decl., Exs. 3, 27.  Nortel routinely brought suits and

defended them in California.  See, e.g., Times Networks, Inc. v.

Nortel Networks Corp., Case No. 06-00532 (N.D. Cal.) and Nortel

Networks Inc. v. State Bd. of Equalization, 191 Cal. App. 4th 1259

(2011).

    Google does not allege that Rockstar maintained Nortel's

Santa Clara presence in California.  Google contends instead that,

although the bulk of Rockstar's employees operate out of Canada,

Rockstar nevertheless pursues a significant patent licensing

business aimed at the technology industry in the Silicon Valley,

in California.  As Rockstar has stated on many occasions to the

press and others, Rockstar is exclusively "a patent licensing

business" and operates by reverse-engineering products on the

market and proposing that the companies which offer those products

purchase licenses.  Madigan Decl., Ex. 7, 13; Dean Decl. ¶¶ 18-21.

Rockstar does not currently sell any products; commercialization

of its significant patent portfolio is its only business.  Because

the Silicon Valley technology industry is Rockstar's main target,

as acknowledged by Rockstar's CEO, Rockstar naturally would have

to come into constant contact with the forum state.  Madigan

Decl., Exs. 16, 35.  Rockstar confirmed that, as of May 2012, it

had "started negotiations with as many as 100 potential licensees"

and has since approached many more.  Id., Exs. 7, 17.  At least a

12

United States District Court
For the Northern District of California

1   couple of these meetings were in California.  See Dean Decl. ¶ 18.

2   Rockstar has one employee or independent contractor in California,

3   Wilson, who contacts potential licensees in California.  See

4   Madigan Decl. Ex. 17.

5       Google's showing is insufficient to render Defendants

6   "essentially at home" in California.  Even if it is true that

7   Defendants engage in "continuous and systematic" business in the

8   forum state, that does not mean that Defendants' presence in the

9   forum state is so substantial that it should fairly be subject to

10  suit "on causes of action arising from dealings entirely distinct

11  from those activities."  Daimler AG, 134 S. Ct. at 761.

12

13  II.  Specific Jurisdiction

14      Specific jurisdiction exists where the cause of action arises

15  out of the defendant's contacts with the forum state, even if

16  those contacts are isolated and sporadic.  Red Wing Shoe Co., Inc.

17  v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1359 (Fed. Cir.

18  1998) (citing Burger King Corp., 471 U.S. at 471-77).  Even a

19  single act may support a finding of personal jurisdiction so long

20  as it creates a "substantial connection with the forum, as opposed

21  to an attenuated affiliation."  Id.  The Federal Circuit has

22  developed a three-factor test to determine whether specific

23  jurisdiction exists: "whether (1) the defendant purposefully

24  directed its activities at residents of the forum state, (2) the

25  claim arises out of or relates to the defendant's activities with

26  the forum state, and (3) assertion of personal jurisdiction is

27

28

United States District Court
For the Northern District of California

1  reasonable and fair." Electronics For Imaging, Inc., 340 F.3d at

2  1350.

3      Here, Defendants sued seven Google customers, alleging that

4  they infringed by making and selling "certain mobile communication

5  devices having a version (or adaptation thereof) of Android

6  operating system" which is developed by Google. See Dean Decl.,

7  Exs. A-H.  Both Defendants met with Google in California to

8  discuss licensing of the patents-in-suit.  Rockstar also met in

9  California with a few of the Google customers sued in the

10 Halloween actions to discuss licensing of the patents-in-suit.

11 These contacts with Google and its customers in California created

12 a cloud of patent infringement charges over Google's Android

13 platform.  Google's causes of action for declaratory judgment of

14 non-infringement, which are intended to "clear the air of

15 infringement charges" targeting Google's Android platform, "arise

16 out of or relate to" Defendants' contacts with the forum.  See Red

17 Wing Shoe Co., Inc., 148 F.3d at 1360 (holding that "cease-and-

18 desist letters are the cause of the entanglement and at least

19 partially give rise to the plaintiff's action").

20     Defendants argue that imposing jurisdiction based on the act

21 of sending cease-and-desist letters alone violates the principles

22 of fair play and substantial justice.  Id.  The Federal Circuit

23 has explained that exercising personal jurisdiction over a

24 patentee based solely on the sending of cease-and-desist letters

25 would be unfair under the second prong of the traditional due

14

United States District Court
For the Northern District of California

process inquiry: "whether the maintenance of personal jurisdiction
would comport with fair play and substantial justice." Id. at
1361 (quotation marks omitted).  This is because due process
"afford[s] the patentee sufficient latitude to inform others of
its patent rights without subjecting itself to jurisdiction in a
foreign forum."  Id.  An offer to license may sometimes be "more
closely akin to an offer for settlement of a disputed claim rather
than an arms-length negotiation in anticipation of a long-term
continuing business relationship," and, if so, by itself may be
insufficient to justify exercising specific jurisdiction.  Id.
Accordingly, to find specific jurisdiction, the Federal Circuit
has required that a showing that a defendant engaged in "other
activities" in the forum state related to the action at hand.
Id.; Avocent Huntsville Corp., 552 F.3d at 1334.  These activities
need not be limited to those directed at Google itself, but must
be related in some way to the patents-in-suit.  Avocent Huntsville
Corp, 552 F.3d at 1334.

Courts have held that such "other activities" may include
forming obligations with forum residents that relate to
enforcement of the asserted patents.  Some examples of "other
activities" that courts have recognized include "initiating
judicial or extra-judicial patent enforcement within the forum, or
entering into an exclusive license agreement or other undertaking
which imposes enforcement obligations with a party residing or

1  regularly doing business in the forum." Id.[5]  A review of Federal

2  Circuit case law reveals that the relationship must extend beyond

3  the mere payment of royalties or cross-licensing payments, "such

4  as granting both parties the right to litigate infringement cases

5  or granting the licensor the right to exercise control over the

6  licensee's sales or marketing activities." Breckenridge Pharm.,

7  Inc. v. Metabolite Labs., Inc., 444 F.3d 1356, 1366 (Fed. Cir.

8  2006).  The defendants must create "continuing obligations between

9  themselves and residents of the forum," forming a "substantial

10  connection" that proximately results from the defendants' own

11  actions such that it would not be "unreasonable to require

12  defendants to submit to the burdens of litigation in that forum as

13  well." Electronics For Imaging, Inc., 340 F.3d at 1350.

---

17  [5] See Campbell Pet Co. v. Miale, 542 F.3d 879, 886 (Fed. Cir. 2008) (finding jurisdiction over a patentee who conducted extra-judicial patent enforcement by enlisting a third party in the forum to remove defendant's products from a trade show); Genetic Implant Sys., Inc. v. Core-Vent Corp., 123 F.3d 1455, 1458 (Fed. Cir. 1997) (holding that specific jurisdiction existed over patentee because it had appointed an in-state distributor to sell a product covered by the asserted patent, which was a business relationship "analogous to a grant of a patent license" and created obligations to sue third-party infringers); Akro Corp. v. Luker, 45 F.3d 1541, 1548-49 (Fed. Cir. 1995) (because defendant had entered into an exclusive licensing agreement with one of the alleged infringer's competitors, which meant that defendant had "obligations . . . to defend and pursue any infringement" against the patent, specific jurisdiction was proper); SRAM Corp. v. Sunrace Roots Enter. Co., Ltd., 390 F. Supp. 2d 781, 787 (N.D. Ill. 2005) (specific jurisdiction was proper where defendant had "purposefully directed its activities" at residents of the forum by marketing a product that directly competed with the alleged infringer).

United States District Court
For the Northern District of California

1    Google contends that Defendants have accepted substantial

2  obligations to Apple, a forum resident, which require Defendants

3  "to defend and pursue any infringement against" their patents.

4  Akro Corp., 45 F.3d at 1543.  Google alleges that Apple is a

5  majority shareholder of Defendants and exerts substantial control

6  over them, and as a result Defendants are obliged to act on

7  Apple's behalf in a campaign to attack Google's Android platform.[6]

8

9    In support of this allegation, Google submits strong evidence

10  that Apple is indeed the majority shareholder of Defendants based

11  on Apple's majority investment in Rockstar's predecessor entity,

12  Rockstar Bidco.[7]  Currently, Rockstar is a Delaware limited

13  partnership which lists "Rockstar Consortium LLC" located in New

14  York as general partner.  Id., Exs. 32-33; Dean Decl. ¶ 15.  But

15  Apple contributed $2.6 billion, or fifty-eight percent of the $4.5

16  billion total investment in Rockstar Bidco.  Madigan Decl., Ex. 9

17  at 34.  Although Rockstar Bidco reorganized itself to become

18

19

20

---

21    [6] Defendants contend that Google has not proven that alter
22  ego or agency theories apply, and thus Apple's contacts with the
   forum cannot be imputed to Defendants.  See Defendants' Reply
22  at 11.  Defendants misunderstand Google's argument.  Google does
23  not seek to impute to Defendants Apple's contacts with the forum
   state, but instead argues that Defendants have undertaken a
24  substantial obligation to Apple related to the asserted patents
25  that makes it reasonable to impose specific jurisdiction.

26    [7] As previously noted, Rockstar wholly owns MobileStar and
   the Court considers the two entities jointly for purposes of
27  jurisdiction because it is likely that MobileStar was created
   solely for litigation purposes.
28

17

Rockstar, it does not appear that any ownership interests changed, nor do Defendants assert otherwise.

Even if Apple is a majority shareholder of Rockstar, if Defendants were able to demonstrate that Apple is a mere passive shareholder and takes no part in patent assertion strategy, then the relationship between Apple and Defendants might not be sufficient to uphold specific jurisdiction.  Cf. Breckenridge Pharm., Inc., 444 F.3d at 1366.  Google alleges that Apple's role extends beyond the mere receipt of profits.  Rockstar's CEO Veschi stated that he does not talk to its shareholders about potential licensing partners or infringement suits, but admitted that he has to show them "progress and that real work is being done."  Madigan Decl., Ex. 12 at 4-5.  Veschi holds periodic calls and meetings with the owners, primarily with their intellectual property departments, and Veschi acknowledges that they "work well together."  Id. at 5.  Although Veschi states they avoid talking about details, it does appear at least telling that Veschi speaks directly and periodically with the owners' intellectual property departments to demonstrate that "work is being done."  Id. at 4-5.

Google demonstrates a direct link between Apple's unique business interests, separate and apart from mere profitmaking, and Defendants' actions against Google and its customers.  Google and

Apple's rivalry in the smartphone industry is well-documented.[8]
Apple's founder stated that he viewed Android as a "rip off" of
iPhone features and intended to "destroy" Android by launching a
"thermonuclear war."  Id., Ex. 31.  Defendants' litigation
strategy of suing Google's customers in the Halloween actions is
consistent with Apple's particular business interests.  In suing
the Halloween action defendants, Defendants here limited their
infringement claims to Android-operating devices only, even where
they asserted a hardware-based patent.  See, e.g., Dean Decl.,
Ex. A and the '551 patent.  This "scare the customer and run"
tactic advances Apple's interest in interfering with Google's
Android business.  See Campbell, 542 F.3d at 887 (finding
jurisdiction where the patentee "took steps to interfere with the
plaintiff's business").

        In sum, with conflicts in the allegations and evidence
resolved in its favor, Google has shown that it is likely that
Defendants have created continuing obligations with a forum
resident to marshal the asserted patents such that it would not be
unreasonable to require Defendants to submit to the burdens of

_____

        [8] See, e.g., Madigan Decl., Ex. 24 (Rockstar's "stockpile was
finally used for what pretty much everyone suspected it would be
used for -- launching an all-out patent attack on Google and
Android"); Ex. 25 ("This is an all out assault on Google and the
Android smartphone ecosystem and it would be fair to say that most
experts expected those patents would rear their ugly head sometime
in the future"); Ex. 26 (new attention focused on Rockstar
"largely because it gives the appearance that three leading
competitors to Android are teaming up against it"); Ex. 27
(further detailing Apple's anti-Android litigation campaign).

United States District Court
For the Northern District of California

litigation in this forum.  _Electronics For Imaging, Inc._, 340 F.3d
at 1350.  Defendants have purposefully directed activities to
residents of this forum in a way which relates materially to the
enforcement or defense of the patent, which is sufficient to
establish specific jurisdiction.  _Avocent Huntsville Corp._, 552
F.3d at 1338.[9]

III. Jurisdiction under Declaratory Judgment Act

   The Declaratory Judgment Act provides, "In a case of actual
controversy within its jurisdiction, any court of the United
States . . . may declare the rights and other legal relations of
any interested party seeking such declaration, whether or not
further relief is or could be sought."  28 U.S.C. § 2201.  The
declaratory judgment plaintiff must establish that the "facts
alleged under all the circumstances show that there is a
substantial controversy between parties having adverse legal
interests of sufficient immediacy and reality to warrant the
issuance of a declaratory judgment."  _Micron Tech., Inc. v. Mosaid
Technologies, Inc._, 518 F.3d 897, 901 (Fed. Cir. 2008) (citing
_MedImmune, Inc. v. Genentech, Inc._, 549 U.S. 118, 126 (2007)
(holding that there was a real and substantial controversy based
on threatening letters and public statements showing an "intent to
continue an aggressive litigation strategy")).

---

   [9] Because the Court finds personal jurisdiction over
Defendants is proper, venue is also proper.  _Trintech Indus._, 395
F.3d at 1280 ("Venue in a patent action against a corporate
defendant exists wherever there is personal jurisdiction").

**– A320 –**

United States District Court
For the Northern District of California

Even when declaratory judgment jurisdiction is present, courts have some discretion to decline to exercise that jurisdiction. Wilton v. Seven Falls Co., 515 U.S. 277, 289-90 (1995). In order to decide whether to exercise jurisdiction under the Declaratory Judgment Act, the court "must determine whether hearing the case would serve the objectives for which the Declaratory Judgment Act was created." Capo, Inc. v. Dioptics Med. Products, Inc., 387 F.3d 1352, 1355 (Fed. Cir. 2004). When the objectives of the Declaratory Judgment Act are served by the action, dismissal is rarely proper. Id. "There must be well-founded reasons for declining to entertain a declaratory judgment action." Id.

The present suit serves the purposes of the Declaratory Judgment Act, which "in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." Micron Tech., Inc., 518 F.3d at 902. A real and substantial controversy existed when Google filed suit. Defendants had sued a number of Google's customers, based in part

United States District Court
For the Northern District of California

21

**− A321 −**

**United States District Court**
For the Northern District of California

on their use of the Android platform developed by Google.[10]

Defendants did not, however, name Google as a defendant.  This

tactic of targeting the customers instead of the manufacturer

"infects the competitive environment of the business community

with uncertainty and insecurity."  <u>Electronics for Imaging, Inc.</u>

<u>v. Coyle</u>, 394 F.3d 1341, 1346 (Fed. Cir. 2005).  In response to

the uncertainty caused by Defendants' actions, Google filed this

declaratory judgment action to "clear the air of infringement

charges."  <u>Avocent Huntsville Corp.</u>, 552 F.3d at 1329.  That

uncertainty still exists in part because, although Defendants

later amended one of the Halloween actions to implicate Google

directly, they accused Google of infringing only three of the

seven of the patents at issue here.  Case No. 13-0900, Docket

No. 19.  Although Defendants recently sought to include the final

four other patents in the Texas case, leave to amend has not yet

_____

[10] Defendants filed a Statement of Recent Decision calling the
Court's attention to <u>Microsoft Corp. v. DataTern, Inc.</u>, 2013-1184,
2014 WL 1327923 (Fed. Cir. Apr. 4, 2014).  The Federal Circuit
noted that, although suits against customers do not "automatically
give rise to a case or controversy regarding induced
infringement," there is a case or controversy if "there is a
controversy between the patentee and the supplier as to the
supplier's liability for induced or contributory infringement
based on the alleged acts of direct infringement by its
customers."  <u>Id.</u> at *2-3.  The vast majority of the claims brought
in the Halloween actions appear to be targeted specifically at
Android features; the exception is the '551 patent, with which it
is not clear if Android is specifically involved.  It is also not
clear if Defendants approached Google to license the '551 patent.
<u>See id.</u> at *2.  Because the <u>DataTern</u> court had the benefit of
claim charts to discern the details of the patentee's infringement
theories, the Court may revisit the inclusion of the '551 patent
at a later date.

been granted.  Case No. 13-0900, Docket Nos. 45-46.  Because the

patent owners failed to "grasp the nettle and sue," Google was

justified in bringing the present action.  Electronics for

Imaging, Inc., 394 F.3d at 1346.

IV.    Motion to Transfer

    A.    First-to-File Rule

    When cases between the same parties raising the same issues

are pending in two or more federal districts, the general rule is

to favor the forum of the first-filed action, regardless of

whether it is a declaratory judgment action.  Micron Tech., Inc.,

518 F.3d at 904.  The court of the actual first-filed case should

rule on motions to dismiss or transfer based on exceptions to the

first-to-file rule or on the convenience factors.  See id.  The

parties dispute which is the first-filed action.  Google argues

that the first-filed action is the present suit, which was filed

before Google faced charges in the Eastern District of Texas due

to Defendants' New Year's Eve amendment.  Defendants argue that

the Halloween actions themselves constituted the first-filed

suits.  Defendants' Motion to Dismiss at 5, 19-24.  Although the

Halloween actions did not name Google specifically, Defendants

contend that they should be considered first-filed suits against

Google because they involved "substantially the same" parties as

those implicated here.  Id. (citing Futurewei Techs., Inc. v.

Acacia Research Corp, 737 F.3d 704, 706 (Fed. Cir. 2013)).

However, the present situation is not equivalent to the

23

"substantially similar" parties that were implicated in <u>Futurewei</u>, which were a patent owner, its exclusive licensee, and the licensee's wholly-owned subsidiary/assignee. <u>Id.</u> at 705-06. By contrast, the relationship between Google and the Halloween defendants is one of manufacturer and customer. Google and the Halloween defendants are not in privity. <u>Cf.</u> <u>Microchip Tech, Inc. v. United Module Corp.</u>, 2011 WL 2669627, at *3 (N.D. Cal.) ("similar" parties were parent and its wholly-owned subsidiary).

Even if the parties were substantially similar in the Halloween actions and this one, the customer-suit exception to the first-to-file rule would apply. <u>Codex Corp v. Milgo Elec. Corp</u>, 553 F.2d 735, 737 (1st Cir. 1977) ("an exception to the first-filed rule has developed in patent litigation where the earlier action is an infringement suit against a mere customer and the later suit is a declaratory judgment action brought by the manufacturer of the accused devices"). Because the determination of the infringement issues here would likely be dispositive of the other cases, and the manufacturer presumably has a greater interest in defending against charges of patent infringement than the customers, the present suit takes precedence. <u>Kahn v. Gen. Motors Corp.</u>, 889 F.2d 1078, 1081 (Fed. Cir. 1989); <u>Cf.</u> <u>ContentGuard Holdings, Inc. v. Google, Inc.</u>, Case No. 14-0061 (E.D. Tex.), Docket No. 37, at 6.

B.    Convenience Factors

The Court could make an exception to the general rule giving

**United States District Court**
For the Northern District of California

preference the first-filed case if doing so would be "in the interest of justice or expediency, as in any issue of choice of forum." Micron Tech., Inc., 518 F.3d at 904. To resolve disputes of "competing forum interests" between accused infringers and patent holders, the court may consider the "convenience factors" under the transfer analysis of 28 U.S.C. § 1404(a), including: the convenience and availability of witnesses, the absence of jurisdiction over all necessary or desirable parties, the possibility of consolidation with related litigation, and considerations relating to the interests of justice. Id. at 902-05. See Reflex Packaging, Inc. v. Audio Video Color Corp., 2013 WL 5568345, at *2 (N.D. Cal.) (listing additional transfer factors).

       1.   Convenience and availability of witnesses

The convenience and availability of witnesses is "probably the single most important factor" in the transfer analysis. In re Genentech, Inc., 566 F.3d 1338, 1343 (Fed. Cir. 2009). This factor favors California because Google's Android products, the target of this infringement action, were designed and created here. Many of the witnesses who can testify to the design and development of the accused Android platform's features reside near Google's headquarters in Mountain View, California. Dubey Decl. ¶¶ 3-8. Other witnesses, such as the inventors of the patents-in-suit, are likely to be in Canada. Defendants do not name any witnesses in Texas essential to the suit.

25

> 2.   Jurisdiction over parties to this action and
>       possibility of consolidation with related
>       litigation

Defendants argue that this Court lacks jurisdiction over some of the customer defendants to the Halloween actions in Texas. Defendants contend those customers necessarily would be indispensable parties to this litigation because their rights in the patents-in-suit are at play.  However, those parties are not essential to resolution of claims between Defendants and Google. It cannot be said that any customer who uses the technology at issue is an indispensable party.

The Halloween actions might not and need not be transferred here.[11]  They might be stayed in Texas and be reopened upon completion of this suit, which likely will resolve some of the infringement issues there.  If the Texas actions are transferred here, they can be consolidated with this case at least for pretrial purposes.

> 3.   Other factors

Other factors that may be considered include: the plaintiff's choice of forum, the convenience of the parties, the ease of access to the evidence, the familiarity of each forum with the applicable law, the local interest in the controversy, the

---

[11] In each of the remaining Halloween actions, the defendant has filed a motion to stay or, in the alternative, to transfer the case to this district.  See Docket Nos. 46, 48, 50-51, 55.

26

1   relative court congestion, and the interests of justice.  Reflex

2   Packaging, Inc., 2013 WL 5568345, at *2.

3       Defendants argue that they are the true plaintiffs and

4   accordingly, their choice of forum should take precedence.  The

5   Court finds this factor at best to favor Defendants only slightly

6   because each side accuses the other of forum shopping.  Indeed,

7   Defendants have not identified any witnesses residing in Texas,

8   their primary operations and headquarters are in Canada, and they

9   admit that many of the inventors of the patents-in-suit were

10  listed at least years ago as being from Canada.  Defendants'

11  argument of their own convenience is similarly attenuated because,

12

13  again, their operations appear to be based in Canada, not Texas.

14      The Northern District of California has the greater interest

15  in this litigation because the claims here will "call into

16  question the work and reputation of several individuals residing

17  in or conducting business in this community."  In re Hoffman-La

18

19  Roche, 587 F.3d 1333, 1336 (Fed. Cir. 2009).  Courts in the

20  Eastern District of Texas have recognized that the "Northern

21  District of California has an interest in protecting intellectual

22  property rights that stem from research and development in Silicon

23  Valley."  Affinity Labs of Texas v. Samsung Elecs. Co., Ltd., 2013

24  WL 5508122, at *3 (E.D. Tex.).  Although Defendants claim to have

25  substantial ties to Texas, their headquarters appear to be in

26  Canada.  The interest of the Eastern District of Texas in this

27

28

27

controversy is therefore outweighed by the compelling interests in California.

The remaining factors are either neutral or favor Google. Because Google, the accused infringer, resides in California, much of the evidence is here.  Some of the evidence may be in Canada or other states; however, that does not make Texas the more convenient forum.  Each forum is familiar with patent law, and both have similar court congestion and time to trial.  All of the cases are in early stages.

On balance, the factors do not weigh in favor of transferring the action to the Eastern District of Texas.

CONCLUSION

The motion to dismiss or transfer is DENIED.

IT IS SO ORDERED.

Dated: 04/17/2014

CLAUDIA WILKEN
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| ROCKSTAR CONSORTIUM US LP AND MOBILESTAR TECHNOLOGIES, LLC | § § § | Civil Action No. 13-cv-0900-JRG |
| Plaintiffs, | § § | **JURY TRIAL DEMANDED** |
| v. | § § § | |
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, GOOGLE INC., | § § § § § | |
| Defendants. | § § | |

## DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE, TO TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS ..................................................................................................1

    A.    Apple and Other Companies Form Rockstar ........................................................1

    B.    Rockstar Consortium US LP and MobileStar File This Action..............................2

    C.    Rockstar's Principal Place of Business is in Canada, Not Texas ...........................3

ARGUMENT ...................................................................................................................4

I.    THE COURT SHOULD STAY THIS ACTION PENDING RESOLUTION OF
    THE GOOGLE ACTION ...........................................................................................4

II.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER TO THE
    NORTHERN DISTRICT OF CALIFORNIA ...............................................................6

    A.    This Action Could Have Been Filed in The Northern District of California..........6

    B.    Rockstar Has No Meaningful Connection to This Forum .....................................7

    C.    The Private Interest Factors Strongly Favor Transfer..............................................7

        1.    Documentary Sources of Proof Are in The Northern District ....................7

        2.    The Cost of Attendance of Willing Witnesses is Lower in The
        Northern District of California Than in The Eastern District of
        Texas ...................................................................................................8

        3.    Availability of Compulsory Process Favors Transfer...............................11

        4.    There Are No Practical Problems With Transferring This Case to
        The Northern District of California .........................................................13

        5.    This Court Has Transferred Similar Cases on Similar Facts ....................13

    D.    The Public Interest Factors Similarly Favor Transfer or Are Neutral ..................15

        1.    The Northern District Has a Much Greater Interest in This Case.............15

        2.    The Remaining Public Interest Factors Are Neutral.................................15

CONCLUSION...............................................................................................................16

i

## TABLE OF AUTHORITIES

**Page**

### Cases

*Adaptix, Inc. v. HTC Corp.*,
  937 F. Supp. 2d 867 (E.D. Tex. 2013)............................................................8

*Affinity Labs of Texas v. Samsung Elecs. Co.*,
  No. 12-557, 2013 WL 5508122 (E.D. Tex. Sept. 18, 2013).............................13, 15

*In re Apple Inc.*,
  456 F. App'x 907 (Fed. Cir. 2012) .................................................................7

*Blue Spike, LLC v. Texas Instruments, Inc.*,
  No. 12-558 (E.D. Tex. Mar. 13, 2014) .........................................................14

*DataTern, Inc., v. Staples, Inc.*,
  No. 10-133 (E.D. Tex. Feb. 12, 2012) ..........................................................5

*Delphi Corp. v. Auto. Tech.'s Int'l, Inc.*,
  No. 08-11048, 2008 WL 2941116 (E.D. Mich. July 25, 2008) ..........................5

*In re Genentech, Inc.*,
  566 F.3d 1338 (Fed. Cir. 2009)..............................................................6, 8, 11

*Google Inc. v. Rockstar Consortium US LP*,
  Case No. 13-5833 (N.D. Cal.)......................................................................2

*Hertz Corp. v. Friend*,
  559 U.S. 77 (2010)......................................................................................7

*In re Hoffman-La Roche Inc.*,
  587 F.3d 1333 (Fed. Cir. 2009)...............................................................8, 15

*Ingeniador, LLC v. Adobe Sys. Inc.*,
  No. 12-00805, 2014 WL 105106 (E.D. Tex. Jan. 10, 2014).........................9, 12, 14

*Katz v. Lear Siegler, Inc.*,
  909 F.2d 1459 (Fed. Cir. 1990)....................................................................4

*Landis v. North Am. Co*,
  299 U.S. 248 (1936)....................................................................................5

*Leviton Mfg. Co., Inc. v. Interline Brands, Inc.*,
  No. 05-123, 2006 WL 2523137 (M.D. Fla. Aug. 30, 2006) ...............................5

*Microlinc, LLC v. Intel Corp.*,
  No. 07-488, 2010 WL 3766655 (E.D. Tex. Sept. 20, 2010)................................5

*In re Microsoft Corp.*,
  630 F.3d 1361 (Fed. Cir. 2011)....................................................................7

*Microsoft Corp. v. Geotag Inc.*,
   847 F. Supp. 2d 675 (D. Del. 2012) .........................................................................5

*In re Nintendo Co.*,
   589 F.3d 1194 (Fed. Cir. 2009) ...............................................................................6

*On Semiconductor Corp v. Hynix Semiconductor, Inc.*,
   No. 09-0390, 2010 WL 3855520 (E.D. Tex. Sept. 30, 2010) .................................7

*Optimum Power Solutions LLC v. Apple Inc.*,
   794 F. Supp. 2d 696 (E.D. Tex. Feb. 22, 2011) .....................................................13

*Phil-Insul Corp. v. Reward Wall Sys., Inc.*,
   No. 11-0053 (E.D. Tex. Feb. 10, 2012), Docket No. 106 ........................................8

*Ricoh Co. Ltd. v. Aeroflex Inc.*,
   279 F. Supp. 2d 554 (D. Del. 2003) .........................................................................5

*Rockstar Consortium US LP v. ASUSTek Computer, Inc.*,
   No. 13-0894, Docket No. 1 .......................................................................................2

*Rockstar Consortium US LP v. HTC Corp.*,
   No. 13-0895, Docket No. 1 .......................................................................................2

*Rockstar Consortium US LP v. Huawei Investment & Holding Co.*,
   No. 13-0896, Docket No. 1 .......................................................................................2

*Rockstar Consortium US LP v. LG Elecs. Inc.*,
   No. 13-0898, Docket No. 1 .......................................................................................2

*Rockstar Consortium US LP v. Pantech Co.*,
   No. 13-0899, Docket No. 1 .......................................................................................2

*Rockstar Consortium US LP v. ZTE Corp.*,
   No. 13-0901, Docket No. 1 .......................................................................................2

*Rockstar Consortium US LP v. Google Inc.*,
   No. 13-0893 ...............................................................................3, 4, 8, 10, 13

*Southwire Co. v. Cerro Wire, Inc.*,
   750 F. Supp. 2d 775 (E.D. Tex. 2010) .....................................................................5

*Spread Spectrum Screening LLC v. Eastman Kodak Co.*,
   657 F.3d 1349 (Fed. Cir. 2011) ...........................................................................4, 5

*Touchscreen Gestures v. HTC*,
   No. 12-0261 (E.D. Tex. Mar. 27, 2013) .................................................................13

*In re TS Tech*,
   551 F.3d 1315, 1320 (Fed. Cir. 2008) ....................................................................15

*TransUnion Intelligence LLC v. Search America, Inc.*,
   No. 10-130, 2011 WL 1327038 (E.D. Tex. Apr. 5, 2011) ......................................13

*Van Dusen v. Barrack*,
　376 U.S. 612 (1964)................................................................................6

*In re Verizon Bus. Network Servs. Inc.*,
　635 F.3d 559 (Fed. Cir. 2011)................................................................8

*In re Volkswagen AG*,
　371 F.3d 201 (5th Cir. 2004) ...............................................................10

*In re Volkswagen of Am., Inc.*,
　545 F.3d 304 (5th Cir. 2008) .............................................................6, 7

*In re Zimmer Holdings, Inc.*,
　609 F.3d 1378 (Fed. Cir. 2010)........................................................7, 13

## <u>Statutes</u>

28 U.S.C. § 1404(a) ..................................................................................6, 16

Fed. R. Civ. P. 45(b)(2)..................................................................................11

Fed. R. Civ. P. 45(c)(1)(B)(ii)........................................................................11

Plaintiffs assert that devices running Google's Android platform (designed and developed primarily in Mountain View, California) manufactured by Samsung (in Korea) or sold by Google (in Mountain View) infringe patents developed by Nortel (formerly Canada's largest telephone company) and now owned by Rockstar Consortium US LP and MobileStar Technologies LLC (both headquartered in Ottawa, Canada).  Whether or not these allegations are correct, they do not have anything to do with Texas.  The Court should thus stay this action pending resolution of Google's complaint for declaratory judgment that its Android platform does not infringe the patents asserted here, currently pending in the Northern District of California.  That action will dispose of major questions at issue in this case, and will likely moot this litigation entirely.  In the alternative, the Court should transfer this action to the Northern District, where Google developed and develops Android, and which holds the vast majority of documents and witnesses.

## STATEMENT OF FACTS

**A.     Apple and Other Companies Form Rockstar**

In 2011, five companies including Google competitors Apple, Blackberry, and Microsoft, together purchased patents auctioned following the bankruptcy of Nortel Networks ("Nortel"). (Declaration of Kristin Madigan ("Madigan Decl.") Exs. 1-3.)  Their winning bid was $4.5 billion.  (*Id.* Exs. 1-2.)  Apple contributed "approximately $2.6 billion," or 58% of the total.  (*Id.* Ex. 4.)  To hold and assert these patents, the five new owners formed an interlocking and often opaque network of companies including the two plaintiffs here, Rockstar Consortium US LP and MobileStar Technologies LLC (collectively, "Rockstar").  (*Id.* Ex. 1, 5-9.)  Rockstar is admittedly a "patent licensing business" that produces no products and practices no patents.  (*Id.* Ex. 10.)  Instead, Rockstar engineers examine other companies' successful products to develop infringement allegations, its licensing staff send demand letters to those companies, and Rockstar extracts licenses to its patents under threat of litigation.  (*Id.* Exs. 1, 11.)

### B.    Rockstar Consortium US LP and MobileStar File This Action

On October 30, 2013, Rockstar Consortium US LP formed a wholly owned subsidiary, MobileStar LLC ("MobileStar").  (Madigan Decl. Ex. 8.)  Rockstar Consortium US LP and MobileStar are both Delaware entities claiming their "principal place of business" at Legacy Town Center 1, 7160 North Dallas Parkway, Suite No. 250, Plano, Texas.  (Docket No. 19 ("Am. Compl.") ¶¶ 1-2.)  The next day, Halloween 2013, Rockstar Consortium US LP transferred to MobileStar ownership of five of the seven patents in suit.  (Madigan Decl. Ex. 12.)  That same day, Rockstar filed this action and six others accusing Android OEMs of infringement by "certain mobile communication devices having a version (or an adaption thereof) of Android operating system" developed by Google.  (Docket No. 1 ¶ 16.)[1]  Although Google is well-known as the author of Android, Rockstar, for its own reasons, chose not to sue Google itself.  (*Id.*)

On December 23, 2013, Google filed a declaratory action in the Northern District of California, seeking judgment that Android does not infringe the same seven patents.  *Google Inc. v. Rockstar Consortium US LP*, No. 13-5833 (N.D. Cal.), Docket No. 1; the "Google Action".  Only after that, on December 31, 2013, did Rockstar amend its complaint here to accuse Google of infringing three of the seven patents.  (Am. Compl. ¶ 27.)  Three months later, on March 10, 2014, Rockstar sought leave to add allegations that Google infringed the other four patents as well.  (Docket No. 45.)  The Google Action in California remains the first-filed action between Rockstar and Google, and the only action between them to include all patents-in-suit.

---

[1]    See also *Rockstar Consortium US LP v. ASUSTek Computer, Inc.*, No. 13-0894, Docket No. 1 ¶ 14; *Rockstar Consortium US LP v. HTC Corp.*, No. 13-0895, Docket No. 1 ¶ 15; *Rockstar Consortium US LP v. Huawei Investment & Holding Co.*, No. 13-0896, Docket No. 1 ¶ 20; *Rockstar Consortium US LP v. LG Elecs. Inc.*, No. 13-0898, Docket No. 1 ¶ 16; *Rockstar Consortium US LP v. Pantech Co.*, No. 13-0899, Docket No. 1 ¶ 14; and *Rockstar Consortium US LP v. ZTE Corp.*, No. 13-0901, Docket No. 1 ¶ 15.

### C.    Rockstar's Principal Place of Business is in Canada, Not Texas

Plaintiffs in this action, Rockstar Consortium US LP and MobileStar LLC (collectively, "Rockstar"), each claim to have "its principal place of business" in Texas.  (Am. Compl. ¶¶ 1-2.) Public records reveal that Rockstar's principal place of business is in Ottawa, Canada.

Rockstar does not hide its Canadian connections.  Rockstar's website lists addresses in Canada and Texas; Canada comes first, and has the only phone number.  (Madigan Decl. Ex. 10.)  The same website links to Rockstar's LinkedIn page, which lists Rockstar's Canadian address as its "headquarters."  (*Id.* Exs. 13-14.)  Rockstar also lists its employees on LinkedIn; there are 33 of them, with only five in Texas.  (*Id.* Exs. 14-15.)  Even Rockstar's own declarant, opposing transfer in another action, could aver only that the same employees work in Rockstar's Texas office.  *Rockstar Consortium US LP v. Google Inc.*, No. 13-0893, Docket No. 33-1 ¶ 21. The bulk of Rockstar's employees, including its senior management, work in Ontario, Canada:



Figure 1. **Senior Rockstar management**

(Madigan Decl. Ex. 16.)  Of these ten members of Rockstar's senior management, five work in Canada; one each in California, Colorado, Massachusetts, New York, and Pennsylvania; and none in Texas.  (*Id.* Exs. 15-19.)  In addition to its senior management, Rockstar lists on its website six "Corporate Leaders," none of whom are from Texas.  (*Id.* Ex. 20.)  None of Rockstar's declarants have averred that its management, "senior" or otherwise, is in Texas.

Rockstar's documents confirm this.  Rockstar's business is licensing, and its licensing

letters are key to this business.  Rockstar's licensing letters come from Rockstar's headquarters

in Canada, and from Rockstar's licensing executive in California.  (Madigan Decl. Ex. 21.)  But

the most telling exposure of Rockstar's Canadian origin comes from the document transferring

five of the patents-in-suit from Rockstar Consortium US LP to MobileStar.  (*Id.* Ex. 12.)

Although Rockstar alleges that both buyer and seller have "Texas roots" (Google Action, Docket

Nos. 20 at 5, 39-3 at 9) and "longstanding ties" to "this area," (*Rockstar Consortium US LP v.*

*Google Inc.*, No. 13-0893, Docket No. 33 at 1), this critical transaction, which Rockstar alleges

makes MobileStar indispensable, was executed by two members of Rockstar's senior

management, both Canadians, *in Canada*—duly witnessed and notarized by Rockstar's Canadian

corporate counsel.  (Madigan Decl. Ex. 12.)  Rockstar has not even asserted that MobileStar set

foot in Texas before filing this action.  MobileStar did not even register with the Secretary of

State, as required by Texas law, until more than a month later.  (Docket No. 26 at 3-4.)

## ARGUMENT

**I.     The Court Should Stay This Action Pending Resolution of The Google Action**

Because the Google Action will answer many, if not all, of the central questions at issue

here, the Court should stay this case and allow that action to proceed to judgment first.  In the

interest of judicial efficiency and to guard against abuse, "'litigation against or brought by the

manufacturer of infringing goods takes precedence over a suit by the patent owner against

customers of the manufacturer.'"  *Spread Spectrum Screening LLC v. Eastman Kodak Co*., 657

F.3d 1349, 1357 (Fed. Cir. 2011) (quoting *Katz v. Lear Siegler, Inc.*, 909 F. 2d 1459, 1464 (Fed.

Cir. 1990)).  The manufacturer's case need not resolve every issue in the customer suits; it "need

only have the potential to resolve the 'major issues' concerning the claims against the

customer—not every issue—in order to justify a stay of the customer suits."  *Spread Spectrum*,

657 F.3d at 1358 (citing *Katz*, 909 F.2d at 1464).  The Google Action easily clears this bar.

Android originates with Google, which supervises its "design and production" and is "in the best position to defend its own products." *Delphi Corp. v. Auto. Tech.'s Int'l, Inc.*, No. 08-11048, 2008 WL 2941116, at *5 (E.D. Mich. July 25, 2008); *Microsoft Corp. v. Geotag Inc.*, 847 F. Supp. 2d 675, 681 (D. Del. 2012) (finding "the real dispute" was between the patentee and defendants Microsoft and Google, rather than customers who featured Microsoft and Google mapping services on their websites). The Google Action will resolve "major issues" in this litigation, simplifying and likely obviating it. *Spread Spectrum*, 657 F.3d at 1358; *DataTern, Inc., v. Staples, Inc.*, No. 10-133 at 9 (E.D. Tex. Feb. 12, 2012), Docket No. 185 (staying customer suits in favor of declaratory judgment action brought by software developers in New York because "'in all likelihood [the New York cases] will settle many [issues] and simplify them all.'" (quoting *Landis v. North Am. Co*, 299 U.S. 248, 256 (1936) (alterations in original)). The Google Action should "efficiently dispose of the infringement issues" presented here, *Ricoh Company v. Aeroflex Inc.*, 279 F. Supp. 2d 554, 558 (D. Del. 2003), and should promote judicial economy by encouraging "global" resolution rather than "piecemeal litigation." *Delphi Corp.*, 2008 WL 2941116, at *5; *Ricoh*, 279 F. Supp. 2d at 557 ("it is more efficient for the dispute to be settled directly between the parties in interest"); *Leviton Mfg. Co., Inc. v. Interline Brands, Inc.*, No. 05-123, 2006 WL 2523137, at *2 (M.D. Fla. Aug. 30, 2006) (stay will "preserve judicial resources, prevent duplicative expenses, and prevent the possibility of inconsistent judgments"). The Court should stay this action pending resolution of the Google Action.[2]

---

[2]   This Court should also stay this action under its inherent authority because this case is in its early stages, a stay will simplify the issues, *see supra* at 5, and will not prejudice Rockstar. *See Southwire Co. v. Cerro Wire, Inc.*, 750 F. Supp. 2d 775, 778-80 (E.D. Tex. 2010). Rockstar is a non-practicing entity that can be fully compensated with damages. *Microlinc, LLC v. Intel Corp.*, No. 07-488, 2010 WL 3766655, at *2 (E.D. Tex. Sept. 20, 2010).

## II.    In the Alternative, the Court Should Transfer to the Northern District of California

Should the Court decline to grant a stay, it should transfer this case to the Northern

District of California, the more convenient forum.  For "the convenience of parties and

witnesses, in the interest of justice, a district court may transfer any civil action to another district

or division where it might have been brought."  *In re Genentech, Inc.*, 566 F.3d 1338, 1342 (Fed.

Cir. 2009) (citing 28 U.S.C. § 1404(a)).  In evaluating whether the proposed transferee forum is

sufficiently more convenient, courts look to "private" and "public" interest factors:

> The private interest factors are:  (1) the relative ease of access to sources of proof; (2) the
> availability of compulsory process to secure the attendance of witnesses; (3) the cost of
> attendance for willing witnesses; and (4) all other practical problems that make trial of a
> case easy, expeditious and inexpensive.  The public interest factors are:  (1) the
> administrative difficulties flowing from court congestion; (2) the local interest in having
> localized interests decided at home; (3) the familiarity of the forum with the law that will
> govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in]
> the application of foreign law.

*In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) ("*Volkswagen II*")

(citation omitted)).  The law requires an "individualized, case-by-case consideration of

convenience and fairness" to the parties, *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964), and

"forbids treating the plaintiff's choice of venue as a factor in the analysis of a request to transfer

for the convenience of the parties."  *In re Nintendo Co.*, 589 F.3d 1194, 1200 (Fed. Cir. 2009);

*Volkswagen II*, 545 F.3d at 313-15.

### A.    This Action Could Have Been Filed in The Northern District of California

The Court must first determine "whether a civil action 'might have been brought' in the

destination venue."  *Volkswagen II*, 545 F.3d at 312.  This test is not difficult to meet; it is "only

a requirement that the transferee court have jurisdiction over the defendants in the transferred

complaint."  *Genentech*, 566 F.3d at 1346.  Google and Samsung are both subject to jurisdiction

in the Northern District of California, resolving this issue.

### B.    Rockstar Has No Meaningful Connection to This Forum

Although both Rockstar Consortium LP and MobileStar claim their "principal place of business" is in this District, Rockstar's true principal place of business is in Canada.  (*See supra* at 3-4.)  The Supreme Court has defined "principal place of business" as "the place where a corporation's officers direct, control, and coordinate the corporation's activities," also known as "the corporation's 'nerve center.'"  *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010).  Citing *Hertz Corp.*, the Federal Circuit has transferred similar cases out of this District.  *In re Microsoft Corp.*, 630 F.3d 1361, 1364 (Fed. Cir. 2011) (granting mandamus and reminding that courts should, if "the record reveals attempts at manipulation" regarding the principal place of business, "take as the 'nerve center' the place of actual direction, control, and coordination, in the absence of such manipulation"); *In re Zimmer Holdings, Inc.*, 609 F.3d 1378, 1381 (Fed. Cir. 2010) (noting that *Hertz Corp.* urges "courts to ensure that the purposes of jurisdictional and venue laws are not frustrated by a party's attempts at manipulation," and finding the patentee's "presence in Texas appears to be recent, ephemeral, and an artifact of litigation").  "Courts should not 'honor connections to a preferred forum made in anticipation of litigation and for the likely purpose of making that forum appear convenient.'"  *In re Apple Inc.*, 456 F. App'x 907, 908-09 (Fed. Cir. 2012) (quoting *Microsoft Corp.*, 630 F.3d at 1364).

### C.    The Private Interest Factors Strongly Favor Transfer

#### 1.    Documentary Sources of Proof Are in The Northern District

This factor turns on "which party, usually the accused infringer, will most probably have the greater volume of documents relevant to the litigation and their presumed location in relation to the transferee and transferor venues."  *On Semiconductor Corp v. Hynix Semiconductor, Inc.*, No. 09-0390, 2010 WL 3855520, at *2 (E.D. Tex. Sep. 30, 2010) (citing *Volkswagen II*, 545 F.3d at 314-15).  In *Hynix*, the court noted that relevant documents were "spread throughout the

country and world," including in Texas, but still found that this factor favored transfer to the Northern District of California because it was closer to most of defendants' documents and, "typically in a patent case, the defendant has the majority of relevant documents." *Id.* at *4.  That is certainly true here:  Google's design and development documents are managed and maintained from Google's headquarters in California.  (Declaration of Abeer Dubey ("Dubey Decl.") ¶ 12.) "[T]he volume of physical evidence located in, or closer to, the transferee forum" is significant "especially when no physical evidence is located in Texas."  *Phil-Insul Corp. v. Reward Wall Sys., Inc.*, No. 11-53, at 4 (E.D. Tex. Feb. 10, 2012), Docket No. 106 .  Rockstar admits that its purportedly relevant documents come from Nortel's former office, which Rockstar further admits was *not in this District*.  *Rockstar Consortium US LP v. Google Inc.*, No. 13-0893, Docket No. 33-1 ¶¶ 6, 24.  Rockstar moved these documents into this District (*id.* ¶¶ 18, 24), "but documents relocated in anticipation of litigation are not considered."  *Adaptix, Inc. v. HTC Corp.*, 937 F. Supp. 2d 867, 872 (E.D. Tex. 2013) (citing *In re Hoffman-La Roche Inc.*, 587 F.3d 1333, 1336-7 (Fed. Cir. 2009)).  In any event, "the bulk of the relevant evidence usually comes from the accused infringer," here, Google in the Northern District.  *Genentech*, 566 F.3d at 1345.

> **2.    The Cost of Attendance of Willing Witnesses is Lower in The Northern District of California Than in The Eastern District of Texas**

Transfer to the Northern District of California will serve the convenience of the witnesses, which is "probably the single most important factor in transfer analysis."  *Genentech*, 566 F.3d at 1343; *see In re Verizon Bus. Network Servs. Inc.*, 635 F.3d 559, 561 (Fed. Cir. 2011). "All potential material and relevant witnesses must be taken into account for the transfer analysis, irrespective of their centrality to the issues raised in a case or their likelihood of being called to testify at trial."  *Hynix*, 2010 WL 3855520, at *5 (citing *Genentech*, 566 F.3d at 1343).

Google is headquartered in Mountain View, California.  (Dubey Decl. ¶¶ 4-6.)  Google witnesses are concentrated in Mountain View, including engineers responsible for the research, design, and development of the accused Android features.  (*Id*. ¶ 7.)  There are approximately 850 people in the group that develops the Android platform.  Of these, over 200 are outside of the U.S. (*id*. ¶ 8)—which should not impact the venue analysis.  Of the approximately 630 United States-based employees in this group, more than 85% work in the San Francisco Bay Area.  (*Id*.)  This group is led by Hiroshi Lockheimer, Vice President of Engineering, who works in Mountain View, California.  Jon Gold, a Finance Manager with knowledge of financial information related to Google's Android platform, also works in Mountain View.  (*Id*. ¶ 9.)  There are no relevant Google documents or employees in the Eastern District.  (*Id*. ¶¶ 11-12.)  Google's witnesses residing near Mountain View "would be forced to travel more than 1,500 miles to attend trial in this Court."  *Ingeniador*, *LLC v. Adobe Sys. Inc.*, No. 12-0805, 2014 WL 105106, at *3 (E.D. Tex. Jan. 10, 2014).

Samsung Electronics Co., Ltd. ("SEC") is a Korean company based in Korea.  Samsung Electronics America, Inc. ("SEA") is a corporation organized and existing under the laws of the state of New York, with a principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey.  Samsung Telecommunications America, LLC ("STA")  is a limited liability company organized and existing under the laws of the state of Delaware, with a principal place of business at 1301 East Lookout Drive, Richardson, Texas.  SEC manufactures the accused devices outside the U.S.—in fact, no Samsung cell phones or tablets are manufactured here.  (Decl. of B. J. Kang In Support of Defendants' Motion to Stay, Or In The Alternative, To Transfer To The Northern District of California ("Kang Decl.") ¶ 4.)  Neither STA nor SEA manufactures Samsung cell phones or tablets.  (*Id*.)  Samsung does not operate any retail stores

or conduct any retail operations in the U.S., nor does it sell the accused devices directly to any consumer in the U.S.  (*Id*. ¶ 5.)  Samsung cell phones and tablets are not available for direct purchase in the U.S. through Samsung's websites.  (*Id*.)  The vast majority of Samsung's employees are located in Korea, where the vast majority of planning, design, and development of the accused devices Samsung takes place.  (*Id*. ¶¶ 6-7.)  The vast majority of Samsung's records relating to the design, manufacture, and operation of the accused devices would be located in Korea.  (*Id*. ¶ 8.)  The vast majority of the Samsung employees who possess knowledge likely relevant to the present case, including those knowledgeable about Samsung's phones and tablets with the Android Operating System, live and work in South Korea.  (*Id*. ¶ 10.)

The Northern District of California is more than 100 miles from this District, so the "factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *In re Volkswagen*, 371 F.3d 201, 204-05 (5th Cir. 2004).  The Northern District is a dramatically shorter average distance from the vast majority of potential witnesses, including Google's witnesses in that District and Samsung's in Korea, than is this District.  But the Court must consider not only average distance, but also travel time.  *See id.* at 205 n.3.  Here too the Northern District prevails:  the much smaller number of witnesses who would still have to fly there can fly into international airports in Oakland or San Francisco, 10 and 25 miles from the courthouse hearing the Google Action, while witnesses traveling to this Court must additionally drive 170 miles from Dallas, or take a connecting regional flight into Shreveport and drive back 35 miles.  Rockstar tepidly argues that its employees would *prefer* to come here instead of San Francisco (*Rockstar Consortium US LP v. Google Inc.*, No. 13-0893, Docket No. 33-1 ¶ 25), but cannot show the Eastern District is objectively more convenient for these employees.  In contrast, Google's more numerous witnesses, with more central information, are *actually* in

Mountain View in the Northern District.  (Dubey Decl. ¶¶ 4-9.)  In any event, witnesses traveling

from Rockstar's Ottawa headquarters must travel a significant distance to either district and

therefore should not affect the Court's venue consideration.  *Genentech*, 566 F.3d at 1344.

### 3.    Availability of Compulsory Process Favors Transfer

The third factor, "availability of compulsory process to secure the attendance of

witnesses," strongly favors the Northern District.  Both this Court and the Northern District can

issue nationwide deposition subpoenas under Fed. R. Civ. P. 45(b)(2), but each Court has

different powers to require attendance at trial.  This Court can compel only non-party witnesses

residing within Texas, and the Northern District only from within California.  Fed. R. Civ. P.

45(c)(1)(B)(ii).  In at least three subject-matter areas, the relevant witnesses are in the Northern

District.  First, witnesses with knowledge of the Android platform, including former employees

of Google and Android Inc., remain heavily concentrated in the Northern District.  At least one

named inventor resides in the Northern District (Madigan Decl. Ex. 22), and dozens of relevant

prior artists of record live in the Northern District.[3]

---

[3]    The inventors include Edward H. Frank, James Arthur Gosling, and John C. Liu, named inventors on European Patent No. 0,605,945; Ashish Thanawala, named inventor on European Patent No. 0,630,141; Michael C. Tchao, named inventor on U.S. Patent No. 5,563,996; Scott A. Jenson, named inventor on U.S. Patent No. 5,570,109; Mitchell D. Forcier, named inventor on U.S. Patent No. 5,590,257; Robert Irribarren, named inventor on U.S. Patent No. 5,737,395, Stephen P. Capps, named inventor on U.S. Patent No. 5,745,716; Ilan Raab, Ravi Manghirmalani, Ofer Doitel, and Lynne Marie Izbicki, named inventors on U.S. Patent No. 5,751,967; Ajay Gupta and Gregory Skinner, named inventors on U.S. Patent No. 5,781,550; Judy Dere, Leon Leong, Daniel Simone, and Allan Thomson, named inventors on U.S. Patent No. 5,802,286; Thomas P. Moran and Patrick Chiu, named inventors on U.S. Patent No. 5,809,267; Christopher D. Coley, named inventors on U.S. Patent No. 5,826,014; Tom Ziola and William Herman, named inventors on U.S. Patent No. 5,862,339; Nicolle Henneuse and Pete Billington, named inventors on U.S. Patent No. 5,963,913; John H. Hart and W. Paul Sherer, named inventors on U.S. Patent No. 6,041,166; Srikumar N. Chari, named inventor on U.S. Patent No. 6,046,742; Prakash C. Banthia, a named inventor on U.S. Patent No. 6,085,243; Umesh Muniyappa, Alampoondi Eswaran Natarajan, Nicholas Michael Brailas, and Michael Terzich, named inventors on U.S. Patent No. 6,092,200; Keith McCloghrie, Bernard R. James, Christopher Young, and Norman W. Finn, named inventors on U.S. Patent No. 6,219,699; Leslie

Finally and most critically, the Northern District is home to important, but very likely unwilling, trial witnesses:  employees of Apple.  "[T]he focus of this factor is on witnesses for whom compulsory process might be necessary." *Ingeniador*, 2014 WL 105106, at *2. Rockstar's complaint includes allegations regarding the auction of Nortel's patent portfolio.  (Docket No. 19 ¶¶ 7-12.)  Rockstar alleges that Google "ultimately bid[] as high as $4.4 billion" for the portfolio, but lost to Apple and the other Rockstar owners.  (*Id*. ¶ 11.)  Rockstar has thus put at issue in this action—in fact, at the forefront—the valuation of the entire portfolio auctioned by Nortel.  Rockstar evidently intends to introduce evidence at trial regarding Google's bids on the total Nortel portfolio, evidence which Google can counter by calling witnesses from Apple—but only if Google can compel those witnesses to attend the trial, which it can do in the Northern District but not here.

This Court cannot compel live testimony from these out-of-state witnesses.  As a result, in this District Rockstar could compel testimony from Google regarding its valuation of the Nortel portfolio, while Google could present Apple's valuation only though deposition testimony, on which jurors focus less.  There would thus be total asymmetry of presentation on this controversial issue, which would be highly prejudicial to Google.  The Northern District can compel live testimony from Apple, eliminating this asymmetry.  This factor favors transfer.

Google and Samsung should not be deprived of their ability to call these witnesses live, especially where no relevant non-party witness appears to reside in the Eastern District.  None of the prosecuting attorneys appear to reside here.  (Madigan Decl. Ex. 23.)  Not a single inventor named on the asserted patents was located in Texas.  The sale of Nortel's patent portfolio took

---

J. Arrow and Quentin C. Liu, named inventors on U.S. Patent No. 6,226,751; Snehal G. Karia and Dean C. Cheng, named inventors on U.S. Patent No. 6,643,267; and Kamran Sistanizadeh and Masoud M. Kamali, named inventors on U.S. Patent No. 6,681,232.  (Jachlewski Decl. ¶ 3.)

place in New York, in which Nortel was represented by New York attorneys.  *Rockstar Consortium US LP v. Google Inc.*, No. 13-0893, Docket No. 33-1 ¶ 14.  The former Nortel licensing executives involved in the sale and Rockstar's acquisition of the patents-in-suit reside in Canada and Massachusetts.  (Madigan Decl. Exs. 24-25.)  The Court should grant transfer where, as here, the present District "is convenient only for [plaintiff]'s litigation counsel."  *Zimmer*, 609 F.3d at 1381.

### 4.    There Are No Practical Problems With Transferring This Case to The Northern District of California

"Practical problems include those that are rationally based on judicial economy."  *Optimum Power Solutions LLC v. Apple Inc.*, 794 F. Supp. 2d 696, 702 (E.D. Tex. Feb. 22, 2011).  There are no practical problems with transferring this case because this case is just beginning:  discovery has not started, the parties have not exchanged initial disclosures or contentions, and any such disclosures or contentions exchanged in the future can be used in the Northern District as well.  The Local Patent Rules of this District were patterned on those of the Northern District of California, meaning any work the parties have done in this District will not be wasted.  *Affinity Labs of Texas v. Samsung Elecs. Co.*, No. 12-557, 2013 WL 5508122, at *2 (E.D. Tex. Sept. 18, 2013).  This factor is thus neutral.  *TransUnion Intelligence LLC v. Search America, Inc.*, No. 10-130, 2011 WL 1327038, at *5 (E.D. Tex. Apr. 5, 2011).

### 5.    This Court Has Transferred Similar Cases on Similar Facts

In *Touchscreen Gestures v. HTC*, the court granted transfer to the Northern District on strikingly similar facts.  No. 12-0261 (E.D. Tex. Mar. 27, 2013), Docket No. 17.  In *Touchscreen*, a Texas LLC brought a patent infringement lawsuit in the Eastern District against a foreign device manufacturer and its U.S. subsidiary.  *Id.* at 1-2.  As in this case, the LLC plaintiff was formed shortly before filing suit against an Android OEM.  *Id.* at 6.  The Court found that

Google's documents are more easily accessed from the Northern District, and the Northern District would be more convenient for witnesses from Google. *Id.* at 7 and 10. The same holds true here. (Dubey Decl. ¶ 3.) Each of the public and private factors is neutral or favors transfer to the Northern District. No factor favors this District.

This Court also recently granted transfer in *Ingeniador*, 2014 WL 105106. Defendant there was headquartered in the Northern District of California. *Id.* at *1. Although some relevant documentary evidence was located in Texas, as Rockstar claims here, *most* of the evidence and witnesses were in the Northern District. *Id.* at *2, *3. The Court found the inconvenience to the witnesses in Texas outweighed by the "substantially increased convenience of witnesses in California," in particular "given that most witnesses will likely come from California." *Id.* at *3. The same is true here.

Similarly, in *Blue Spike, LLC v. Texas Instruments, Inc.*, this Court transferred a patent infringement suit against Google to the Northern District of California. No. 12-558 at 1 (E.D. Tex. Mar. 13, 2014), Docket No. 16. Google's motion was based "largely on the fact that its headquarters—and thus its witnesses and evidence—are in Mountain View, California." *Id.* at 2. Plaintiff argued "(1) the pendency of dozens of related cases in this district, and (2) the presence of Plaintiff Blue Spike as well as Blue Spike CEO and Inventor Scott Moskowitz" weighed against transfer. *Id.* This Court found "the location of Defendant's sources of proof far outweighs the presence of Plaintiff's documents and servers in Texas." *Id.* at 5. This Court also found compulsory process and cost of attendance of willing witnesses favored transfer because Google identified numerous non-party witnesses. *Id.* at 5-7. The Court found the Northern District of California was "a clearly more convenient forum" and granted transfer. *Id.* at 10. The same analysis should apply here.

14

**D.      The Public Interest Factors Similarly Favor Transfer or Are Neutral**

**1.      The Northern District Has a Much Greater Interest in This Case**

The Android platform, developed by Google at Mountain View, is at the core of

Rockstar's claims. "The Northern District of California has an interest in protecting intellectual

property rights that stem from research and development in Silicon Valley." *Affinity*, 2013 WL

5508122, at *3. The Northern District's local interest is even stronger, however, because this

action "calls into question the work and reputation of several individuals residing in or near that

district and who presumably conduct business in that community." *Hoffman La-Roche*, 587 F.3d

at 1336. This District's interest is much weaker. Rockstar alleges only a single connection to

this District, its asserted "principal place of business," but that is actually in Canada. (*See supra*

at 3-4.) The allegedly infringing devices are "sold throughout the United States, and thus the

citizens of the Eastern District of Texas have no more or less of a meaningful connection to this

case than any other venue." *In re TS Tech*, 551 F.3d 1315, 1321 (Fed. Cir. 2008). This factor

favors transfer.

**2.      The Remaining Public Interest Factors Are Neutral**

The remaining public interest factors are neutral or weigh slightly in favor of transfer.

The Northern District and this District resolve cases in nearly identical time. (Madigan Decl. Ex.

26.) Both Courts are familiar with and can apply the federal patent laws to this case, and no

conflict of laws problems are expected in either district. *See TS Tech*, 551 F.3d at 1320.

15

## **CONCLUSION**

For the foregoing reasons, defendants Google and Samsung respectfully request that this

Court stay this case pending resolution of the Google Action or, in the alternative, transfer this

case to the Northern District of California pursuant to 28 U.S.C. § 1404(a).

Dated:  March 21, 2014                        Respectfully submitted,

                                              /s/ *J. Mark Mann*

J. Mark Mann (State Bar No. 12926150)         J. Mark Mann (State Bar No. 12926150)
mark@themannfirm.com                          mark@themannfirm.com
G. Blake Thompson (State Bar No. 24042033)    G. Blake Thompson (State Bar No. 24042033)
blake@themannfirm.com                         blake@themannfirm.com
MANN | TINDEL | THOMPSON                       MANN | TINDEL | THOMPSON
300 West Main Street                          300 West Main Street
Henderson, Texas  75652                       Henderson, Texas  75652
(903) 657-8540                                (903) 657-8540
(903) 657-6003 facsimile                      (903) 657-6003 facsimile

Charles K. Verhoeven (Cal. Bar. No. 170151)   Charles K. Verhoeven (Cal. Bar. No. 170151)
Sean Pak (Cal. Bar. No. 2190323)              Sean Pak (Cal. Bar. No. 219032)
quinn-samsung-e.d.tex.-13-0900                Amy H. Candido (Cal. Bar. No. 237829)
     @quinnemanuel.com                        Matthew S. Warren (Cal. Bar. No. 230565)
QUINN EMANUEL URQUHART                          quinn-google-e.d.tex.-13-00900
     & SULLIVAN, LLP                               @quinnemanuel.com
50 California Street, 22nd Floor              QUINN EMANUEL URQUHART
San Francisco, California 94111                    & SULLIVAN, LLP
(415) 875-6600                                50 California Street, 22nd Floor
(415) 875-6700 facsimile                      San Francisco, California  94111
                                              (415) 875-6600
Kevin P.B. Johnson (Cal. Bar No. 177129)      (415) 875-6700 facsimile
QUINN EMANUEL URQUHART
     & SULLIVAN, LLP                           *Attorneys for Defendant Google Inc.*
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California  94065
(650) 801-5000
(650) 801-5100 facsimile

Joseph Milowic III (NY Bar. No. 4,622,221)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000
(212) 849-7100 facsimile

*Attorneys for Defendants Samsung Electronics, Co., Ltd.,*
*Samsung Electronics America, Inc., and Samsung*
*Telecommunications America, LLC*

17

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that all counsel of record have consented to electronic service and are

being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-

5(a)(3) on March 21, 2014.

/s/ *J. Mark Mann*
  J. Mark Mann

Case 2:13-cv-00900-JRG   Document 52-1   Filed 03/21/14   Page 1 of 6 PageID #:  1795

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| ROCKSTAR CONSORTIUM US LP AND MOBILESTAR TECHNOLOGIES, LLC | § § § | Civil Action No. 13-cv-0900-JRG |
| Plaintiffs, | § § | **JURY TRIAL DEMANDED** |
| v. | § § § | |
| SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA, LLC, GOOGLE INC., | § § § § § § | |
| Defendants. | § § | |

**DECLARATION OF KRISTIN J. MADIGAN
IN SUPPORT OF DEFENDANTS' MOTION TO STAY OR, IN THE ALTERNATIVE,
TO TRANSFER TO THE NORTHERN DISTRICT OF CALIFORNIA**

I, Kristin J. Madigan, hereby declare as follows:

1.      I am Of Counsel at Quinn Emanuel Urquhart & Sullivan, LLP, counsel for

defendants.  I submit this declaration in support of Defendants' Motion To Stay Or, In The

Alternative, To Transfer To The Northern District Of California.  I have personal knowledge of

the following facts, and would competently testify to them if called upon to do so.

2.      Attached hereto as Exhibit 1 is a true and correct copy of Robert McMillan, *How

Apple and Microsoft Armed 4,000 Patent Warheads*, Wired Enterprise, May 21, 2012.

3.      Attached hereto as Exhibit 2 is a true and correct copy of Joff Wild, *Rockstar

CEO says he would not bet against further suits to follow those issued last week*, IAM Magazine,

November 4, 2013, available at http://www.ip-rockstar.com/Press_Releases/First

%20enforcement%20actions%20%E2%80%93%20Intellectual%20Asset%20Management.pdf.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Order Authorizing

and Approving (A) The Sale of Certain Patent and Related Assets Free And Clear of All Claims

and Interests, (B) The Assumption and Assignment of Certain Executory Contracts, (C) The

Rejection of Certain Patent Licenses and (D) The License Non-Assignment and Non-Renewal

Protections, *In re Nortel Networks Inc., et al.*, No. 09-10138 (D. Del. July 11, 2011), Docket. No.

5935.

5.      Attached hereto as Exhibit 4 is a true and correct copy of a document titled Apple

Inc. Form 10-Q Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act

of 1934 for the quarterly period ended June 25, 2011.

6.      Attached hereto as Exhibit 5 is a true and correct copy of the Certificate of

Limited Partnership of Rockstar Bidco, LP.

7.      Attached hereto as Exhibit 6 is a true and correct copy of the Certificate of Formation of Rockstar Consortium LLC.

8.      Attached hereto as Exhibit 7 is a true and correct copy of the Certificate of Limited Partnership of Rockstar Consortium US LP.

9.      Attached hereto as Exhibit 8 is a true and correct copy of the Certificate of Formation of MobileStar Technologies LLC.

10.     Attached hereto as Exhibit 9 is a true and correct copy of Robert McMillan, *Facebook Infringes My Patents Too, Says CEO Who Just Sued Google*, Wired Enterprise, November 1, 2013.

11.     Attached hereto as Exhibit 10 is a true and correct copy of an excerpt from the ip-rockstar.com website page titled "About Rockstar."

12.     Attached hereto as Exhibit 11 is a true and correct copy of an excerpt from the ip-rockstar.com website page titled "Innovation."

13.     Attached hereto as Exhibit 12 is a true and correct copy of  patent assignment record Reel No. 031523, Frame No. 0182-90, from the United States Patent And Trademark Office.

14.     Attached hereto as Exhibit 13 is a true and correct copy of an excerpt from the ip-rockstar.com website page titled "Grow together through innovation."

15.     Attached hereto as Exhibit 14 is a true and correct copy of a website page from www.LinkedIn.com for "Rockstar Consortium."

16.     Attached hereto as Exhibit 15 is a true and correct copy of website pages from www.LinkedIn.com for thirty-three individuals who include "Rockstar Consortium" as their current employer.

17.     Attached hereto as Exhibit 16 is a true and correct copy of Joff Wild, *Star Man*, Intellectual Asset Management, July/August 2013, available at http://www.ip-rockstar.com/Press_Releases/IAM%20Rockstar%20Article%20JulyAugust%202013.pdf.

18.     Attached hereto as Exhibit 17 is a true and correct copy of a website page from www.LinkedIn.com for Mark Wilson, as accessed on December 19, 2013.

19.     Attached hereto as Exhibit 18 is a true and correct copy of a website page from www.LinkedIn.com for Mark Wilson.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a website page from www.LinkedIn.com for Michael Dunleavy.

21.     Attached hereto as Exhibit 20 is a true and correct copy of an excerpt from the ip-rockstar.com website page titled "Corporate Leaders."

22.     Attached hereto as Exhibit 21 is a true and correct copy of Exhibits Q-U to Docket No. 1, *Charter Communications v. Rockstar et. al*., No. 14-0055 (D. Del. Jan. 17, 2014).

23.     Attached hereto as Exhibit 22 is a true and correct copy of a website page from www.LinkedIn.com for Don Lindsay.

24.     Attached hereto as Exhibit 23 is a true and correct copy of excerpts from the following websites:

www.finnegan.com

www.fisherbroyles.com

www.foley.com

www.harrityllp.com

www.massbbo.org

25.     Attached hereto as Exhibit 24 is a true and correct copy of Joff Wild, *Rockstar getting ready to roll . . .*, Intellectual Asset Management, February 19, 2012.

26.     Attached hereto as Exhibit 25 is a true and correct copy of a website page from www.LinkedIn.com for Chris Cianciolo.

27.     Attached hereto as Exhibit 26 is a true and correct copy of a table from www.uscourts.gov titled "U.S. District Courts—Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending June 30, 2013."

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 21, 2014, at San Francisco, California.

/s/ *Kristin J. Madigan*
Kristin J. Madigan

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record have consented to electronic service and are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on March 21, 2014.

/s/ *J. Mark Mann*
J. Mark Mann

# EXHIBIT 1

http://www.wired.com/wiredenterprise/2012/05/rockstar/all/

Scott Widdowson is a specialist, one of 10 reverse-engineers working full time for a stealthy company funded by some of the biggest names in technology: Apple, Microsoft, Research In Motion, Sony, and Ericsson. Called the Rockstar Consortium, the 32-person outfit has a single-minded mission: It ...

Enterprise
IT Happens
› Software
› Hardware
› Mobile Computing
Share on Facebook
775 shares

Tweet  568      +1  286        Share   195

# How Apple and Microsoft Armed 4,000 Patent Warheads

› By Robert McMillan
› 05.21.12
› 6:30 AM

Follow @bobmcmillan



Inside the reverse-engineering lab at Rockstar, Scott Widdowson is looking for products that infringe on the company's 4,000 patents. *Photo: Rockstar*

In many ways, Scott Widdowson is your typical electrical engineer. Most days, when the weather's good, he bikes the 15 miles along the Ottawa River to his company's offices in the west end of the Canadian capital. Once there, he settles in for a day of reading technical specifications, poring over computer textbooks, or prying apart consumer electronics — logic probe in one hand and a soldering

http://www.wired.com/wiredenterprise/2012/05/rockstar/all/

iron in the other.

But Widdowson is a specialist. He's one of 10 reverse-engineers working full time for a stealthy company funded by some of the biggest names in technology: Apple, Microsoft, Research In Motion, Sony, and Ericsson. Called the Rockstar Consortium, the 32-person outfit has a single-minded mission: It examines successful products, like routers and smartphones, and it tries to find proof that these products infringe on a portfolio of over 4,000 technology patents once owned by one of the world's largest telecommunications companies.

When a Rockstar engineer uncovers evidence of infringement, the company documents it, contacts the manufacturer, and demands licensing fees for the patents in question. The demand is backed by the implicit threat of a patent lawsuit in federal court. Eight of the company's staff are lawyers. In the last two months, Rockstar has started negotiations with as many as 100 potential licensees. And with control of a patent portfolio covering core wireless communications technologies such as LTE (Long Term Evolution) and 3G, there is literally no end in sight.

"Pretty much anybody out there is infringing," says John Veschi, Rockstar's CEO. "It would be hard for me to envision that there are high-tech companies out there that don't use some of the patents in our portfolio."

Rockstar has its roots in last year's high-profile auction of 6,000 patents owned by the bankrupt Canadian telco giant Nortel. Google made headlines when it cast the first bid of $900 million for the portfolio, but the search giant was soon in a heated bidding war with a consortium of rivals led by Apple and Microsoft. The final sale price was $4.5 billion, and Rockstar Bidco, as it was then called, was the winner.

"Pretty much anybody out there is infringing, I would think. It would be hard for me to envision that there are high-tech companies out there that don't use some of the patents in our portfolio." — John Veschi

Since then, Rockstar Bidco has given way to a new entity, called Rockstar Consortium. And for the first time, the consortium's strategy for the Nortel patents is clear. Ownership of about 2,000 of the patents was shifted to the individual companies that won the auction: Apple, Microsoft, et al. But the remaining 4,000 have been transferred to Rockstar Consortium, which is now a pure patent exploitation operation funded by all of the winning bidders except EMC, which has dropped out of the picture, according to Veschi.

Rockstar is a special kind of company. Because it doesn't actually make anything, it can't be countersued in patent cases. That wouldn't be the case with Apple or Microsoft if they had kept the patents for themselves. And because it's independent, it can antagonize its owners' partners and customers in ways that its owner companies could not. "The principals have plausible deniability," says Thomas Ewing, an attorney and intellectual property consultant. "They can say with a straight face: 'They're an independent company. We don't control them.' And there's some truth to that."

When the Rockstar Bidco group purchased Nortel's patents, the U.S. Department of Justice took a look at the deal, as part of a broader investigation into several large technology patent sales. The DoJ was concerned that patent attacks might somehow be used to knock Rockstar's competitors out of the smartphone or tablet market. But in February, the DoJ closed its investigation, in part because Microsoft and Apple had promised to license many of their core wireless patents under reasonable terms to anyone who needed them.

But the new company — Rockstar Consortium — isn't bound by the promises that its member companies made, according to Veschi. "We are separate," he says. "That does not apply to us." Rockstar owners could choose to simply recoup their investment by licensing the patents and then reselling them — much as Microsoft did recently when it bought patents from AOL and then turned around and sold them to Facebook. Or Rockstar could play into the strategic interests of its owner companies by going after Google, and Android partners such as HTC, says Colleen Chien, a law professor at Santa Clara University who has made a study of the market for technology patents.

http://www.wired.com/wiredenterprise/2012/05/rockstar/all/

Microsoft, Ericsson and EMC declined to comment for this story. The other Rockstar owners didn't respond to messages.

To say that technology patents have become more important over the past decade is to risk comic understatement. A patent is essentially a government-sanctioned monopoly designed to give the inventor a two-decade head start to commercialize any new technology. But in practice, patents are weapons. Technology companies load up on patents like Cold War nations stockpiling nuclear bombs, hoarding them for use when an important market is at stake. And few companies have been loading up on patents as aggressively as Apple and Google, two companies that had nothing to do with the smartphone market 10 or 15 years ago when many of Nortel's wireless patents were being developed.

Many companies stockpile patents for defensive purposes, but others actively look for ways they can make money from them — big money. The kind of reverse-engineering practiced by Widdowson happens more often than most people realize. It's just not widely discussed.

"Big companies are doing this work with a combination of their own resources and outsourcing," says Fas Mosleh, senior vice president of IP transactions with Kanzatec, a Los Altos, California, company that sells the type of reverse-engineering services that Widdowson practices in Rockstar's Ottawa lab.

The companies that do this are big because the costs are big. When patent fights go to trial, the legal fees typically run into the millions of dollars. "This is the sport of kings," says Ewing. "Ordinary people can't play in this arena."

But the rewards can be great too. In 2007, a U.S. jury hit Microsoft with $1.5 billion in damages after finding that it violated Lucent's MP3 patents (that verdict was later appealed, and most of the case settled out of court). On Friday, the U.S. International Trade Commission threatened to halt the import of all Motorola Mobility's Android phones and tablets after finding that Motorola had violated a Microsoft patent on how to fire off meeting requests from a mobile device.

# Welcome to Ground Zero

Right now, ground zero for the patent wars is the smartphone market, where everyone from Google, Oracle, Microsoft, and Apple to Motorola, HTC and Samsung are battling it out in the courts. Some companies use patents as a competitive weapon, launching legal wars of attrition against competitors. Others find that they can make big money in some areas without necessarily having to win in the marketplace. Qualcomm makes nearly $4 billion annually licensing its mobile patents. IBM, one of the top patent-holders on the planet, makes over $1 billion each year.

"The creation of these conglomeration of patents — what this does is create a barrier to entry for the little guy." — Julie Samuels

Veschi says that he — and not Rockstar's board of directors — is calling the shots when it comes to licensing deals. The company's mission is "to manage the patent portfolio to achieve a return on investment, probably through a combination of licensing and sales," says Veschi. "So, in some cases, we might be selling some patents, and in other cases, we might be licensing some patents." Rockstar hasn't sued anyone yet, but Veschi expects that to happen too.

Because it doesn't actually produce anything, some knock Rockstar as a straight-up patent troll.

"This deal is indicative of a much larger fundamental problem that we see today," says Julie Samuels, a staff attorney with the Electronic Frontier Foundation. She says she hears from small companies regularly who get pressured out of the U.S. market because they simply can't defend themselves against massive patent claims, whether legitimate or not. None of them want to talk to the press, though, for fear of drawing attention — and possibly more legal troubles — to themselves. Ultimately, Samuels worries that patents — especially software patents — will hurt innovators rather than help them. And that's exactly the opposite of what patents are supposed to do.

"The creation of these conglomerations of patents ... what this does is create a barrier to entry for the little guy," Samuels says. "It makes it so much harder to break into the market if you are a creator or

3

http://www.wired.com/wiredenterprise/2012/05/rockstar/all/

an innovator."



After surviving the Nortel meltdown, Rockstar CEO John Veschi now controls 4,000 patents. Photo: Dan Krauss/Wired

## Building in the Nortel Crater

With just 32 employees, Veschi's company is tiny, but it has a big legacy. It's the final resting place of the patent portfolio of Canada's most storied technology company, Nortel Networks, a telecommunications giant whose origins date back to 1882 when it was the telephone manufacture and repair department of the Bell Telephone Company of Canada. Three-quarters of Rockstar's employees, including Veschi and Widdowson worked at Nortel and kept their jobs by helping the creditors understand and then sell Nortel's patent portfolio.

Nortel flamed out spectacularly in 2009, in a complex international bankruptcy that cost more than 30,000 employees their jobs, left others without pension and life insurance coverage, and saw several top executives face fraud charges in a trial that's still ongoing.

"How the hell did you guys go bankrupt? Why weren't you Google? Why weren't you Facebook?" — John Veschi

Employee pensions were slashed in half when the company could no longer meet payment obligations. Some workers lost life insurance or medical benefits when the company's self-funded programs collapsed. And they're still hurting three years later, waiting for courts in the United States, Canada, and the United Kingdom to hammer out final bankruptcy settlements, says Anne Clark-Stewart, a spokeswoman with Nortel Retirees and Former Employees Protection Canada, a group representing more than 20,000 former Nortel employees.

But what was a tragedy for the company's employees turned out to be an unprecedented opportunity for Rockstar's investors. Nortel had a massive patent portfolio — nearly 9,000 patents in all — most of them related to computer networking. And according to Veschi, they were high-quality patents — the kind that you'd normally find in a Bell Labs or an IBM; the kind that would be likely to stand up in a court case. Nortel's patents covered broad areas of wireless networking, telecom switching,

http://www.wired.com/wiredenterprise/2012/05/rockstar/all/

internet routers, modems, personal computers, even search and social networking.

"A lot of people are still surprised to see the quality and the diversity of the IP that was in Nortel," he says. "And the fundamental question comes back: 'How the hell did you guys go bankrupt? Why weren't you Google? Why weren't you Facebook? Why weren't you all these things, because you guys actually had the ideas for these business models before they did?' They were within a Bell Labs-y kind of environment, and maybe the wherewithal of turning them into businesses wasn't necessarily there."

Nortel went bankrupt because it was mismanaged and, ultimately, fizzled out in the marketplace. Best known as a maker of telephone-company hardware and corporate phone systems, it once boasted more than 90,000 employees. But it lost out in the data center to Cisco, and it was outmaneuvered in its traditional telecom business by China's Huawei.

## No More Friendly Canadians

When Veschi signed on in 2008, Nortel hadn't done much work to license its intellectual property. It was run by friendly Canadians who didn't want to antagonize partners and customers by suing them. But the company had been remarkably adept at filing patents. "We had huge patent ceremonies in the CTO group that we made a big production of every year," says Gillian McColgan, a former Nortel technical manager who is now chief technology officer with Rockstar.

Nortel's patents sold for $4.5 billion — $1.3 billion more than the combined value of all of the company's business units.

Employees were paid bonuses, and sometimes, they'd join up with senior management at fancy award ceremonies held at swank venues such as the five-star Adolphus Hotel in Dallas, home to Queen Elizabeth II whenever she's in Texas.

Nortel had long patented its inventions, but encouraged by former CEO Mike Zafirovski, it started doing something called "defensive patenting." Engineers were encouraged to file patents that could be used to fire back in the event that someone brought a patent suit against Nortel. "A large focus of our patenting efforts had been around in the pre-bankruptcy era, had been trying to identify what our competitors might do, and laying down inventions in those spaces to protect ourselves," McColgan says.

"We ended up with a large portfolio of patents that are directed toward products and areas of technology that our competitors were working in, where we didn't necessarily have products ourselves," she adds.

When Nortel went belly up, patents representing tens of billions of dollars in research and development were suddenly made available on the open market. It was an unprecedented opportunity for patent buyers. "There had never been anything like it up to this point, not even close," says David Descoteaux, a banker with Lazard, an investment firm that advised Nortel through the bankruptcy.

It wasn't just the quality of the patents that attracted serious investors. It was the sheer volume. Having thousands of high-quality patents to aim at a competitor is a uniquely useful weapon in this new sport of kings.

Patent attorneys love large patent portfolios because they make negotiations easier, says Thomas Ewing, the IP consultant. "When you get to these big numbers ... you're not talking about merits anymore. The merit discussion just goes out the window," he says. The reason? Whey you're paying lawyers between $10,000 to $15,000 per patent to drill down and research each patent, it's usually less expensive to cut a licensing deal. "Anything over 200, nobody's talking about merits," he says.

But Google, Apple, and Microsoft saw the same promise as Veschi, and soon, they marshaled forces for a bidding war over Nortel's patent portfolio. When the dust settled, Nortel's patents sold for $4.5 billion — $1.3 billion more than the combined value of all of the company's business units.

# The $4.5 Billion Sales Job

http://www.wired.com/wiredenterprise/2012/05/rockstar/all/

John Veschi and his small team of former Nortel employees had front-row seats to the bidding war. In fact, they deserve a lot of the credit for driving the patent portfolio sale as high as it went.

Veschi is serious and intense. A half-marathon runner who likes to talk, but with a peripatetic way of qualifying his thoughts in mid-sentence. His first job out of school was as an officer at Fort Monmouth, New Jersey, the now-decommissioned Army signals facility that was once the workplace of Julius Rosenberg.

Veschi signed on to run Nortel's licensing business in the summer of 2008 — just six months before the company declared bankruptcy. He had run licensing practices at Lucent and semiconductor maker LSI before Nortel, and he saw a rare opportunity: a vast portfolio of top-quality patents that nobody had yet tried to license.

"I was getting my equity struck at a nice low point and the future was rosy and I could help make it that way. We could be less wimpy about our IP." — John Veschi

He thought it was the perfect time to jump onboard and work on building a licensing business that rivaled Lucent or IBM. "I was getting my equity struck at a nice low point and the future was rosy and I could help make it that way," he said, because "we could be less wimpy about our IP."

What he ended up with was a quick hiring freeze and then, after bankruptcy, the job of analyzing Nortel's 8,500 patents, figuring out which ones should be sold with the company's business units, and which ones could be sold separately at auction. When this job — called the Patent Segmentation Exercise — was done, Veschi had a portfolio of 6,000 patents to put up at auction.

It's a remarkable story. Veschi and his small team ended up riding along with Nortel right through the bankruptcy, and ultimately selling Nortel executives and creditors on the idea that the patents should be split apart from the rest of company's assets and sold separately. That wasn't immediately obvious to some creditors and company executives who thought they could bump up the sale prices of Nortel's business units by rolling in more patents. "It was at the time controversial," says Michael Lasinski, an early ally of Veschi's who worked on a committee for unsecured Nortel creditors during the bankruptcy.

Lasinski was quick to see the value of Nortel's patents because, like Veschi, he'd had some experience in the patent marketplace. He'd worked at the Ocean Tomo Patent Brokerage, a company that had pioneered the idea of Sotheby's-style patent auctions.

Veschi and his team started building financial models. From his time at Lucent, he knew how to show just how much Nortel's patent portfolio could bring in. At first, some executives thought it would be less than a billion dollars. But with Lasinski's support the models showed a lot more money. The team built a database of Nortel's patents and mapped them out to current and emerging networking standards to show where they might play.

Then came the sales job of proving just how valuable these patents were to potential buyers. Google was first out of the gate, with a $900 million stalking horse bid — a bid pre-approved by Nortel's management and creditors aimed at establishing the minimum amount that the patents would sell for in bankruptcy auction.

It didn't take long for others to jump in. At first, Apple, Intel, RIM, and others were interested, as was a patent company called RPX, which buys up patents defensively, so they cannot be used against its investors. By the time the bidding got to $4.5 billion, there were just two groups: Rockstar, and a group called Ranger. Ranger was Intel and Google.

# Does Rockstar Own 4G?

After the Rockstar group acquired the 6,000 Nortel patents, about 2,000 were transferred to the companies behind the consortium. But 4,000 remained with Rockstar the company, which is actively trying to make money from them.

It turned out that Nortel had patents that covered parts of the up-and-coming mobile data technology called Long Term Evolution. Also known as 4G, this is the standard now bringing speedier internet access to mobile phones. Many of those patents are now owned by Rockstar and

http://www.wired.com/wiredenterprise/2012/05/rockstar/all/

could be enforced against mobile phone companies — Google, for example — in the coming months.
"You knew you were making tens or hundreds of millions of dollars' difference." — Scott Widdowson
But Nortel's patents also covered core networking technologies used by routers and switches and many other areas. The European Telecommunications Standards Institute, the standards body for the European telecommunications industry, has a database that lists whose patents may apply to emerging telecommunications standards, and it lists 43 standards areas, many relating to LTE, where Nortel patents — some of them now transferred to Rockstar — are in play.

Close to 25 of Rockstar's employees are former Nortel workers, including lawyers, managers and engineers. Having longtime Nortel engineers like Widdowson and McColgan — people who know the business and the patent portfolio — is going to help Veschi do a better job in figuring out where to go looking for licensing fees. Widdowson won't say what he's working on, by the way, except that it's related to consumer telecommunications technology.

But that's not why Widdowson says he stuck it out through the bankruptcy. He was offered another job, and he turned it down.

Former coworkers might have found this a little strange, but it turned out that Widdowson liked the work he was doing. The mesh of the legal and technical work was a new challenge for him, but there was another reason he stuck with it. He felt like he was helping his former Nortel colleagues who were hurting because of the bankruptcy.

McColgan reports a similar story. Even though she had colleagues telling her she was "off her rocker," she stuck it out with the patent work because she thought she could make a difference and increase the amount paid back to Nortel's workers.

"You knew you were making tens or hundreds of millions of dollars' difference," Widdowson says, "which is not usual for someone who is an engineer."

**Pages:** 1 2 3 View All



Robert McMillan is a writer with Wired Enterprise. Got a tip? Send him an email at: robert_mcmillan [at] wired.com.
Read more by Robert McMillan
Follow @bobmcmillan on Twitter.

WE RECOMMEND

RECOMMENDED BY



http://www.wired.com/wiredenterprise/2012/05/rockstar/all/

Google Takes Over NASA's Hangar One, a Silicon Valley Icon



This Might Be the Most Beautiful iPad Game of 2014



5 Infographics to Teach You How to Easily Create Infographics in PowerPoint

- HUBSPOT

Post Comment | 81 Comments |  Permalink

Back to top

Share on Facebook

775 shares

Tweet   568    285

Reddit  Digg Stumble Upon  Email

**Comments for this thread are now closed.**

---

**81 Comments**    Wired: Wired Enterprise      Login

Sort by Best                                                                   Share ⬈   Favorite ★

 **Jesse Petersen** · 2 years ago
This is exactly what's wrong with the patent system.
78      |    · Share ›

 **Scott Sterling** → Jesse Petersen · 2 years ago
In a free enterprise system, if you legitimately own a patent, what is wrong with asking another company that wants to use your patent to pay a small fee?

Is it complicated and messy? Of course. But what exactly is wrong with it?
8      |    · Share ›

 **MustBeSaid** → Scott Sterling · 2 years ago
What's wrong is the over the top time allowance on patents. That you're allowed to patent computer code and businesses processes which are nothing more than a description of a way to produce a desired result. They're a recipe and you can't patent a recipe.

That the USPTO doesn't do any real work in checking for infringement. They grant moronic patents left and right then leave it up to overpriced lawyers and courts to figure it out. Big companies can afford this, small, medium or individual inventors cannot.Companies are allowed to patent things they have no intention of ever producing just so they can block others who actually spend the time, money and energy to develop those things.You shouldn't be allowed to hold onto a patent without proof that you're actively developing or using that patent for something other than licensing. Before you're allowed to license you should have to at least bring a product to market or show a working, viable prototype that uses that patent.This whole process of sketching some overly simplistic idea on a napkin and getting a patent on it along with a thousand others like it just to sit on it and sue anyone who comes up with the idea and actually uses it should be illegal. Patent trolling should be illegal which is all these "rockstar" guys really are.They and the lawyers that handle these lawsuits produce nothing. They protect nothing probably 90% of the time. Protecting a patent that should have never been granted or should have long since expired is just legal extortion.
61      |    · Share ›

 **Cowboydroid** → Scott Sterling · 2 years ago
The thing that is "wrong" with it is that many large corporations are taking advantage of the lax approval process the patent office has had for the last 15ish

http://www.wired.com/wiredenterprise/2012/05/rockstar/all/

Collapse

Previous Article

## Microsoft to Launch Amazon EC2 Rival. Again

Next Article

## Looking for a Coding Job? Better a Ninja Than a Brogrammer



Case 2:13-cv-00900-JRG   Document 52-3   Filed 03/21/14   Page 1 of 4 PageID #:  1813

# EXHIBIT 2

Rockstar CEO says he would not bet against further suits to follow those issued last week - Blog - IAM Magazine          19-11-04 11:25 AM



**Intellectual Asset <span style="color:red">Management</span>**



## Rockstar CEO says he would not bet against further suits to follow those issued last week

John Veschi was not anticipating headlines about reigniting the smartphone patent wars when he gave the final sign-off on Rockstar's first enforcement actions last week and he was slightly taken aback when they appeared. For the CEO of the NPE that manages many of the patents acquired at the Nortel auction in June 2011, it was a business decision and nothing more. "I am old school when it comes to litigation," Veschi told me when I spoke to him yesterday. "I am reluctant to call in the lawyers, but eventually if you hear from enough people that you need to sue in order to get the attention of their C-suites then that is what you are going to do."

The problem, Veschi explains, is that now that patent litigation has become much more common than it once was many companies will not begin talking unless they are confronted with a suit: "Maybe I am naïve in expecting that it is the quality of the patents that you own that should get you a seat at the negotiating table, but it seems that for many businesses these days in order to be a tier one prospect you need to go to court first." That has certainly been the experience with at least some (though not all) of those that are now being sued by Rockstar in the Eastern District of Texas, he states.

What is important to remember about Rockstar is that it is essentially the continuation of what was previously the Nortel licensing operation – or the one that Veschi would have established if he had been able to see through his plans for the Canadian telecoms company before it entered bankruptcy. Veschi joined Nortel as its chief IP officer in 2008 and by 2009 had already established programmes for both its internet patent portfolio and the one relating to handsets. As a result, he and his team have actually been negotiating with parties for four or five years, not just the two since Rockstar came into being. "The real question is why it took us so long to initiate actions. We didn't and we didn't, but there comes a time when you have to. There is nothing magic about it," Veschi says.

Of course, what makes the Rockstar action last week so newsworthy is the identity of its shareholders – Apple, BlackBerry, Ericsson, Microsoft and Sony. These are five of the six companies that formed the Rockstar Bidco consortium which tabled the successful $4.5 billion bid for the Nortel portfolio in 2011 (the other member, EMC, is not involved). Given the amount they paid and given the on-going issues at least some of them have with both Google and the Android platform, many reports have talked about the consortium going on the attack or have assumed that it is the shareholders that have driven things. This is categorically not the case, Veschi says. "It was entirely my call based on the facts in front of me," he states. "The shareholders got an email telling them what had happened after the suits were issued."

Asked to clarify what the relationship he has with Rockstar's five owners is, Veschi repeats what he told me when I interviewed him for *IAM* magazine earlier this year: "They are the shareholders and there is a relationship that is distant. I understand that it might be sexy to say that they are pulling the strings, but actually it is also slightly insulting to us. We are running the business. We do that job and they do their jobs and that's it."

However, Veschi does note that all five have essentially already paid large licensing fees for the Nortel IP and it would be entirely wrong for them to be disadvantaged for having done that. Others that use IP from the same portfolio should also pay

– A371 –

Rockstar CEO says he would not bet against further suits to follow those issued last week | IAM Magazine                    04 11:25 AM

up, he says. And the fact is that as of right now, not many do. Because of this more suits could well be issued over the coming months. These may well also cover the NetStar and MobileStar franchises that Rockstar has established to cover its internet and handset portfolios, but could also extend to other areas as well – telecoms is one that Veschi mentioned. "We will always prefer not to litigate – and it is right to give people and processes a chance – but I would not bet against it happening," Veschi states.

Where any actions are launched will be closely watched. Last week's were all filed in the Eastern District of Texas.  "We gave a lot of thought to fora and it just happened that for a variety of reasons Texas was the best place for these suits,"  Veschi states (it's worth noting that Rockstar has an office in Plano, which is actually in the Eastern District and which it inherited from Nortel). If and when other suits are filed it could well be that it happens in other parts of the US.

As for the inevitable "troll" accusations that always get thrown around when suits are filed by an NPE, Veschi is comfortable with that. "People will say what they want to say and if they want to think of us as a bad guy then they can. But the sale of the Nortel patents benefited thousands of the company's pensioners. Had there been restrictions on how those patents could now be deployed, they would not have fetched the price they did."

## Sectors

**Licensing**, **IP litigation**, **Patents**, **IP business**

## Comments

**RE: Rockstar CEO says he would not bet against further suits to follow those issued last week**

"What is important to remember about Rockstar is that it is essentially the continuation of what was previously the Nortel licensing operation – or the one that Veschi would have established if he had been able to see through his plans for the Canadian telecoms company before it entered bankruptcy. "

t would be interesting to see if Nortel had already begun the deconstruction process on the Android-based cell phones *prior* to the auction. It's my understanding that Rockstar hired the reverse engineers, not Nortel.

"They are the shareholders and there is a relationship that is distant. I understand that it might be sexy to say that they are pulling the strings, but actually it is also slightly insulting to us."

a) Balderdash and b) did he say "sexy"? No one uses that term in business anymore, that's so 2005.

Just sayin',

IPTT (http://iptrolltracker2.wordpress.com)

Stephanie Kennedy, 898 Data on 04 Nov 2013 @ 12:29

**RE: Rockstar CEO says he would not bet against further suits to follow those issued last week**

Stephanie,

Most of the reverse engineers - and certainly the most senior ones - were part of the Nortel operation prior to Rockstar being launched. They played a key role in the discussions leading up to the auction in 2011. Rockstar now is essentially the Nortel IP team as was, with a few additions.

Balderdash is so 1458!!

Joff

Joff Wild, IAM Magazine on 04 Nov 2013 @ 12:36

Case: 14-147     Document: 2-2     Page: 382     Filed: 08/14/2014

Rockstar CEO says he would not bet against further suits to follow those issued last week | IAM Magazine    2013-11-04 11:25 AM

**RE: Rockstar CEO says he would not bet against further suits to follow those issued last week**

"Balderdash is so 1458!!"

This from a man who misspells his own first name? KIDDING! =)

OK fine, I'll give you the engineers. But lets examine this, via FOSS:

"Almost two and a half years ago, Google lost the Nortel patents auction to a consortium of six industry leaders (Apple, BlackBerry, EMC, Ericsson, Microsoft, Sony) who just wanted to clear the market before anyone would abuse Nortel's patents, particularly its 4G/LTE patents, the way Google's Motorola Mobility still tries to abuse its standard-essential patents. The price for preventing abuse was $4.5 billion, several times what analysts expected before the auction. "

Rockstar's not preventing abuse, it's exacting it...

Cheers,

Steph

Stephanie Kennedy, 898 Data on 04 Nov 2013 @ 13:41

---

© Copyright 2003-2013 **Globe White Page Ltd**

**– A373 –**

# EXHIBIT 3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------X
                         :

*In re*                        :

Nortel Networks Inc., *et al.*,[1]   :

         Debtors.     :

                         :
-----------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**RE: D.I. 5202**

**ORDER AUTHORIZING AND APPROVING (A) THE SALE OF**
**CERTAIN PATENT AND RELATED ASSETS FREE AND CLEAR**
**OF ALL CLAIMS AND INTERESTS, (B) THE ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS,**
**(C) THE REJECTION OF CERTAIN PATENT LICENSES AND**
**(D) THE LICENSE NON-ASSIGNMENT AND NON-RENEWAL PROTECTIONS**

Upon the motion, dated April 4, 2011 (the "Motion")[2] of Nortel Networks Inc. ("NNI")

and its affiliated debtors, as debtors and debtors in possession in the above-captioned Chapter 11

Cases (collectively, the "Debtors"), for entry of orders under sections 105, 107(b)(1), 363 and

365 of Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9014 and 9018 and Local Rules

6004-1 and 9018-1 (I)(A) authorizing Debtors' entry into the Stalking Horse Agreement,

(B) authorizing and approving the Bidding Procedures and the Bid Protections, (C) approving the

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, including the proposed bidding procedures attached thereto, or if not defined in the Motion, shall have the meanings ascribed to such terms in the Sale Agreement (as defined herein).

Notice Procedures and the Assumption and Assignment Procedures, (D) approving the License Rejection Procedures, (E) approving a Side Agreement, (F) authorizing the filing of certain documents under seal, and (G) setting a date for the sale hearing, and (II) authorizing and approving (A) the sale of substantially all of the Debtors' patents and related assets free and clear of all claims and interests, (B) the assumption and assignment of certain executory contracts, (C) the rejection of certain patent licenses and (D) the License Non-Assignment and Non-Renewal Protections (as defined below); and the Court having entered an order approving, among other things, the Bidding Procedures [D.I. 5359] (the "Bidding Procedures Order") based upon the evidence presented at the bidding procedures hearing held on May 2, 2011 (the "Bidding Procedures Hearing"); and the auction held on June 27-30, 2011 (the "Auction") having been held in accordance with the Bidding Procedures Order; and at the conclusion of the Auction, the bid submitted jointly by Apple, Inc. ("Apple") and Rockstar Bidco, LP ("Rockstar" or the "Purchaser") was chosen as the Successful Bid in accordance with the Bidding Procedures; and the Court having conducted a hearing on the Motion on July 11, 2011 (the "Sale Hearing"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the asset sale agreement attached hereto as Exhibit A (the "Sale Agreement"), by and among NNI, Nortel Networks Limited ("NNL"), Nortel Networks Corporation ("NNC"), Nortel Networks UK Limited (in administration), Nortel Networks (Ireland) Limited (in administration), Nortel Networks S.A. (in administration and liquidation judiciaire), Nortel Networks France S.A.S. (in administration) and Nortel GmbH (in administration) and certain other entities identified therein as sellers (collectively, the "Sellers"), the Joint Administrators, the French Liquidator, and the Purchaser and the transactions contemplated thereby (the

2

"Transactions"), including[3] the granting by the Sellers of any licenses contemplated thereunder; and the Court having reviewed and considered the Motion, and the arguments of counsel made, and the evidence adduced, at the Bidding Procedures Hearing and the Sale Hearing; and upon the record of the Bidding Procedures Hearing and the Sale Hearing and these Chapter 11 Cases, and after due deliberation thereon, and good cause appearing therefor,

### IT IS HEREBY FOUND AND DETERMINED THAT:[4]

A.    This Court has jurisdiction over the Motion and the Transactions pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

B.    Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

C.    The statutory predicates for the relief sought in the Motion are sections 105, 107(b)(1), 363 and 365 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*., as amended (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9014 and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 6004-1 and 9018-1.

D.    Notice of the Motion and the Sale Hearing has been provided (a) to (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the nine (9) months preceding the filing of the Motion, (ii) all entities reasonably known to have asserted any claim, lien, encumbrance or interest in the Purchased Assets, (iii) the counterparties to the Cross-License Agreements and Outbound License Agreements, (iv) the attorneys general for all states in which Purchased Assets owned by the Debtors are located, all federal and state taxing authorities, the Securities and Exchange Commission, the Internal Revenue Service, and

---

[3]    For the avoidance of doubt, as used in this Order, the word "including" means "including without limitation".

[4]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

the Department of Labor and similar state labor or employment agencies, (v) all parties entitled

to notice pursuant to Local Rule 2002-1(b), (vi) all known creditors of the Debtors, (vii) counsel

to the Committee, (viii) counsel to the Bondholder Group and (ix) the additional persons agreed

between the Debtors and the Stalking Horse Purchaser to be served in accordance with the terms

of the Stalking Horse Agreement; and (b) through publication of the Publication Notice, all in

accordance with and as provided by the Bidding Procedures Order.

      E.     As evidenced by affidavits of publication filed with the Court [D.I. 5465, 5466,

5467, and 5468], notice of the Sale Hearing was published in The Wall Street Journal (National

Edition), The Globe and Mail (National Edition), The New York Times (National Edition) and

The Financial Times (International Edition) on May 23, 2011.

      F.     Based upon the affidavits of service and publication filed with the Court [D.I.

5799, 5408, 5413, 5465, 5466, 5467, 5736, 5468 and 5907]: (a) notice of the Motion, the Sale

Hearing, the Auction, and the sale of the Purchased Assets (the "Sale") was adequate and

sufficient under the circumstances of these Chapter 11 Cases and these proceedings and

complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy

Rules and the Bidding Procedures Order, and (b) a reasonable opportunity to object and be heard

with respect to the Motion and the relief requested therein was afforded to all interested persons

and entities.

      G.     Based upon the affidavits of service and publication filed with the Court [D.I.

5408, 5413, 5465, 5466, 5467, 5468 and 5907]: (a) notice to the counterparties of the Cross-

License Agreements and Outbound License Agreements of the License Non-Assignment and

Non-Renewal Protections was adequate and sufficient under the circumstances of these Chapter

11 Cases and these proceedings and complied with the various applicable requirements of the

Bankruptcy Code, the Bankruptcy Rules, and the Bidding Procedures Order, and (b) a reasonable opportunity to object and be heard with respect to the License Non-Assignment and Non-Renewal Protections was afforded to all counterparties to the Cross-License Agreements and Outbound License Agreements.

H.    The Debtors have complied with the License Rejection Procedures approved by this Court in the Bidding Procedures Order.  Based upon the affidavits of service and publication filed with the Court [D.I. 5799, 5408, 5413, 5465, 5466, 5467, 5468 and 5907]: (a) notice to the counterparties to the Unknown Licenses was adequate and sufficient under the circumstances of these Chapter 11 Cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Bidding Procedures Order, (b) a reasonable opportunity to object and be heard with respect to the rejection of any Unknown License and the License Rejection Procedures was afforded to all counterparties to the Unknown Licenses and (c) a reasonable opportunity to make an election under section 365(n)(1) of the Bankruptcy Code was afforded to any counterparties to the Unknown Licenses.  The following parties filed timely elections under section 365(n)(1), pursuant to the License Rejection Procedures, with respect to purported Unknown Licenses:  AT&T Services, Inc. [D.I. 5584], Broadcom Corporation [D.I. 5587], Hewlett-Packard Company [D.I. 5600], EADS Secure Networks S.A.S. [D.I. 5607], Nokia Corporation [D.I. 5610], International Business Machine Corporation [D.I. 5612], Verizon Communications Inc. [D.I. 5613], Hitachi, Ltd. [D.I. 5614], Motorola Solutions, Inc.[D.I. 5616], Qwest Corporation, Qwest Communications Company, LLC, and Embarq Management Company [D.I. 5618], and Thomas & Betts Manufacturing, Inc. [D.I. 5619].  No other parties timely filed such elections.

5

I.    No further or other notice beyond that described in the foregoing Paragraphs E, F, G and H is required in connection with the Transactions.

J.    The Assets (as defined in the Sale Agreement), the licenses under the Jointly Owned Patents, Specified UK Patents, Undisclosed Patent Interests and any other Patents granted by the Sellers to the Purchaser pursuant to the Sale Agreement, and, effective upon receipt by the Sellers of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement, any Undisclosed Patent Interest, sought to be transferred, granted and/or assigned by the Debtors to the Purchaser pursuant to the Sale Agreement (the "Purchased Assets") are property of the Debtors' estates and good and valid title thereto is vested in the Debtors' estates. Together with the other Sellers, the Debtors own all right, title and interest to the Purchased Assets.

K.    As demonstrated by (a) the testimony and other evidence proffered or adduced at the Sale Hearing and (b) the representations of counsel made on the record at the Sale Hearing, the Debtors and their professionals marketed the Purchased Assets and conducted the marketing and sale process as set forth in and in accordance with the Motion.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

L.    On or about April 4, 2011, the Sellers, the Joint Administrators, the French Liquidator and Ranger Inc. (the "Stalking Horse Purchaser") and Google Inc. entered into the Stalking Horse Agreement, subject to higher and better offers.

M.    The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders.  The Debtors undertook substantial marketing efforts, and conducted the sale process (including the Auction) without collusion and in accordance with the Bidding

6

Procedures. The Debtors (a) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Purchased Assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets and (c) considered any bids submitted on or before the Bid Deadline.

N.    The Purchaser submitted a bid in accordance with the Bidding Procedures Order. Prior to the Auction, the Debtors, in consultation with their advisors, the Committee, the Bondholder Group, the Monitor, and the Joint Administrators, analyzed Apple's bid and Rockstar's bid and determined that each was a Qualified Bid and that each of Apple and Rockstar was a Qualified Bidder eligible to participate in the Auction. During the Auction, with the consent of the Debtors, in consultation with their advisors, the Committee, the Bondholder Group, the Monitor, and the Joint Administrators, Apple partnered with the original Rockstar Bidco, LP consortium and adopted the transaction structure of the original Rockstar Bidco, LP consortium (including using the Purchaser as the purchaser of the Purchased Assets). At the conclusion of the Auction, in accordance with the Bidding Procedures Order, the Debtors determined, in consultation with their advisors, the Committee, the Bondholder Group, the Monitor, and the Joint Administrators, in a valid and sound exercise of their business judgment, that the highest and best Qualified Bid was the joint bid submitted by Apple and the original Rockstar Bidco, L.P. consortium and that the Purchaser was the Successful Bidder.

O.    Subject to the entry of this Order, each Debtor that is a Seller (a) has full power and authority to execute the Sale Agreement and all other documents contemplated thereby, (b) has all of the power and authority necessary to consummate the Transactions contemplated by the Sale Agreement and (c) has taken all company action necessary to authorize and approve

7

the Sale Agreement and all other documents contemplated thereby, the Sale and the consummation by the Debtors of the Transactions. No consents or approvals, other than those expressly provided for in the Sale Agreement or this Order, are required for the Debtors to close the Sale and consummate the Transactions.

P.    The Sale Agreement and the Transactions were negotiated and have been and are undertaken by the Debtors and the Purchaser at arm's length without collusion or fraud, and in good faith, within the meaning of section 363(m) of Bankruptcy Code. The Purchaser is purchasing the Purchased Assets in good faith and the Purchaser has otherwise proceeded in good faith in connection with these proceedings in that *inter alia*: (a) the Debtors were free to deal with any other party in connection with the sale of the Purchased Assets; (b) the Purchaser complied with the provisions in the Bidding Procedures Order; (c) the selection of the Purchaser as the Successful Bidder was the result of the competitive bidding process set forth in the Bidding Procedures Order; (d) no common identity of directors or controlling stockholders exists between the Purchaser and any of the Debtors; (e) the Purchaser in no way induced or caused the chapter 11 filings by the Debtors; and (f) all payments to be made by the Purchaser in connection with the Sale have been disclosed. As a result of the foregoing, the Debtors and the Purchaser are entitled to and shall have the protections of section 363(m) of the Bankruptcy Code.

Q.    The total consideration provided by or on behalf of the Purchaser for the Assets and any related licenses is fair and reasonable and is the highest and best offer received by the Sellers, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession

8

thereof, or the District of Columbia, for the Assets. The sale of the Assets to the Purchaser may not be avoided under section 363(n) of the Bankruptcy Code or any other section of the Bankruptcy Code or applicable non-bankruptcy law. No person or entity or group of persons or entities has offered to purchase the Assets pursuant to the Bidding Procedures established by this Court in a transaction that would provide greater value to the Sellers than the Transactions. The Court's approval of the Motion, the Sale Agreement, and all other documents contemplated thereby is in the best interests of the Debtors, their estates, their creditors and all other parties in interest.

R.    The transfer of the Debtors' right, title and interest in the Purchased Assets to the Purchaser will be a legal, valid, enforceable and effective transfer of the Purchased Assets, and, except for the Assumed Liabilities, Permitted Encumbrances, the Standards Obligations (as defined below), as provided for in the Nokia Agreement (as defined below) and as provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement, will vest the Purchaser with all of the Debtors' right, title and interest of, in and to the Purchased Assets, free and clear of (i) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), obligations, demands, restrictions, indemnities, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, common law, statutory law, equity or otherwise (collectively, the "Claims"), (ii) all Interests (as defined herein) of any kind or nature whatsoever and (iii) all Excluded Liabilities (as defined in the Sale Agreement).

S.    The Purchaser would not have entered into the Sale Agreement and would not consummate the Transactions, thus adversely affecting the Debtors, their estates and their

9

creditors, if the sale of the Purchased Assets to the Purchaser and the assumption of the Assumed Liabilities set forth in the Sale Agreement by the Purchaser were not free and clear of all liens, claims and interests pursuant to section 363(f) of the Bankruptcy Code, or if the Purchaser would, or in the future could, be liable for any of such liens, claims and interests. A sale of the Purchased Assets other than one free and clear of all liens, claims and interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale. Therefore, the Sale contemplated by the Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

T.     The Debtors may sell the Purchased Assets free and clear of all Claims and Interests, because, with respect to each creditor asserting a Claim or Interest, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Claims and Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims or Interests that did object and the Claims and Interests held by such holders, fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

U.     A sale of the Purchased Assets that does not include the License Non-Assignment and Non-Renewal Protections would yield less value for the Debtors' estates, with less certainty, than the Sale. Therefore, the Sale contemplated by the Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest. The Purchaser would not have entered into the Sale Agreement, and the Purchaser would not consummate the Transactions, without the License Non-Assignment and Non-Renewal Protections.

10

– A384 –

V.     Neither the Debtors nor the Purchaser, or any of their respective affiliates and representatives engaged in any conduct, or failed to take any action, that would cause or permit the Sale Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, or any other amounts to be recovered against any of them jointly or severally, under section 363(n) of the Bankruptcy Code.

W.     The Sale Agreement and the agreements contemplated thereby were not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Purchaser has entered into the Sale Agreement or any agreement contemplated thereby or is consummating the Sale with any fraudulent or otherwise improper purpose.

X.     The Purchaser is not holding itself out to the public as a continuation of the Debtors and is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and any of the Debtors. Pursuant to the Sale Agreement, the Purchaser is not purchasing all of the Debtors' assets. The conveyance of the Purchased Assets pursuant to the Transactions does not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors and/or Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates. Upon the Closing, the Purchaser shall be deemed to have assumed only those liabilities that it agreed to assume in the

11

Sale Agreement. Except for such liabilities assumed by the Purchaser under the Sale Agreement, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing, to the extent permitted by applicable law. The Purchaser's operations shall not be deemed a continuation of the Debtors' business as a result of the acquisition of the Purchased Assets. The Court finds that the Purchaser would not have acquired the Purchased Assets but for the foregoing protections against potential claims based upon "successor liability" theories.

Y.      The Debtors have demonstrated that it is a good and sufficient exercise of their sound business judgment to seek the License Non-Assignment and Non-Renewal Protections and that such relief is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.

Z.      The Debtors have demonstrated that it is a good and sufficient exercise of their sound business judgment to have the right to assume and assign the Assumed and Assigned Contracts to the Purchaser in connection with the consummation of the Sale and therefore is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The right to assign the Assumed and Assigned Contracts to the Purchaser is an integral part of the Purchased Assets being purchased by the Purchaser, and accordingly is reasonable and enhances the value of the Debtors' estates. The Cure Costs required to be paid pursuant to section 365(b) of the Bankruptcy Code to the counterparty to the applicable Assumed and Assigned Contract, or as ordered to be paid by this Court pursuant to a final order, are deemed to be the entire cure obligations due and owing under the Assumed and Assigned Contracts under section 365 of the Bankruptcy Code and no further amounts will be required to be paid.

12

AA.    The Debtors have not designated any contracts as Assumed and Assigned Contracts on or prior to the date of this Order.

BB.    Each and every provision of the Assumed and Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assumed and Assigned Contract has been satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code.

CC.    The Purchaser has demonstrated adequate assurance of future performance of all Assumed and Assigned Contracts within the meaning of section 365 of Bankruptcy Code.

DD.    Upon the assignment and Sale to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in the Assumed and Assigned Contracts or other restrictions prohibiting assignment or transfer.

EE.    Entry into the Sale Agreement, the agreements contemplated thereby and consummation of the Transactions constitute a good and sufficient exercise by the Debtors of their sound business judgment, and such acts are in the best interests of the Debtors, their estates and creditors, and all parties in interest. The Court finds that the Debtors have articulated both (a) good, sufficient, and sound business purposes and justifications and (b) compelling circumstances for the Sale of the Purchased Assets to the Purchaser pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization. Additionally, (a) the Sale Agreement constitutes the highest and best offer for the Purchased Assets; (b) the Sale Agreement and the Closing will present the best opportunity to realize the value of the Purchased Assets and avoid further decline and devaluation of the Purchased Assets; (c) there is risk of

13

deterioration of the value of the Purchased Assets if the Sale is not consummated promptly; and (d) the Sale Agreement and the Closing will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative.

FF.     The sale and assignment of the Purchased Assets outside of a plan of reorganization pursuant to the Sale Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan for the Debtors. The Sale does not constitute a *sub rosa* chapter 11 plan.

GG.     The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code. Accordingly, appointment of a consumer privacy ombudsman pursuant to sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

HH.     Time is of the essence in consummating the Sale.  In order to maximize the value of the Debtors' assets, it is essential that the Sale occur within the time constraints set forth in the Sale Agreement.  Accordingly, there is a cause to lift the stay contemplated by the Bankruptcy Rules 6004(h) and 6006(d).

II.     There is no legal or equitable reason to delay the Transactions.

JJ.     The Schedules to the Sale Agreement contain substantial sensitive commercial information, which would be damaging to the Debtors and the Purchaser if such information were to be disclosed to their competitors.  Filing the Schedules to the Sale Agreement under seal or refraining from filing the Schedules to the extent they are substantially similar to the Stalking Horse Agreement schedules filed under seal is in the best interests of the Debtors, their estates, creditors and other parties-in-interest; and it is therefore:

14

**ORDERED ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Motion is **GRANTED**.

2.    All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing, and all reservations of rights included therein, are hereby overruled on the merits, with prejudice.    Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with the Bidding Procedures Order, section 102(1) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 9014.

3.    Pursuant to sections 105, 363 and 365 of Bankruptcy Code, and subject to the approval of the Sale by the Ontario Superior Court of Justice in the Canadian Proceedings with respect to the Canadian Debtors, the Sale Agreement, the agreements contemplated thereby, the Sale of the Purchased Assets, and consummation of the Transactions are hereby approved and the Debtors are authorized to enter into the Sale Agreement and to comply with the Sale Agreement and the ancillary agreements contemplated thereby.

4.    Pursuant to section 365 of the Bankruptcy Code, notwithstanding any provision of any Assumed and Assigned Contracts or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assumed and Assigned Contracts, the Debtors are authorized to assume and to assign the Assumed and Assigned Contracts to the Purchaser, which assignment shall take place on and be effective as of the Closing, or as otherwise provided by order of this Court. The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assumed and Assigned Contracts. Notwithstanding the foregoing, unless required by the Purchaser under the Sale Agreement, no Debtor shall be required by the Court to assume and assign any Assumed and Assigned Contracts, and, if no such assumption and

15

**— A389 —**

assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required.

5.     [Reserved]

6.     The Debtors' assumption of the Assumed and Assigned Contracts is subject to the consummation of the Sale of the Purchased Assets to the Purchaser.  To the extent that an objection by a counterparty to any Assumed and Assigned Contract, including an objection related to the applicable Cure Cost, is not resolved prior to the Closing Date, the Debtors, in consultation with the Purchaser, may, without any further approval of the Court or notice to any party, elect to (a) not assume such Assumed and Assigned Contract, or (b) postpone the assumption of such Assumed and Assigned Contract until the resolution of such objection.  Any Cure Costs outstanding on the Closing Date shall be paid to the appropriate counterparty as a condition subsequent to such assumption and/or assumption and assignment of the relevant Assumed and Assigned Contract.

7.     Effective as of the Closing, the Unknown Licenses are rejected.  Counterparties to the rejected Unknown Licenses have no rights against the Purchaser or the Purchased Assets with respect to such Unknown Licenses except to the extent that both (a) such counterparty made a timely election on or before June 6, 2011 under section 365(n)(1)(B) in accordance with the License Rejection Procedures approved by this Court in the Bidding Procedures Order and (b) neither the Debtors, the Purchaser, nor any other party in interest has objected to such election or the Court has determined by Final Order that the election was proper.  To the extent that a counterparty to an Unknown License retains rights under a contract with a Debtor upon the satisfaction of (a) and (b) of this paragraph, such rights shall not be greater than the rights retained under section 365(n) of the Bankruptcy Code.  Any counterparty to a rejected Unknown

16

License that has not made an election on or before June 6, 2011 shall have the right to file a rejection damages claim against the applicable Sellers, subject to all applicable deadlines and the allowance of such claim under applicable law, and no other rights, remedies or claims, including no rights, remedies, or claims against the Purchaser or the Purchased Assets. For the avoidance of doubt, the licenses granted under the Subject Agreements (as defined in section 2 of the Commercial License Acknowledgement attached hereto as Exhibit B) shall constitute Commercial Licenses under the Sale Agreement.

8.    Upon the Closing (and in the case of any Undisclosed Patent Interests, subject to receipt by the Sellers of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement), (a) the Debtors are hereby authorized to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Debtors' right, title and interest in the Purchased Assets to the Purchaser free and clear of any and all Claims and interests pursuant to sections 363 and 365 of the Bankruptcy Code including all liens, including any and all liens (statutory or otherwise), Lien (as defined in the Sale Agreement), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance, collateral assignment, easement, encroachment, right-of-way, restrictive covenant, rights of offset or recoupment, lease or conditional sale arrangement (collectively, the "Liens") and debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims, in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding,

17

law, equity or otherwise (collectively, the "Liabilities" and together with the Liens, the "Interests") other than (i) the Assumed Liabilities, (ii) the Permitted Encumbrances, (iii) to the extent valid and enforceable under applicable non-bankruptcy law, any promises, declarations and commitments granted, made or committed in writing by the Sellers (or made on the Sellers' behalf by any of their Affiliates and legally binding upon the Sellers) in writing to standard-setting bodies and industry groups (including any written commitments, declarations and promises that were made by or on behalf of the Sellers to the members or participants thereof, but solely in connection with the standard-setting activities of such bodies or groups and solely to the extent legally valid and enforceable under applicable non-bankruptcy law) concerning the licensing of or the grant of rights with respect to the use of any of the Transferred Patents, Purchased Specified UK Patents, Undisclosed Patent Interests or Jointly Owned Patents acquired pursuant to the Sale Agreement (including those legally valid and enforceable commitments contained in the membership agreements, by-laws or policies of the standard-setting bodies and industry groups), whether or not listed in Section 1.1(g) of the Sellers Disclosure Schedule (the "Standards Obligations"), (iv) as provided for in that certain letter agreement dated as of the date hereof between the Sellers and the Purchaser with respect to Nokia Corporation (the "Nokia Agreement") and (v) as provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement, with such Interests to attach to the sale proceeds in the same validity, extent and priority as existed with respect to the Purchased Assets immediately prior to the Transactions, subject to any rights, claims and defenses of the Debtors and other parties in interest, and (b) except for (i) the Assumed Liabilities, (ii) the Permitted Encumbrances, (iii) the Standards Obligations, (iv) as provided for in the Nokia Agreement and (v) as provided in Sections 2.1.1(a) and 5.21 of the

18

Sale Agreement, all such Interests shall be and hereby are released, terminated and discharged as to the Purchaser and the Purchased Assets.

9.      Except with respect to enforcing the terms of the Sale Agreement, the Bidding Procedures Order or this Order, no person shall take any action to prevent, enjoin or otherwise interfere with the consummation of the Sale of the Purchased Assets and the Transactions, including the transfer to the Purchaser of the Debtors' title to and the right to use and enjoy the Purchased Assets.

10.     The transfer of the Debtors' right, title and interest in the Purchased Assets to the Purchaser pursuant to the Sale Agreement shall be, and hereby is deemed to be, a legal, valid, enforceable and effective transfer of the Debtors' right, title and interest in the Purchased Assets, and vests with or will vest in the Purchaser all right, title and interest of the Debtors in the Purchased Assets, free and clear of all Claims and Interests of any kind or nature whatsoever (other than the Permitted Encumbrances, the Standards Obligations and the Assumed Liabilities, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement), with any Interests attaching to the sale proceeds in the same validity, extent and priority as existed with respect to the Purchased Assets immediately prior to the Transactions, subject to any rights, claims and defenses of the Debtors and other parties in interest.

11.     Upon the Closing, and except for the Assumed Liabilities, the Permitted Encumbrances, the Standards Obligations, as otherwise provided in the Sections 2.1.1(a), 5.8(c) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement, the Purchaser shall not be liable for any Claims against, Interests against or in or obligations of, the Debtors or any of the Debtors' predecessors or Affiliates, as a result of having purchased the Purchased Assets or

19

otherwise as a result of the Transactions.  Without limiting the generality of the foregoing, (a) the Purchaser shall have no liability or obligation to pay wages, bonuses, severance pay, benefits (including contributions or payments on account of any under-funding with respect to any pension plans) or make any other payment to employees of the Debtors, (b) the Purchaser shall have no liability or obligation in respect of any employee pension plan, employee health plan, employee retention program, employee incentive program or any other similar agreement, plan or program to which any Debtors are a party (including liabilities or obligations arising from or related to the rejection or other termination of any such plan, program agreement or benefit), (c) the Purchaser shall in no way be deemed a party to or assignee of any such employee benefit, agreement, plan or program, and (d) all parties to any such employee benefit, agreement, plan or program are enjoined from asserting against the Purchaser any Claims or Interests arising from or relating to such employee benefit, agreement, plan or program.

12.    As of the Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of Debtors' rights and obligations in the Assumed and Assigned Contracts first arising and attributable to the time period occurring on or after the Closing and shall have all rights thereunder.

13.    Upon Closing, (a) all defaults (monetary and non-monetary) under the Assumed and Assigned Contracts through the Closing shall be deemed cured and satisfied in full through the payment of the Cure Costs; (b) no other amounts will be owed by the Debtors, their estates or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to, the period before Closing with respect to the Assumed and Assigned Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, or the Purchaser or the Purchased Assets that any additional amounts are

20

due or defaults exist under the Assumed and Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Closing. The Purchaser's promise pursuant to the terms of the Sale Agreement to pay the Cure Costs and to perform the obligations under the Assumed and Assigned Contracts after the Closing shall constitute adequate assurance of its future performance under the Assumed and Assigned Contracts being assigned to it within the meanings of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

14.    Upon assumption of the Assumed and Assigned Contracts by the Debtors and assignment to the Purchaser, the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Purchaser, notwithstanding any provision in the contracts or other restrictions prohibiting assignment or transfer. To the extent any executory contract or unexpired lease is assumed and assigned to the Purchaser under the Order, no executory contract or unexpired lease will be assumed and assigned pursuant to this Order until the Closing. Furthermore, other than Assumed and Assigned Contracts, no other Contract shall be deemed assumed by and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code. The failure of the Debtors or Purchaser to enforce at any time one or more terms or conditions of any Assumed and Assigned Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assumed and Assigned Contracts.

15.    The Transactions have been undertaken by the Purchaser in good faith and the Purchaser is a good faith purchaser of the Purchased Assets as that term is used in section 363(m) of Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to

21

the Purchaser. The Purchaser is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

16.     Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors and the Purchaser are each hereby authorized to take any and all actions, including the payment of any fee or cost, necessary or appropriate to: (a) consummate the Sale of the Purchased Assets to the Purchaser, the Transactions, including the granting of any licenses contemplated by the Sale Agreement, and the Closing in accordance with the Motion, the Sale Agreement and this Order; (b) assume and assign the Assumed and Assigned Contracts; and (c) perform, consummate, implement and close fully the Sale Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Agreement. The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Sale Agreement and the agreements contemplated thereby prior to or after Closing without further order of the Court.

17.     For the avoidance of doubt, the Transactions authorized herein shall be of full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

18.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale and the Transactions.

19.     The Debtors have, to the extent necessary, satisfied the requirements of section 363(b)(1) of the Bankruptcy Code. Accordingly, appointment of a consumer privacy ombudsman pursuant to sections 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the relief requested in the Motion.

22

20.    The consideration provided by or on behalf of the Purchaser for the Purchased Assets under the Sale Agreement, including in respect of the granting of any related licenses, shall be deemed for all purposes to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, and costs, damages, or other amounts may not be imposed, recovered or awarded, under section 363(n) of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar state laws.

21.    From and after the Closing Date (and in the case of any Undisclosed Patent Interests, subject to receipt by the Sellers of the applicable Exercise Price pursuant to Section 5.19 of the Sale Agreement), this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Debtors' right, title and interest in the Purchased Assets and a bill of sale transferring good, valid and marketable title in such Purchased Assets to the Purchaser on the Closing Date pursuant to the terms of the Sale Agreement and any ancillary agreements, free and clear of all Claims and Interests (other than the Assumed Liabilities, the Standards Obligations, Permitted Encumbrances, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement). From and after the Closing Date, the licenses under the Jointly Owned Patents, Specified UK Patents, Undisclosed Patent Interests and any other Patents granted by the Debtors to the Purchaser or the other licenses granted by the Debtors, in either case, pursuant to the Sale Agreement and any related ancillary agreements shall be legal, valid and binding and enforceable in accordance with their terms. The Purchaser is hereby authorized in connection with the consummation of the Sale and the other Transactions or otherwise to

23

allocate the Purchased Assets or any licenses granted pursuant to the Sale Agreement or any related ancillary agreements among its affiliates, designees, assignees and/or successors as contemplated by the Sale Agreement or in such other manner as it in its sole discretion deems appropriate.

22.     Any and all Purchased Assets in the possession or control of any person or entity, including any vendor, supplier or employee of the Debtors shall be transferred to the Purchaser free and clear of all Claims and Interests (other than the Assumed Liabilities, Permitted Encumbrances and the Standards Obligations, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement) and shall be delivered and deemed delivered at the time of Closing (or such other time as provided in the Sale Agreement) to the Purchaser.

23.     Upon the Closing, all holders of Claims and Interests against the Debtors or the Purchased Assets are permanently and forever barred, restrained and enjoined from asserting any Claims or Interests or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Purchaser or the Purchased Assets on account of any of the Claims, Interests, Excluded Liabilities or Excluded Assets (other than the Assumed Liabilities, Permitted Encumbrances and the Standards Obligations, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement).

24.     There is no legal or equitable reason to delay the Transactions.

25.     The Transactions do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no continuity of enterprise, business or operations between the Debtors and the Purchaser, the Purchaser is not a mere continuation of

24

the Debtors or the Debtors' estates or their respective or collective businesses or operations, and the Purchaser does not constitute a successor to the Debtor or the Debtors' estates for any purposes including for purposes of any liabilities, debts or obligations of or required to be paid by the Debtors for any tax, pension, labor, employment, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine. Except for the Assumed Liabilities, Permitted Encumbrances and the Standards Obligations, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims or theories of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of Closing to the extent permitted by applicable law. The Purchaser's business and operations shall not be deemed a continuation of the Debtors' business or operations as a result of the acquisition of the Purchased Assets or the Transactions.

26. This Order (a) is and shall be effective as a determination that, other than the Permitted Encumbrances, the Standards Obligations, the Assumed Liabilities, as otherwise provided in Sections 2.1.1(a) and 5.21 of the Sale Agreement and as provided in the Nokia Agreement, all Claims and Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) is and shall be binding upon and shall authorize all persons, institutions, agencies, and entities, including, all filing agents and agencies, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units (including the U.S. Patent

25

and Trademark Office and similar patent agencies of any jurisdiction), governments and governmental departments or units, secretaries of state, federal, state and local officials and all other persons institutions, agencies, and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Purchased Assets conveyed to the Purchaser. All such entities described above in this paragraph are authorized and specifically directed to strike all recorded Interests against the Purchased Assets from their records, official and otherwise.

27.    If any person or entity which has filed statements or other documents or agreements evidencing Interests in the Purchased Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests which the person or entity has or may assert with respect to the Purchased Assets, the Debtors and the Purchaser are each acting singly hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets without further order of the Court.

28.    In furtherance of the sale of the Purchased Assets to the Purchaser, effective from and after the Closing,

    a.    the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) to any renewal, extension, assignment, amendment, waiver or modification of any license under the Transferred Patents,

Specified UK Patents or Jointly Owned Patents pursuant to any Cross-License Agreement or Outbound License Agreement (excluding (i) the Commercial Licenses, (ii) the transition services agreements (the "TSAs") and intellectual property license agreements (the "IPLAs") that the Debtors entered into with the purchasers of their various business units after the Petition Date in connection with their divestitures, (iii) any intercompany Contracts with the Sellers (the "Intercompany Licenses") and (iv) the Technology License Contract between Northern Telecom Limited and Guangdong-Nortel Telecommunications Switching Equipment Ltd., dated November 8, 1994, as amended (the "GDNT License")) (collectively, the "License Agreements", and any one, a "License Agreement") that requires the consent of any Debtor pursuant to the terms of such License Agreement and that would have the practical effect of expanding the scope or term of the licenses to the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder (regardless of whether such renewal, extension, assignment, amendment, waiver or modification is sought prior to or after the Debtors dissolve or otherwise cease to exist), in each case unless the Purchaser shall otherwise agree in writing, in its sole discretion,

b.    the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) (i) to any amendment, modification or waiver to the GDNT License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of the GDNT

27

License or any rights or obligations thereunder other than to Ericsson (as defined in the Sale Agreement) or another purchaser of all or substantially all of the assets of or all of the outstanding shares of Guangdong Nortel Telecommunication Equipment Company Ltd., in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

c.       the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) (i) to any amendment. or modification to the IPLAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder and (ii) to any assignment of any IPLA by the license counterparty or any rights or obligations of the license counterparty under any IPLA, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

d.       the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) to any amendment, modification, renewal or extension to the TSAs that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder beyond June 30, 2012 unless the Purchaser shall otherwise agree in writing, in its sole discretion,

e.       the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a

28

result of inaction by such Debtor) to any amendment or modification of any Commercial License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except (i) to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement or (ii) to the extent the Purchaser shall otherwise agree in writing, in its sole discretion,

f.      the Debtors shall be deemed to have affirmatively and reasonably refused to give consent (including any consent of any Debtor that may be deemed to be given as a result of inaction by such Debtor) (i) to any amendment or modification of any Intercompany License that would have the practical effect of expanding the scope or the term of the licenses under the Transferred Patents, Specified UK Patents or Jointly Owned Patents thereunder except to the extent such licenses, as amended or modified, would be permitted to be granted under the Closing Date License Agreement, and (ii) to any assignment of any Intercompany License by the license counterparty or any rights or obligations of the license counterparty under any Intercompany License, in each case, unless the Purchaser shall otherwise agree in writing, in its sole discretion,

g.      no Debtor shall have the right or power to transfer any of its obligations, right, title or interest in the licenses under the Transferred Patents, Specified UK Patents and Jointly Owned Patents under

            (1)     any License Agreement,

            (2)     the GDNT License,

29

(3)    any Intercompany License,

(4)    (other than in connection with the consolidation, wind-down, reorganization or restructuring of the Debtors and their affiliates (including to reorganized Debtors under confirmed plan(s) of reorganization)) any IPLA or

(5)    (other than the transfer by the Debtors of Retained Contracts (as defined in the Sale Agreement) or contracts relating to the disposal of Inventory (as defined in the Sale Agreement), in each case to the extent a sublicense to the assignee of such contract is permitted by the Closing Date License Agreement) any Commercial License,

in each case, to any other person from and after the Closing, and any purported renewal, extension, assignment, amendment, waiver, transfer or modification of a License Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License that would contravene the provisions of subparagraphs 28(a) through 28(g) hereof shall be null and void ab initio and unenforceable and of no force or effect and

h.    the Purchaser is hereby irrevocably appointed (such appointment being coupled with an interest) as each Debtor's attorney-in-fact, with full authority in the place and stead of such Debtor and in the name of such Debtor, from time to time from and after the Closing, in the Purchaser's sole discretion, subject to the provisions of paragraph 5.25 of the Sale Agreement, (x) to take any and all action and to execute and deliver any and all instruments that the Purchaser may deem necessary or advisable to accomplish the purposes of subparagraphs 28(a) through 28(g) hereof and (y) regardless of whether or not any Debtor party to the applicable License Agreement is then in existence, to terminate the license under the Transferred Patents, Specified UK Patents or Jointly Owned Patents in any License Agreement (including by delivering a notice of termination on behalf of a Debtor party thereto, regardless of whether such Debtor is then in existence) upon

30

the occurrence of any specific date or event or the existence of any specific circumstance to the extent that the occurrence of such date or event or the existence of such circumstance gives any Debtor (regardless of whether such Debtor is then in existence) a right to terminate such License Agreement pursuant to the terms thereof (the provisions of this sentence set forth in subparagraphs 28(a) through 28(h) hereof collectively, the "License Non-Assignment and Non-Renewal Protections").

    i.    For the avoidance of doubt, the License Non-Assignment and Non-Renewal Protections shall not limit in any way the applicable Debtors' obligations to comply with the provisions of Section 5.13(b) of the Sale Agreement. Each counterparty to a License Agreement, Intercompany License, TSA, IPLA, GDNT License or Commercial License has been provided adequate notice of and opportunity to object to the License Non-Assignment and Non-Renewal Protections and is hereby bound thereby.

29.    The License Non-Assignment and Non-Renewal Protections shall not constitute the assignment of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses to, or assumption of the License Agreements, Intercompany Licenses, TSAs, IPLAs, GDNT License or Commercial Licenses by, the Purchaser.

30.    In the event that any Debtor or any of their Affiliates owns any Undisclosed Patent Interest, no Debtor shall directly or indirectly sell, transfer, assign, convey, license or sublicense such Undisclosed Patent Interest to a Third Party (as defined in the Sale Agreement), other than the Purchaser, including by operation of law, in any transaction, series of related transactions or otherwise, except as expressly permitted by Section 5.19 of the Sale Agreement,

31

and any attempted sale, transfer, assignment, conveyance, license or sublicense not expressly permitted by Section 5.19 of the Sale Agreement shall be null and void *ab initio* and of no force or legal effect.

31.     All counterparties to the Assumed and Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Purchaser, and shall not charge the Debtors or the Purchaser for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Transactions.

32.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Transactions.

33.     No governmental unit may revoke or suspend any lawful right, license, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the Sale or other Transactions.

34.     To the extent this Order is inconsistent with any prior order or pleading in these Chapter 11 Cases, the terms of this Order shall govern.  To the extent there is any inconsistency between the terms of this Order and the terms of the Sale Agreement (including all ancillary documents executed in connection therewith), the terms of the Order shall govern.

35.     Except as expressly provided in this Order, the Sale Agreement or the ancillary agreements contemplated thereby, nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impair or diminish

any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

36.     This Order shall not be modified by any chapter 11 plan confirmed in these Chapter 11 Cases by any dismissal or conversion of these Chapter 11 Cases, by the appointment of or any action or inaction by any trustee, examiner, responsible person, or foreign representative, or otherwise by any subsequent order of this Court unless expressly consented to in writing by the Purchaser.

37.     This Order and the Sale Agreement shall be binding in all respects upon all creditors and interest holders of any of the Debtors (whether known or unknown), all non-debtor parties to the Assumed and Assigned Contracts, all license counterparties, the Committee, the Bondholder Group, all successors and assigns of the Debtors and their Affiliates and subsidiaries, and any trustees, examiners, "responsible persons," foreign representatives, or other fiduciaries appointed in the Debtors' bankruptcy cases or upon a conversion to chapter 7 under the Bankruptcy Code, and the Sale Agreement shall not be subject to rejection or avoidance under any circumstances.

38.     The failure specifically to include or make reference to any particular provisions of the Sale Agreement or any ancillary agreement contemplated thereby in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Sale Agreement and the ancillary agreements contemplated thereby are authorized and approved in their entirety.

39.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order, including the authority to: (a) interpret, implement and enforce the terms and provisions of this Order (including the injunctive relief provided in this Order) and

the terms of the Sale Agreement, the ancillary agreements contemplated thereby, all amendments thereto and any waivers and consents thereunder; (b) protect the Purchaser, or the Purchased Assets, from and against any Claims, Interests or Excluded Liabilities; (c) compel delivery of all Purchased Assets to the Purchaser; (d) compel the Purchaser and the Debtors to perform all of their obligations under the Sale Agreement; (e) resolve any disputes arising under or related to the Sale Agreement, the ancillary agreements contemplated thereby, the Sale or the Transactions; and (f) provide any further relief that is necessary or appropriate in furtherance of this Order or the Transactions.

40.    The Sale Agreement, the ancillary agreements contemplated thereby and any related agreements, documents or other instruments may be modified, amended, or supplemented through a written document signed by the parties in accordance with the terms thereof without further order of the Court; provided, however, that any such modification, amendment or supplement is neither material nor materially changes the economic substance of the transactions contemplated hereby (it being understood, for the sake of clarity, for the purposes of this paragraph, that no such modification, amendment or supplement shall be deemed to be material or shall be deemed to materially change the economic substance of the transactions to the extent that the impact does not exceed two percent of the Purchase Price); and provided further that no such modifications, amendments, or supplements may be made except following two (2) days written notice to, or with the prior consent of, the Committee, c/o Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036 (Attention: Fred S. Hodara, Stephen Kuhn, and Kenneth Davis). The Debtors are hereby authorized to perform each of their covenants and undertakings as provided in the Sale Agreement and the ancillary agreements thereto prior to or after Closing without further order of the Court.

41.     Notwithstanding any provision in the Bankruptcy Rules or the Local Rules to the contrary, (a) the terms of this Order shall be immediately effective and enforceable upon its entry, (b) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (c) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

42.     The provisions of this Order are nonseverable and mutually dependent.

43.     The Purchaser is not and will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the Transactions contemplated by the Sale Agreement based upon any arrangement made by or on behalf of the Debtors.

44.     This Order applies only to Assets owned by the Debtors or in which the Debtors, individually or collectively, have any right, title or interest, to the extent of the Debtors' right title and interest in such Assets.  Consequently, notwithstanding any other provision of this Order or the Sale Agreement to the contrary, the portions of this Order that approve the transfer of the Purchased Assets to the Purchaser free and clear of all Claims and Interests, or that modify, enjoin, release or otherwise limit the rights of creditors of entities transferring Purchased Assets, apply only to Purchased Assets owned by the Debtors or in which the Debtors, individually or collectively, have any right, title or interest (to the extent of such right, title and interest) and do not apply to any assets owned solely by non-debtor entities and/or in which the Debtors, individually or collectively, have no right, title or interest.

45.     The Purchaser shall deposit proceeds of the Sale less the Good Faith Deposit and any applicable transfer or value-added taxes incurred by the Sellers, and, to the extent agreed by the Sellers, any transaction costs, into an Escrow Account (as defined in the Interim Funding and

Settlement Agreement, dated June 9, 2009 (the "IFSA")). In accordance with this Court's order approving and authorizing the transactions contemplated by the IFSA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all of the Selling Debtors (as such term is defined in the IFSA) as to the distribution of such proceeds (subject to the prior consent of the Committee and the Bondholder Group acting in good faith in accordance with Section 12.g of the IFSA) or (b) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol (as such term is defined in the IFSA and subject to the requirements of Section 12.g of the IFSA), which Interim Sales Protocol shall be approved by the Court. The Debtors are hereby authorized to negotiate and enter into an escrow agreement, on terms and conditions reasonably satisfactory to the Committee and the Monitor acting in good faith, with an escrow agent to establish an Escrow Account without further order of this Court.

46.    Neither the Purchaser nor the Debtors shall have an obligation to close the Transactions until all conditions precedent in the Sale Agreement to each of their obligations to close the Transactions have been met, satisfied, or waived in accordance with the terms of the Sale Agreement.

47.    This Court hereby requests the aid and recognition of any court, tribunal, regulatory, administrative or other governmental body having jurisdiction in Canada, the United States, France, Germany, the United Kingdom, Ireland or elsewhere, to give effect to this Order and to assist the Sellers and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Sellers as may be necessary or desirable to give

36

effect to this Order or to assist the Sellers and their respective agents in carrying out the terms of this Order.

48.     The Sellers are hereby authorized and empowered to apply to any court, tribunal, regulatory, administrative or other governmental body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

49.     The Schedules delivered to the Court by the Debtors shall be kept segregated and under seal by the Clerk of Court and shall not be made publicly available pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018 and Local Rule 9081-1(b).

50.     Nothing in this Order is intended to affect the ability of the U.S. Department of Justice to undertake antitrust review or other action with respect to any subsequent use, allocation or distribution of the Purchased Assets.

DATED: July __11__, 2011

_____
THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

37

# EXHIBIT 4

EDGAR Online

# APPLE INC

# FORM 10-Q
### (Quarterly Report)

## Filed 07/20/11 for the Period Ending 06/25/11

| | |
|---|---|
| Address | ONE INFINITE LOOP |
| | CUPERTINO, CA 95014 |
| Telephone | (408) 996-1010 |
| CIK | 0000320193 |
| Symbol | AAPL |
| SIC Code | 3571 - Electronic Computers |
| Industry | Computer Hardware |
| Sector | Technology |
| Fiscal Year | 09/30 |

Powered By EDGAR Online
http://www.edgar-online.com

© Copyright 2011, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 25, 2011

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____to _____.

Commission file number: 000-10030

# APPLE INC.

### (Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **California** | **94-2404110** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1 Infinite Loop** | |
| **Cupertino, California** | **95014** |
| (Address of principal executive offices) | (Zip Code) |

#### Registrant's telephone number, including area code: (408) 996-1010

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒      No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☒      No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☒ | | Accelerated filer | ☐ |
| Non-accelerated filer ☐ | (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes ☐      No ☒

927,090,886 shares of common stock issued and outstanding as of July 8, 2011

**PART I. FINANCIAL INFORMATION**

Item 1.        **Financial Statements**

### APPLE INC.

#### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (Unaudited)
(in millions, except share amounts which are reflected in thousands and per share amounts)

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | June 25, 2011 | June 26, 2010 | June 25, 2011 | June 26, 2010 |
| Net sales | $ 28,571 | $ 15,700 | $ 79,979 | $ 44,882 |
| Cost of sales | 16,649 | 9,564 | 47,541 | 26,710 |
| Gross margin | 11,922 | 6,136 | 32,438 | 18,172 |
| Operating expenses: | | | | |
| Research and development | 628 | 464 | 1,784 | 1,288 |
| Selling, general and administrative | 1,915 | 1,438 | 5,574 | 3,946 |
| Total operating expenses | 2,543 | 1,902 | 7,358 | 5,234 |
| Operating income | 9,379 | 4,234 | 25,080 | 12,938 |
| Other income and expense | 172 | 58 | 334 | 141 |
| Income before provision for income taxes | 9,551 | 4,292 | 25,414 | 13,079 |
| Provision for income taxes | 2,243 | 1,039 | 6,115 | 3,374 |
| Net income | $ 7,308 | $ 3,253 | $ 19,299 | $ 9,705 |
| Earnings per common share: | | | | |
| Basic | $ 7.89 | $ 3.57 | $ 20.91 | $ 10.69 |
| Diluted | $ 7.79 | $ 3.51 | $ 20.63 | $ 10.51 |
| Shares used in computing earnings per share: | | | | |
| Basic | 926,108 | 912,197 | 922,917 | 907,762 |
| Diluted | 937,810 | 927,361 | 935,688 | 923,341 |

See accompanying Notes to Condensed Consolidated Financial Statements.

2

**APPLE INC.**

**CONDENSED CONSOLIDATED BALANCE SHEETS (Unaudited)**
(in millions, except share amounts)

| | June 25, 2011 | September 25, 2010 |
|---|---|---|
| **ASSETS:** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 12,091 | $ 11,261 |
| Short-term marketable securities | 16,304 | 14,359 |
| Accounts receivable, less allowances of $55 in each period | 6,102 | 5,510 |
| Inventories | 889 | 1,051 |
| Deferred tax assets | 1,892 | 1,636 |
| Vendor non-trade receivables | 5,369 | 4,414 |
| Other current assets | 4,251 | 3,447 |
| Total current assets | 46,898 | 41,678 |
| Long-term marketable securities | 47,761 | 25,391 |
| Property, plant and equipment, net | 6,749 | 4,768 |
| Goodwill | 741 | 741 |
| Acquired intangible assets, net | 1,169 | 342 |
| Other assets | 3,440 | 2,263 |
| Total assets | $ 106,758 | $ 75,183 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY:** | | |
| Current liabilities: | | |
| Accounts payable | $ 15,270 | $ 12,015 |
| Accrued expenses | 7,597 | 5,723 |
| Deferred revenue | 3,992 | 2,984 |
| Total current liabilities | 26,859 | 20,722 |
| Deferred revenue - non-current | 1,407 | 1,139 |
| Other non-current liabilities | 9,149 | 5,531 |
| Total liabilities | 37,415 | 27,392 |
| Commitments and contingencies | | |
| Shareholders' equity: | | |
| Common stock, no par value; 1,800,000,000 shares authorized; 926,903,779 and 915,970,050 shares issued and outstanding, respectively | 12,715 | 10,668 |
| Retained earnings | 56,239 | 37,169 |
| Accumulated other comprehensive income/(loss) | 389 | (46) |
| Total shareholders' equity | 69,343 | 47,791 |
| Total liabilities and shareholders' equity | $ 106,758 | $ 75,183 |

See accompanying Notes to Condensed Consolidated Financial Statements.

3

**APPLE INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (Unaudited)**

(in millions)

| | Nine Months Ended | |
| --- | --- | --- |
| | June 25, 2011 | June 26, 2010 |
| Cash and cash equivalents, beginning of the period | $    11,261 | $    5,263 |
| Operating activities: | | |
| Net income | 19,299 | 9,705 |
| Adjustments to reconcile net income to cash generated by operating activities: | | |
| Depreciation, amortization and accretion | 1,271 | 698 |
| Stock-based compensation expense | 870 | 655 |
| Deferred income tax expense | 2,232 | 1,298 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable, net | (592) | (79) |
| Inventories | 162 | (487) |
| Vendor non-trade receivables | (955) | (1,256) |
| Other current and non-current assets | (1,551) | (1,001) |
| Accounts payable | 2,480 | 2,812 |
| Deferred revenue | 1,276 | 806 |
| Other current and non-current liabilities | 2,608 | (239) |
| Cash generated by operating activities | 27,100 | 12,912 |
| Investing activities: | | |
| Purchases of marketable securities | (75,133) | (41,318) |
| Proceeds from maturities of marketable securities | 16,396 | 19,758 |
| Proceeds from sales of marketable securities | 34,301 | 14,048 |
| Payments made in connection with business acquisitions, net of cash acquired | 0 | (615) |
| Payments for acquisition of property, plant and equipment | (2,615) | (1,245) |
| Payments for acquisition of intangible assets | (266) | (63) |
| Other | 34 | (36) |
| Cash used in investing activities | (27,283) | (9,471) |
| Financing activities: | | |
| Proceeds from issuance of common stock | 577 | 733 |
| Excess tax benefits from equity awards | 915 | 652 |
| Taxes paid related to net share settlement of equity awards | (479) | (384) |
| Cash generated by financing activities | 1,013 | 1,001 |
| Increase in cash and cash equivalents | 830 | 4,442 |
| Cash and cash equivalents, end of the period | $    12,091 | $    9,705 |
| Supplemental cash flow disclosure: | | |
| Cash paid for income taxes, net | $    2,563 | $    2,657 |

See accompanying Notes to Condensed Consolidated Financial Statements.

4

**Apple Inc.**

**Notes to Condensed Consolidated Financial Statements (Unaudited)**

**Note 1 – Summary of Significant Accounting Policies**

Apple Inc. and its wholly-owned subsidiaries (collectively "Apple" or the "Company") designs, manufactures, and markets mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content and applications. The Company sells its products worldwide through its retail stores, online stores, and direct sales force, as well as through third-party cellular network carriers, wholesalers, retailers and value-added resellers. In addition, the Company sells a variety of third-party iPhone, iPad, Macintosh ("Mac"), and iPod compatible products including application software, printers, storage devices, speakers, headphones, and various other accessories and supplies through its online and retail stores. The Company sells to consumers, small and mid-sized businesses, education, enterprise and government customers.

**Basis of Presentation and Preparation**

The accompanying condensed consolidated financial statements include the accounts of the Company. Intercompany accounts and transactions have been eliminated. The preparation of these condensed consolidated financial statements in conformity with U.S. generally accepted accounting principles ("GAAP") requires management to make estimates and assumptions that affect the amounts reported in these condensed consolidated financial statements and accompanying notes. Actual results could differ materially from those estimates. Certain prior period amounts in the condensed consolidated financial statements and notes thereto have been reclassified to conform to the current period's presentation.

These condensed consolidated financial statements and accompanying notes should be read in conjunction with the Company's annual consolidated financial statements and the notes thereto for the fiscal year ended September 25, 2010, included in its Annual Report on Form 10-K (the "2010 Form 10-K"). Unless otherwise stated, references to particular years or quarters refer to the Company's fiscal years ended in September and the associated quarters of those fiscal years.

During the first quarter of 2011, the Company adopted the Financial Accounting Standard Board's ("FASB") new accounting standard on consolidation of variable interest entities. This new accounting standard eliminates the mandatory quantitative approach in determining control for evaluating whether variable interest entities need to be consolidated in favor of a qualitative analysis, and requires an ongoing reassessment of control over such entities. The adoption of this new accounting standard did not impact the Company's condensed consolidated financial statements.

**Revenue Recognition**

*Revenue Recognition for Arrangements with Multiple Deliverables*

For multi-element arrangements that include tangible products containing software that is essential to the tangible product's functionality, undelivered software elements relating to the tangible product's essential software, and undelivered non-software services, the Company allocates revenue to all deliverables based on their relative selling prices. In such circumstances, the Company uses a hierarchy to determine the selling price to be used for allocating revenue to deliverables: (i) vendor-specific objective evidence of fair value ("VSOE"), (ii) third-party evidence of selling price ("TPE"), and (iii) best estimate of the selling price ("ESP"). VSOE generally exists only when the Company sells the deliverable separately and is the price actually charged by the Company for that deliverable. ESPs reflect the Company's best estimates of what the selling prices of elements would be if they were sold regularly on a stand-alone basis.

5

For sales of iPhone, iPad, Apple TV, for sales of iPod touch beginning in June 2010, and for sales of Mac beginning in June 2011, the Company has indicated it may from time-to-time provide future unspecified software upgrades and features free of charge to customers. In June 2011, the Company announced it would provide various non-software services ("the online services") to owners of qualifying versions of iPhone, iPad, iPod touch and Mac. The Company has identified up to three deliverables in arrangements involving the sale of these devices. The first deliverable is the hardware and software essential to the functionality of the hardware device delivered at the time of sale. The second deliverable is the embedded right included with the purchase of iPhone, iPad, iPod touch, Mac and Apple TV to receive on a when-and-if-available basis, future unspecified software upgrades and features relating to the product's essential software. The third deliverable is the online services to be provided to qualifying versions of iPhone, iPad, iPod touch and Mac. The Company allocates revenue between these deliverables using the relative selling price method. Because the Company has neither VSOE nor TPE for these deliverables, the allocation of revenue has been based on the Company's ESPs. Amounts allocated to the delivered hardware and the related essential software are recognized at the time of sale provided the other conditions for revenue recognition have been met. Amounts allocated to the embedded unspecified software upgrade rights and the online services are deferred and recognized on a straight-line basis over the estimated lives of each of these devices, which range from 24 to 48 months. Cost of sales related to delivered hardware and related essential software, including estimated warranty costs, are recognized at the time of sale. Costs incurred to provide non-software services are recognized as cost of sales as incurred, and engineering and sales and marketing costs are recognized as operating expenses as incurred.

The Company's process for determining its ESP for deliverables without VSOE or TPE considers multiple factors that may vary depending upon the unique facts and circumstances related to each deliverable. The Company believes its customers, particularly consumers, would be reluctant to buy the types of unspecified software upgrade rights embedded with iPhone, iPad, iPod touch, Mac and Apple TV. This view is primarily based on the fact that unspecified upgrade rights do not obligate the Company to provide upgrades at a particular time or at all, and do not specify to customers which upgrades or features will be delivered. The Company also believes its customers would be unwilling to pay a significant amount for access to the online services because other companies offer similar services at little or no cost to users. Therefore, the Company has concluded that if it were to sell upgrade rights or access to the online services on a standalone basis, including those rights and services attached to iPhone, iPad, iPod touch, Mac and Apple TV, the selling price would be relatively low. Key factors considered by the Company in developing the ESPs for the upgrade rights include prices charged by the Company for similar offerings, market trends for pricing of Mac and iOS software, the Company's historical pricing practices, the nature of the upgrade rights (e.g., unspecified and when-and-if-available), and the relative ESP of the upgrade rights as compared to the total selling price of the product. The Company may also consider, when appropriate, the impact of other products and services, including advertising services, on selling price assumptions when developing and reviewing its ESPs for software upgrade rights and related deliverables. The Company may also consider additional factors as appropriate, including the pricing of competitive alternatives if they exist and product-specific business objectives. When relevant, the same factors are considered by the Company in developing ESPs for service offerings such as the online services; however, the primary consideration in developing ESPs for the online services is the estimated cost to provide such services over the life of the related devices, including consideration for a reasonable profit margin.

Beginning with the Company's June 2011 announcement of the upcoming release of the online services and Mac OS X Lion, the Company's combined ESP for the unspecified software upgrade rights and the right to receive the online services are as follows: $16 for iPhone and iPad, $11 for iPod touch, and $22 for Mac. The Company's ESP for the embedded unspecified software upgrade right included with each Apple TV is $5 for 2011. Amounts allocated to the embedded unspecified software upgrade rights and the online services associated with iPhone, iPad, iPod touch and Apple TV are recognized on a straight-line basis over 24 months, and amounts allocated to the embedded unspecified software upgrade rights and the online services associated with Mac are recognized on a straight-line basis over 48 months.

The Company recognizes revenue in accordance with industry specific software accounting guidance for sales of software upgrades. Therefore, beginning in July 2011 the Company will defer all revenue from the sale of upgrades to the Mac OS and iLife software and recognize it ratably over 36 months.

**Earnings Per Common Share**

Basic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of shares of common stock outstanding during the period. Diluted earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of shares of common stock outstanding during the period increased to include the number of additional shares of common stock that would have been outstanding if the potentially dilutive securities had been issued. Potentially dilutive securities include outstanding options, shares to be purchased under the employee stock purchase plan, and unvested restricted stock units ("RSUs"). The dilutive effect of potentially dilutive securities is reflected in diluted earnings per common share by application of the treasury stock method. Under the treasury stock method, an increase in the fair market value of the Company's common stock can result in a greater dilutive effect from potentially dilutive securities.

The following table summarizes the computation of basic and diluted earnings per common share for the three- and nine-month periods ended June 25, 2011 and June 26, 2010 (in thousands, except net income in millions and per share amounts):

| | Three Months Ended | | Nine Months Ended | |
| | June 25, 2011 | June 26, 2010 | June 25, 2011 | June 26, 2010 |
|---|---|---|---|---|
| Numerator: | | | | |
|     Net income | $ 7,308 | $ 3,253 | $ 19,299 | $ 9,705 |
| Denominator: | | | | |
|     Weighted-average shares outstanding | 926,108 | 912,197 | 922,917 | 907,762 |
|     Effect of dilutive securities | 11,702 | 15,164 | 12,771 | 15,579 |
|     Weighted-average diluted shares | 937,810 | 927,361 | 935,688 | 923,341 |
| Basic earnings per common share | $ 7.89 | $ 3.57 | $ 20.91 | $ 10.69 |
| Diluted earnings per common share | $ 7.79 | $ 3.51 | $ 20.63 | $ 10.51 |

Potentially dilutive securities representing approximately 2,000 shares and 220,000 shares of common stock for the three months ended June 25, 2011 and June 26, 2010, respectively, and 206,000 shares and 498,000 shares of common stock for the nine months ended June 25, 2011 and June 26, 2010, respectively, were excluded from the computation of diluted earnings per common share for these periods because their effect would have been antidilutive.

**Fair Value Measurements**

Fair value is the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

*Level 1* – Quoted prices in active markets for identical assets or liabilities.

*Level 2* – Observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

*Level 3* – Inputs that are generally unobservable and typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.

7

**Note 2 – Financial Instruments**

**Cash, Cash Equivalents and Marketable Securities**

All highly liquid investments with maturities of three months or less at the date of purchase are classified as cash equivalents. The Company's marketable debt and equity securities have been classified and accounted for as available-for-sale. Management determines the appropriate classification of its investments at the time of purchase and reevaluates the available-for-sale designations as of each balance sheet date. The Company classifies its marketable debt securities as either short-term or long-term based on each instrument's underlying contractual maturity date. Marketable debt securities with maturities of 12 months or less are classified as short-term and marketable debt securities with maturities greater than 12 months are classified as long-term. The Company classifies its marketable equity securities, including mutual funds, as either short-term or long-term based on the nature of each security and its availability for use in current operations.

The following tables summarize the Company's available-for-sale securities' adjusted cost, gross unrealized gains, gross unrealized losses and fair value by significant investment category recorded as cash and cash equivalents or short-term or long-term marketable securities as of June 25, 2011 and September 25, 2010 (in millions):

| | Adjusted Cost | Unrealized Gains | Unrealized Losses | Fair Value | Cash and Cash Equivalents | Short-Term Marketable Securities | Long-Term Marketable Securities |
|---|---|---|---|---|---|---|---|
| | | | | June 25, 2011 | | | |
| Cash | $ 2,769 | $ 0 | $ 0 | $ 2,769 | $ 2,769 | $ 0 | $ 0 |
| Level 1: | | | | | | | |
|    Money market funds | 1,414 | 0 | 0 | 1,414 | 1,414 | 0 | 0 |
|    Mutual funds | 150 | 0 | 0 | 150 | 0 | 150 | 0 |
|    Subtotal | 1,564 | 0 | 0 | 1,564 | 1,414 | 150 | 0 |
| Level 2: | | | | | | | |
|    U.S. Treasury securities | 10,736 | 51 | 0 | 10,787 | 1,139 | 1,876 | 7,772 |
|    U.S. agency securities | 9,986 | 17 | (1) | 10,002 | 391 | 1,980 | 7,631 |
|    Non-U.S. government securities | 6,127 | 18 | (1) | 6,144 | 427 | 1,952 | 3,765 |
|    Certificates of deposit and time deposits | 4,538 | 4 | 0 | 4,542 | 893 | 1,231 | 2,418 |
|    Commercial paper | 6,326 | 0 | 0 | 6,326 | 4,977 | 1,349 | 0 |
|    Corporate securities | 30,441 | 167 | (9) | 30,599 | 81 | 7,242 | 23,276 |
|    Municipal securities | 3,389 | 35 | (1) | 3,423 | 0 | 524 | 2,899 |
|    Subtotal | 71,543 | 292 | (12) | 71,823 | 7,908 | 16,154 | 47,761 |
|    Total | $ 75,876 | $ 292 | $ (12) | $ 76,156 | $ 12,091 | $ 16,304 | $ 47,761 |

8

**– A421 –**

| | September 25, 2010 | | | | | | |
| | Adjusted Cost | Unrealized Gains | Unrealized Losses | Fair Value | Cash and Cash Equivalents | Short-Term Marketable Securities | Long-Term Marketable Securities |
|---|---|---|---|---|---|---|---|
| Cash | $ 1,690 | $ 0 | $ 0 | $ 1,690 | $ 1,690 | $ 0 | $ 0 |
| Level 1: | | | | | | | |
| Money market funds | 2,753 | 0 | 0 | 2,753 | 2,753 | 0 | 0 |
| Level 2: | | | | | | | |
| U.S. Treasury securities | 9,872 | 42 | 0 | 9,914 | 2,571 | 2,130 | 5,213 |
| U.S. agency securities | 8,717 | 10 | 0 | 8,727 | 1,916 | 4,339 | 2,472 |
| Non-U.S. government securities | 2,648 | 13 | 0 | 2,661 | 10 | 865 | 1,786 |
| Certificates of deposit and time deposits | 2,735 | 5 | (1) | 2,739 | 374 | 850 | 1,515 |
| Commercial paper | 3,168 | 0 | 0 | 3,168 | 1,889 | 1,279 | 0 |
| Corporate securities | 17,349 | 102 | (9) | 17,442 | 58 | 4,522 | 12,862 |
| Municipal securities | 1,899 | 19 | (1) | 1,917 | 0 | 374 | 1,543 |
| Subtotal | 46,388 | 191 | (11) | 46,568 | 6,818 | 14,359 | 25,391 |
| Total | $ 50,831 | $ 191 | $ (11) | $ 51,011 | $ 11,261 | $ 14,359 | $ 25,391 |

The net unrealized gains as of June 25, 2011 and September 25, 2010 related primarily to long-term marketable securities. The Company may sell certain of its marketable securities prior to their stated maturities for strategic reasons including, but not limited to, anticipation of credit deterioration and duration management. The Company recognized net realized gains of $14 million and $70 million during the three- and nine-month periods ended June 25, 2011, respectively. The Company recognized no significant net realized gains or losses during the three- and nine-month periods ended June 26, 2010. The maturities of the Company's long-term marketable securities generally range from one year to five years.

As of June 25, 2011 and September 25, 2010, gross unrealized losses related to individual securities that had been in a continuous loss position for 12 months or longer were not significant.

The Company considers the declines in market value of its marketable securities investment portfolio to be temporary in nature. The Company typically invests in highly-rated securities, and its policy generally limits the amount of credit exposure to any one issuer. The Company's investment policy requires investments to generally be investment grade, primarily rated single-A or better, with the objective of minimizing the potential risk of principal loss. Fair values were determined for each individual security in the investment portfolio. When evaluating the investments for other-than-temporary impairment, the Company reviews factors such as the length of time and extent to which fair value has been below cost basis, the financial condition of the issuer and any changes thereto, and the Company's intent to sell, or whether it is more likely than not it will be required to sell, the investment before recovery of the investment's amortized cost basis. During the three- and nine-month periods ended June 25, 2011 and June 26, 2010, the Company did not recognize any significant impairment charges. As of June 25, 2011, the Company does not consider any of its investments to be other-than-temporarily impaired.

**Derivative Financial Instruments**

The Company uses derivatives to partially offset its business exposure to foreign currency exchange risk. The Company may enter into foreign currency forward and option contracts to offset some of the foreign exchange risk on expected future cash flows on certain forecasted revenue and cost of sales, on net investments in certain foreign subsidiaries, and on certain existing assets and liabilities. To help protect gross margins from fluctuations in foreign currency exchange rates, certain of the Company's subsidiaries whose functional currency is the U.S. dollar hedge a portion of forecasted foreign currency revenue. The Company's subsidiaries whose functional currency is not the U.S. dollar and who sell in local currencies may hedge a portion of forecasted inventory purchases not denominated in the subsidiaries' functional currencies. The Company typically hedges portions of its forecasted foreign currency exposure associated with revenue and inventory purchases for three to six months. To help protect the net investment in a foreign operation from adverse changes in foreign currency exchange rates, the Company may enter into foreign currency forward and option contracts to offset the changes in the carrying amounts of these investments due to fluctuations in foreign currency exchange rates. The Company may also enter into foreign currency forward and option contracts to partially offset the foreign currency exchange gains and losses generated by the re-measurement of certain assets and liabilities denominated in non-functional currencies. However, the Company may choose not to hedge certain foreign currency exchange exposures for a variety of reasons including, but not limited to, materiality, accounting considerations and the prohibitive economic cost of hedging particular exposures. There can be no assurance the hedges will offset more than a portion of the financial impact resulting from movements in foreign currency exchange rates.

9

The Company's accounting policies for these instruments are based on whether the instruments are designated as hedge or non-hedge instruments. The Company records all derivatives on the Condensed Consolidated Balance Sheets at fair value. The effective portions of cash flow hedges are recorded in other comprehensive income until the hedged item is recognized in earnings. The effective portions of net investment hedges are recorded in other comprehensive income as a part of the cumulative translation adjustment. The ineffective portions of cash flow hedges and net investment hedges are recorded in other income and expense. Derivatives that are not designated as hedging instruments are adjusted to fair value through earnings in the financial statement line item the derivative relates to.

The Company had a net deferred gain associated with cash flow hedges of approximately $21 million and a net deferred loss associated with cash flow hedges of approximately $252 million, net of taxes, recorded in other comprehensive income as of June 25, 2011 and September 25, 2010, respectively. Deferred gains and losses associated with cash flow hedges of foreign currency revenue are recognized as a component of net sales in the same period as the related revenue is recognized, and deferred gains and losses related to cash flow hedges of inventory purchases are recognized as a component of cost of sales in the same period as the related costs are recognized. Substantially all of the Company's hedged transactions as of June 25, 2011 are expected to occur within six months.

Derivative instruments designated as cash flow hedges must be de-designated as hedges when it is probable the forecasted hedged transaction will not occur in the initially identified time period or within a subsequent two-month time period. Deferred gains and losses in other comprehensive income associated with such derivative instruments are reclassified immediately into earnings through other income and expense. Any subsequent changes in fair value of such derivative instruments are reflected in other income and expense unless they are re-designated as hedges of other transactions. The Company did not recognize any significant net gains or losses related to the loss of hedge designation on discontinued cash flow hedges during the three- and nine-month periods ended June 25, 2011 and June 26, 2010.

The Company's unrealized net gains and losses on net investment hedges, included in the cumulative translation adjustment account of accumulated other comprehensive income ("AOCI"), were not significant as of June 25, 2011 and September 25, 2010, respectively. The ineffective portions and amounts excluded from the effectiveness test of net investment hedges are recorded in other income and expense.

The Company recognized in earnings a net loss on foreign currency forward and option contracts not designated as hedging instruments of $45 million and $100 million during the three- and nine-month periods ended June 25, 2011, respectively, and a net gain on foreign currency forward and option contracts not designated as hedging instruments of $25 million and $15 million during the three- and nine-month periods ended June 26, 2010, respectively. These amounts, recorded in other income and expense, represent the net gain or loss on the derivative contracts and do not include changes in the related exposures, which generally offset a portion of the gain or loss on the derivative contracts.

10

The following table summarizes the notional principal amounts of the Company's outstanding derivative instruments and credit risk amounts associated with outstanding or unsettled derivative instruments as of June 25, 2011 and September 25, 2010 (in millions):

| | June 25, 2011 | | September 25, 2010 | |
| | Notional Principal | Credit Risk Amounts | Notional Principal | Credit Risk Amounts |
|---|---|---|---|---|
| **Instruments qualifying as accounting hedges:** | | | | |
| Foreign exchange contracts | $ 12,282 | $ 128 | $ 13,957 | $ 62 |
| **Instruments other than accounting hedges:** | | | | |
| Foreign exchange contracts | $ 6,415 | $ 14 | $ 10,727 | $ 45 |

The notional principal amounts for outstanding derivative instruments provide one measure of the transaction volume outstanding and do not represent the amount of the Company's exposure to credit or market loss. The credit risk amounts represent the Company's gross exposure to potential accounting loss on derivative instruments that are outstanding or unsettled if all counterparties failed to perform according to the terms of the contract, based on then-current currency exchange rates at each respective date. The Company's gross exposure on these transactions may be further mitigated by collateral received from certain counterparties. The Company's exposure to credit loss and market risk will vary over time as a function of currency exchange rates. Although the table above reflects the notional principal and credit risk amounts of the Company's foreign exchange instruments, it does not reflect the gains or losses associated with the exposures and transactions that the foreign exchange instruments are intended to hedge. The amounts ultimately realized upon settlement of these financial instruments, together with the gains and losses on the underlying exposures, will depend on actual market conditions during the remaining life of the instruments.

The Company generally enters into master netting arrangements, which reduce credit risk by permitting net settlement of transactions with the same counterparty. To further limit credit risk, the Company generally enters into collateral security arrangements that provide for collateral to be received or posted when the net fair value of certain financial instruments fluctuates from contractually established thresholds. The Company presents its derivative assets and derivative liabilities at their gross fair values. As of June 25, 2011, the Company received cash collateral related to the derivative instruments under its collateral security arrangements of $8 million, which it recorded as accrued expenses in the Condensed Consolidated Balance Sheet. As of September 25, 2010, the Company posted cash collateral related to the derivative instruments under its collateral security arrangements of $445 million, which it recorded as other current assets in the Condensed Consolidated Balance Sheet. The Company did not have any derivative instruments with credit-risk related contingent features that would require it to post additional collateral as of June 25, 2011 or September 25, 2010.

11

The following tables summarize the gross fair value of the Company's derivative instruments as reflected in the Condensed Consolidated Balance Sheets as of June 25, 2011 and September 25, 2010 (in millions):

| | June 25, 2011 | | |
| | Fair Value of Derivatives Designated as Hedge Instruments | Fair Value of Derivatives Not Designated as Hedge Instruments | Total Fair Value |
|---|---|---|---|
| Derivative assets (a): | | | |
| Foreign exchange contracts | $ 125 | $ 14 | $ 139 |
| Derivative liabilities (b): | | | |
| Foreign exchange contracts | $ 64 | $ 6 | $ 70 |

| | September 25, 2010 | | |
| | Fair Value of Derivatives Designated as Hedge Instruments | Fair Value of Derivatives Not Designated as Hedge Instruments | Total Fair Value |
|---|---|---|---|
| Derivative assets (a): | | | |
| Foreign exchange contracts | $ 62 | $ 45 | $ 107 |
| Derivative liabilities (b): | | | |
| Foreign exchange contracts | $ 488 | $ 118 | $ 606 |

(a)    The fair value of derivative assets is measured using Level 2 fair value inputs and is recorded as other current assets in the Condensed Consolidated Balance Sheets.

(b)    The fair value of derivative liabilities is measured using Level 2 fair value inputs and is recorded as accrued expenses in the Condensed Consolidated Balance Sheets.

The following table summarizes the pre-tax effect of the Company's derivative instruments designated as cash flow and net investment hedges in the Condensed Consolidated Statements of Operations for the three- and nine-month periods ended June 25, 2011 and June 26, 2010 (in millions):

| | Three Month Periods | | | | | | |
| | Gains/(Losses) Recognized in OCI - Effective Portion (e) | | Gains/(Losses) Reclassified from AOCI into Income - Effective Portion (e) | | | Gains/(Losses) Recognized – Ineffective Portion and Amount Excluded from Effectiveness Testing | |
| | June 25, 2011 | June 26, 2010 | June 25, 2011 (a) | June 26, 2010 (b) | Location | June 25, 2011 | June 26, 2010 |
|---|---|---|---|---|---|---|---|
| Cash flow hedges: | | | | | Other income | | |
| Foreign exchange contracts | $ 12 | $ 83 | $ (162) | $ 67 | and expense | $ 15 | $ (50) |
| Net investment hedges: | | | | | Other income | | |
| Foreign exchange contracts | (7) | (18) | 0 | 0 | and expense | 1 | 0 |
| Total | $ 5 | $ 65 | $ (162) | $ 67 | | $ 16 | $ (50) |

12

| | Nine Month Periods | | | | | | |
| | Gains/(Losses) Recognized in OCI - Effective Portion (e) | | Gains/(Losses) Reclassified from AOCI into Income - Effective Portion (e) | | | Gains/(Losses) Recognized – Ineffective Portion and Amount Excluded from Effectiveness Testing | |
| | June 25, 2011 | June 26, 2010 | June 25, 2011 (c) | June 26, 2010 (d) | Location | June 25, 2011 | June 26, 2010 |
|---|---|---|---|---|---|---|---|
| **Cash flow hedges:** | | | | | | | |
| Foreign exchange contracts | | | | | Other income | | |
| | $ (270) | $ 145 | $ (701) | $ 80 | and expense | $ (104) | $ (88) |
| **Net investment hedges:** | | | | | | | |
| Foreign exchange contracts | | | | | Other income | | |
| | (21) | (16) | 0 | 0 | and expense | 1 | 0 |
| Total | $ (291) | $ 129 | $ (701) | $ 80 | | $ (103) | $ (88) |

(a)  Includes gains/(losses) reclassified from AOCI into income for the effective portion of cash flow hedges, of which $(101) million and $(61) million were recognized within net sales and cost of sales, respectively, within the Condensed Consolidated Statement of Operations for the three months ended June 25, 2011. There were no amounts reclassified from AOCI into income for the effective portion of net investment hedges for the three months ended June 25, 2011.

(b)  Includes gains/(losses) reclassified from AOCI into income for the effective portion of cash flow hedges, of which $78 million and $(11) million were recognized within net sales and cost of sales, respectively, within the Condensed Consolidated Statement of Operations for the three months ended June 26, 2010. There were no amounts reclassified from AOCI into income for the effective portion of net investment hedges for the three months ended June 26, 2010.

(c)  Includes gains/(losses) reclassified from AOCI into income for the effective portion of cash flow hedges, of which $(382) million and $(319) million were recognized within net sales and cost of sales, respectively, within the Condensed Consolidated Statement of Operations for the nine months ended June 25, 2011. There were no amounts reclassified from AOCI into income for the effective portion of net investment hedges for the nine months ended June 25, 2011.

(d)  Includes gains/(losses) reclassified from AOCI into income for the effective portion of cash flow hedges, of which $109 million and $(29) million were recognized within net sales and cost of sales, respectively, within the Condensed Consolidated Statement of Operations for the nine months ended June 26, 2010. There were no amounts reclassified from AOCI into income for the effective portion of net investment hedges for the nine months ended June 26, 2010.

(e)  Refer to Note 5, "Shareholders' Equity and Stock-Based Compensation" of this Form 10-Q, which summarizes the activity in AOCI related to derivatives.

**Accounts Receivable**

The Company has considerable trade receivables outstanding with its third-party cellular network carriers, wholesalers, retailers, value-added resellers, small and mid-sized businesses, and education, enterprise and government customers that are not covered by collateral, third-party financing arrangements or credit insurance. As of June 25, 2011, trade receivables from one customer accounted for 12% of the Company's total trade receivables. Trade receivables from two of the Company's customers accounted for 15% and 12% of total trade receivables as of September 25, 2010. The Company's cellular network carriers accounted for 60% and 64% of trade receivables as of June 25, 2011 and September 25, 2010, respectively.

Additionally, the Company has non-trade receivables from certain of its manufacturing vendors. Vendor non-trade receivables from two of the Company's vendors accounted for 56% and 22% of total non-trade receivables as of June 25, 2011 and vendor non-trade receivables from two of the Company's vendors accounted for 57% and 24% of total non-trade receivables as of September 25, 2010.

13

**– A426 –**

**Note 3 – Condensed Consolidated Financial Statement Details**

The following tables summarize the Company's condensed consolidated financial statement details as of June 25, 2011 and September 25, 2010 (in millions):

**Property, Plant and Equipment**

|  | June 25, 2011 | September 25, 2010 |
|---|---|---|
| Land and buildings | $ 2,028 | $ 1,471 |
| Machinery, equipment and internal-use software | 5,789 | 3,589 |
| Office furniture and equipment | 172 | 144 |
| Leasehold improvements | 2,359 | 2,030 |
| Gross property, plant and equipment | 10,348 | 7,234 |
| Accumulated depreciation and amortization | (3,599) | (2,466) |
| Net property, plant and equipment | $ 6,749 | $ 4,768 |

**Accrued Expenses**

|  | June 25, 2011 | September 25, 2010 |
|---|---|---|
| Accrued warranty and related costs | $ 1,190 | $ 761 |
| Deferred margin on component sales | 1,362 | 663 |
| Accrued taxes | 1,130 | 524 |
| Accrued compensation and employee benefits | 546 | 436 |
| Accrued marketing and selling expenses | 488 | 396 |
| Other current liabilities | 2,881 | 2,943 |
| Total accrued expenses | $ 7,597 | $ 5,723 |

**Non-Current Liabilities**

|  | June 25, 2011 | September 25, 2010 |
|---|---|---|
| Deferred tax liabilities | $ 7,331 | $ 4,300 |
| Other non-current liabilities | 1,818 | 1,231 |
| Total other non-current liabilities | $ 9,149 | $ 5,531 |

**Note 4 – Income Taxes**

As of June 25, 2011, the Company recorded gross unrecognized tax benefits of $1.2 billion, of which $534 million, if recognized, would affect the Company's effective tax rate. As of September 25, 2010, the total amount of gross unrecognized tax benefits was $943 million, of which $404 million, if recognized, would affect the Company's effective tax rate. The Company's total gross unrecognized tax benefits are classified as other non-current liabilities in the Condensed Consolidated Balance Sheets. The Company had $266 million and $247 million of gross interest and penalties accrued as of June 25, 2011 and September 25, 2010, respectively, which are classified as other non-current liabilities in the Condensed Consolidated Balance Sheets.

Management believes that an adequate provision has been made for any adjustments that may result from tax examinations. However, the outcome of tax audits cannot be predicted with certainty. If any issues addressed in the Company's tax audits are resolved in a manner not consistent with management's expectations, the Company could be required to adjust its provision for income tax in the period such resolution occurs. Although timing of the resolution and/or closure of audits is not certain, the Company does not believe it is reasonably possible that its unrecognized tax benefits would materially change in the next 12 months.

**Note 5 – Shareholders' Equity and Stock-Based Compensation**

**Preferred Stock**

The Company has five million shares of authorized preferred stock, none of which is issued or outstanding. Under the terms of the Company's Restated Articles of Incorporation, the Board of Directors is authorized to determine or alter the rights, preferences, privileges and restrictions of the Company's authorized but unissued shares of preferred stock.

**Comprehensive Income**

Comprehensive income consists of two components, net income and other comprehensive income. Other comprehensive income refers to revenue, expenses, gains, and losses that under GAAP are recorded as an element of shareholders' equity but are excluded from net income. The Company's other comprehensive income consists of foreign currency translation adjustments from those subsidiaries not using the U.S. dollar as their functional currency, unrealized gains and losses on marketable securities categorized as available-for-sale, and net deferred gains and losses on certain derivative instruments accounted for as cash flow hedges.

The following table summarizes the components of total comprehensive income, net of taxes, during the three- and nine-month periods ended June 25, 2011 and June 26, 2010 (in millions):

|  | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
|  | June 25, 2011 | June 26, 2010 | June 25, 2011 | June 26, 2010 |
| Net income | $ 7,308 | $ 3,253 | $ 19,299 | $ 9,705 |
| Other comprehensive income: | | | | |
| Change in unrecognized gains/losses on derivative instruments | 112 | 13 | 273 | 41 |
| Change in foreign currency translation | 11 | (54) | 101 | (43) |
| Change in unrealized gains/losses on marketable securities | 140 | 24 | 61 | 33 |
| Total comprehensive income | $ 7,571 | $ 3,236 | $ 19,734 | $ 9,736 |

The following table summarizes activity in other comprehensive income related to derivatives, net of taxes, held by the Company during the three- and nine-month periods ended June 25, 2011 and June 26, 2010 (in millions):

|  | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
|  | June 25, 2011 | June 26, 2010 | June 25, 2011 | June 26, 2010 |
| Change in fair value of derivatives | $ 8 | $ 55 | $ (175) | $ 91 |
| Adjustment for net gains/losses realized and included in income | 104 | (42) | 448 | (50) |
| Change in unrecognized gains/losses on derivative instruments | $ 112 | $ 13 | $ 273 | $ 41 |

The following table summarizes the components of AOCI, net of taxes, as of June 25, 2011 and September 25, 2010 (in millions):

|  | June 25, 2011 | September 25, 2010 |
|---|---|---|
| Net unrealized gains/losses on marketable securities | $ 232 | $ 171 |
| Net unrecognized gains/losses on derivative instruments | 21 | (252) |
| Cumulative foreign currency translation | 136 | 35 |
| Accumulated other comprehensive income/(loss) | $ 389 | $ (46) |

15

**Equity Awards**

A summary of the Company's RSU activity and related information for the nine months ended June 25, 2011, is as follows (in thousands, except per share amounts):

| | Number of Shares | | Weighted-Average Grant Date Fair Value | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Balance at September 25, 2010 | 13,034 | $ | 165.63 | |
| RSUs granted | 5,232 | $ | 296.08 | |
| RSUs vested | (4,224) | $ | 166.49 | |
| RSUs cancelled | (609) | $ | 183.53 | |
| Balance at June 25, 2011 | 13,433 | $ | 215.35 | $ 4,383,924 |

RSUs that vested during the three- and nine-month periods ended June 25, 2011 had a fair value of $637 million and $1.4 billion, respectively, as of the vesting dates. RSUs that vested during the three- and nine-month periods ended June 26, 2010 had a fair value of $353 million and $990 million, respectively, as of the vesting dates.

A summary of the Company's stock option activity and related information for the nine months ended June 25, 2011, is as follows (in thousands, except per share amounts and contractual term in years):

| | Number of Shares | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| Balance at September 25, 2010 | 21,725 | $ | 90.46 | | |
| Options granted | 1 | $ | 342.62 | | |
| Options cancelled | (149) | $ | 124.71 | | |
| Options exercised | (7,822) | $ | 63.20 | | |
| Balance at June 25, 2011 | 13,755 | $ | 105.62 | 2.54 | $ 3,036,128 |
| Exercisable at June 25, 2011 | 12,431 | $ | 99.59 | 2.43 | $ 2,818,845 |
| Expected to vest after June 25, 2011 | 1,324 | $ | 162.24 | 3.57 | $ 217,283 |

Aggregate intrinsic value represents the value of the Company's closing stock price on the last trading day of the fiscal period in excess of the weighted-average exercise price multiplied by the number of options outstanding or exercisable. The aggregate intrinsic value excludes stock options that have a zero or negative intrinsic value. The total intrinsic value of options at the time of exercise was $248 million and $2.1 billion for the three- and nine-month periods ended June 25, 2011, respectively, and $559 million and $1.6 billion for the three- and nine-month periods ended June 26, 2010, respectively.

The Company had approximately 53.6 million shares and 62.7 million shares reserved for future issuance under the Company's stock plans as of June 25, 2011 and September 25, 2010, respectively. RSUs granted are deducted from the shares available for grant under the Company's stock plans utilizing a factor of two times the number of RSUs granted. Similarly, RSUs cancelled are added back to the shares available for grant under the Company's stock plans utilizing a factor of two times the number of RSUs cancelled.

16

**Stock-Based Compensation**

Stock-based compensation cost for RSUs is measured based on the closing fair market value of the Company's common stock on the date of grant. Stock-based compensation cost for stock options and employee stock purchase plan rights ("stock purchase rights") is estimated at the grant date and offering date, respectively, based on the fair-value as calculated using the Black-Scholes Merton ("BSM") option-pricing model. The BSM option-pricing model incorporates various assumptions including expected volatility, expected life and interest rates. The expected volatility is based on the historical volatility of the Company's common stock over the most recent period commensurate with the expected life of the Company's stock options and other relevant factors including implied volatility in market traded options on the Company's common stock. The Company bases its expected life assumption on its historical experience and on the terms and conditions of the stock awards it grants to employees. The Company recognizes stock-based compensation cost as expense on a straight-line basis over the requisite service period.

The Company did not grant any stock options during the three-month periods ended June 25, 2011 and June 26, 2010. The Company granted 1,370 stock options with a weighted-average grant date fair value of $181.13 per share during the nine months ended June 25, 2011 and granted approximately 34,000 stock options with a weighted-average grant date fair value of $108.58 per share during the nine months ended June 26, 2010.

The Company did not assume any stock options during the three- and nine-month periods ended June 25, 2011. During the three- and nine-month periods ended June 26, 2010, the Company assumed 31,000 and 98,000 stock options, respectively, in conjunction with certain business combinations. The weighted-average fair value of stock options assumed during the three- and nine-month periods ended June 26, 2010 was $256.63 and $216.82, respectively.

The weighted-average fair value of stock purchase rights per share was $72.63 and $67.70 during the three- and nine-month periods ended June 25, 2011, respectively, and was $46.82 and $41.98 during the three- and nine-month periods ended June 26, 2010, respectively.

The following table summarizes the stock-based compensation expense included in the Condensed Consolidated Statements of Operations for the three- and nine-month periods ended June 25, 2011 and June 26, 2010 (in millions):

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | June 25, 2011 | June 26, 2010 | June 25, 2011 | June 26, 2010 |
| Cost of sales | $ 52 | $ 38 | $ 155 | $ 112 |
| Research and development | 119 | 80 | 336 | 240 |
| Selling, general and administrative | 113 | 101 | 379 | 303 |
| Total stock-based compensation expense | $ 284 | $ 219 | $ 870 | $ 655 |

The income tax benefit related to stock-based compensation expense was $113 million and $349 million for the three- and nine-month periods ended June 25, 2011, respectively, and $77 million and $238 million for the three- and nine-month periods ended June 26, 2010, respectively. As of June 25, 2011, the total unrecognized compensation cost related to outstanding stock options and RSUs was $2.3 billion, which the Company expects to recognize over a weighted-average period of 2.8 years.

**Employee Benefit Plans**

*Rule 10b5-1 Trading Plans*

During the third quarter of 2011, executive officers Timothy D. Cook, Peter Oppenheimer, D. Bruce Sewell and Jeffrey E. Williams, and directors William V. Campbell and Arthur D. Levinson had trading plans pursuant to Rule 10b5-1(c)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). A trading plan is a written document that pre-establishes the amounts, prices and dates (or a formula for determining the amounts, prices and dates) of future purchases or sales of the Company's stock, including the exercise and sale of employee stock options and shares acquired pursuant to the Company's employee stock purchase plan and upon vesting of RSUs.

17

**Note 6 – Commitments and Contingencies**

**Accrued Warranty and Indemnifications**

The following table summarizes changes in the Company's accrued warranties and related costs for the three- and nine-month periods ended June 25, 2011 and June 26, 2010 (in millions):

| | Three Months Ended | | Nine Months Ended | |
| | June 25, 2011 | June 26, 2010 | June 25, 2011 | June 26, 2010 |
|---|---|---|---|---|
| Beginning accrued warranty and related costs | $ 1,103 | $ 588 | $ 761 | $ 577 |
| Cost of warranty claims | (288) | (155) | (790) | (427) |
| Accruals for product warranty | 375 | 157 | 1,219 | 440 |
| Ending accrued warranty and related costs | $ 1,190 | $ 590 | $ 1,190 | $ 590 |

The Company generally does not indemnify end-users of its operating system and application software against legal claims that the software infringes third-party intellectual property rights. Other agreements entered into by the Company sometimes include indemnification provisions under which the Company could be subject to costs and/or damages in the event of an infringement claim against the Company or an indemnified third-party. However, the Company has not been required to make any significant payments resulting from such an infringement claim asserted against it or an indemnified third-party. In the opinion of management, there was not at least a reasonable possibility the Company may have incurred a material loss with respect to indemnification of end-users of its operating system or application software for infringement of third-party intellectual property rights. The Company did not record a liability for infringement costs related to indemnification as of either June 25, 2011 or September 25, 2010.

The Company has entered into indemnification agreements with its directors and executive officers. Under these agreements, the Company has agreed to indemnify such individuals to the fullest extent permitted by law against liabilities that arise by reason of their status as directors or officers and to advance expenses incurred by such individuals in connection with related legal proceedings. It is not possible to determine the maximum potential amount of payments the Company could be required to make under these agreements due to the limited history of prior indemnification claims and the unique facts and circumstances involved in each claim. However, the Company maintains directors and officers liability insurance coverage to reduce its exposure to such obligations, and payments made under these agreements historically have not been material.

**Concentrations in the Available Sources of Supply of Materials and Product**

Although most components essential to the Company's business are generally available from multiple sources, certain key components including but not limited to microprocessors, enclosures, certain liquid crystal displays ("LCDs"), certain optical drives and application-specific integrated circuits ("ASICs") are currently obtained by the Company from single or limited sources, which subjects the Company to significant supply and pricing risks. Many of these and other key components that are available from multiple sources including but not limited to NAND flash memory, dynamic random access memory ("DRAM") and certain LCDs, are subject at times to industry-wide shortages and significant commodity pricing fluctuations. In addition, the Company has entered into certain agreements for the supply of key components including, but not limited to, microprocessors, NAND flash memory, DRAM and LCDs with favorable pricing, but there can be no guarantee that the Company will be able to extend or renew these agreements on similar favorable terms, or at all, upon expiration or otherwise obtain favorable pricing in the future. Therefore, the Company remains subject to significant risks of supply shortages and/or price increases that can materially adversely affect its financial condition and operating results.

The Company and other participants in the mobile communication and media device, and personal computer industries also compete for various components with other industries that have experienced increased demand for their products. In addition, the Company uses some custom components that are not common to the rest of these industries, and new products introduced by the Company often utilize custom components available from only one source. When a component or product uses new technologies, initial capacity constraints may exist until the suppliers' yields have matured or manufacturing capacity has increased. If the Company's supply of a key single-sourced component for a new or existing product were delayed or constrained, if such components were available only at significantly higher prices, or if a key outsourcing partner delayed shipments of completed products to the Company, the Company's financial condition and operating results could be materially adversely affected. The Company's business and financial performance could also be adversely affected depending on the time required to obtain sufficient quantities from the original source, or to identify and obtain sufficient quantities from an alternative source. Continued availability of these components at acceptable prices, or at all, may be affected if those suppliers decided to concentrate on the production of common components instead of components customized to meet the Company's requirements.

Substantially all of the Company's iPhones, iPads, Macs, iPods, logic boards and other assembled products are manufactured by outsourcing partners, primarily in various parts of Asia. A significant concentration of this outsourced manufacturing is currently performed by only a few outsourcing partners of the Company, often in single locations. Certain of these outsourcing partners are the sole-sourced supplier of components and manufacturing outsourcing for many of the Company's key products including but not limited to final assembly of substantially all of the Company's hardware products. Although the Company works closely with its outsourcing partners on manufacturing schedules, the Company's operating results could be adversely affected if its outsourcing partners were unable to meet their production commitments. The Company's purchase commitments typically cover its requirements for periods ranging from 30 to 150 days.

### Long-Term Supply Agreements

The Company has entered into long-term agreements to secure the supply of certain inventory components. These agreements generally expire between 2011 and 2022. As of June 25, 2011, the Company had a total of $2.4 billion of inventory component prepayments outstanding, of which $701 million are classified as other current assets and $1.7 billion are classified as other assets in the Condensed Consolidated Balance Sheets. The Company had a total of $956 million of inventory component prepayments outstanding as of September 25, 2010. The Company's outstanding prepayments will be applied to certain inventory component purchases made during the term of each respective agreement. As of June 25, 2011, the Company had off-balance sheet commitments under long-term supply agreements totaling approximately $1.7 billion to make additional inventory component prepayments and to acquire capital equipment in 2011 and beyond.

### Other Off-Balance Sheet Commitments

The Company leases various equipment and facilities, including retail space, under noncancelable operating lease arrangements. The Company does not currently utilize any other off-balance sheet financing arrangements. The major facility leases are typically for terms not exceeding 10 years and generally provide renewal options for terms not exceeding five additional years. Leases for retail space are for terms ranging from five to 20 years, the majority of which are for 10 years, and often contain multi-year renewal options. As of June 25, 2011, the Company's total future minimum lease payments under noncancelable operating leases were $2.7 billion, of which $2.2 billion related to leases for retail space.

Additionally, as of June 25, 2011, the Company had outstanding off-balance sheet commitments for outsourced manufacturing and component purchases of $11.0 billion. Other outstanding obligations were $1.6 billion as of June 25, 2011, and were comprised mainly of commitments to acquire product tooling and manufacturing process equipment and commitments related to advertising, research and development, Internet and telecommunications services and other obligations. These commitments exclude the off-balance sheet commitments under the long-term supply agreements described above.

### Contingencies

The Company is subject to various legal proceedings and claims that have arisen in the ordinary course of business and have not been fully adjudicated, which are discussed in Part II, Item 1 of this Form 10-Q under the heading "Legal Proceedings" and in Part II Item 1A under the heading "Risk Factors." In the opinion of management, there was not at least a reasonable possibility the Company may have incurred a material loss, or a material loss in excess of a recorded accrual, with respect to loss contingencies. However, the outcome of litigation is inherently uncertain. Therefore, although management considers the likelihood of such an outcome to be remote, if one or more of these legal matters were resolved against the Company in the same reporting period for amounts in excess of management's expectations, the Company's condensed consolidated financial statements of a particular reporting period could be materially adversely affected.

19

On March 14, 2008, Mirror Worlds, LLC filed an action against the Company alleging that certain of its products infringed on three patents covering technology used to display files. On October 1, 2010, a jury returned a verdict against the Company, and awarded damages of $208 million per patent for each of the three patents asserted. On April 4, 2011, the Judge overturned the verdict in the Company's favor. Mirror Worlds has appealed the ruling. The Company had not recorded a loss contingency for this action.

Production and marketing of products in certain states and countries may subject the Company to environmental, product safety and other regulations including, in some instances, the requirement to provide customers the ability to return product at the end of its useful life, and place responsibility for environmentally safe disposal or recycling with the Company. Such laws and regulations have been passed in several jurisdictions in which the Company operates, including various countries within Europe and Asia and certain states and provinces within North America. Although the Company does not anticipate any material adverse effects in the future based on the nature of its operations and the thrust of such laws, there can be no assurance that such existing laws or future laws will not materially adversely affect the Company's financial condition or operating results.

### Note 7 – Segment Information and Geographic Data

The Company reports segment information based on the "management" approach. The management approach designates the internal reporting used by management for making decisions and assessing performance as the source of the Company's reportable segments.

The Company manages its business primarily on a geographic basis. Accordingly, the Company determined its operating and reporting segments, which are generally based on the nature and location of its customers, to be the Americas, Europe, Japan, Asia-Pacific and Retail operations. The Americas, Europe, Japan and Asia-Pacific reportable segment results do not include results of the Retail segment. The Americas segment includes both North and South America. The Europe segment includes European countries, as well as the Middle East and Africa. The Asia-Pacific segment includes Australia and Asia, but does not include Japan. The Retail segment operates Apple retail stores in 11 countries, including the U.S. Each reportable operating segment provides similar hardware and software products and similar services. The accounting policies of the various segments are the same as those described in Note 1, "Summary of Significant Accounting Policies" of this Form 10-Q and in the Notes to Consolidated Financial Statements in the Company's 2010 Form 10-K.

The Company evaluates the performance of its operating segments based on net sales and operating income. Net sales for geographic segments are generally based on the location of customers, while Retail segment net sales are based on sales from the Company's retail stores. Operating income for each segment includes net sales to third parties, related cost of sales and operating expenses directly attributable to the segment. Advertising expenses are generally included in the geographic segment in which the advertising occurs. Operating income for each segment excludes other income and expense and certain expenses managed outside the operating segments. Costs excluded from segment operating income include various corporate expenses such as manufacturing costs and variances not included in standard costs, research and development, corporate marketing expenses, stock-based compensation expense, income taxes, various nonrecurring charges, and other separately managed general and administrative costs. The Company does not include intercompany transfers between segments for management reporting purposes. Segment assets exclude corporate assets, such as cash, cash equivalents, short-term and long-term investments, manufacturing and corporate facilities, miscellaneous corporate infrastructure, goodwill and other acquired intangible assets. Except for the Retail segment, capital expenditures for long-lived assets are not reported to management by segment.

The Company has certain retail stores that have been designed and built to serve as high-profile venues to promote brand awareness and serve as vehicles for corporate sales and marketing activities. Because of their unique design elements, locations and size, these stores require substantially more investment than the Company's more typical retail stores. The Company allocates certain operating expenses associated with its high-profile stores to corporate expense to reflect the estimated Company-wide benefit. The allocation of these operating costs to corporate expense is based on the amount incurred for a high-profile store in excess of that incurred by a more typical Company retail location. The Company had opened a total of 16 high-profile stores as of June 25, 2011. Amounts allocated to corporate expense resulting from the operations of high-profile stores were $26 million and $75 million during the three- and nine-month periods ended June 25, 2011, respectively, and $18 million and $54 million during the three- and nine-month periods ended June 26, 2010, respectively.

20

Summary information by operating segment for the three- and nine-month periods ended June 25, 2011 and June 26, 2010 is as follows (in millions):

| | Three Months Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | June 25, 2011 | | June 26, 2010 | | June 25, 2011 | | June 26, 2010 | |
| Americas: | | | | | | | | |
| Net sales | $ | 10,126 | $ | 6,227 | $ | 28,667 | $ | 17,312 |
| Operating income | $ | 3,596 | $ | 1,997 | $ | 10,250 | $ | 5,482 |
| Europe: | | | | | | | | |
| Net sales | $ | 7,098 | $ | 4,160 | $ | 20,381 | $ | 13,234 |
| Operating income | $ | 3,107 | $ | 1,631 | $ | 8,414 | $ | 5,457 |
| Japan: | | | | | | | | |
| Net sales | $ | 1,510 | $ | 910 | $ | 4,326 | $ | 2,580 |
| Operating income | $ | 735 | $ | 390 | $ | 1,996 | $ | 1,185 |
| Asia-Pacific: | | | | | | | | |
| Net sales | $ | 6,332 | $ | 1,825 | $ | 16,062 | $ | 5,524 |
| Operating income | $ | 2,782 | $ | 841 | $ | 6,869 | $ | 2,553 |
| Retail: | | | | | | | | |
| Net sales | $ | 3,505 | $ | 2,578 | $ | 10,543 | $ | 6,232 |
| Operating income | $ | 828 | $ | 593 | $ | 2,665 | $ | 1,447 |

A reconciliation of the Company's segment operating income to the condensed consolidated financial statements for the three- and nine-month periods ended June 25, 2011 and June 26, 2010 is as follows (in millions):

| | Three Months Ended | | | | Nine Months Ended | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | June 25, 2011 | | June 26, 2010 | | June 25, 2011 | | June 26, 2010 | |
| Segment operating income | $ | 11,048 | $ | 5,452 | $ | 30,194 | $ | 16,124 |
| Stock-based compensation expense | | (284) | | (219) | | (870) | | (655) |
| Other corporate expenses, net (a) | | (1,385) | | (999) | | (4,244) | | (2,531) |
| Total operating income | $ | 9,379 | $ | 4,234 | $ | 25,080 | $ | 12,938 |

(a) Other corporate expenses include research and development, corporate marketing expenses, manufacturing costs and variances not included in standard costs, and other separately managed general and administrative expenses, including certain corporate expenses associated with support of the Retail segment.

**Note 8 – Related Party Transactions and Certain Other Transactions**

In 2001, the Company entered into a Reimbursement Agreement with its CEO, Steve Jobs, for the reimbursement of expenses incurred by Mr. Jobs in the operation of his private plane when used for Apple business. The Company did not recognize any expenses pursuant to the Reimbursement Agreement during the three months ended June 25, 2011 and recognized a total of $15,000 in expenses pursuant to the Reimbursement Agreement during the nine months ended June 25, 2011. The Company recognized a total of $12,000 and $155,000 in expenses pursuant to the Reimbursement Agreement during the three- and nine-month periods ended June 26, 2010, respectively. All expenses recognized pursuant to the Reimbursement Agreement have been included in selling, general and administrative expenses in the Condensed Consolidated Statements of Operations.

21

**Item 2.        Management's Discussion and Analysis of Financial Condition and Results of Operations**

*This section and other parts of this Form 10-Q contain forward-looking statements that involve risks and uncertainties. Forward-looking statements can be identified by words such as "anticipates," "expects," "believes," "plans," "predicts," and similar terms. Forward-looking statements are not guarantees of future performance and the Company's actual results may differ significantly from the results discussed in the forward-looking statements. Factors that might cause such differences include, but are not limited to, those discussed in Part II, Item 1A, "Risk Factors," which are incorporated herein by reference. The following discussion should be read in conjunction with the Company's Annual Report on Form 10-K for the year ended September 25, 2010 (the "2010 Form 10-K") filed with the U.S. Securities and Exchange Commission ("SEC") and the condensed consolidated financial statements and notes thereto included elsewhere in this Form 10-Q. All information presented herein is based on the Company's fiscal calendar. Unless otherwise stated, references in this report to particular years or quarters refer to the Company's fiscal years ended in September and the associated quarters of those fiscal years. The Company assumes no obligation to revise or update any forward-looking statements for any reason, except as required by law.*

**Available Information**

The Company's Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to reports filed pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended ("Exchange Act") are filed with the SEC. Such reports and other information filed by the Company with the SEC are available on the Company's website at http://www.apple.com/investor when such reports are available on the SEC website. The public may read and copy any materials filed by the Company with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains an Internet site that contains reports, proxy, and information statements and other information regarding issuers that file electronically with the SEC at http://www.sec.gov . The contents of these websites are not incorporated into this filing. Further, the Company's references to the URLs for these websites are intended to be inactive textual references only.

**Executive Overview**

The Company designs, manufactures, and markets a range of mobile communication and media devices, personal computers, and portable digital music players, and sells a variety of related software, services, peripherals, networking solutions, and third-party digital content and applications. The Company's products and services include iPhone ®, iPad ®, Mac ®, iPod ®, Apple TV ®, a portfolio of consumer and professional software applications, the iOS and Mac OS ® X operating systems, iCloud ®, and a variety of related accessories, services and support offerings. The Company also sells and delivers third-party digital content and applications through the iTunes Store ®, App Store SM, iBookstore SM, and Mac App Store SM. The Company sells its products worldwide through its retail stores, online stores, and direct sales force, as well as through third-party cellular network carriers, wholesalers, retailers, and value-added resellers. In addition, the Company sells a variety of third-party iPhone, iPad, Mac and iPod compatible products, including application software, printers, storage devices, speakers, headphones, and various other accessories and peripherals through its online and retail stores. The Company sells to consumers, small and mid-sized businesses, education, enterprise and government customers.

The Company is committed to bringing the best user experience to its customers through its innovative hardware, software, peripherals, services, and Internet offerings. The Company's business strategy leverages its unique ability to design and develop its own operating systems, hardware, application software, and services to provide its customers new products and solutions with superior ease-of-use, seamless integration, and innovative industrial design. The Company believes continual investment in research and development is critical to the development and enhancement of innovative products and technologies. In conjunction with its strategy, the Company continues to build and host a robust platform for the discovery and delivery of third-party digital content and applications through the iTunes Store. Within the iTunes Store, the Company has expanded its offerings through the App Store and iBookstore, which allow customers to browse, search for, and purchase third-party applications and books through either a Mac or Windows-based computer or by wirelessly downloading directly to an iPhone, iPad or iPod touch ®. In January 2011, the Company opened the Mac App Store allowing customers to easily find, download and install Apple-branded and third-party applications for their Macs. The Company also works to support a community for the development of third-party software and hardware products and digital content that complement the Company's offerings. Additionally, the Company's strategy includes expanding its distribution network to effectively reach more customers and provide them with a high-quality sales and post-sales support experience. The Company is therefore uniquely positioned to offer superior and well-integrated digital lifestyle and productivity solutions.

The Company participates in several highly competitive markets, including mobile communications and media devices with its iPhone, iPad and iPod product families; personal computers with its Mac computers; and distribution of third-party digital content and applications through the iTunes Store, App Store, iBookstore, and Mac App Store. While the Company is widely recognized as a leading innovator in the markets where it competes, these markets are highly competitive and subject to aggressive pricing. To remain competitive, the Company believes that increased investment in research and development and marketing and advertising is necessary to maintain or expand its position in the markets where it competes. The Company's research and development spending is focused on investing in new hardware and software products, and in further developing its existing products, including iPhone, iPad, Mac, and iPod hardware; iOS and Mac OS X operating systems; and a variety of application software and online services. The Company also believes increased investment in marketing and advertising programs is critical to increasing product and brand awareness.

The Company utilizes a variety of direct and indirect distribution channels, including its retail stores, online stores, and direct sales force, and third-party cellular network carriers, wholesalers, retailers, and value-added resellers. The Company believes that sales of its innovative and differentiated products are enhanced by knowledgeable salespersons who can convey the value of the hardware, software, and peripheral integration, demonstrate the unique digital lifestyle solutions that are available on its products, and demonstrate the compatibility of the Mac with the Windows-based platform and networks. The Company further believes providing direct contact with its targeted customers is an effective way to demonstrate the advantages of its products over those of its competitors and providing a high-quality sales and after-sales support experience is critical to attracting new and retaining existing customers. To ensure a high-quality buying experience for its products in which service and education are emphasized, the Company continues to expand and improve its distribution capabilities by expanding the number of its own retail stores worldwide. Additionally, the Company has invested in programs to enhance reseller sales by placing high quality Apple fixtures, merchandising materials and other resources within selected third-party reseller locations. Through the Apple Premium Reseller Program, certain third-party resellers focus on the Apple platform by providing a high level of integration and support services, and product expertise.

## Products

The Company offers a range of mobile communication and media devices, personal computing products, and portable digital music players, as well as a variety of related software, services, peripherals, networking solutions and various third-party hardware and software products. In addition, the Company offers its own software products, including iOS, the Company's proprietary mobile operating system; Mac OS X, the Company's proprietary operating system software for its Mac computers; server software; and application software for consumer, education, and business customers.

In June 2011, the Company introduced iCloud, its new cloud service, which stores music, photos, apps, contacts, calendars, and documents and wirelessly pushes them to multiple iOS devices, Macs and PCs. iCloud includes iTunes in the Cloud, Photo Stream, Documents in the Cloud, Contacts, Calendar, Mail, Automatic downloads and purchase history for apps and books, and Backup. Users will be able to sign up for free access to iCloud using an iOS device running iOS 5 or a Mac running Mac OS ® X Lion ("Mac OS X Lion"). iCloud is expected to be available in the fall of 2011.

In June 2011, the Company previewed iOS 5, the latest version of its mobile operating system. iOS 5 includes new features such as Notification Center, a way to view and manage notifications in one place; iMessage, a messaging service that allows users to send text messages, photos and videos between iOS devices; and Newsstand, a way to purchase and organize newspaper and magazine subscriptions. iOS 5 is expected to be available in the fall of 2011.

In June 2011, the Company announced Mac OS X Lion, the eighth major release of the Company's Mac operating system. Mac OS X Lion includes support for new Multi-Touch™ gestures; system-wide support for full screen applications; Mission Control, a way to view everything running on a user's Mac; the Mac App Store; Launchpad, a new home for a user's applications; and a redesigned Mail application. Mac OS X Lion was made available in July 2011.

A detailed discussion of the Company's other products may be found in Part I, Item 1, "Business," of the Company's 2010 Form 10-K.

23

**Japan Earthquake and Tsunami**

On March 11, 2011, the northeast coast of Japan experienced a severe earthquake followed by a tsunami, with continuing aftershocks. These geological events have caused significant damage in the region, including severe damage to nuclear power plants, and have impacted Japan's power and other infrastructure as well as its economy. Certain of the Company's suppliers are located in Japan, and certain of its other suppliers integrate components or use materials manufactured in Japan in the production of its products. To the extent that component production has been affected, the Company has generally obtained alternative sources of supply or implemented other measures. The Company does not currently believe these events will have a material impact on its operations in the fourth quarter of 2011 unless conditions worsen, including, but not limited to, power outages and expansion of evacuation zones around the nuclear power plants.

Beyond the fourth quarter of 2011, uncertainty exists with respect to the availability of electrical power, the damage to nuclear power plants and the impact to other infrastructure. Thus, there is a risk that the Company could in the future experience delays or other constraints in obtaining key components and products and/or price increases related to such components and products that could materially adversely affect the Company's financial condition and operating results.

**Critical Accounting Policies and Estimates**

The preparation of financial statements and related disclosures in conformity with U.S. generally accepted accounting principles ("GAAP") and the Company's discussion and analysis of its financial condition and operating results require the Company's management to make judgments, assumptions, and estimates that affect the amounts reported in its condensed consolidated financial statements and accompanying notes. Note 1, "Summary of Significant Accounting Policies" of this Form 10-Q and in the Notes to Consolidated Financial Statements in the Company's 2010 Form 10-K describes the significant accounting policies and methods used in the preparation of the Company's condensed consolidated financial statements. Management bases its estimates on historical experience and on various other assumptions it believes to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results may differ from these estimates and such differences may be material.

Management believes the Company's critical accounting policies and estimates are those related to revenue recognition, valuation and impairment of marketable securities, inventory valuation and inventory purchase commitments, warranty costs, income taxes, and legal and other contingencies. Management considers these policies critical because they are both important to the portrayal of the Company's financial condition and operating results, and they require management to make judgments and estimates about inherently uncertain matters. The Company's senior management has reviewed these critical accounting policies and related disclosures with the Audit and Finance Committee of the Company's Board of Directors.

*Revenue Recognition*

Net sales consist primarily of revenue from the sale of hardware, software, digital content and applications, peripherals, and service and support contracts. The Company recognizes revenue when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collection is probable. Product is considered delivered to the customer once it has been shipped and title and risk of loss have been transferred. For most of the Company's product sales, these criteria are met at the time the product is shipped. For online sales to individuals, for some sales to education customers in the U.S., and for certain other sales, the Company defers recognition of revenue until the customer receives the product because the Company retains a portion of the risk of loss on these sales during transit. The Company recognizes revenue from the sale of hardware products (e.g., iPhones, iPads, Macs, iPods and peripherals), software bundled with hardware that is essential to the functionality of the hardware, and third-party digital content sold on the iTunes Store in accordance with general revenue recognition accounting guidance. The Company recognizes revenue in accordance with industry specific software accounting guidance for the following types of sales transactions: (i) standalone sales of software products, (ii) sales of software upgrades and (iii) sales of software bundled with hardware not essential to the functionality of the hardware.

24

For multi-element arrangements that include tangible products containing software essential to the tangible product's functionality, undelivered software elements relating to the tangible product's essential software, and undelivered non-software services, the Company allocates revenue to all deliverables based on their relative selling prices. In such circumstances, the Company uses a hierarchy to determine the selling price to be used for allocating revenue to deliverables: (i) vendor-specific objective evidence of fair value ("VSOE"), (ii) third-party evidence of selling price ("TPE") and (iii) best estimate of the selling price ("ESP"). VSOE generally exists only when the Company sells the deliverable separately and is the price actually charged by the Company for that deliverable. ESPs reflect the Company's best estimates of what the selling prices of elements would be if they were sold regularly on a stand-alone basis.

For sales of iPhone, iPad, Apple TV, for sales of iPod touch beginning in June 2010, and for sales of Mac beginning in June 2011, the Company has indicated it may from time-to-time provide future unspecified software upgrades and features free of charge to customers. In June 2011, the Company announced it would provide various non-software services ("the online services") to owners of qualifying versions of iPhone, iPad, iPod touch and Mac. Because the Company has neither VSOE nor TPE for embedded unspecified software upgrade rights or the online services, revenue is allocated to these rights and services based on the Company's ESPs. Amounts allocated to the embedded unspecified software upgrade rights and online services are deferred and recognized on a straight-line basis over the estimated lives of each of these devices, which range from 24 to 48 months. The Company's process for determining ESPs involves management's judgment. The Company's process considers multiple factors that may vary over time depending upon the unique facts and circumstances related to each deliverable. If the facts and circumstances underlying the factors considered change or should future facts and circumstances lead the Company to consider additional factors, the Company's ESP for software upgrades and online services related to future sales of these devices could change. If the estimated life of one or more of the hardware products should change, the future rate of amortization of the revenue allocated to the software upgrade rights would also change.

The Company records reductions to revenue for estimated commitments related to price protection and for customer incentive programs, including reseller and end-user rebates, and other sales programs and volume-based incentives. For transactions involving price protection, the Company recognizes revenue net of the estimated amount to be refunded, provided the refund amount can be reasonably and reliably estimated and the other conditions for revenue recognition have been met. The Company's policy requires that, if refunds cannot be reliably estimated, revenue is not recognized until reliable estimates can be made or the price protection lapses. For customer incentive programs, the estimated cost of these programs is recognized at the later of the date at which the Company has sold the product or the date at which the program is offered. The Company also records reductions to revenue for expected future product returns based on the Company's historical experience. Future market conditions and product transitions may require the Company to increase customer incentive programs and incur incremental price protection obligations that could result in additional reductions to revenue at the time such programs are offered. Additionally, certain customer incentive programs require management to estimate the number of customers who will actually redeem the incentive. Management's estimates are based on historical experience and the specific terms and conditions of particular incentive programs. If a greater than estimated proportion of customers redeem such incentives, the Company would be required to record additional reductions to revenue, which would have a negative impact on the Company's results of operations.

*Valuation and Impairment of Marketable Securities*

The Company's investments in available-for-sale securities are reported at fair value. Unrealized gains and losses related to changes in the fair value of investments are included in accumulated other comprehensive income, net of tax, as reported in the Company's Condensed Consolidated Balance Sheets. Changes in the fair value of investments impact the Company's net income only when such investments are sold or an other-than-temporary impairment is recognized. Realized gains and losses on the sale of securities are determined by specific identification of each security's cost basis. The Company regularly reviews its investment portfolio to determine if any investment is other-than-temporarily impaired due to changes in credit risk or other potential valuation concerns, which would require the Company to record an impairment charge in the period any such determination is made. In making this judgment, the Company evaluates, among other things, the duration and extent to which the fair value of an investment is less than its cost, the financial condition of the issuer and any changes thereto, and the Company's intent to sell, or whether it is more likely than not it will be required to sell, the investment before recovery of the investment's amortized cost basis. The Company's assessment on whether an investment is other-than-temporarily impaired or not, could change in the future due to new developments or changes in assumptions related to any particular investment.

25

*Inventory Valuation and Inventory Purchase Commitments*

The Company must order components for its products and build inventory in advance of product shipments. The Company records a write-down for inventories of components and products, including third-party products held for resale, which have become obsolete or are in excess of anticipated demand or net realizable value. The Company performs a detailed review of inventory each fiscal quarter that considers multiple factors including demand forecasts, product life cycle status, product development plans, current sales levels, and component cost trends. The industries in which the Company competes are subject to a rapid and unpredictable pace of product and component obsolescence and demand changes. If future demand or market conditions for the Company's products are less favorable than forecasted or if unforeseen technological changes negatively impact the utility of component inventory, the Company may be required to record additional write-downs, which would negatively affect its results of operations in the period when the write-downs were recorded.

The Company records accruals for estimated cancellation fees related to component orders that have been cancelled or are expected to be cancelled. Consistent with industry practice, the Company acquires components through a combination of purchase orders, supplier contracts, and open orders based on projected demand information. These commitments typically cover the Company's requirements for periods ranging from 30 to 150 days. If there is an abrupt and substantial decline in demand for one or more of the Company's products or an unanticipated change in technological requirements for any of the Company's products, the Company may be required to record additional accruals for cancellation fees that would negatively affect its results of operations in the period when the cancellation fees are identified and recorded.

*Warranty Costs*

The Company provides for the estimated cost of hardware and software warranties at the time the related revenue is recognized based on historical and projected warranty claim rates, historical and projected cost-per-claim, and knowledge of specific product failures that are outside of the Company's typical experience. Each quarter, the Company reevaluates its estimates to assess the adequacy of its recorded warranty liabilities considering the size of the installed base of products subject to warranty protection and adjusts the amounts as necessary. If actual product failure rates or repair costs differ from estimates, revisions to the estimated warranty liability would be required and could materially affect the Company's results of operations.

The Company periodically provides updates to its applications and operating system software to maintain the software's compliance with specifications. The estimated cost to develop such updates is accounted for as warranty cost that is recognized at the time related software revenue is recognized. Factors considered in determining appropriate accruals related to such updates include the number of units delivered, the number of updates expected to occur, and the historical cost and estimated future cost of the resources necessary to develop these updates.

*Income Taxes*

The Company records a tax provision for the anticipated tax consequences of the reported results of operations. The provision for income taxes is computed using the asset and liability method, under which deferred tax assets and liabilities are recognized for the expected future tax consequences of temporary differences between the financial reporting and tax bases of assets and liabilities, and for operating losses and tax credit carryforwards. Deferred tax assets and liabilities are measured using the currently enacted tax rates that apply to taxable income in effect for the years in which those tax assets are expected to be realized or settled. The Company records a valuation allowance to reduce deferred tax assets to the amount that is believed more likely than not to be realized.

The Company recognizes tax benefits from uncertain tax positions only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the financial statements from such positions are then measured based on the largest benefit that has a greater than 50% likelihood of being realized upon ultimate settlement.

Management believes it is more likely than not that forecasted income, including income that may be generated as a result of certain tax planning strategies, together with future reversals of existing taxable temporary differences, will be sufficient to fully recover the deferred tax assets. In the event that the Company determines all or part of the net deferred tax assets are not realizable in the future, the Company will make an adjustment to the valuation allowance that would be charged to earnings in the period such determination is made. In addition, the calculation of tax liabilities involves significant judgment in estimating the impact of uncertainties in the application of GAAP and complex tax laws. Resolution of these uncertainties in a manner inconsistent with management's expectations could have a material impact on the Company's financial condition and operating results.

As discussed in Part II, Item 1 of this Form 10-Q under the heading "Legal Proceedings" and in Note 6, "Commitments and Contingencies" in Notes to Condensed Consolidated Financial Statements, the Company is subject to various legal proceedings and claims that arise in the ordinary course of business. The Company records a liability when it is probable that a loss has been incurred and the amount is reasonably estimable. There is significant judgment required in both the probability determination and as to whether an exposure can be reasonably estimated. In the opinion of management, there was not at least a reasonable possibility the Company may have incurred a material loss, or a material loss in excess of a recorded accrual, with respect to loss contingencies. However, the outcome of legal proceedings and claims brought against the Company are subject to significant uncertainty. Therefore, although management considers the likelihood of such an outcome to be remote, if one or more of these legal matters were resolved against the Company in the same reporting period for amounts in excess of management's expectations, the Company's condensed consolidated financial statements of a particular reporting period could be materially adversely affected.

27

*Legal and Other Contingencies*

**Net Sales**

The following table summarizes net sales by operating segment and net sales and unit sales by product during the three- and nine-month periods ended June 25, 2011 and June 26, 2010 (in millions, except unit sales in thousands and per unit amounts):

| | Three Months Ended | | | Nine Months Ended | | |
|---|---|---|---|---|---|---|
| | June 25, 2011 | June 26, 2010 | Change | June 25, 2011 | June 26, 2010 | Change |
| **Net Sales by Operating Segment :** | | | | | | |
| Americas net sales | $ 10,126 | $ 6,227 | 63% | $ 28,667 | $ 17,312 | 66% |
| Europe net sales | 7,098 | 4,160 | 71% | 20,381 | 13,234 | 54% |
| Japan net sales | 1,510 | 910 | 66% | 4,326 | 2,580 | 68% |
| Asia-Pacific net sales | 6,332 | 1,825 | 247% | 16,062 | 5,524 | 191% |
| Retail net sales | 3,505 | 2,578 | 36% | 10,543 | 6,232 | 69% |
| Total net sales | $ 28,571 | $ 15,700 | 82% | $ 79,979 | $ 44,882 | 78% |
| **Net Sales by Product :** | | | | | | |
| Desktops (a) | $ 1,580 | $ 1,301 | 21% | $ 4,752 | $ 4,525 | 5% |
| Portables (b) | 3,525 | 3,098 | 14% | 10,759 | 8,084 | 33% |
| Total Mac net sales | 5,105 | 4,399 | 16% | 15,511 | 12,609 | 23% |
| iPod | 1,325 | 1,545 | (14)% | 6,350 | 6,797 | (7)% |
| Other music related products and services (c) | 1,571 | 1,214 | 29% | 4,636 | 3,705 | 25% |
| iPhone and related products and services (d) | 13,311 | 5,334 | 150% | 36,077 | 16,357 | 121% |
| iPad and related products and services (e) | 6,046 | 2,166 | 179% | 13,490 | 2,166 | 523% |
| Peripherals and other hardware (f) | 517 | 396 | 31% | 1,690 | 1,337 | 26% |
| Software, service and other sales (g) | 696 | 646 | 8% | 2,225 | 1,911 | 16% |
| Total net sales | $ 28,571 | $ 15,700 | 82% | $ 79,979 | $ 44,882 | 78% |
| **Unit Sales by Product :** | | | | | | |
| Desktops (a) | 1,155 | 1,004 | 15% | 3,391 | 3,385 | 0% |
| Portables (b) | 2,792 | 2,468 | 13% | 8,450 | 6,392 | 32% |
| Total Mac unit sales | 3,947 | 3,472 | 14% | 11,841 | 9,777 | 21% |
| iPod unit sales | 7,535 | 9,406 | (20)% | 35,998 | 41,261 | (13)% |
| iPhone unit sales | 20,338 | 8,398 | 142% | 55,220 | 25,887 | 113% |
| iPad unit sales | 9,246 | 3,270 | 183% | 21,271 | 3,270 | 550% |

(a)   Includes iMac, Mac mini, Mac Pro and Xserve product lines.

(b)   Includes MacBook, MacBook Air and MacBook Pro product lines.

(c)   Includes sales from the iTunes Store, App Store, and iBookstore in addition to sales of iPod services and Apple-branded and third-party iPod accessories.

(d)   Includes revenue recognized from iPhone sales, carrier agreements, services, and Apple-branded and third-party iPhone accessories.

(e)   Includes revenue recognized from iPad sales, services, and Apple-branded and third-party iPad accessories.

(f)   Includes sales of displays, wireless connectivity and networking solutions, and other hardware accessories.

(g)   Includes sales from the Mac App Store in addition to sales of other Apple-branded and third-party Mac software and Mac and Internet services.

28

**– A441 –**

Net sales during the third quarter of 2011 and the first nine months of 2011 increased $12.9 billion or 82%, and $35.1 billion or 78%, respectively, compared to the same periods in 2010. Several factors contributed positively to this increase, including the following:

- Net sales of iPhone and related products and services were $13.3 billion and $36.1 billion in the third quarter of 2011 and first nine months of 2011, respectively, representing increases of 150% and 121% over the same periods in 2010. iPhone handset unit sales totaled 20.3 million and 55.2 million during the third quarter of 2011 and first nine months of 2011, respectively. iPhone unit sales increased 11.9 million or 142% during the third quarter of 2011 and 29.3 million or 113% during the first nine months of 2011 compared to the same periods in 2010. iPhone year-over-year net sales growth reflected strong demand for iPhone 4 in all of the Company's operating segments. The expanded U.S. distribution of iPhone to the Verizon Wireless network beginning in February 2011 and continued expansion and growth of distribution with existing carriers and resellers also contributed to the year-over-year growth of iPhone. As of June 25, 2011, the Company distributed iPhone in 105 countries through 228 carriers. Net sales of iPhone and related products and services accounted for 47% and 45% of the Company's total net sales for the third quarter of 2011 and first nine months of 2011, respectively.

- Net sales of iPad and related products and services, which the Company introduced in the third quarter of 2010, were $6.0 billion in the third quarter of 2011, an increase of 179% over the same period in 2010. Net sales of iPad during the first nine months of 2011 totaled $13.5 billion. Unit sales of iPad were 9.2 million and 21.3 million during the third quarter of 2011 and first nine months of 2011, respectively. The year-over-year unit growth and net sales growth were driven by strong iPad demand in all the Company's operating segments. The Company distributes iPad through its direct channels, certain cellular network carriers' distribution channels and certain third-party resellers. The Company distributed iPad in 64 countries as of June 25, 2011. Net sales of iPad and related products and services accounted for 21% and 17% of the Company's total net sales for the third quarter of 2011 and first nine months of 2011, respectively.

- Mac net sales increased by $706 million or 16% and $2.9 billion or 23% in the third quarter of 2011 and first nine months of 2011, respectively, compared to the same periods in 2010. Mac unit sales increased by 475,000 or 14% and 2.1 million or 21% in the third quarter of 2011 and first nine months of 2011, respectively, compared to the same periods in 2010. The year-over-year growth in Mac net sales and unit sales was due primarily to higher demand for MacBook Air and MacBook Pro, which were updated in October 2010 and February 2011, respectively, and experienced significant growth in all of the Company's operating segments. Net sales of the Company's Macs accounted for 18% and 19% of the Company's total net sales for the third quarter of 2011 and first nine months of 2011, respectively.

- Net sales of other music related products and services increased $357 million or 29% and $931 million or 25% during the third quarter of 2011 and first nine months of 2011, respectively, compared to the same periods in 2010. The increases were due primarily to increased net sales from the iTunes Store, which experienced growth in all of the Company's geographic segments. During the third quarter of 2011 and the first nine months of 2011, the combined net sales for the iTunes Store, App Store and iBookstore were $1.4 billion and $3.9 billion, respectively. The Company believes this continued growth is the result of heightened consumer interest in downloading third-party digital content, continued growth in its customer base of iPhone, iPad and iPod customers, expansion of third-party audio and video content available for sale and rent via the iTunes Store, and continued interest in and growth of the App Store. Net sales of other music related products and services accounted for 5% and 6% of the Company's total net sales for the third quarter of 2011 and first nine months of 2011, respectively.

Partially offsetting the positive factors contributing to the overall increase in net sales was a decrease in net sales of iPod of $220 million or 14% during the third quarter of 2011 and a decrease of $447 million or 7% during the first nine months of 2011 compared to the same periods in 2010. Similarly, iPod unit sales decreased by 20% and 13% in the third quarter of 2011 and first nine months of 2011, respectively, compared to the same periods in 2010. However, net sales per iPod unit sold increased during the third quarter of 2011 and the first nine months of 2011 compared to the same periods in 2010 due primarily to a shift in iPod product mix toward iPod touch. Net sales of iPod accounted for 5% and 8% of the Company's total net sales for the third quarter of 2011 and first nine months of 2011, respectively.

29

**Segment Operating Performance**

The Company manages its business primarily on a geographic basis. The Company's reportable operating and reporting segments consist of the Americas, Europe, Japan, Asia-Pacific and Retail operations. The Americas, Europe, Japan and Asia-Pacific reportable segment results do not include the results of the Retail segment. The Americas segment includes both North and South America. The Europe segment includes European countries as well as the Middle East and Africa. The Asia-Pacific segment includes Australia and Asia, but does not include Japan. The Retail segment operates Apple retail stores in 11 countries, including the U.S. Each reportable operating segment provides similar hardware and software products and similar services. Further information regarding the Company's operating segments may be found in Note 7, "Segment Information and Geographic Data" in Notes to condensed consolidated financial statements of this Form 10-Q.

*Americas*

Net sales in the Americas segment during the third quarter of 2011 increased $3.9 billion or 63% compared to the same period in 2010. The increase in net sales during the third quarter of 2011 was attributable to increased iPhone revenue driven by expanded U.S. distribution on the Verizon Wireless network beginning in February 2011 and continued growth from existing carriers, the introduction of iPad 2 in March 2011, higher sales of third-party digital content and applications from the iTunes Store and App Store, and increased sales of Macs, partially offset by a decrease in iPod net sales. The Americas segment represented 36% and 40% of the Company's total net sales in the third quarters of 2011 and 2010, respectively.

During the first nine months of 2011, net sales in the Americas segment increased $11.4 billion or 66% compared to the same period in 2010. The primary contributors to the growth in net sales during the first nine months of 2011 were a significant year-over-year increase in iPhone revenue from carrier expansion, strong sales of the original iPad and iPad 2, and increased sales of Macs, partially offset by a decrease in iPod net sales. Higher sales of third-party digital content and applications from the iTunes Store and App Store also drove higher sales during the first nine months of 2011. The Americas segment represented approximately 36% and 39% of the Company's total net sales for the first nine months of 2011 and 2010, respectively.

*Europe*

Net sales in the Europe segment increased $2.9 billion or 71% during the third quarter of 2011 compared to the same period of 2010. The growth in net sales was mainly due to an increase in iPhone revenue attributable to country and carrier expansion, the introduction of iPad 2 in March 2011, higher sales of third-party digital content and applications from the iTunes Store and App Store, and strength in the Euro and British Pound relative to the U.S. dollar. The Europe segment represented 25% and 26% of the Company's total net sales in the third quarter of 2011 and 2010, respectively.

For the first nine months of 2011, net sales in the Europe segment increased $7.1 billion or 54%, compared to the same period in 2010. The increase in net sales during the first nine months of 2011 was attributable primarily to the continued year-over-year increase in iPhone revenue, strong sales of both the original iPad and iPad 2, increased sales of Macs, and higher sales of third-party digital content and applications from the iTunes Store and App Store, partially offset by a decrease in iPod net sales. The Europe segment represented 26% and 29% of total net sales for the first nine months in 2011 and 2010, respectively.

*Japan*

Japan's net sales increased $600 million or 66% during the third quarter of 2011 and increased $1.7 billion or 68% during the first nine months of 2011 compared to the same periods in 2010. The key contributors to Japan's net sales growth for the third quarter and first nine months of 2011 were increased iPhone revenue, strong sales of both the original iPad and iPad 2, increased sales of Macs, and strength in the Japanese Yen relative to the U.S. dollar. The Japan segment represented 5% of total net sales in the third quarter of 2011 compared to 6% in the year ago quarter, and 5% of total net sales in the first nine months of 2011 compared to 6% in the first nine months of 2010.

The recent earthquakes and tsunami that struck the northeast coast of Japan have created uncertainty regarding general economic and market conditions in Japan. Any significant impact of these events on consumer demand could negatively impact the Company's net sales in Japan in the future. The Company does not currently believe that the impact of these events will have a material adverse effect on the Company or its results of operations.

30

*Asia-Pacific*

Net sales in the Asia Pacific segment increased $4.5 billion or 247% during the third quarter of 2011 and increased $10.5 billion or 191% during the first nine months of 2011 compared to the same periods in 2010. The Company experienced particularly strong year-over-year net sales growth in China, Hong Kong, Korea, and Australia during the third quarter of 2011 and first nine months of 2011. Higher net sales in the Asia Pacific segment were due mainly to the increase in iPhone revenue primarily attributable to new carrier launches, strong sales of both the original iPad and iPad 2, and increased sales of Macs. The Asia Pacific segment represented 22% and 12% of total net sales in the third quarter of 2011 and 2010, respectively, and 20% and 12% of total net sales in the first nine months of 2011 and 2010, respectively.

*Retail*

Retail segment net sales increased $927 million or 36% during the third quarter of 2011 compared to the same period of 2010. The increase in net sales was driven primarily by strong demand for iPad, a significant year-over-year increase in iPhone sales, and higher sales of Macs. The Company opened four new retail stores during the third quarter of 2011, all of which were international stores, ending the quarter with 327 stores open compared to 293 stores at the end of the third quarter of 2010. With an average of 325 stores and 287 stores open during the third quarter of 2011 and 2010, respectively, average revenue per store increased 20% to $10.8 million in the third quarter of 2011 compared to the third quarter of 2010. The Retail segment represented 12% and 16% of total net sales in the third quarter of 2011 and 2010, respectively.

Retail net sales grew $4.3 billion or 69% during the first nine months of 2011 compared to the same period in 2010 driven primarily by strong sales of both the original iPad and iPad 2, a significant year-over-year increase in iPhone sales, and higher sales of Macs. Average revenue per store increased 48% to $32.6 million for the first nine months of 2011 compared to the same period in 2010. The Retail segment represented 13% and 14% of total net sales for the first nine months of 2011 and 2010, respectively.

The Retail segment reported operating income of $828 million and $593 million during the third quarter of 2011 and the third quarter of 2010, respectively. The Retail segment reported operating income of $2.7 billion during the first nine months of 2011 compared to $1.4 billion during the first nine months of 2010. The year-over-year increase in Retail operating income was primarily attributable to higher overall net sales and a more favorable sales mix toward products with higher gross margin, which resulted in significantly higher average revenue per store during the third quarter and first nine months of 2011 compared to the same periods in 2010.

Expansion of the Retail segment has required and will continue to require a substantial investment in fixed assets and related infrastructure, operating lease commitments, personnel, and other operating expenses. Capital asset purchases associated with the Retail segment since inception totaled $2.5 billion through the third quarter of 2011. As of June 25, 2011, the Retail segment had approximately 30,600 full-time equivalent employees and had outstanding lease commitments associated with retail space and related facilities of $2.2 billion. The Company would incur substantial costs if it were to close multiple retail stores and such costs could adversely affect the Company's financial condition and operating results.

**Gross Margin**

Gross margin for the three- and nine-month periods ended June 25, 2011 and June 26, 2010 was as follows (in millions, except gross margin percentages):

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | June 25, 2011 | June 26, 2010 | June 25, 2011 | June 26, 2010 |
| Net sales | $ 28,571 | $ 15,700 | $ 79,979 | $ 44,882 |
| Cost of sales | 16,649 | 9,564 | 47,541 | 26,710 |
| Gross margin | $ 11,922 | $ 6,136 | $ 32,438 | $ 18,172 |
| Gross margin percentage | 41.7% | 39.1% | 40.6% | 40.5% |

The gross margin percentage in the third quarter of 2011 was 41.7%, compared to 39.1% in the third quarter of 2010. This year-over-year increase in gross margin is largely driven by a more favorable sales mix towards products with higher gross margins, primarily iPhone, a weaker U.S. dollar and lower commodity and other manufacturing costs. The gross margin percentage for the first nine months of 2011 was relatively flat at 40.6% compared to 40.5% for the first nine months of 2010.

31

**– A444 –**

The Company expects to experience decreases in its gross margin percentage in future periods, as compared to levels achieved during the first nine months of 2011, largely due to a higher mix of new and innovative products that have higher cost structures and deliver greater value to customers, and expected and potential future component cost and other cost increases.

The foregoing statements regarding the Company's expected gross margin percentage are forward-looking and could differ from anticipated levels because of several factors including, but not limited to certain of those set forth below in Part II, Item 1A, "Risk Factors" under the subheading " *Future operating results depend upon the Company's ability to obtain key components including but not limited to microprocessors, NAND flash memory, DRAM and LCDs at favorable prices and in sufficient quantities* ," which is incorporated herein by reference. In general, gross margins and margins on individual products will remain under downward pressure due to a variety of factors, including continued industry wide global product pricing pressures, increased competition, compressed product life cycles, product transitions and potential and expected increases in the cost of key components including but not limited to microprocessors, NAND flash memory, DRAM and LCDs, as well as potential increases in the costs of outside manufacturing services and a potential shift in the Company's sales mix towards products with lower gross margins. In response to these competitive pressures, the Company expects it will continue to take product pricing actions, which would adversely affect gross margins. Gross margins could also be affected by the Company's ability to manage product quality and warranty costs effectively and to stimulate demand for certain of its products. Due to the Company's significant international operations, financial results can be significantly affected in the short-term by fluctuations in exchange rates.

**Operating Expenses**

Operating expenses for the three- and nine-month periods ended June 25, 2011 and June 26, 2010, were as follows (in millions, except for percentages):

| | Three Months Ended | | Nine Months Ended | |
| --- | --- | --- | --- | --- |
| | June 25, 2011 | June 26, 2010 | June 25, 2011 | June 26, 2010 |
| Research and development | $ 628 | $ 464 | $ 1,784 | $ 1,288 |
| Percentage of net sales | 2% | 3% | 2% | 3% |
| Selling, general and administrative | $ 1,915 | $ 1,438 | $ 5,574 | $ 3,946 |
| Percentage of net sales | 7% | 9% | 7% | 9% |

*Research and Development Expense ("R&D")*

R&D expense increased $164 million or 35% to $628 million during the third quarter of 2011 compared to the same period of 2010, and increased $496 million or 39% to $1.8 billion during the first nine months of 2011 compared to the same period in 2010. These increases were due primarily to an increase in headcount and related expenses to support expanded R&D activities.

Although total R&D expense increased 35% and 39% during the third quarter and first nine months of 2011, compared to the same periods in 2010, respectively, it declined slightly as a percentage of net sales, due to the 82% and 78% year-over-year growth in the Company's net sales during the third quarter and first nine months of 2011, respectively. The Company continues to believe that focused investments in R&D are critical to its future growth and competitive position in the marketplace and are directly related to timely development of new and enhanced products that are central to the Company's core business strategy. As such, the Company expects to make further investments in R&D to remain competitive.

*Selling, General and Administrative Expense ("SG&A")*

SG&A expense increased $477 million or 33% to $1.9 billion during the third quarter of 2011 compared to the same period of 2010, and increased $1.6 billion or 41% to $5.6 billion during the first nine months of 2011 compared to the same period in 2010. These increases were due primarily to the Company's continued expansion of its Retail segment, increased headcount, higher spending on marketing and advertising programs, and increased variable costs associated with the overall growth of the Company's net sales.

**Other Income and Expense**

Total other income and expense increased $114 million or 197% to $172 million during the third quarter of 2011 compared to the same period of 2010, due primarily to lower premium expense on foreign exchange option contracts and higher interest income on larger cash, cash equivalents and marketable securities balances. Total other income and expense increased $193 million or 137% to $334 million during the first nine months of 2011 compared to the same period in 2010, due primarily to higher interest income and net realized gains on sales of marketable securities. The weighted-average interest rate earned by the Company on its cash, cash equivalents and marketable securities was flat at 0.76% during the third quarters of 2011 and 2010.

**Provision for Income Taxes**

The Company's effective tax rate for the three- and nine-month periods ended June 25, 2011 was approximately 24%, compared to approximately 24% and 26% for the three- and nine-month periods ended June 26, 2010, respectively. The Company's effective rates for both periods differ from the statutory federal income tax rate of 35% due primarily to certain undistributed foreign earnings for which no U.S. taxes are provided because such earnings are intended to be indefinitely reinvested outside the U.S. The lower effective tax rate during the first nine months of 2011 compared to the same period in 2010 is due primarily to a higher proportion of foreign earnings and the recognition of a tax benefit as a result of legislation enacted during the first quarter of 2011 retroactively reinstating the research and development tax credit.

The Internal Revenue Service (the "IRS") has completed its field audit of the Company's federal income tax returns for the years 2004 through 2006 and proposed certain adjustments. The Company has contested certain of these adjustments through the IRS Appeals Office. The IRS is currently examining the years 2007 through 2009. All IRS audit issues for years prior to 2004 have been resolved. In addition, the Company is subject to audits by state, local, and foreign tax authorities. Management believes that adequate provision has been made for any adjustments that may result from tax examinations. However, the outcome of tax audits cannot be predicted with certainty. If any issues addressed in the Company's tax audits are resolved in a manner not consistent with management's expectations, the Company could be required to adjust its provision for income taxes in the period such resolution occurs.

**Liquidity and Capital Resources**

The following table summarizes selected financial information and statistics as of June 25, 2011 and September 25, 2010 (in millions):

|  | June 25, 2011 | September 25, 2010 |
|---|---|---|
| Cash, cash equivalents and marketable securities | $ 76,156 | $ 51,011 |
| Accounts receivable, net | $ 6,102 | $ 5,510 |
| Inventory | $ 889 | $ 1,051 |
| Working capital | $ 20,039 | $ 20,956 |

As of June 25, 2011, the Company had $76.2 billion in cash, cash equivalents and marketable securities, an increase of $25.1 billion from September 25, 2010. The principal component of this net increase was the cash generated by operating activities of $27.1 billion, which was partially offset by payments for acquisition of property, plant and equipment of $2.6 billion and payments for acquisition of intangible assets of $266 million. The Company believes its existing balances of cash, cash equivalents and marketable securities will be sufficient to satisfy its working capital needs, capital asset purchases, outstanding commitments and other liquidity requirements associated with its existing operations over the next 12 months.

The Company's marketable securities investment portfolio is invested primarily in highly rated securities and its policy generally limits the amount of credit exposure to any one issuer. The Company's investment policy requires investments to generally be investment grade, primarily rated single-A or better with the objective of minimizing the potential risk of principal loss. As of June 25, 2011 and September 25, 2010, $47.6 billion and $30.8 billion, respectively, of the Company's cash, cash equivalents and marketable securities were held by foreign subsidiaries and are generally based in U.S. dollar-denominated holdings.

33

*Capital Assets*

The Company's capital expenditures were $3.1 billion during the first nine months of 2011 consisting of approximately $316 million for retail store facilities and $2.8 billion for other capital expenditures, including product tooling and manufacturing process equipment, real estate for the future development of the Company's second corporate campus, and other corporate facilities and infrastructure. The Company's actual cash payments for capital expenditures during the first nine months of 2011 were $2.6 billion, of which $315 million relates to retail store facilities.

The Company anticipates utilizing approximately $5.0 billion for capital expenditures during 2011, including approximately $650 million for retail store facilities and approximately $4.35 billion for product tooling and manufacturing process equipment, and corporate facilities and infrastructure, including information systems hardware, software and enhancements.

Historically the Company has opened between 25 and 50 new retail stores per year. During 2011, the Company expects to open about 40 new retail stores, with about 70% expected to be located outside of the U.S.

## Off-Balance Sheet Arrangements and Contractual Obligations

The Company has not entered into any transactions with unconsolidated entities whereby the Company has financial guarantees, subordinated retained interests, derivative instruments or other contingent arrangements that expose the Company to material continuing risks, contingent liabilities, or any other obligation under a variable interest in an unconsolidated entity that provides financing, liquidity, market risk or credit risk support to the Company.

*Lease Commitments*

The Company's major facility leases are typically for terms not exceeding 10 years and generally provide renewal options for terms not exceeding five additional years. Leases for retail space are for terms ranging from five to 20 years, the majority of which are for 10 years, and often contain multi-year renewal options. As of June 25, 2011, the Company's total future minimum lease payments under noncancelable operating leases were $2.7 billion, of which $2.2 billion related to leases for retail space.

*Purchase Commitments with Outsourcing Partners and Component Suppliers*

The Company utilizes several outsourcing partners to manufacture sub-assemblies for the Company's products and to perform final assembly and test of finished products. These outsourcing partners acquire components and build product based on demand information supplied by the Company, which typically covers periods ranging from 30 to 150 days. The Company also obtains individual components for its products from a wide variety of individual suppliers. Consistent with industry practice, the Company acquires components through a combination of purchase orders, supplier contracts, and open orders based on projected demand information. As of June 25, 2011, the Company had outstanding off-balance sheet third-party manufacturing commitments and component purchase commitments of $11.0 billion.

The Company has also entered into long-term agreements to secure the supply of certain inventory components. These agreements generally expire between 2011 and 2022. As of June 25, 2011, the Company had off-balance sheet commitments under long-term supply agreements totaling approximately $1.7 billion to make additional inventory component prepayments and to acquire capital equipment in 2011 and beyond.

*Other Obligations*

Other outstanding obligations were $1.6 billion as of June 25, 2011, and were comprised mainly of commitments to acquire product tooling and manufacturing process equipment, in addition to that noted above under long-term supply agreements, and commitments related to advertising, research and development, Internet and telecommunications services and other obligations.

The Company's other non-current liabilities in the Condensed Consolidated Balance Sheets consist primarily of deferred tax liabilities, gross unrecognized tax benefits and the related gross interest and penalties. As of June 25, 2011, the Company had non-current deferred tax liabilities of $7.3 billion. Additionally, as of June 25, 2011, the Company had gross unrecognized tax benefits of $1.2 billion and an additional $266 million for gross interest and penalties classified as non-current liabilities. At this time, the Company is unable to make a reasonably reliable estimate of the timing of payments in individual years due to uncertainties in the timing of tax audit outcomes.

On June 27, 2011, the Company, as part of a consortium, participated in the acquisition of Nortel's patent portfolio for an overall purchase price of $4.5 billion, of which the Company's contribution will be approximately $2.6 billion. This asset acquisition is subject to approval by various regulatory agencies.

34

**Indemnifications**

The Company generally does not indemnify end-users of its operating system and application software against legal claims that the software infringes third-party intellectual property rights. Other agreements entered into by the Company sometimes include indemnification provisions under which the Company could be subject to costs and/or damages in the event of an infringement claim against the Company or an indemnified third-party. However, the Company has not been required to make any significant payments resulting from such an infringement claim asserted against it or an indemnified third-party. In the opinion of management, there was not at least a reasonable possibility the Company may have incurred a material loss with respect to indemnification of end-users of its operating system or application software for infringement of third-party intellectual property rights. The Company did not record a liability for infringement costs related to indemnification as of either June 25, 2011 or September 25, 2010.

The Company has entered into indemnification agreements with its directors and executive officers. Under these agreements, the Company has agreed to indemnify such individuals to the fullest extent permitted by law against liabilities that arise by reason of their status as directors or officers and to advance expenses incurred by such individuals in connection with related legal proceedings. It is not possible to determine the maximum potential amount of payments the Company could be required to make under these agreements due to the limited history of prior indemnification claims and the unique facts and circumstances involved in each claim. However, the Company maintains directors and officers liability insurance coverage to reduce its exposure to such obligations, and payments made under these agreements historically have not been material.

## Item 3.    Quantitative and Qualitative Disclosures About Market Risk

The Company's market risk profile has not changed significantly during the first nine months of 2011.

### Interest Rate and Foreign Currency Risk Management

The Company regularly reviews its foreign exchange forward and option positions, both on a stand-alone basis and in conjunction with its underlying foreign currency and interest rate related exposures. However, given the effective horizons of the Company's risk management activities and the anticipatory nature of the exposures, there can be no assurance the hedges will offset more than a portion of the financial impact resulting from movements in either foreign exchange or interest rates. In addition, the timing of the accounting for recognition of gains and losses related to mark-to-market instruments for any given period may not coincide with the timing of gains and losses related to the underlying economic exposures and, therefore, may adversely affect the Company's financial condition and operating results.

### Interest Rate Risk

While the Company is exposed to interest rate fluctuations in many of the world's leading industrialized countries, the Company's interest income and expense is most sensitive to fluctuations in the general level of U.S. interest rates. As such, changes in U.S. interest rates affect the interest earned on the Company's cash, cash equivalents and marketable securities, the fair value of those investments, as well as costs associated with foreign currency hedges.

The Company's investment policy and strategy are focused on preservation of capital and supporting the liquidity requirements of the Company. A portion of the Company's cash is managed by external managers within the guidelines of the Company's investment policy and to objective market benchmarks. The Company's internal portfolio is benchmarked against external manager performance.

The Company's exposure to market risk for changes in interest rates relates primarily to the Company's investment portfolio. The Company typically invests in highly rated securities and its policy generally limits the amount of credit exposure to any one issuer. The Company's investment policy requires investments to generally be investment grade, primarily rated single-A or better with the objective of minimizing the potential risk of principal loss. All highly liquid investments with initial maturities of three months or less at the date of purchase are classified as cash equivalents. The Company's marketable debt and equity securities have been classified and accounted for as available-for-sale. Management determines the appropriate classification of its investments at the time of purchase and reevaluates the available-for-sale designations as of each balance sheet date. The Company classifies its marketable debt securities as either short-term or long-term based on each instrument's underlying contractual maturity date. Marketable debt securities with maturities 12 months or less are classified as short-term and marketable debt securities with maturities greater than 12 months are classified as long-term. The Company classifies its marketable equity securities, including mutual funds, as either short-term or long-term based on the nature of each security and its availability for use in current operations. The Company may sell certain of its marketable securities prior to their stated maturities for strategic reasons including, but not limited to anticipation of credit deterioration and duration management.

35

*Foreign Currency Risk*

In general, the Company is a net receiver of currencies other than the U.S. dollar. Accordingly, changes in exchange rates, and in particular a strengthening of the U.S. dollar, will negatively affect the Company's net sales and gross margins as expressed in U.S. dollars. There is also a risk that the Company will have to adjust local currency product pricing due to competitive pressures when there has been significant volatility in foreign currency exchange rates.

The Company may enter into foreign currency forward and option contracts with financial institutions to protect against foreign exchange risks associated with certain existing assets and liabilities, certain firmly committed transactions, forecasted future cash flows, and net investments in foreign subsidiaries. Generally, the Company's practice is to hedge a majority of its material foreign exchange exposures, typically for three to six months. However, the Company may choose not to hedge certain foreign exchange exposures for a variety of reasons, including but not limited to immateriality, accounting considerations and the prohibitive economic cost of hedging particular exposures.

## Item 4.    Controls and Procedures

*Evaluation of Disclosure Controls and Procedures*

Based on an evaluation under the supervision and with the participation of the Company's management, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended ("Exchange Act") were effective as of June 25, 2011 to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms and (ii) accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

*Changes in Internal Control Over Financial Reporting*

There were no changes in the Company's internal control over financial reporting during the third quarter of 2011, which were identified in connection with management's evaluation required by paragraph (d) of Rules 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

## PART II. OTHER INFORMATION

## Item 1.    Legal Proceedings

As of June 25, 2011, the end of the quarterly period covered by this report, the Company was subject to the various legal proceedings and claims discussed below, as well as certain other legal proceedings and claims that have not been fully resolved and that have arisen in the ordinary course of business. In the opinion of management, there was not least a reasonable possibility the Company may have incurred a material loss, or a material loss in excess of a recorded accrual, with respect to loss contingencies. However, the outcome of legal proceedings and claims brought against the Company are subject to significant uncertainty. Therefore, although management considers the likelihood of such an outcome to be remote, if one or more of these legal matters were resolved against the Company in the same reporting period for amounts in excess of management's expectations, the Company's condensed consolidated financial statements of a particular reporting period could be materially adversely affected. See the risk factors " *The Company's future results could be materially adversely affected if it is found to have infringed on intellectual property rights.* " and " *Unfavorable results of legal proceedings could materially adversely affect the Company.* " in Part II, Item 1A of this Quarterly Report on Form 10-Q under the heading "Risk Factors." The Company settled certain matters during the third quarter of 2011 that did not individually or in the aggregate have a material impact on the Company's financial condition and results of operations.

36

*In re Apple & ATTM Antitrust Litigation (brought on behalf of named plaintiffs Kliegerman, Holman, Rivello, Smith, Lee, Macasaddu, Morikawa, Scotti and Sesso)*

This is a purported class action filed against the Company and AT&T Mobility in the United States District Court for the Northern District of California. The Consolidated Complaint alleges that the Company and AT&T Mobility violated the federal antitrust laws by monopolizing and/or attempting to monopolize the "aftermarket for voice and data services" for the iPhone and that the Company monopolized and/or attempted to monopolize the "aftermarket for software applications for iPhones." Plaintiffs are seeking unspecified compensatory and punitive damages for the class, treble damages, injunctive relief and attorneys fees. On July 8, 2010 the Court granted in part plaintiffs' motion for class certification. Following a favorable Supreme Court ruling for AT&T Mobility in its case against Conception, defendants have filed Motions to Compel Arbitration and to Decertify the Class.

*The Apple iPod iTunes Antitrust Litigation (formerly Charoensak v. Apple Computer, Inc. and Tucker v. Apple Computer, Inc.); Somers v. Apple Inc.*

These related cases have been filed on January 3, 2005, July 21, 2006 and December 31, 2007 in the United States District Court for the Northern District of California on behalf of a purported class of direct and indirect purchasers of iPods and iTunes Store content, alleging various claims including alleged unlawful tying of music and video purchased on the iTunes Store with the purchase of iPods and unlawful acquisition or maintenance of monopoly market power and unlawful acquisition or maintenance of monopoly market power under §§1 and 2 of the Sherman Act, the Cartwright Act, California Business & Professions Code §17200 (unfair competition), the California Consumer Legal Remedies Act and California monopolization law. Plaintiffs are seeking unspecified compensatory and punitive damages for the class, treble damages, injunctive relief, disgorgement of revenues and/or profits and attorneys fees. Plaintiffs are also seeking digital rights management ("DRM") free versions of any songs downloaded from iTunes or an order requiring the Company to license its DRM to all competing music players. The cases are currently pending.

## Item 1A.    Risk Factors

Because of the following factors, as well as other factors affecting the Company's financial condition and operating results, past financial performance should not be considered to be a reliable indicator of future performance, and investors should not use historical trends to anticipate results or trends in future periods.

*Economic conditions could materially adversely affect the Company.*

The Company's operations and performance depend significantly on worldwide economic conditions. Uncertainty about current global economic conditions poses a risk as consumers and businesses may continue to postpone spending in response to tighter credit, unemployment, negative financial news and/or declines in income or asset values, which could have a material negative effect on demand for the Company's products and services. Demand also could differ materially from the Company's expectations since the Company generally raises prices on goods and services sold outside the U.S. on the effect of a strengthening of the U.S. dollar. Other factors that could influence demand include increases in fuel and other energy costs, conditions in the real estate and mortgage markets, labor and healthcare costs, access to credit, consumer confidence, and other macroeconomic factors affecting consumer spending behavior. These and other economic factors could materially adversely affect demand for the Company's products and services and the Company's financial condition and operating results.

In the event of renewed financial turmoil affecting the banking system and financial markets, additional consolidation of the financial services industry, or significant financial service institution failures, there could be a new or incremental tightening in the credit markets, low liquidity, and extreme volatility in fixed income, credit, currency, and equity markets. In addition, the risk remains that there could be a number of follow-on effects from the credit crisis on the Company's business, including the insolvency of key outsourcing partners or suppliers or their inability to obtain credit to finance development and/or manufacture products resulting in product delays; inability of customers, including channel partners, to obtain credit to finance purchases of the Company's products and/or customer, including channel partner, insolvencies; and failure of derivative counterparties and other financial institutions negatively impacting the Company's treasury operations. Other income and expense also could vary materially from expectations depending on gains or losses realized on the sale or exchange of financial instruments; impairment charges resulting from revaluations of debt and equity securities and other investments; interest rates; cash balances; and changes in fair value of derivative instruments. Increased volatility in the financial markets and overall economic uncertainty would increase the risk of the actual amounts realized in the future on the Company's financial instruments differing significantly from the fair values currently assigned to them.

37

**– A450 –**

Uncertainty about current global economic conditions could also continue to increase the volatility of the Company's stock price.

*Global markets for the Company's products and services are highly competitive and subject to rapid technological change. If the Company is unable to compete effectively in these markets, its financial condition and operating results could be materially adversely affected.*

The Company competes in highly competitive global markets characterized by aggressive price cutting, with resulting downward pressure on gross margins, frequent introduction of new products, short product life cycles, evolving industry standards, continual improvement in product price/performance characteristics, rapid adoption of technological and product advancements by competitors, and price sensitivity on the part of consumers.

The Company's ability to compete successfully depends heavily on its ability to ensure a continuing and timely introduction of innovative new products and technologies to the marketplace. The Company believes it is unique in that it designs and develops nearly the entire solution for its products, including the hardware, operating system, numerous software applications, and related services. As a result, the Company must make significant investments in research and development and as such, the Company currently holds a significant number of patents and copyrights and has registered and/or has applied to register numerous patents, trademarks and service marks. By contrast, many of the Company's competitors seek to compete primarily through aggressive pricing and very low cost structures. If the Company is unable to continue to develop and sell innovative new products with attractive margins or if other companies infringe on the Company's intellectual property, the Company's ability to maintain a competitive advantage could be negatively affected and its financial condition and operating results could be materially adversely affected.

The Company currently markets certain mobile communication and media devices, and third-party digital content and applications. The Company faces substantial competition from companies that have significant technical, marketing, distribution and other resources, as well as established hardware, software and digital content supplier relationships. Additionally, the Company faces significant price competition as competitors reduce their selling prices and attempt to imitate the Company's product features and applications within their own products or, alternatively, collaborate with each other to offer solutions that are more competitive than those they currently offer. The Company also competes with illegitimate ways to obtain third-party digital content and applications. The Company has entered the mobile communications and media device markets, and many of its competitors in these markets have significantly greater experience, product breadth and distribution channels than the Company. Because some current and potential competitors have substantial resources and/or experience and a lower cost structure, they may be able to provide such products and services at little or no profit or even at a loss. The Company also expects competition to intensify as competitors attempt to imitate the Company's approach to providing these components seamlessly within their individual offerings or work collaboratively to offer integrated solutions.

The Company currently receives subsidies from its carriers providing cellular network service for iPhone. There is no assurance that such subsidies will be continued at all or in the same amounts upon renewal of the Company's agreements with these carriers or in agreements the Company enters into with new carriers.

In the market for personal computers and peripherals, the Company faces a significant number of competitors, many of which have broader product lines, lower priced products, and larger installed customer bases. Consolidation in this market has resulted in larger and potentially stronger competitors. Price competition has been particularly intense as competitors selling Windows-based personal computers have aggressively cut prices and lowered product margins. The Company also faces increased competition in key market segments, including consumer, SMB, education, enterprise, government and creative markets. An increasing number of Internet devices that include software applications and are smaller and simpler than traditional personal computers compete for market share with the Company's existing products.

38

The Company is currently the only authorized maker of hardware using the Mac OS. The Mac OS has a minority market share in the personal computer market, which is dominated by computer makers using competing operating systems, most notably Windows. The Company's financial condition and operating results depend substantially on the Company's ability to continually improve the Mac platform to maintain functional and design advantages. Use of unauthorized copies of the Mac OS on other companies' hardware products may result in decreased demand for the Company's hardware products, and could materially adversely affect the Company's financial condition and operating results.

There can be no assurance the Company will be able to continue to provide products and services that compete effectively.

*To remain competitive and stimulate customer demand, the Company must successfully manage frequent product introductions and transitions.*

Due to the highly volatile and competitive nature of the industries in which the Company competes, the Company must continually introduce new products, services and technologies, enhance existing products and services, and effectively stimulate customer demand for new and upgraded products. The success of new product introductions depends on a number of factors including but not limited to timely and successful product development, market acceptance, the Company's ability to manage the risks associated with new products and production ramp issues, the availability of application software for new products, the effective management of purchase commitments and inventory levels in line with anticipated product demand, the availability of products in appropriate quantities and costs to meet anticipated demand, and the risk that new products may have quality or other defects in the early stages of introduction. Accordingly, the Company cannot determine in advance the ultimate effect of new product introductions and transitions on its financial condition and operating results.

*The Company faces substantial inventory and other asset risk in addition to purchase commitment cancellation risk.*

The Company records a write-down for product and component inventories that have become obsolete or exceed anticipated demand or net realizable value and accrues necessary cancellation fee reserves for orders of excess products and components. The Company also reviews its long-lived assets for impairment whenever events or changed circumstances indicate the carrying amount of an asset may not be recoverable. If the Company determines that impairment has occurred, it records a write-down equal to the amount by which the carrying value of the assets exceeds its fair market value. Although the Company believes its provisions related to inventory, other assets and purchase commitments are currently adequate, no assurance can be given that the Company will not incur additional related charges given the rapid and unpredictable pace of product obsolescence in the industries in which the Company competes. Such charges could materially adversely affect the Company's financial condition and operating results.

The Company must order components for its products and build inventory in advance of product announcements and shipments. Consistent with industry practice, components are normally acquired through a combination of purchase orders, supplier contracts, open orders and, where appropriate, inventory component prepayments, in each case based on projected demand. Such purchase commitments typically cover forecasted component and manufacturing requirements for periods ranging from 30 to 150 days. Because the Company's markets are volatile, competitive and subject to rapid technology and price changes, there is a risk the Company will forecast incorrectly and order or produce excess or insufficient amounts of components or products, or not fully utilize firm purchase commitments. The Company's financial condition and operating results have been in the past and could be in the future materially adversely affected by the Company's ability to manage its inventory levels and respond to short-term shifts in customer demand patterns.

*Future operating results depend upon the Company's ability to obtain key components including but not limited to microprocessors, NAND flash memory, DRAM and LCDs at favorable prices and in sufficient quantities.*

Because the Company currently obtains certain key components including but not limited to microprocessors, enclosures, certain LCDs, certain optical drives, and ASICs, from single or limited sources, the Company is subject to significant supply and pricing risks. Many of these and other key components that are available from multiple sources including but not limited to NAND flash memory, DRAM and certain LCDs, are subject at times to industry-wide shortages and significant commodity pricing fluctuations. The Company has entered into certain agreements for the supply of key components including but not limited to microprocessors, NAND flash memory, DRAM and LCDs with favorable pricing, but there can be no guarantee that the Company will be able to extend or renew these agreements on similar favorable terms, or at all, upon expiration or otherwise obtain favorable pricing in the future. The follow-on effects from the credit crisis on the Company's key suppliers, referred to in " *Economic conditions could materially adversely affect the Company"* above, which is incorporated herein by reference, also could affect the Company's ability to obtain key components . Therefore, the Company remains subject to significant risks of supply shortages and/or price increases that could materially adversely affect the Company's financial condition and operating results. The Company expects to experience decreases in its gross margin percentage in future periods, as compared to levels achieved during the first nine months of 2011, largely due to a higher mix of new and innovative products that have higher cost structures and deliver greater value to customers, and expected and potential future component cost and other cost increases. For additional information refer to Part I, Item 2, "Management's Discussion and Analysis of Financial Condition and Results of Operations," under the subheading "Gross Margin," which is incorporated herein by reference.

39

The Company and other participants in the mobile communication and media device, and personal computer industries compete for various components with other industries that have experienced increased demand for their products. The Company uses some custom components that are not common to the rest of these industries. The Company's new products often utilize custom components available from only one source. When a component or product uses new technologies, initial capacity constraints may exist until the suppliers' yields have matured or manufacturing capacity has increased. Continued availability of these components at acceptable prices, or at all, may be affected if those suppliers decided to concentrate on the production of common components instead of components customized to meet the Company's requirements. If the supply of a key single-sourced component for a new or existing product were delayed or constrained, if such components were available only at significantly higher prices, or if a key manufacturing vendor delayed shipments of completed products to the Company, the Company's financial condition and operating results could be materially adversely affected.

Please also refer to the discussion of risks related to the March 11, 2011, Japan earthquake and tsunami in Part I, Item 2, "Management's Discussion and Analysis of Financial Condition and Results of Operations," under the subheading "Japan Earthquake and Tsunami," which is incorporated herein by reference.

*The Company depends on component and product manufacturing and logistical services provided by third parties, many of whom are located outside of the U.S.*

Substantially all of the Company's manufacturing is performed in whole or in part by a few outsourcing partners. The Company has also outsourced much of its transportation and logistics management. While these arrangements may lower operating costs, they also reduce the Company's direct control over production and distribution. It is uncertain what effect such diminished control will have on the quality or quantity of products or services, or the Company's flexibility to respond to changing conditions. Although arrangements with such manufacturers or individual component suppliers may contain provisions for warranty expense reimbursement, the Company may remain responsible to the consumer for warranty service in the event of product defects. In addition, the Company relies on third-party manufacturers to adhere to the Company's supplier code of conduct. Any unanticipated product defect or warranty liability, whether pursuant to arrangements with outsourcing partners or otherwise, or material violations of the supplier code of conduct, could materially adversely affect the Company's reputation, financial condition and operating results.

The supply and manufacture of many critical components is performed by sole-sourced third-party vendors in the U.S., Asia and Europe. Single-sourced third-party vendors in Asia perform final assembly of substantially all of the Company's hardware products. If manufacturing or logistics in these locations is disrupted for any reason including, but not limited to, natural disasters, information technology system failures, military actions or economic, business, labor, environmental, public health, or political issues, the Company's financial condition and operating results could be materially adversely affected.

Please also refer to the discussion of risks related to the March 11, 2011, Japan earthquake and tsunami in Part I, Item 2, "Management's Discussion and Analysis of Financial Condition and Results of Operations," under the subheading "Japan Earthquake and Tsunami," which is incorporated herein by reference.

*The Company relies on third-party intellectual property and digital content, which may not be available to the Company on commercially reasonable terms or at all.*

Many of the Company's products are designed to include third-party intellectual property, and in the future the Company may need to seek or renew licenses relating to various aspects of its products and business. Although the Company believes that, based on past experience and industry practice, such licenses generally could be obtained on reasonable terms, there is no assurance that the necessary licenses would be available on acceptable terms or at all. If the Company is unable to obtain or renew critical licenses on reasonable terms, the Company's financial condition and operating results may be materially adversely affected.

The Company also contracts with certain third parties to offer their digital content through the Company's iTunes Store. The Company's licensing arrangements with these third parties are short-term and do not guarantee the continuation or renewal of these arrangements on reasonable terms, if at all. Some third-party content providers currently or in the future may offer competing products and services, and could take action to make it more difficult or impossible for the Company to license their content in the future. Other content owners, providers or distributors may seek to limit the Company's access to, or increase the total cost of, such content. If the Company is unable to continue to offer a wide variety of content at reasonable prices with acceptable usage rules, or continue to expand its geographic reach, the Company's financial condition and operating results may be materially adversely affected.

Many third-party content providers require that the Company provide certain DRM and other security solutions. If these requirements change, the Company may have to develop or license new technology to provide these solutions. There is no assurance the Company will be able to develop or license such solutions at a reasonable cost and in a timely manner. In addition, certain countries have passed or may propose legislation that would force the Company to license its DRM, which could lessen the protection of content and subject it to piracy and also could affect arrangements with the Company's content providers.

*The Company's future results could be materially adversely affected if it is found to have infringed on intellectual property rights.*

Technology companies, including many of the Company's competitors, frequently enter into litigation based on allegations of patent infringement or other violations of intellectual property rights. In addition, patent holding companies seek to monetize patents they have purchased or otherwise obtained. As the Company has grown, the intellectual property rights claims against it have increased and may continue to increase as it develops new products and technologies. In particular, with the introduction of iPhone and 3G enabled iPads, the Company began to compete with mobile communication and media device companies that hold significant patent portfolios, and the number of patent claims against the Company in that technological space has increased. The Company is vigorously defending infringement actions in courts in a number of U.S. jurisdictions and before the U.S. International Trade Commission, as well as internationally in Europe and Asia. The plaintiffs in these actions frequently seek injunctions and substantial damages.

The Company's products and technologies may not be able to withstand these or any other third-party claims regardless of the merits of the claim.

Regardless of the scope or validity of such patents or the merits of any patent claims by potential or actual litigants, the Company may have to engage in protracted litigation, enter into expensive license agreements or settlements, pay significant damage awards, and/or modify or even discontinue one or more of its products or technologies. Any of these events could have a material adverse impact on the Company's financial condition and operating results.

In certain cases, the Company may consider the desirability of entering into licensing agreements, although no assurance can be given that such licenses can be obtained on acceptable terms or that litigation will not occur. These licenses may also significantly increase the Company's operating expenses. If the Company is found to be infringing one or more patents, it may be required to pay substantial damages. If there is a temporary or permanent injunction prohibiting the Company from marketing or selling certain products or a successful claim of infringement against the Company requires it to pay royalties to a third party, the Company's financial condition and operating results could be materially adversely affected, regardless of whether it can develop non-infringing technology.

In management's opinion there was not at least a reasonable possibility the Company may have incurred a material loss, or a material loss in excess of a recorded accrual, with respect to loss contingencies. However, the outcome of litigation is inherently uncertain. Therefore, although management considers the likelihood of such an outcome to be remote, if one or more of these legal matters were resolved against the Company in the same reporting period for amounts in excess of management's expectations, the Company's condensed consolidated financial statements of a particular reporting period could be materially adversely affected.

41

*The Company's future performance depends on support from third-party software developers. If third-party software applications and services cease to be developed and maintained for the Company's products, customers may choose not to buy the Company's products.*

The Company believes decisions by customers to purchase its hardware products, including its iPhones, iPads, Macs and iPods, are often based to a certain extent on the availability of third-party software applications, and services, including online services. There is no assurance that third-party developers will continue to develop and maintain applications and services for the Company's products on a timely basis or at all, and discontinuance or delay of these applications and services could materially adversely affect the Company's financial condition and operating results.

With respect to its Mac products, the Company believes the availability of third-party software applications and services depends in part on the developers' perception and analysis of the relative benefits of developing, maintaining, and upgrading such software for the Company's products compared to Windows-based products. This analysis may be based on factors such as the perceived strength of the Company and its products, the anticipated revenue that may be generated, continued acceptance by customers of Mac OS X, and the costs of developing such applications and services. If the Company's minority share of the global personal computer market causes developers to question the Company's prospects, developers could be less inclined to develop or upgrade software for the Company's products and more inclined to devote their resources to developing and upgrading software for the larger Windows market. The Company's development of its own software applications and services may also negatively affect the decisions of third-party developers, such as Microsoft, Adobe and Google, to develop, maintain, and upgrade similar or competitive software and services for the Company's products.

With respect to iPhone, iPad and iPod touch, the Company relies on the continued availability and development of compelling and innovative software applications. Unlike third-party software applications for Mac products, the software applications for the iPhone, iPad and iPod touch platforms are distributed through a single distribution channel, the App Store. The absence of multiple distribution channels, which are available for competing platforms, may limit the availability and acceptance of third-party applications by the Company's customers, thereby causing developers to curtail significantly, or stop, development for the Company's platforms. In addition, iPhone, iPad and iPod touch are subject to rapid technological change, and, if third-party developers are unable to keep up with this pace of change, third-party applications might not successfully operate and may result in dissatisfied customers. Further, if the Company develops its own software applications and services, such development may negatively affect the decisions of third-party developers to develop, maintain, and upgrade similar or competitive applications for the iPhone, iPad and iPod touch platforms. As with applications for the Company's Mac products, the availability and development of these applications also depend on developers' perceptions and analysis of the relative benefits of developing software for the Company's products rather than its competitors' products, including devices that use competing platforms. If developers focus their efforts on these competing platforms, the availability and quality of applications for the Company's devices may suffer.

*The Company's future operating performance depends on the performance of distributors, carriers and other resellers.*

The Company distributes its products through wholesalers, resellers, national and regional retailers, value-added resellers, and cataloguers, many of whom distribute products from competing manufacturers. The Company also sells many of its products and resells third-party products in most of its major markets directly to customers, certain education customers, cellular network carriers' distribution channels and certain resellers through its online and retail stores.

Many resellers operate on narrow operating margins and have been negatively affected in the past by weak economic conditions. Some resellers have perceived the expansion of the Company's direct sales as conflicting with their business interests as distributors and resellers of the Company's products. Such a perception could discourage resellers from investing resources in the distribution and sale of the Company's products or lead them to limit or cease distribution of those products. The Company's financial condition and operating results could be materially adversely affected if the financial condition of these resellers weakens, if resellers stopped distributing the Company's products, or if uncertainty regarding demand for the Company's products caused resellers to reduce their ordering and marketing of the Company's products. The Company has invested and will continue to invest in programs to enhance reseller sales, including staffing selected resellers' stores with Company employees and contractors and improving product placement displays. These programs could require a substantial investment while providing no assurance of return or incremental revenue.

42

**– A455 –**

*The Company's Retail business has required and will continue to require a substantial investment and commitment of resources and is subject to numerous risks and uncertainties.*

The Company's retail stores have required substantial fixed investment in equipment and leasehold improvements, information systems, inventory and personnel. The Company also has entered into substantial operating lease commitments for retail space, with terms ranging from five to 20 years, the majority of which are for 10 years. Certain stores have been designed and built to serve as high-profile venues to promote brand awareness and serve as vehicles for corporate sales and marketing activities. Because of their unique design elements, locations and size, these stores require substantially more investment than the Company's more typical retail stores. Due to the high fixed cost structure associated with the Retail segment, a decline in sales or the closure or poor performance of individual or multiple stores could result in significant lease termination costs, write-offs of equipment and leasehold improvements, and severance costs that could materially adversely affect the Company's financial condition and operating results.

Many factors unique to retail operations, some of which are beyond the Company's control, pose risks and uncertainties that could materially adversely affect the Company's financial condition and operating results. These risks and uncertainties include, but are not limited to, macro-economic factors that could have a negative effect on general retail activity, as well as the Company's inability to manage costs associated with store construction and operation, inability to sell third-party products at adequate margins, failure to manage relationships with existing retail channel partners, more challenging environment in managing retail operations outside the U.S., costs associated with unanticipated fluctuations in the value of retail inventory, and inability to obtain and renew leases in quality retail locations at a reasonable cost.

*Investment in new business strategies and initiatives could disrupt the Company's ongoing business and present risks not originally contemplated.*

The Company has invested, and in the future may invest, in new business strategies or acquisitions. Such endeavors may involve significant risks and uncertainties, including distraction of management from current operations, insufficient revenue to offset liabilities assumed and expenses associated with the strategy, inadequate return of capital, and unidentified issues not discovered in the Company's due diligence. Because these new ventures are inherently risky, no assurance can be given that such strategies and initiatives will be successful and will not materially adversely affect the Company's financial condition and operating results.

*The Company's products and services experience quality problems from time to time that can result in decreased sales and operating margin.*

The Company sells highly complex hardware and software products and services that can contain defects in design and manufacture. Sophisticated operating system software and applications, such as those sold by the Company, often contain "bugs" that can unexpectedly interfere with the software's intended operation. Defects may also occur in components and products the Company purchases from third parties. There can be no assurance the Company will be able to detect and fix all defects in the hardware, software and services it sells. Failure to do so could result in lost revenue, harm to reputation, and significant warranty and other expenses, and could have a material adverse impact on the Company's financial condition and operating results.

43

*The Company is subject to risks associated with laws, regulations and industry-imposed standards related to mobile communications and media devices.*

Laws and regulations related to mobile communications and media devices in the many jurisdictions in which the Company operates are extensive and subject to change. Such changes, which could include but are not limited to restrictions on production, manufacture, distribution, and use of the device, locking the device to a carrier's network, or mandating the use of the device on more than one carrier's network, could materially adversely affect the Company's financial condition and operating results.

Mobile communication and media devices, such as iPhones and 3G enabled iPads, are subject to certification and regulation by governmental and standardization bodies, as well as by cellular network carriers for use on their networks. These certification processes are extensive and time consuming, and could result in additional testing requirements, product modifications or delays in product shipment dates, which could materially adversely affect the Company's financial condition and operating results.

*The Company's success depends largely on the continued service and availability of key personnel.*

Much of the Company's future success depends on the continued availability and service of key personnel, including its CEO, its executive team and highly skilled employees in technical, marketing and staff positions. Experienced personnel in the technology industry are in high demand and competition for their talents is intense, especially in the Silicon Valley, where most of the Company's key personnel are located. The Company's CEO has taken a medical leave of absence and will continue to be involved in major strategic decisions during his leave. There can be no assurance that the Company will continue to attract and retain key personnel.

*Political events, war, terrorism, public health issues, natural disasters and other circumstances could materially adversely affect the Company.*

War, terrorism, geopolitical uncertainties, public health issues, and other business interruptions have caused and could cause damage or disruption to international commerce and the global economy, and thus could have a strong negative effect on the Company, its suppliers, logistics providers, manufacturing vendors and customers, including channel partners. The Company's business operations are subject to interruption by natural disasters, fire, power shortages, nuclear power plant accidents, terrorist attacks, and other hostile acts, labor disputes, public health issues, and other events beyond its control. Such events could decrease demand for the Company's products, make it difficult or impossible for the Company to make and deliver products to its customers, including channel partners, or to receive components from its suppliers, and create delays and inefficiencies in the Company's supply chain. Should major public health issues, including pandemics, arise, the Company could be negatively affected by more stringent employee travel restrictions, additional limitations in freight services, governmental actions limiting the movement of products between regions, delays in production ramps of new products, and disruptions in the operations of the Company's manufacturing vendors and component suppliers. The majority of the Company's research and development activities, its corporate headquarters, information technology systems, and other critical business operations, including certain component suppliers and manufacturing vendors, are in locations that could be affected by natural disasters. In the event of a natural disaster, losses and significant recovery time could be required to resume operations and the Company's financial condition and operating results could be materially adversely affected.

Please also refer to the discussion of risks related to the March 11, 2011, Japan earthquake and tsunami in Part I, Item 2, "Management's Discussion and Analysis of Financial Condition and Results of Operations," under the subheading "Japan Earthquake and Tsunami," which is incorporated herein by reference.

*The Company may be subject to information technology system failures or network disruptions that could damage the Company's reputation, business operations, and financial conditions.*

The Company may be subject to information technology system failures and network disruptions. These may be caused by natural disasters, accidents, power disruptions, telecommunications failures, acts of terrorism or war, computer viruses, physical or electronic break-ins, or similar events or disruptions. System redundancy may be ineffective or inadequate, and the Company's disaster recovery planning may not be sufficient for all eventualities. Such failures or disruptions could prevent access to the Company's online stores and services, preclude retail store transactions, compromise Company or customer data, and result in delayed or cancelled orders. System failures and disruptions could also impede the manufacturing and shipping of products, transactions processing and financial reporting.

*The Company may be subject to breaches of its information technology systems, which could damage the Company's reputation, business partner and customer relationships, and access to online stores and services. Such breaches could subject the Company to significant reputational, financial, legal, and operational consequences.*

The Company's business requires it to use and store customer, employee, and business partner personally identifiable information ("PII"). This may include names, addresses, phone numbers, email addresses, contact preferences, tax identification numbers, and payment account information. Although malicious attacks to gain access to PII affect many companies across various industries, the Company may be at a relatively greater risk of being targeted because of its high profile and the amount of PII managed.

The Company requires user names and passwords in order to access its information technology systems. The Company also uses encryption and authentication technologies to secure the transmission and storage of data. These security measures may be compromised as a result of third-party security breaches, employee error, malfeasance, faulty password management, or other irregularity, and result in persons obtaining unauthorized access to Company data or accounts. Third parties may attempt to fraudulently induce employees or customers into disclosing user names, passwords or other sensitive information, which may in turn be used to access the Company's information technology systems. To help protect customers and the Company, the Company monitors accounts and systems for unusual activity and may freeze accounts under suspicious circumstances, which may result in the delay or loss of customer orders.

The Company devotes significant resources to network security, data encryption, and other security measures to protect its systems and data, but these security measures cannot provide absolute security. The Company may experience a breach of its systems and may be unable to protect sensitive data. Moreover, if a computer security breach affects the Company's systems or results in the unauthorized release of PII, the Company's reputation and brand could be materially damaged and use of the Company's products and services could decrease. The Company would also be exposed to a risk of loss or litigation and possible liability, which could result in a material adverse effect on the Company's business, results of operations and financial condition.

*The Company's business is subject to a variety of U.S. and international laws, rules, policies and other obligations regarding data protection.*

The Company is subject to federal, state and international laws relating to the collection, use, retention, security and transfer of PII. In many cases, these laws apply not only to third-party transactions, but also to transfers of information between the Company and its subsidiaries, and among the Company, its subsidiaries and other parties with which the Company has commercial relations. Several jurisdictions have passed new laws in this area, and other jurisdictions are considering imposing additional restrictions. These laws continue to develop and may be inconsistent from jurisdiction to jurisdiction. Complying with emerging and changing international requirements may cause the Company to incur substantial costs or require the Company to change its business practices. Noncompliance could result in penalties or significant legal liability.

The Company's privacy policies and practices concerning the use and disclosure of data are posted on its website. Any failure by the Company, its suppliers or other parties with whom the Company does business to comply with its posted privacy policies or with other federal, state or international privacy-related or data protection laws and regulations could result in proceedings against the Company by governmental entities or others, which could have a material adverse effect on the Company's business, results of operations and financial condition.

The Company is also subject to payment card association rules and obligations under its contracts with payment card processors. Under these rules and obligations, if information is compromised, the Company could be liable to payment card issuers for the cost of associated expenses and penalties. In addition, if the Company fails to follow payment card industry security standards, even if no customer information is compromised, the Company could incur significant fines or experience a significant increase in payment card transaction costs.

45

*The Company expects its quarterly revenue and operating results to fluctuate for a variety of reasons.*

The Company's profit margins vary among its products and its distribution channels. The Company's software, accessories, and service and support contracts generally have higher gross margins than certain of the Company's other products. Gross margins on the Company's hardware products vary across product lines and can change over time as a result of product transitions, pricing and configuration changes, and component, warranty, and other cost fluctuations. The Company's direct sales generally have higher associated gross margins than its indirect sales through its channel partners. In addition, the Company's gross margin and operating margin percentages, as well as overall profitability, may be materially adversely impacted as a result of a shift in product, geographic or channel mix, new products, component cost increases, strengthening U.S. dollar, or price competition. The Company has typically experienced greater net sales in the first and fourth fiscal quarters compared to the second and third fiscal quarters due to seasonal demand related to the holiday season and the beginning of the school year, respectively. Furthermore, the Company sells more products from time-to-time during the third month of a quarter than it does during either of the first two months. Developments late in a quarter, such as lower-than-anticipated demand for the Company's products, issues with new product introductions, an internal systems failure, or failure of one of the Company's key logistics, components supply, or manufacturing partners, could have a material adverse impact on the Company's financial condition and operating results.

*The Company's stock price continues to be volatile.*

The Company's stock has at times experienced substantial price volatility due to a number of factors including, but not limited to variations between its actual and anticipated financial results, announcements by the Company and its competitors, and uncertainty about current global economic conditions. The stock market as a whole also has experienced extreme price and volume fluctuations that have affected the market price of many technology companies in ways that may have been unrelated to these companies' operating performance. Furthermore, the Company believes its stock price reflects high future growth and profitability expectations. If the Company fails to meet these expectations its stock price may significantly decline, which could have a material adverse impact on investor confidence and employee retention.

*The Company's business is subject to the risks of international operations.*

The Company derives a significant portion of its revenue and earnings from its international operations. Compliance with U.S. and foreign laws and regulations that apply to the Company's international operations, including without limitation import and export requirements, anti-corruption laws, tax laws (including U.S. taxes on foreign subsidiaries), foreign exchange controls and cash repatriation restrictions, data privacy requirements, labor laws, and anti-competition regulations, increases the costs of doing business in foreign jurisdictions, and any such costs, which may rise in the future as a result of changes in these laws and regulations or in their interpretation. Furthermore, the Company has implemented policies and procedures designed to ensure compliance with these laws and regulations, but there can be no assurance that the Company's employees, contractors, or agents will not violate such laws and regulations or the Company's policies. Any such violations could individually or in the aggregate materially adversely affect the Company's financial condition or operating results.

The Company's financial condition and operating results also could be significantly affected by other risks associated with international activities including, but not limited to, economic and labor conditions, increased duties, taxes and other costs, political instability, and changes in the value of the U.S. dollar versus local currencies. Margins on sales of the Company's products in foreign countries, and on sales of products that include components obtained from foreign suppliers, could be materially adversely affected by foreign currency exchange rate fluctuations and by international trade regulations, including duties, tariffs and antidumping penalties. Additionally, the Company is exposed to credit and collectability risk on its trade receivables with customers in certain international markets. There can be no assurance it can effectively limit its credit risk and avoid losses, which could materially adversely affect the Company's financial condition and operating results.

The Company's primary exposure to movements in foreign currency exchange rates relate to non-U.S. dollar denominated sales in Europe, Japan, Australia, Canada and certain parts of Asia, as well as non-U.S. dollar denominated operating expenses incurred throughout the world. Weakening of foreign currencies relative to the U.S. dollar will adversely affect the U.S. dollar value of the Company's foreign currency-denominated sales and earnings, and generally will lead the Company to raise international pricing, potentially reducing demand for the Company's products. In some circumstances, due to competition or other reasons, the Company may decide not to raise local prices to the full extent of the dollar's strengthening, or at all, which would adversely affect the U.S. dollar value of the Company's foreign currency denominated sales and earnings. Conversely, a strengthening of foreign currencies, while generally beneficial to the Company's foreign currency-denominated sales and earnings, could cause the Company to reduce international pricing and incur losses on its foreign currency derivative instruments, thereby limiting the benefit. Additionally, strengthening of foreign currencies may also increase the Company's cost of product components denominated in those currencies, thus adversely affecting gross margins.

The Company has used derivative instruments, such as foreign currency forward and option contracts, to hedge certain exposures to fluctuations in foreign currency exchange rates. The use of such hedging activities may not offset any or more than a portion of the adverse financial effects of unfavorable movements in foreign exchange rates over the limited time the hedges are in place.

46

*The Company is exposed to credit risk and fluctuations in the market values of its investment portfolio.*

Although the Company has not recognized any significant losses to date on its cash, cash equivalents and marketable securities, any significant future declines in their market values could materially adversely affect the Company's financial condition and operating results. Given the global nature of its business, the Company has investments both domestically and internationally. Credit ratings and pricing of these investments can be negatively impacted by liquidity, credit deterioration or losses, financial results, economic and political risk, or other factors. As a result, the value or liquidity of the Company's cash, cash equivalents and marketable securities could decline and result in a material impairment, which could materially adversely affect the Company's financial condition and operating results.

*The Company is exposed to credit risk on its trade accounts receivable, vendor non-trade receivables and prepayments related to long-term supply agreements. This risk is heightened during periods when economic conditions worsen.*

The Company distributes its products through third-party cellular network carriers, wholesalers, retailers and value-added resellers. A substantial majority of the Company's outstanding trade receivables are not covered by collateral or credit insurance. The Company's exposure to credit and collectability risk on its trade receivables are increased in certain international markets and its ability to mitigate such risks may be limited. Cellular network carriers accounted for a significant portion of the Company's trade receivables as of June 25, 2011. The Company also has unsecured vendor non-trade receivables resulting from purchases of components by outsourcing partners and other vendors that manufacture sub-assemblies or assemble final products for the Company. Two vendors accounted for a significant portion of the Company's non-trade receivables as of June 25, 2011. In addition, the Company has made prepayments associated with long-term supply agreements to secure supply of certain inventory components. While the Company has procedures to monitor and limit exposure to credit risk on its trade and vendor non-trade receivables as well as long-term prepayments, there can be no assurance such procedures will effectively limit its credit risk and avoid losses, which could materially adversely affect the Company's financial condition and operating results.

*Unfavorable results of legal proceedings could materially adversely affect the Company.*

The Company is subject to various legal proceedings and claims that have arisen out of the ordinary conduct of its business and are not yet resolved and additional claims may arise in the future. Results of legal proceedings cannot be predicted with certainty. Regardless of merit, litigation may be both time-consuming and disruptive to the Company's operations and cause significant expense and diversion of management attention. In recognition of these considerations, the Company may enter into material settlements. Although management considers the likelihood of such an outcome to be remote, should the Company fail to prevail in certain matters or if one or more of these legal matters were resolved against the Company in the same reporting period for amounts in excess of management's expectations, the Company's condensed consolidated financial statements of a particular reporting period could be materially adversely affected. In such circumstances, the Company may be faced with significant compensatory, punitive or trebled monetary damages, disgorgement of revenues or profits, remedial corporate measures or injunctive relief against it that would materially adversely affect a portion of its business.

47

*The Company is subject to risks associated with laws and regulations related to health, safety and environmental protection.*

The Company's products and services, and the production and distribution of those goods and services, are subject to a variety of laws and regulations. These may require the Company to offer customers the ability to return a product at the end of its useful life and place responsibility for environmentally safe disposal or recycling with the Company. Such laws and regulations have been passed in several jurisdictions in which the Company operates, including various countries within Europe and Asia and certain states and provinces within North America. Although the Company does not anticipate any material adverse effects based on the nature of its operations and the focus of such laws, there is no assurance such existing laws or future laws will not materially adversely affect the Company's financial condition and operating results.

*Changes in the Company's tax rates, the adoption of new U.S. or international tax legislation or exposure to additional tax liabilities could affect its future results.*

The Company is subject to taxes in the United States and numerous foreign jurisdictions. The Company's future effective tax rates could be affected by changes in the mix of earnings in countries with differing statutory tax rates, changes in the valuation of deferred tax assets and liabilities, or changes in tax laws or their interpretation. In addition, the current administration and Congress have announced proposals for new U.S. tax legislation that, if adopted, could adversely affect the Company's tax rate. Any of these changes could have a material adverse effect on the Company's profitability. The Company is also subject to the continual examination of its income tax returns by the Internal Revenue Service and other tax authorities. The Company regularly assesses the likelihood of adverse outcomes resulting from these examinations to determine the adequacy of its provision for taxes. There can be no assurance that the outcomes from these examinations will not materially adversely affect the Company's financial condition and operating results.

*The Company is subject to risks associated with the availability and coverage of insurance.*

For certain risks, the Company does not maintain insurance coverage because of cost and/or availability. Because the Company retains some portion of its insurable risks, and in some cases self-insures completely, unforeseen or catastrophic losses in excess of insured limits could materially adversely affect the Company's financial condition and operating results.

**Item 2.    Unregistered Sales of Equity Securities and Use of Proceeds**

None.

**Item 3.    Defaults Upon Senior Securities**

None.

**Item 5.    Other Information**

None.

48

**Item 6.**     **Exhibits**

(a) **Index to Exhibits**

| Exhibit Number | Exhibit Description | Form | Incorporated by Reference Filing Date/ Period End Date |
|---|---|---|---|
| 3.1 | Restated Articles of Incorporation, filed with the Secretary of State of the State of California on July 10, 2009. | 10-Q | 6/27/09 |
| 3.2 | Bylaws of the Registrant, as amended through April 20, 2011. | 10-Q | 3/26/11 |
| 4.1 | Form of Stock Certificate of the Registrant. | 10-Q | 12/30/06 |
| 10.1* | Employee Stock Purchase Plan, as amended through March 8, 2010. | 10-Q | 3/27/10 |
| 10.2* | Form of Indemnification Agreement between the Registrant and each director and executive officer of the Registrant. | 10-Q | 6/27/09 |
| 10.3* | 1997 Director Stock Plan, as amended through February 25, 2010. | 8-K | 3/1/10 |
| 10.4* | 2003 Employee Stock Plan, as amended through February 25, 2010. | 8-K | 3/1/10 |
| 10.5* | Reimbursement Agreement dated as of May 25, 2001 by and between the Registrant and Steven P. Jobs. | 10-Q | 6/29/02 |
| 10.6* | Form of Option Agreement. | 10-K | 9/24/05 |
| 10.7* | Form of Restricted Stock Unit Award Agreement effective as of August 28, 2007. | 10-K | 9/29/07 |
| 10.8* | Form of Restricted Stock Unit Award Agreement effective as of November 11, 2008. | 10-Q | 12/27/08 |
| 10.9* | Form of Restricted Stock Unit Award Agreement effective as of November 16, 2010. | 10-Q | 12/25/10 |
| 14.1 | Business Conduct Policy of the Registrant dated July 2010. | 10-K | 9/25/10 |
| 31.1** | Rule 13a-14(a) / 15d-14(a) Certification of Chief Executive Officer. | | |
| 31.2** | Rule 13a-14(a) / 15d-14(a) Certification of Chief Financial Officer. | | |
| 32.1*** | Section 1350 Certifications of Chief Executive Officer and Chief Financial Officer. | | |
| 101.INS | XBRL Instance Document | | |
| 101.SCH | XBRL Taxonomy Extension Schema Document | | |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document | | |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document | | |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document | | |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document | | |

*       Indicates management contract or compensatory plan or arrangement.

**     Filed herewith.

***   Furnished herewith.

49

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

July 20, 2011                                            APPLE INC.

                                                        By:   /s/ Peter Oppenheimer
                                                              _____
                                                              Peter Oppenheimer
                                                              Senior Vice President,
                                                              Chief Financial Officer

50

**Exhibit 31.1**

## CERTIFICATIONS

I, Steven P. Jobs, certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Apple Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: July 20, 2011

By:  /s/ Steven P. Jobs
_____
Steven P. Jobs
Chief Executive Officer

Exhibit 31.2

## CERTIFICATIONS

I, Peter Oppenheimer, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Apple Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: July 20, 2011

By:  /s/ Peter Oppenheimer
Peter Oppenheimer
Senior Vice President,
Chief Financial Officer

Exhibit 32.1

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER**
**PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Steven P. Jobs, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Apple Inc. on Form 10-Q for the period ended June 25, 2011 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Form 10-Q fairly presents in all material respects the financial condition and results of operations of Apple Inc.

Date: July 20, 2011

By: /s/ Steven P. Jobs
Steven P. Jobs
Chief Executive Officer

I, Peter Oppenheimer, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Apple Inc. on Form 10-Q for the period ended June 25, 2011 fully complies with the requirements of Section 13(a) or 15 (d) of the Securities Exchange Act of 1934 and that information contained in such Form 10-Q fairly presents in all material respects the financial condition and results of operations of Apple Inc.

Date: July 20, 2011

By: /s/ Peter Oppenheimer
Peter Oppenheimer
Senior Vice President,
Chief Financial Officer

A signed original of this written statement required by Section 906 has been provided to Apple Inc. and will be retained by Apple Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

Case 2:13-cv-00900-JRG   Document 52-6   Filed 03/21/14   Page 1 of 2 PageID #:  1910

# EXHIBIT 5

State of Delaware
Secretary of State
Division of Corporations
Delivered 07:30 PM 06/07/2011
FILED 07:19 PM 06/07/2011
SRV 110698990 - 4991803 FILE

## CERTIFICATE OF LIMITED PARTNERSHIP

### OF

### ROCKSTAR BIDCO, LP

This Certificate of Limited Partnership is being executed on June ✝, 2011 for the purpose of forming a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act.

NOW, THEREFORE, the undersigned hereby certifies as follows:

1.    <u>Name</u>.  The name of the limited partnership: Rockstar Bidco, LP (the "Partnership").

2.    <u>Registered Office and Registered Agent</u>.  The registered office of the Partnership in the State of Delaware is located at 615 South DuPont Highway, City of Dover, County of Kent, Delaware 19901.  The name of the registered agent of the Partnership for service of process at such address is National Corporate Research, Ltd.

3.    <u>Name and Business Address of General Partner</u>.  The name of the general partner is Rockstar Bidco GP, LLC, a Delaware liability company, having a mailing address of c/o Paul, Weiss, Rifkind, Wharton & Garrison LLP, Attention: Marilyn Sobel.

IN WITNESS WHEREOF, the undersigned has caused this Certificate of Limited Partnership to be duly executed on the day and year first above written.

GENERAL PARTNER:

ROCKSTAR BIDCO GP, LLC

By: _____

Name: Per Oscarsson
Title:   President

Doc#: US1:6902845v1

Case 2:13-cv-00900-JRG   Document 52-7   Filed 03/21/14   Page 1 of 2 PageID #:  1912

# EXHIBIT 6

State of Delaware
Secretary of State
Division of Corporations
Delivered 07:15 PM 07/19/2011
FILED 07:15 PM 07/19/2011
SRV 110837564 - 5013774 FILE

# CERTIFICATE OF FORMATION

## OF

## ROCKSTAR CONSORTIUM LLC

The undersigned, an authorized natural person, for the purpose of forming a limited liability company under the provisions and subject to the requirements of the State of Delaware (particularly Chapter 18, Title 6 of the Delaware Code and the acts amendatory thereof and supplemental thereto, and known, identified, and referred to as the "Delaware Limited Liability Company Act"), hereby certifies that:

FIRST:  The name of the limited liability company (hereinafter called the "limited liability company") is Rockstar Consortium LLC.

SECOND:  The address of the limited liability company's registered office in the State of Delaware is 615 South DuPont Highway, City of Dover, County of Kent, State of Delaware 19901.  The name of its registered agent at such address is National Corporate Research, Ltd.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation on July 19, 2011.

Name: Andrew Hennigar
Title:  Authorized Person

Doc#: US1:7041938v1

**– A470 –**

Case 2:13-cv-00900-JRG   Document 52-8   Filed 03/21/14   Page 1 of 2 PageID #:  1914

# EXHIBIT 7

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 01:46 PM 07/22/2011*
*FILED 01:17 PM 07/22/2011*
*SRV 110848947 - 5014368 FILE*

**CERTIFICATE OF LIMITED PARTNERSHIP**

OF

**ROCKSTAR CONSORTIUM US LP**

This Certificate of Limited Partnership is being executed on July **22**, 2011 for the purpose of forming a limited partnership pursuant to the Delaware Revised Uniform Limited Partnership Act.

NOW, THEREFORE, the undersigned hereby certifies as follows:

1.    Name.  The name of the limited partnership: Rockstar Consortium US LP (the "Partnership").

2.    Registered Office and Registered Agent.  The registered office of the Partnership in the State of Delaware is located at 615 South DuPont Highway, City of Dover, County of Kent, Delaware 19901.  The name of the registered agent of the Partnership for service of process at such address is National Corporate Research, Ltd.

3.    Name and Business Address of General Partner.  The name of the general partner is Rockstar Consortium LLC, a Delaware liability company, having a mailing address of c/o Paul, Weiss, Rifkind, Wharton & Garrison LLP, Attention: Marilyn Sobel.

IN WITNESS WHEREOF, the undersigned has caused this Certificate of Limited Partnership to be duly executed on the day and year first above written.

GENERAL PARTNER:

ROCKSTAR CONSORTIUM LLC

By: _____
Name:  Kasim Alfalahi
Title:    President

Doc# US1 7043550v1

Case 2:13-cv-00900-JRG   Document 52-9   Filed 03/21/14   Page 1 of 2 PageID #:  1916

# EXHIBIT 8

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:24 AM 10/30/2013*
*FILED 11:20 AM 10/30/2013*
*SRV 131250064 – 5423717 FILE*

## CERTIFICATE OF FORMATION

## OF

## MOBILESTAR TECHNOLOGIES LLC

The undersigned, for the purpose of complying with the provisions of the Delaware Limited Liability Company Act (6 *Del. C.* § 18-101, *et seq.*) and forming a limited liability company thereunder, hereby certifies as follows:

    1.    **Name.** The name of the limited liability company formed hereby is MobileStar Technologies LLC (the "*Company*").

    2.    **Registered Agent.** The name and address of the registered agent for service of process of the Company in the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

    IN WITNESS WHEREOF, the undersigned authorized person has executed this Certificate of Formation this 29th day of October, 2013.

                         _Sheri L. Berndt-Smith_
                         Sheri L. Berndt-Smith, Authorized Person

4839-7035-9056\1

# EXHIBIT 9

http://www.wired.com/wiredenterprise/2013/11/veschi/

Rockstar — the closely watched consortium that sued Google, Samsung, and six other handset makers on Thursday — says that another big-name company is infringing its vast patent portfolio: Facebook.

Enterprise

IT Happens

› Expand/Collapse

› **Mobile**

› Bitcoin

› Cloud

› Data Centers

› History

› Microchips

› Networks

› Out in the Open

› Research

› Security

› Servers

› Software

› Storage

› Tech Law

› Tech Time Warp of the Week

› Software

› Mobile Computing

› Patents

Share on Facebook

98 shares

| Tweet ◁ 208 |  35 | Share   23 |

# Facebook Infringes My Patents Too, Says CEO Who Just Sued Google

› By Robert McMillan

› 11.01.13

› 7:54 PM

Follow @bobmcmillan

http://www.wired.com/wiredenterprise/2013/11/veschi/



Inside the reverse-engineering lab at Rockstar, Scott Widdowson is looking for products that infringe on the company's 4,000 patents. *Photo: Rockstar*

Rockstar — the closely watched consortium that sued Google, Samsung, and six other handset makers on Thursday — says that another big-name company is infringing its vast patent portfolio: Facebook.

Rockstar CEO John Veschi doesn't want to get into the details, but he believes his company's 4,000-patents — which it inherited after Apple, Microsoft, Blackberry, Sony, and Ericsson purchased the majority of patents owned by the imploded Canadian telecom giant, Nortel — cover, or "read on," the kind of social network operated by Facebook.

"I'm definitely aware of many that 'read on' features that are in any social network, whether it's Facebook LinkedIn or any other thing like that," he says. Though he declined to say more, Veschi has said in the past that his patent portfolio is so great that it's hard to imagine any high-tech companies that don't use techniques covered by the Nortel patents.

Rockstar had been negotiating with technology companies for more than a year and a half, trying to get outfits such as Google to license its portfolio of more than 4,000 patents, which cover a wide range of areas. The company has been trying to cut intellectual property licensing deals across six broad sectors — including social media. And while Rockstar has sealed a "fairly small number" of deals to date, it's been a difficult business.



After surviving the Nortel meltdown, Rockstar CEO John Veschi now controls 4,000 patents related to mobile devices and computer networks. *Photo: Dan Krauss/WIRED*

That's what's forcing the lawsuits, the first of which were filed on Thursday in federal court in Texas. "We've gotten to a point with many of them where they even say to us: 'Look, you need to sue us. I can't really get the attention of management because we have other people who have sued us. And if you don't sue us, you haven't basically put the table stakes down to get to the big table.'"

Veschi says that, although Rockstar sued Google (over search technology patents) and seven of Google's Android partners on Thursday, that it is incorrect to see Rockstar as a proxy agent for Apple, Microsoft, and Blackberry — all of whom are part-owners of Rockstar with seats on its board of directors. "It was basically all my decision-making," he says. "I think it's important for people to realize that my shareholders had nothing to do with this."

Veschi, like many of Rockstar's employees is an ex-Nortel worker. He was hired by the telecommunications giant in 2008 to find patent licensing revenue — something Nortel hadn't ever done effectively. He says that Nortel that the search and mobile phone lawsuits that were filed yesterday can be traced back to the first work he did at Nortel five years ago. "Mobile and the internet search are in some ways the most ripe because they were actually the two franchises I built first when I joined Nortel in 2008."

Rockstar revealed yesterday that it has set up subsidiaries to manage its patent licensing activities in mobile and search. The company is also dividing up its patents to include licensing for telecommunication services providers, networking equipment, enterprise technology and social networking, Veschi says.

From Veschi's perspective, Rockstar is simply seeking the revenue that Nortel had coming to it for its pioneering work in telecommunications. Not surprisingly, the Electronic Frontier Foundation, which has long fought against such patent suits, sees things differently. "The marketplace is where this entire fight should be taking place," says Julie Samuels, senior staff attorney with the EFF.

"Nortel made its money off its products. Now people are trying to squeeze water form the rock that was Nortel. In any rational economic system there would be no there there, but because of our messed-up patent system, they're able to do that."



Robert McMillan is a writer with Wired Enterprise. Got a tip? Send him an email at: robert_mcmillan [at] wired.com.
Read more by Robert McMillan
Follow @bobmcmillan on Twitter.

WE RECOMMEND                                          RECOMMENDED BY



Ex-Amazon Engineer Builds Library for World's Software Code



An Ice Cream Geek Reinvents the Scoop So It Won't Snap Your Wrist



5 Infographics to Teach You How to Easily Create Infographics in PowerPoint
- HUBSPOT

Tags: Apple, Google, lawsuits, mobile, Patents, Rockstar
Post Comment | 34 Comments |  Permalink
Back to top

Share on Facebook
98 shares
Tweet 208     g+1 35

Reddit  Digg Stumble Upon  Email

http://www.wired.com/wiredenterprise/2013/11/veschi/

**Comments for this thread are now closed.**

---

**34 Comments**    Wired: Wired Enterprise         Login

Sort by Best                          Share    Favorite ★

 **Allen Bryce** • 5 months ago

The original point of patents is to encorrage companies to do more, they are increasingly being used as a weapon to harm the industry and make some money in the process. It's past time the system was reviewed.

32   |   • Share ›

>  **Lefty** → Allen Bryce • 5 months ago
>
> They do not harm the industry ! If you invent something let`s use Tesla for example what did he come up with ? Then got screwed died alone in a hotel room and who got the credit ? Cash makes the world go round and in a land were you can sue for a ham sandwich who is at fault now the patent office or the courts.
>
> 2   |   • Share ›

>>  **M W** → Lefty • 5 months ago
>>
>> Tesla's situation does not describe the patent environment in the 21st century. That was around 100 years ago.
>>
>> 9   |   • Share ›

>>  **NooYawker** → Lefty • 4 months ago
>>
>> We're not talking major breakthroughs here. The bulk of these patents are so small and insignificant yet somehow gets patented, it inhibits everyone. Slide to unlock is not a breakthrough, it's not inventive, and it should never have gotten patented. I'm sure 99.9% of these patents are of the same nature.
>>
>> 4   |   • Share ›

>  **IP what** → Allen Bryce • 4 months ago
>
> "to encorrage companies to do more"
>
> Well sure, but do *what*? Today, most pro-patent people have given up or downplay the argument that patents are needed to incentivize invention (excepting perhaps pharmaceuticals). The much stronger argument is that patents play an important role in getting the inventor to disclose what they've done - discouraging trade secrets and black boxes.
>
> In my opinion, the biggest problem with Myriad, the case that holds you can't patent genes, is that genetic medicine companies are simply not going to tell you what genes they've identified as predictive of disease. Before Myriad, if you were a genetics lab, you could say to the world - hey, this chunk of DNA indicates a propensity for breast cancer, without worrying that every university lab in the country would start testing destroying any

Collapse

Previous Article
**Apple and Microsoft's Patent Troll Sues Google Over Android**



Next Article
**Out in the Open: Square Helps Coders Export Software to Foreign Lands**

# EXHIBIT 10



# Rockstar



## Contact

**Canada**

515 Legget Drive, Suite 300
Ottawa, Ontario
K2K 3G4
613-576-1000

**US**

Legacy Town Center 1
7160 North Dallas Parkway
Suite No. 250
Plano, TX 75024
info@ip-rockstar.com

## Career opportunities

Have a passion for innovation and technology?
There could be a place for you at Rockstar. Join
our staff of engineering and legal professionals.

Contact us today at careers@ip-rockstar.com

## About Rockstar

Rockstar is a patent licensing business that owns and manages
a portfolio of more than 4,000 patents developed by
technology pioneer Nortel Networks. This portfolio consists of
patents covering a wide range of consumer and enterprise
communications technologies currently in use or in
development in markets worldwide.

Through patent licensing and sales, Rockstar brings these
innovations to businesses around the globe.

### Facts about Rockstar's portfolio

The bulk of the Nortel Networks patent portfolio was
transitioned to Rockstar as part of Nortel's bankruptcy process

in 2011. This transaction yielded an historic $4.5B for Nortel's creditors, and established an initial set of
founding licensees to the Rockstar portfolio. Because Rockstar's portfolio is based on a wide range of
telecommunications, wired and networking based research and development performed by Nortel
engineers, a significant portion of today's high technology products and services relate to these patents.

### Rockstar in the news

- Rockstar – Spherix(July 29th
  2013)
- IAM Rockstar
  Article(July/August 2013)
- Rockstar profiled in Wired
  magazine (May 2012)
- US DOJ approves Rockstar
  patents purchase
- IP Business Congress 2010 –
  Interview with John Veshi(June
  26th 2012)

# EXHIBIT 11

# Rockstar

- Home
- About
- Innovation
- Privacy Policy
- Sales
- People

- LinkedIn

# Contact

**Canada**

515 Legget Drive, Suite 300

Ottawa, Ontario

K2K 3G4

613-576-1000

**US**

Legacy Town Center 1

7160 North Dallas Parkway

Suite No. 250

Plano, TX 75024

info@ip-rockstar.com

# Let innovation thrive

Rockstar is deeply committed to advancing innovation worldwide through its patent licensing program. Intellectual property is a strategic asset. Acquisition of such an asset from Rockstar through a license or purchase can provide significant strategic value to our partners and customers. Our licensees gain access to the

immense power and know-how of the patented technologies in Rockstar's portfolio, in addition to gaining freedom of design, improving time-to-market product development and delivering better end-customer satisfaction.

## Protect when necessary

Licensing is always the preferred route at Rockstar. However, with a portfolio that is widely regarded by peers and analysts as one of the most significant, high-quality collections in the technology industry today, Rockstar is committed to protecting its intellectual property where necessary.

## When patent infringement occurs

Today, a vast number of companies in the marketplace are using technology products or processes built directly from patents in Rockstar's portfolio. When patent infringement occurs, there is typically one of two consequences: either the infringing businesses obtain the legal right to use that technology via a patent license, or the parties pursue the case through litigation—a step that can be costly and time consuming for both parties.

## How evidence of patent infringement is collected

While Rockstar prefers to help innovation in the marketplace grow through the licensing route, we also aggressively pursue those who refuse to respect and compensate patent holders. Evidence of patent infringement is collected and analyzed by Rockstar at our in-house labs. Rockstar engineers—many of whom are patent holders themselves—conduct extensive reverse engineering on products that are suspected of patent infringement. When evidence of use is established, a claim report is created and an infringing company is contacted to discuss next steps.

# Find out more about patent licensing and sales

At Rockstar, licensing and sales are the preferred way of bringing innovation to the market. For authorized representatives of firms who develop technology-based products and processes, contact our [Sales Department](#) today for more information on patent sales and licensing options for your firm.

Rockstar | Patent licensing and patent sales

- [Home](#)
- [About](#)
- [Innovation](#)
- [Privacy Policy](#)
- [Sales](#)
- [People](#)

- [LinkedIn](#)

# EXHIBIT 12

**502553597    10/31/2013**

## PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1
Stylesheet Version v1.2

EPAS ID: PAT2599210

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| ROCKSTAR CONSORTIUM US LP | 10/31/2013 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | MOBILESTAR TECHNOLOGIES LLC |
| Street Address: | LEGACY TOWN CENTER 1 |
| Internal Address: | 7160 NORTH DALLAS PARKWAY, SUITE 250 |
| City: | PLANO |
| State/Country: | TEXAS |
| Postal Code: | 75024 |

**PROPERTY NUMBERS Total: 9**

| Property Type | Number |
|---|---|
| Patent Number: | 6037937 |
| Patent Number: | 6333973 |
| Patent Number: | 6510452 |
| Patent Number: | 6738809 |
| Patent Number: | 6765591 |
| Patent Number: | 6463131 |
| Patent Number: | 6122348 |
| Patent Number: | 6937572 |
| Application Number: | 13845955 |

**CORRESPONDENCE DATA**

| | |
|---|---|
| Fax Number: | (613)576-1028 |
| Phone: | 613-576-1005 |
| Email: | akosabek@ip-rockstar.com |

*Correspondence will be sent via US Mail when the email attempt is unsuccessful.*

502553597

PATENT
REEL: 031523 FRAME: 0182

6037937

CH  $360.00

| Correspondent Name: | AMIE KOSABEK |
|---|---|
| Address Line 1: | 515 LEGGET DRIVE |
| Address Line 2: | SUITE 300 |
| Address Line 4: | KANATA, CANADA K2K 3G4 |

| ATTORNEY DOCKET NUMBER: | MOBILESTAR |
|---|---|
| NAME OF SUBMITTER: | AMIE KOSABEK |
| Signature: | /AMIE KOSABEK/ |
| Date: | 10/31/2013 |

Total Attachments: 7
source=31 OCT 2013 - USPTO ASSIGNMENT MOBILESTAR#page1.tif
source=31 OCT 2013 - USPTO ASSIGNMENT MOBILESTAR#page2.tif
source=31 OCT 2013 - USPTO ASSIGNMENT MOBILESTAR#page3.tif
source=31 OCT 2013 - USPTO ASSIGNMENT MOBILESTAR#page4.tif
source=31 OCT 2013 - USPTO ASSIGNMENT MOBILESTAR#page5.tif
source=31 OCT 2013 - USPTO ASSIGNMENT MOBILESTAR#page6.tif
source=31 OCT 2013 - USPTO ASSIGNMENT MOBILESTAR#page7.tif

PATENT
REEL: 031523 FRAME: 0183

## PATENT ASSIGNMENT

This PATENT ASSIGNMENT ("Assignment") dated as of October 31, 2013 (the "Effective Date") by and between:

(i)  Rockstar Consortium US LP, a limited partnership organized under the laws of Delaware ("Assignor"), the address of which is Legacy Town Center 1, 7160 North Dallas Parkway, Suite No. 250, Plano, TX 75024, USA; and

(ii)  MobileStar Technologies LLC, a limited liability company organized under the laws of Delaware ("Assignee"), the address of which is Legacy Town Center 1, 7160 North Dallas Parkway, Suite No. 250, Plano, TX 75024, USA.

## W I T N E S S E T H:

WHEREAS, Assignor agreed to transfer certain assets of Assignor, including, without limitation, the patents, patent applications and provisional patent applications identified and set forth below; and

WHEREAS, Assignor now wishes to assign to Assignee, and Assignee wishes to acquire from Assignor, all of Assignor's right, title and interest in and to the Assigned Patents (as defined below.

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and agreements contained in this Assignment, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.  Assignment. Assignor hereby assigns to Assignee, and Assignee hereby accepts and acquires from Assignor, all of Assignor's right, title, and interest throughout the world (under any and all laws and in any and all jurisdictions) in and to the following (collectively, the "Assigned Patent Assets"):

(i)  All of the patents, patent applications and provisional patent applications set forth on Schedule A attached hereto (collectively, the "Assigned Patents"):

(ii)  all divisionals, continuations, continuations-in-part, substitutes, extensions, renewals, reissues, reexaminations, other applications and related cases (in each instance, whether pending, issued, abandoned or filed in the future) that have been or shall be filed anywhere in the world and that are based upon any of the Assigned Patents (all of the foregoing, collectively, "Related Cases");

(iii)  any inventions and improvements claimed or disclosed in any of the Assigned Patents or Related Cases, and any and all letters patent, certificates of invention, design registrations and utility models which may be granted therefor; and

1

**PATENT**
**REEL: 031523 FRAME: 0184**

(iv)  all causes of action, enforcement rights, infringement claims and other rights (including all rights to pursue damages, injunctive relief and other remedies for past, present and future infringement) based upon, arising out of or relating to any of the Assigned Patents or Related Cases.

Pursuant to the foregoing assignment, each of the Assigned Patent Assets shall hereafter be for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors and assigns, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made.  The assignment pursuant to this Section 1 includes, without limitation (A) the right, if any, to register or apply in all countries and regions in the Assignee's name for patents, utility models, design registrations and like rights of exclusion and for inventors' certificates for said inventions and improvements; (B) the right to apply for, prosecute, maintain and defend the Assigned Patent Assets (including the right to continue any such action underway and to revive any such action previously abandoned) before any public or private agency, office or registrar including by filing reissues, reexaminations, divisionals, continuations, continuations-in-part, substitutes, extensions and all other applications and post issue proceedings included in the Assigned Patent Assets; (C) the right, if any, to claim priority based on the filing dates of any of the Assigned Patents or Related Cases under the International Convention for the Protection of Industrial Property, the Patent Cooperation Treaty, the European Patent Convention, the Paris Convention, and all other treaties of like purposes; and (D) the right to sue and recover damages or other compensation for past, present or future infringements thereof, the right to sue and obtain equitable relief, including injunctive relief, in respect of such infringements, and the right to fully and entirely stand in the place of the Assignor in all matters related to the Assigned Patent Assets.

2.    Authorization.  Assignor also hereby expressly authorizes the respective patent office or governmental agency in each and every jurisdiction worldwide (including the Commissioner of Patents and Trademarks in the United States Patent and Trademark Office, and the corresponding entities or agencies in any applicable foreign countries or multinational authorities) to do the following:  (a) to issue any and all patents or certificates of invention or equivalent which may be granted upon any of the Assigned Patent Assets in the name of Assignee, as the assignee to the entire interest therein; and (b) to record Assignee as the assignee and owner of the Assigned Patent Assets and to deliver to Assignee, and to Assignee's attorneys, agents, successors or assigns, all official documents and communications as may be warranted by this Assignment.

3.    Recordation.  Assignee shall be solely responsible for all actions and all costs whatsoever, including but not limited to taxes, attorneys' fees and patent office fees in any jurisdiction, associated with the perfection of Assignee's right, title, and interest in and to the Assigned Patent Assets and recordation and/or registration of this Assignment or any other document evidencing the assignment to Assignee of the Assigned Patent Assets.

4.    Disclaimer.  There are no warranties, representations or conditions, express or implied, statutory or otherwise between the Parties under this Assignment.  ASSIGNEE ACKNOWLEDGES THAT THE ASSIGNED PATENT ASSETS ARE CONVEYED WITHOUT ANY REPRESENTATION, WARRANTY OR GUARANTY, INCLUDING WITHOUT LIMITATION AS TO THE CONDITION OF TITLE, ENFORCEABILITY, SUITABILITY OR FITNESS  FOR  ANY  PARTICULAR  PURPOSE,  MERCHANTABILITY,  VALIDITY, REGISTRABILITY OR ANY OTHER WARRANTY, WHETHER EXPRESS OR IMPLIED OR BY OPERATION OF LAW, BY ANY PERSON, INCLUDING WITHOUT LIMITATION BY ASSIGNOR, OR ANY OF ITS OFFICERS, DIRECTORS, EMPLOYEES, ACCOUNTANTS,

PATENT
REEL: 031523 FRAME: 0185

FINANCIAL, LEGAL OR OTHER REPRESENTATIVES OR ANY AFFILIATE OF SUCH PERSON.

     5.     Governing Law. This Agreement shall be construed in accordance with the substantive laws of the State of Delaware, excluding the conflict of law principles thereof. Each of the parties hereto hereby irrevocably agrees that any legal suit, action or proceeding arising out of or based upon this Assignment shall be brought exclusively in the state or federal courts located in the Eastern District of Texas and waives, any objection such party may now or hereafter have to the laying of venue of any such proceeding, and irrevocably submits to the exclusive jurisdiction of any such court in any such suit, action or proceeding.

     6.     General Provisions. This Assignment may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Assignment by facsimile or electronic mail shall be as effective as delivery of a manually executed counterpart of this Assignment. This Assignment may not be supplemented, altered, or modified in any manner except by a writing signed by all parties hereto. The failure of any party to enforce any terms or provisions of this Assignment shall not waive any of its rights under such terms or provisions. This Assignment is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns.

[Remainder of this page intentionally left blank]

3

**PATENT<br>REEL: 031523 FRAME: 0186**

**MOBILESTAR TECHNOLOGIES LLC**

By: _____

Name: Afzal Dean

Title: President.

STATE OF            )
                            )    ss.:

COUNTY OF        )

On the 31st day of October 2013, before me, the undersigned, a notary public in and for said state and county, personally appeared _Afzal Dean_____, personally known to me (or proved to me on the basis of satisfactory evidence), to be the individual who executed the foregoing instrument on behalf of MobileStar Technologies LLC as the _President_____ of such company, executed such instrument in such capacity, and acknowledged to me that the execution and delivery of said instrument was duly authorized by said company.

_____

Notary Public
(Affix Seal Below)

Michael Vincent Brantingue

[Signature Page to Patent Assignment]

**PATENT
REEL: 031523 FRAME: 0188**

IN WITNESS WHEREOF, Assignor and Assignee have caused this instrument to be executed by their respective duly authorized representative as of the Effective Date.

**ROCKSTAR CONSORTIUM US LP**

By Rockstar Consortium LLC, *its General Partner*

By _____
Name: John P. Veschi
Title:  CEO

STATE OF                              )
                                             )   ss.:
COUNTY OF                           )

On the 31ˢᵀ day of October 2013, before me, the undersigned, a notary public in and for said state and county, personally appeared John Veschi, personally known to me (or proved to me on the basis of satisfactory evidence), to be the individual who executed the foregoing instrument on behalf of Rockstar Consortium LLC as the ___CEO___ of such company (such company being the General Partner of Rockstar Consortium US LP), executed such instrument in such capacity, and acknowledged to me that the execution and delivery of said instrument was duly authorized by said company.

_____
Notary Public
(Affix Seal Below)

[Signature Page to Patent Assignment]

**PATENT
REEL: 031523 FRAME: 0187**

Schedule A

## LIST OF ASSIGNED PATENTS

| Patent No. | Serial No. | Country | Filing Date | Issue Date | Title |
|---|---|---|---|---|---|
| 6,037,937 | 08/985,265 | US | 12/04/97 | 03/14/00 | NAVIGATION TOOL FOR GRAPHICAL USER INTERFACE |
| 6,333,973 | 08/842,020 | US | 04/23/97 | 12/25/01 | INTEGRATED MESSAGE CENTER |
| 6,510,452 | 09/137,687 | US | 08/21/98 | 01/21/03 | SYSTEM AND METHOD FOR COMMUNICATIONS MANAGEMENT WITH A NETWORK PRESENCE ICON |
| 6,738,809 | 09/137,688 | US | 08/21/98 | 05/18/04 | NETWORK PRESENCE INDICATOR FOR COMMUNICATIONS MANAGEMENT |
| 1,494,392 | 4104937 | DE, FR, GB | 10/08/04 | 03/21/12 | NETWORK PRESENCE INDICATOR FOR COMMUNICATIONS MANAGEMENT |
| 2,280,573 | CA19992280573 19990820 | CA | 08/20/99 | 05/25/10 | SYSTEM AND METHOD FOR COMMUNICATIONS MANAGEMENT WITH A NETWORK PRESENCE ICON |
| 2,280,574 | CA19992280574 19990820 | CA | 08/20/99 | 05/06/08 | NETWORK PRECENSE INDICATOR FOR COMMUNICATIONS MANAGEMENT |
| 69930593 | DE1999630593T 19990823 | DE | 08/23/99 | 03/29/06 | NETWORK PRESENCE INDICATOR FOR COMMUNICATIONS MANAGEMENT |
| 0 989 700 | 99306693.5 | FR, GB | 08/23/99 | 03/29/06 | NETWORK PRESENCE INDICATOR FOR COMMUNICATIONS MANAGEMENT |

[Schedule A]

**PATENT
REEL: 031523 FRAME: 0189**

| Patent No. | Serial No. | Country | Filing Date | Issue Date | Title |
|---|---|---|---|---|---|
| 6,765,591 | 09/285,424 | US | 04/02/99 | 7/20/04 | MANAGING A VIRTUAL PRIVATE NETWORK |
| 6,463,131 | 09/477,679 | US | 01/05/00 | 10/08/02 | SYSTEM AND METHOD FOR NOTIFYING A USER OF AN INCOMING COMMUNICATION EVENT |
| 2,256,289 | CA2256289 | CA | 12/17/98 | 11/06/06 | SYSTEM AND METHOD FOR MANAGING INCOMING COMMUNICATION EVENTS USING MULTIPLE MEDIA OPTIONS |
| 6,122,348 | 08/996,034 | US | 12/22/97 | 09/01/00 | SYSTEM AND METHOD FOR MANAGING INCOMING COMMUNICATION EVENTS USING MULTIPLE MEDIA OPTIONS |
| JPH1126630 9 | JP19980355631 | JP | 12/15/98 | N/A | SYSTEM AND METHOD FOR MANAGING INPUT COMMUNICATION EVENT USING PLURAL MEDIA OPTIONS |
| JP4976471 | JP2009303239 | JP | 09/14/09 | 04/20/12 | SYSTEM AND METHOD FOR INFORMING USER WITH INPUT COMMUNICATION EVENT |
| 0938213 | 98310272.4 | DE, FR, GB, SE | 12/15/98 | 04/05/06 | SYSTEM AND METHOD FOR MANAGING INCOMING COMMUNICATION EVENTS USING MULTIPLE MEDIA OPTIONS |
| 6,937,572 | 09/751,796 | US | 12/29/00 | 08/30/05 | CALL TRACE ON A PACKET SWITCHED NETWORK |
| | 13/845,955 | US | 18-03-13 | | ASSOCIATIVE SEARCH ENGINE |

[Schedule A]

# EXHIBIT 13



## Rockstar

HOME    ABOUT    INNOVATION    PRIVACY POLICY    SALES    PEOPLE

### Grow together through innovation.

Rockstar is an intellectual property (IP) licensing company. We celebrate the value and power of innovation; the ideas that fuel a better way of doing things. Based on Nortel Networks' groundbreaking innovation engine, Rockstar manages a highly valued patent portfolio relevant to all telecom and high tech services and devices. We count among our most valuable assets a professional staff of technology industry veterans—many of whom were part of Nortel's innovation engine, and are inventors and patent holders themselves.

**Learn more**

### Why patent protection is necessary

Fostering innovation works hand-in-hand with the need for patent protection. Great ideas and the investment behind them deserve to be rewarded and respected.

### Recent News

First enforcement actions – Intellectual Asset Management (November, 2013)

WSJ Article – Patent Wars Erupt Again in Tech Sector (November, 2013)

### Opportunities for business

Patent licensing agreements and select patent acquisitions can provide businesses with a competitive edge in their marketplace.

HOME    ABOUT    INNOVATION    PRIVACY POLICY    SALES    PEOPLE

Rockstar | Patent licensing and patent sales

**– A500 –**

# EXHIBIT 14

**Linked** in ®

Join Today · Sign In

**Join LinkedIn and see how you are connected to Rockstar Consortium. It's free.**   Join LinkedIn

Already a member?
Sign in »

Get access to insightful information about your network at thousands of companies!

## Rockstar Consortium

**Overview**  Careers

Rockstar

Rockstar is an intellectual property (IP) licensing company. We celebrate the value and power of innovation: the ideas that fuel a better way of doing things. Based on Nortel Networks' groundbreaking innovation engine, Rockstar manages a highly valued patent portfolio relevant to all telecom and high tech services and devices. We count among our most valuable assets a professional staff of technology industry veterans—many of whom were part of Nortel's innovation engine, and are inventors and patent holders themselves.
less

**Ads By LinkedIn Members**

CONNXUS   **Diverse Suppliers Wanted**
Hundreds of Buyers are Looking for Diverse Suppliers Like You! Connect Now!

Learn More »

**Secure File Transfer?**
Simple, managed file transfers with extensive IT control. Learn more.

Learn More »

**Type**
Privately Held

**Company Size**
11-50 employees

**Website**
http://www.ip-rockstar.com

**Industry**
Telecommunications

**Founded**
2011

**Headquarters**

515 Legget Drive, Suite 300
Ottawa, Ontario K2K 3G4
CANADA

This LinkedIn Company Profile was created by LinkedIn and is about Rockstar Consortium. This page is not endorsed by or affiliated with Rockstar Consortium. For questions regarding LinkedIn Company Profiles contact us

LinkedIn company directory: a b c d e f g h i j k l m n o p q r s t u v w x y z more   Browse companies

By using this site, you agree to LinkedIn's terms of use. Commercial use of this site without express authorization is prohibited.

# EXHIBIT 15





### Senior IP Counsel
Rockstar Consortium LLC
December 2012 – Present (1 year 3 months) | Dallas/Fort Worth Area

Patent assertions, licensing and litigation.

### Director, Patent Litigation/Licensing Management
BlackBerry
November 2010 – November 2012 (2 years 1 month) | Dallas/Fort Worth Area

Dallas, Texas.

▼ 1 recommendation

**Li Chen**
Head of Sidley-Dallas IP Litigation practice

Alfi is a terrific lawyer. He has exceptional judgment, possesses the integrity to speak truth to power, and is an all around good guy. Don't play poker with him unless you're prepared to donate to the Guindi fund. View↓

### Director, Senior IP Counsel
Samsung Electronics Co., Ltd. [South Korea]
January 2009 – November 2010 (1 year 11 months) | Gangnam-gu, Seoul, Korea

Counsel for all four business divisions: Telecommunications, Digital Media, Semiconductors and LCDs.
Seoul, South Korea (1 yr) and Suwon, South Korea (1 yr).

### Associate, Patent Litigation
Quinn Emanuel Urquhart & Sullivan LLP
2006 – 2009 (3 years) | Greater New York City Area

New York Office

▼ 1 recommendation

**Hanson Tipton**
Member with Watson, Roach, Batson, Rowell & Lauderback

Alfi is intelligent, loyal, and fiercely competitive. View↓

### Captain, Company Commander
United States Marine Corps
May 1993 – January 2009 (15 years 9 months)

Active Duty: 1/96-9/99
Reserves: 5/93-12/95; 9/99-9/00; 2/08-1/09

▸ 1 honor or award

### Associate, IP Litigation and IP Transcations Groups
Shearman & Sterling LLP
2005 – 2006 (1 year) | Greater New York City Area

New York Office.

### Associate, Intellectual Property Group
Stroock & Stroock & Lavan LLP
2003 – 2005 (2 years) | Greater New York City Area

Patent Prosecution, Patent Litigation and IP Licensing. New York Office.

### LSAT Teacher/Tutor
PowerScore
December 1999 – August 2004 (4 years 9 months)

99.8 percentile score on LSAT (176/180).

 Certifications



How You're Connected

You

**REDACTED**

Alfi S. Guindi

In Common with Alfi S.



○ You   ● Alfi S.

**4**
Skills & Expertise

**1**
Location

**Licensed Patent Attorney**

United States Patent and Trademark Office, License Reg. No. 51,760

July 2002 – Present

**Licensed Attorney**

New York State Bar Association, License 4243291

2004 – Present

**Commissioned Military Officer**

United States Marine Corps

December 1995 – Present

**Secret Security Clearance**

United States Marine Corps, License (inactive)

---

Honors & Awards

**Tennessee State Record Holder - Marathon (Age-Group)**

February 1990

Tennessee State Marathon Record for 15-yr olds

http://tinyurl.com/TN-Marathon-Records

**Youngest Commissioned Officer in the Marine Corps (Age: 20)**

December 1995

---

Skills & Endorsements

Top Skills

| | |
|---|---|
| 29 | Patents |
| 28 | Intellectual Property |
| 23 | Patent Litigation |
| 15 | Licensing |
| 9 | Litigation |
| 5 | Mediation |
| 5 | Patent Prosecution |
| 4 | Negotiation |
| 4 | Intellectual Property... |
| 3 | Registered Patent... |

Alfi S. also knows about...

| 3 | IP | 2 | Patent Strategy | 2 | Telecommunications | 2 | Trademarks |
| 2 | Copyright Law | 1 | Privacy Law | 1 | Commercial Litigation | 1 | Corporate Law |
| 1 | Patentability |

---





How You're Connected

You

**REDACTED**

Amie K.

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback







LinkedIn Corporation © 2014   |   User Agreement   |   Privacy Policy   |   Community Guidelines   |   Cookie Policy   |   Copyright Policy   |   Send Feedback



**Senior Consultant**
Andersen Consulting
May 1989 – August 1992 (3 years 4 months) | Phoenix, Arizona

📐 **Skills & Endorsements**

**Top Skills**

| | | |
|---|---|---|
| 43 | Intellectual Property | ▶ |
| 27 | Licensing | ▶ |
| 22 | Patents | ▶ |
| 19 | Licensing Negotiations | ▶ |
| 12 | IP | ▶ |
| 5 | Patent Prosecution | ▶ |
| 4 | Patent Litigation | ▶ |
| 3 | Software Licensing | ▶ |
| 2 | Trade Secrets | ▶ |
| 2 | Corporate Law | ▶ |

**Chad also knows about...**

| 1 Intellectual Property... | 1 Trademarks | 1 Enforcement | 1 Patentability |
|---|---|---|---|
| Patent Licensing | Patent Portfolio... | Intellectual Property... | Trademark Procurement... |

🎓 **Education**

**Arizona State University College of Law**
JD, Law
1992 – 1995

**University of Nebraska-Lincoln**
BSEE, Electrical Engineering
1985 – 1989

**How You're Connected**

You

**REDACTED**

Chad Hilyard
Get introduced ▶

**In Common with Chad**

◯ You     ◯ Chad

**3**

Skills & Expertise

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback





Skills & Endorsements

**Top Skills**

| 35 | Wireless |
| 31 | Telecommunications |
| 25 | IP |
| 24 | VoIP |
| 20 | SIP |
| 12 | Business Case |
| 11 | LTE |
| 11 | Unified Communications |
| 9 | Cross-functional Team… |
| 9 | Product Management |

Chris also knows about...

| 8 | Ethernet | 7 | Product Lifecycle… | 4 | Intellectual Property | 4 | UMTS |
| 2 | Patent Portfolio… | 1 | Patent Mapping | 1 | Intellectual Property… | | |
| 1 | Patent Portfolio… | | | | | | |

Education

**Royal Military College of Canada/Collège militaire royal du Canada**
B.Eng, Engineering and Management
1986 – 1991

**Terry Doggett**
Senior IT Specialist at Rockstar
Consortium Inc.

**Michelle Lee**
Technology & IP Commercial Lawyer

**Hinta Chambers**
CFO at Rockstar Consortium

**Ross Morgan, CPA, CA, MAcc**
Managing Director - CFO4Results

**In Common with Chris**

1

Skill or Expertise

**– A518 –**



nortel networks
1997 – 2007 (10 years)

**Software Designer**
Bell Sygma
1993 – 1995 (2 years)

---

**Vicki Carver**
Director, Human Resources

**Shival Virmani**
Patent/Licensing Attorney at Rockstar
Consortium US LP

**Chris Briggs**
Senior Program Manager at Rockstar
Consortium

---

### Patents

**Media Sharing**
United States 7,996,566
Issued August 9, 2011

Share streaming media synchronized between viewers

2 inventors:

**Dan Lingman**                          **Dany Sylvain**
Professor of Game Development at Alg…     Product Line Manager, Applications at …

---

### Skills & Endorsements

Top Skills

| 18 | Java | ▶ |
| 10 | Objective-C | ▶ |
| 9 | Software Development | ▶ |
| 6 | iOS development | ▶ |
| 6 | Mobile Applications | ▶ |
| 4 | XML | ▶ |
| 4 | Software Engineering | ▶ |
| 3 | Xcode | ▶ |
| 3 | Interface Builder | ▶ |
| 3 | Unix | ▶ |

Dan also knows about…

| 3 | Object Oriented Design | 2 | Teaching | 2 | Adult Education | 2 | Cocoa |
| 2 | Web Services | 2 | Software Design | 2 | JSON | 1 | Sustainable Business |
| 1 | Game Development | 1 | Git | 1 | Subversion | 1 | REST | 1 | iPhone |
| 1 | Eclipse | 1 | Android | See 2+ ❯ |

---

### Education

**Lakehead University**
M.Sc, Computer Science
1985 – 1995



**Additional Info**

**Interests**

Software Development, gaming, advanced technology, game development, blogging

**Organizations**

**Additional Organizations**

IPIC, IGDA

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



 Education

### University of Ottawa

Masters, Business Administration

2009 – 2010

· Received $10,000 entrance scholarship for full-time studies.
· GMAT score of 720.
· Concentration on strategy and marketing for high tech businesses.

### McMaster University

B.Eng.&Mgt., Computer Engineering and Management

1995 – 2000

Activities and Societies: VP External, McMaster Engineering Society President, Engineering & Management Club

---

Organizations

### Additional Organizations

Ottawa Carleton Ultimate Association

Vice President of Licensing at Rockstar Consortium US LP

**Vicki Carver**
Director, Human Resources

**Alfi S. Guindi**
Senior IP Counsel at Rockstar Consortium LLC

**Chad Hilyard**
Chief Intellectual Property Counsel at Rockstar Consortium US LP

**Hinta Chambers**
CFO at Rockstar Consortium

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



1991 – 1994 (3 years)

## Skills & Endorsements

**Top Skills**

| 53 | Licensing | |
|----|-----------|---|
| 46 | Patents | |
| 45 | Intellectual Property | |
| 37 | Patent Prosecution | |
| 34 | Patent Litigation | |
| 20 | Patentability | |
| 14 | Trademarks | |
| 13 | Trade Secrets | |
| 11 | Software Patents | |
| 10 | Semiconductors | |

**David also knows about...**

| 8 | Prosecution | 7 | Intellectual Asset... | 7 | Invention | 7 | Patent Applications |
|---|---|---|---|---|---|---|---|

| 6 | Copyright Law | 6 | Software Licensing | 5 | Licensing Negotiations |
|---|---|---|---|---|---|

| 5 | Intellectual Property... | 4 | Start-ups | 4 | Patent Portfolio... |
|---|---|---|---|---|---|

| 3 | Registered Patent... | 3 | Trademark Infringement | 3 | Patent Searching |
|---|---|---|---|---|---|

| 3 | Patent Portfolio... | 3 | Client Counseling | See 11+ > |
|---|---|---|---|---|

## Education

**Hofstra University School of Law**
JD
1994 – 1997

**Rutgers, The State University of New Jersey-New Brunswick**
BSEE, Electrical Engineering / Biomedical Engineering
1985 – 1990

**John Garland**
Vice President of Licensing at
Rockstar Consortium US LP

**Alfi S. Guindi**
Senior IP Counsel at Rockstar
Consortium LLC

**Donald Powers**
Litigation Counsel at Rockstar
Consortium US LP

**Vicki Carver**
Director, Human Resources

**In Common with David**

**1**

Skill or Expertise

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



Native or bilingual proficiency                Professional working proficiency

**How You're Connected**

You

**REDACTED**

### Certifications

**Chartered Professional Accountant (CPA) Candidate**
Institute of Chartered Accountants of Ontario

**Certified Management Accountant (CMA) Candidate**
CMA Ontario

**Certified Patent Valuation Analyst (CPVA)**
Business Development Academy

Derek D.

### Skills & Endorsements

Top Skills

| 18 | Financial Modeling |
| 15 | Financial Analysis |
| 12 | Corporate Finance |
| 9 | Management Consulting |
| 7 | Business Analysis |
| 7 | Finance |
| 6 | Mergers & Acquisitions |
| 5 | Valuation |
| 1 | Management Accounting |
| 1 | Intellectual Property... |

### Education

**Carleton University**
Masters, (MBA) Business Administration - Finance
2010 — 2012
AACSB Accredited

**Rotterdam School of Management, Erasmus University**
Bachelor of Science (BSc), International Business Administration
2005 — 2008

**Canadian Operational Research Society (CORS)**
Diploma, Operational Research
2010 — 2011

### Additional Info

**Advice for Contacting Derek**

derekdelaat@gmail.com

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



### Trial Attorney
Office of the Chief Trial Attorney, U.S. Army Contract Appeals Division
June 1991 – May 1995 (4 years)

Represented the Army against major defense contractors in all phases of government contract litigation before the Armed Services Board of Contract Appeals and the GSA Board of Contract Appeals.

### Senior Prosecutor
197th Infantry Brigade, Fort Benning, Georgia
May 1988 – June 1990 (2 years 2 months)

Legal advisor to the Army's largest separate infantry brigade. Prosecuted cases against soldiers accused of felony and misdemeanor offenses, including murder, rape, sexual assault, drug distribution, larceny, and forgery.

### Administrative Law Attorney
United States Army Infantry Center, Fort Benning, Georgia
July 1986 – April 1988 (1 year 10 months)

Advised on matters concerning government contract, fiscal, personnel, environmental and administrative law. Reviewed contract solicitations and awards, provided advice on issues relating to contract formation and administration, acted as local counsel on protests before the General Accounting Office and disputes before the Armed Services Board of Contract Appeals. Represented the Army on labor matters in hearings before the Equal Employment Opportunity Commission.

 Volunteer Experience & Causes

### Team Member
Team Rubicon, Inc.
November 2012 | Disaster and Humanitarian Relief

 Skills & Endorsements

| Contract Management | Intellectual Property | Telecommunications |
| Contract Negotiation | Litigation | Commercial Litigation | Patent Litigation |
| Drafting Agreements | Legal Advice | Trade Secrets | Class Actions | Civil Litigation |
| Due Diligence | Program Management | RFP | See 2+ › |

 Education

### The Judge Advocate General's School
LLM, Law
1990 – 1991

### The University of Texas School of Law
JD (with honors), Law
1983 – 1986

Activities and Societies: Texas Law Review, Order of the Coif

### The University of Texas at Arlington
BA (with high honors), Political Science
1975 – 1979



**Mark Hearn**
Senior IP Licensing Counsel

**Dave Smith**
Patent Acquisition and Sales at
Rockstar Consortium Inc.

**john veschi**
--

**Alfi S. Guindi**
Senior IP Counsel at Rockstar
Consortium LLC

**In Common with Donald**

◯ You   ◯ Donald

**1**
Skill or Expertise

**1**
Field of Study



**Additional Info**

**Personal Details**

Birthday          March 15

**Honors & Awards**

**Additional Honors & Awards**

Texas Law Review, Order of the Coif, Legion of Merit

**Organizations**

**Additional Organizations**

Supreme Court of the State of Texas United States District Court - Northern District of Texas United States Court of Appeals for the Federal Circuit United States Court of Appeals for the Armed Forces

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback







### Portfolio Management Board, Office of CTO
Nortel Networks
November 2005 – November 2008 (3 years 1 month)

Internally focused on "clean sheeting" business analysis for troubled internal businesses. Activities involved recommendations and restructuring planning offering alternative business plans and opinions to maximise earnings and future potential for the businesses involved.
External focus on filling gaps in Nortel's emerging technology portfolio, included responsibilities for integration of technology partners and small CTO acquisitions ie Diamondware

### Wireless Business portfolio group
Nortel Networks
January 2005 – November 2005 (11 months)

Focused on assessing business cases and divestment opportunities for the Wireless portfolio. Included Due Diligence activities for divestitures and M&A activities.

### Product Line Management, Core Routers
Nortel Networks
January 2003 – January 2005 (2 years 1 month)

Drove the tactical justification and strategic business case framework for the Core Router product segment in Nortel Networks which resulted in the decision to form an OEM partnership to address this market segment. I led the due diligence efforts to assess the various candidate companies and participated in the contractual negotiations which led to the establishment of the OEM relationship. Post contract, I was responsible for day to day management of this relationship.

### IPT Leader Router Networks
Nortel Networks
2000 – 2002 (2 years)

Part of the transition team from Nortel Networks after Bay Networks acquisition, focused on Software and IP Platform Business management roles within the merged Data product Groups.Led a group of engineering and business resources, responsible for business opportunity assessment to customer trial product delivery. Achieved multiple releases of product hardware with supporting software functionality.

### Strategic Marketing
Nortel Networks
1997 – 1999 (2 years)

Emerging Data Technology Marketing. Developing Business Models and Use cases for Customer to support early adoption of new products

### Manager, Optical and Access Product Development
BNR
1993 – 1997 (4 years)

Managed several large R&D groups through multiple projects delivering a variety of Optical and Access Telecom products. Involved multi-site working globally with internal and external OEM partners and customers. .

---

 Volunteer Experience & Causes

### Opportunities Gillian is looking for:

• Joining a nonprofit board

### Causes Gillian cares about:

• Children
• Education
• Science and Technology

---

 Skills & Endorsements



How You're Connected

You

**REDACTED**

Gillian McColgan
Get introduced ▸

Top Skills

| 28 | Wireless | ▶ |
| 22 | Telecommunications | ▶ |
| 21 | Product Development | ▶ |
| 18 | Strategic Planning | ▶ |
| 13 | Business Case | ▶ |
| 12 | Strategy | ▶ |
| 11 | Networking | ▶ |
| 9 | Licensing | ▶ |
| 9 | IP | ▶ |
| 6 | Management | ▶ |

Gillian also knows about...

| 6 | Leadership | | 5 | Mergers & Acquisitions | | 4 | Product Planning |
| 4 | Strategic Partnerships | | 4 | Start-ups | | 3 | Partnerships | | 3 | Product Management |
| 3 | Cross-functional Team… | | 2 | Program Management | | 1 | Patent Licensing |
| 1 | Data Networking | | | Partnership Development |

✏ Education

**University of Ulster**
PGD, Plastics Technology
1991 – 1993

**University of Ulster**
B.Eng (hons), Engineering
1985 – 1989

**Methodist College Belfast**
1979 – 1985

Help Center  About  Press  Blog  Careers  Advertising  Talent Solutions  Tools  Mobile  Developers  Publishers  Language  Upgrade Your Account

LinkedIn Corporation © 2014   User Agreement  Privacy Policy  Community Guidelines  Cookie Policy  Copyright Policy  Send Feedback





Specialties:VPNs, MPLS/GMPLS VPNs, IP Services, Optical VPNs (Layer-1 VPNs), Layer-2 Switching, Ethernet VPNs, etc.

### Experience

**Internet Technology Expert**
Rockstar Consortium
July 2011 – Present (2 years 8 months)

**Distinguished Member of Technical Staff (DMTS)**
Rockstar Consortium Inc.
July 2011 – Present (2 years 8 months)

**Senior Internet Technology and Standard Advisor, Distinguished Member of Technical Staff (DMTS)**
Nortel Networks
June 1993 – July 2011 (18 years 2 months)

### Skills & Endorsements

9 | IP

### Education

**University of Ottawa**
Master of Science, Computer Science
1990 – 1993

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback





Linux    XML    MySQL    PHP    CSS    SIP

## Education

**Herzing college**
Business Management Degeree
2011 – 2012

**Old Dominion University**
Bachelor's degree, Electrical and Electronics Engineering
2006 – 2010

## Additional Info

**Personal Details**
Birthday        November 11

**Advice for Contacting hamid**

Email

Portfolio Development & Enhancement at Rockstar Consortium

**Ron Steeves**
Patent Licensing at Rockstar Consortium Inc.

**Mark Hearn**
Senior IP Licensing Counsel

**Donald Powers**
Litigation Counsel at Rockstar Consortium US LP



(500+ employees)
•Responsible for the development of Planning design strategy to roll-out SAP in over thirty countries
•Managed Accenture Consulting relationship and employees to ensure timely design of project requirements for CO, CoPA, BW and BPS in SAP
•Developed Cost Centre, Profit Centre and allocation strategies
•Built cross functional Senior Executive awareness and support for Finance transformation initiatives

**Senior Finance Manager - Sarbanes Oxley Compliance**
Nortel
*August 2004 – April 2005 (9 months)*

•Responsible for management of SOX 404 compliance for the Financial Close Cycle globally. Developed management self assessment testing strategies and streamlined controls to build consistency and promote efficiency across regions. Identified Internal Control Objectives
•Built Senior Executive awareness and support for SOX compliance
•Managed and provided support & direction to team of fifty Nortel managers and Ernst & Young contractors
•Managed and aligned External Auditor, Deloitte & Touche, expectations and testing for SOX compliance.
•Chairperson for 2004 Accumen Financial Accounting & Reporting for OSC/SEC Compliance conference

---

⚖ **Skills & Endorsements**

Top Skills

| 20 | Internal Controls | ▶ |
|----|-------------------|---|
| 11 | Sarbanes-Oxley Act | ▶ |
| 7 | Strategic Financial... | ▶ |
| 5 | Cross-functional Team... | ▶ |
| 4 | Budgets | ▶ |
| 3 | SAP | ▶ |
| 2 | Financial Accounting | ▶ |
| 2 | Analysis | ▶ |
| 1 | Business Strategy | ▶ |
| 1 | Management | ▶ |

Hinta also knows about...

| 1 | Leadership | | SOX | | Financial Planning | | Budgeting |

---

✏ **Education**

**Wilfrid Laurier University**
HBBA, Business Administration
*1992 – 1996*

**central peel**
*1988 – 1992*

**Afzal Dean**
Vice President - Patent Licensing

**Chad Hilyard**
Chief Intellectual Property Counsel at Rockstar Consortium US LP

**Chris Briggs**
Senior Program Manager at Rockstar Consortium

**Dan Lingman**
Professor of Game Development at Algonquin College

**– A542 –**

LinkedIn Corporation © 2014    |   User Agreement   |   Privacy Policy   |   Community Guidelines   |   Cookie Policy   |   Copyright Policy   |   Send Feedback



**Carleton University**

Bachelor of Engineering (B.Eng.), Biomedical and electrical Engineering with Distinction, Cooperative Education

2008 – 2013

Activities and Societies: Member of Institute of Electrical and Electronics Engineering (IEEE), Member of Carleton University Korean Student Association (CUKAS), Webmaster and Fourth year representative of CUKAS, Member of Carleton University Biomedical Engineering Society, Third year representative of Biomedical Engineering Society, Member of Ottawa Sport and Social Club, Member of LAN Toastmaster (Carling Campus)

▸ 1 project

 **Summary**

• Experienced in intellectual property licensing, patent portfolio management, claim charts presentation, infringement claim mapping, testing Mobile OS (Android), 3G wireless equipment and applications, analysis of hardware devices and software programs, reverse engineering network protocols
• Integrated in embedded software and hardware design for controlling systems, and medical devices including Program Logic Controller, Microcontroller, ADS1298, and Pickit3
• Performed in lab test equipment and software: Oscilloscope, Vector Network Analyzer, Spectrum Analyzer, Logic analyzers, Waveform pattern generator, and Wireshark, Photoshop
• Developed in computer programming with C++, C, Delphi, Matlab, SQL, DDMS
• Evaluated with basic knowledge of analog and digital circuit design in electronic system and analysis tool: UPD design viewer, Allegro PCB editor, Cadence OrCAD Capture CIS, Fusion Design, Advanced Design System, Xilinx Design Suite ISE11 and ModelSim
• Knowledge of the following operating system, information systems technical environment and networking protocols: Linux, VMware, MySQL server, VPNs, TCP/IP, VOIP, SIP, HTML,Kanban
• Familiarized in R & D hardware lab and working on embedded systems, implementing hardware design, fiber optic communication, prototyping systems, and probing
• Able to learn new software tool and hardware equipment quickly without supervision

 **Skills & Endorsements**

Top Skills

| 2 | C++ | ▸ |
| 2 | Microcontrollers | ▸ |
| 1 | Matlab | ▸ |
| 1 | Embedded Systems | ▸ |
|   | Delphi | |

James Geunmyoung also knows about...

| verliog | PCB design | c | MPLAB | Fiber Optics | TCP/IP | Python | Linux |
| VMware | DSP | ASIC | VoIP | Wireshark | SIP | DDMS | See 4+ ❯ |

 **Projects**

**Wearable Wireless Bio-Signal Monitor**

September 2012

• Designed a low-cost, integrated power management solution and ECG data collection system, a functional prototype of a device that is capable of transmitting a signal to a Smart-phone application.
• Developed in embedded systems and digital hardware design that microcontroller received the ECG signal from ADS1298 and stored the data on board with a micro SD card or transmitted the data via… **more**



**How You're Connected**

You

**REDACTED**

James Geunmyoung S.

3 team members

**James Geunmyoung S.**
Junior IP Technology Consultant at Roc...

**Hisham Barkat, EIT**
Power Supply and Distribution Coordin...

**Ali Eissa**
Technical Support Engineer at Solana ...

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



### Principal IT Contractor

Dever Domain Inc.

November 2008 – August 2010 (1 year 10 months)

To provide professional computer systems consulting to various technology firms in the Ottawa area. Clients include Annidis Health Systems and NavCanada.

### Computer Scientist

University of Calgary

December 2004 – July 2008 (3 years 8 months)

### Software Designer

Vault Technologies

June 2003 – November 2004 (1 year 6 months)

Embedded systems software design.

### Testing and Tools Developer

Nortel Networks

May 2000 – August 2003 (3 years 4 months) | Ottawa, Canada Area

Development of automated test tools for the Preside network management solution. This includes a test suite for the CORBA building blocks components using Ionix Oribiter for the sanity test process.

Designed and build the Operator Simulation Tool using Java, Python and Jython to load test large numbers of clients for the performance and scalability engineering group.

### Jakarta Project Committer

The Apache Software Foundation

November 2000 – May 2003 (2 years 7 months)

Committer and Release Prime for the HttpClient 2.0 release.
http://hc.apache.org/httpcomponents-client-ga/index.html

### Software Contractor

Procom

April 2002 – September 2002 (6 months)

On contract to Nortel Networks.

### Junior Software Developer

Natural Resources Canada

January 2000 – April 2000 (4 months)

Pacific Forestry Centre

### Junior Database Developer

ITSD

September 1999 – December 1999 (4 months)

---

Volunteer Experience & Causes

### Coach

Kanata Little League Baseball Association

May 2009 – Present (4 years 10 months) | Children

### Trainer

Kanata Minor Hockey Association

September 2012 | Children

Senior System Analyst at NavCanada

+Connect



Skills & Endorsements

| 10 | Software Development |
| 9 | Software Engineering |
| 7 | Software Design |
| 7 | Linux |
| 5 | Object Oriented Design |
| 4 | Java |
| 1 | UML |
| 1 | Integration |

## Education

**Carleton University**
Master of Engineering (M.Eng.), Technology Innovation Management
2014 – 2016 (expected)
Http://timprogram.ca

**Carleton University**
B.Sc, Computer Science
2000 – 2003

**Camosun College**
E. Tech, Electronics
1997 – 1998

## Groups

**Agile Ottawa**
+ Join

**Air Traffic Control Ne...**
+ Join

**University of Calgary ...**
+ Join

## Following

**Rockstar Consortium**
Telecommunications
+ Follow

**QNX Software Systems**
Computer Software
+ Follow

### Schools

**Carleton University**

**Camosun College**



Ottawa, Canada Area          Canada
+ Follow                      + Follow

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account
LinkedIn Corporation © 2014   |   User Agreement   |   Privacy Policy   |   Community Guidelines   |   Cookie Policy   |   Copyright Policy   |   Send Feedback



### Executive Vice-President

Rembrandt IP Management LLC

February 2007 – March 2012 (5 years 2 months)

Senior executive focused on licensing and commercialization efforts associated with Rembrandt patent assets.

### Executive Vice-President

ThinkFire

July 2001 – January 2007 (5 years 7 months)

Executive VP & General Manager responsible for ThinkFire's overall efforts in licensing and patent valuation and brokering services, as well as developing and delivering IP management and strategy consulting services to leading 'high-tech' clients around the globe. Broad experience in high-tech IP transactions such as patent licensing negotiations, patent/technology acquisitions and divestitures, technology licensing, handling IP matters in establishing within Joint Ventures, and development and implementation of IP defense and commercialization strategies.

### Director of Worldwide Licensing

Lucent Technologies IP Division

May 1993 – July 2001 (8 years 3 months)

Worldwide responsibility for managing and leading a team of licensing executives, including an office in Paris, in the licensing of Lucent's patents to leading semiconductor, multimedia, and optical networking companies. Leading and negotiating patent and technology license agreements with leading 'high tech' companies in North America, Asia, and Europe.

▼ 1 recommendation

**Gene Potkay**
SVP Intellectual Property, Nielsen

John Garland was a substantial contributor at AT&T/Lucent and held positions of lead negotiator for major closures with particular emphasis on semiconductors that extended to multimedia and ultimately to much broader management oversight and... View↓

### Product Manager

AT&T Microelectronics

July 1989 – May 1993 (3 years 11 months)

Marketing Manager with AT&T Microelectronics with worldwide responsibilities for a portfolio of high voltage analog/digital integrated circuits (ASIC, semi-custom, and standard products). Achieved greater than 200% revenue growth during the four-year period (1989-93) and in 1991 was awarded the Outstanding Marketing Support Award for Europe.

### Engineer

AT&T Microelectronics

July 1985 – July 1989 (4 years 1 month)

Test engineer and IC fabrication engineer participated in circuit development, yield enhancement, cost reduction, chip re-design, failure mode analysis and improving manufacturing processes for a family of integrated circuits used in AT&T's Digital Voice Communication System.

---

 Skills & Endorsements

**Top Skills**

| 99+ | Licensing | ▶ |
| 72 | Patents | ▶ |
| 65 | Intellectual Property | ▶ |
| 35 | Commercialization | ▶ |
| 32 | Business Development | ▶ |
| 25 | Contract Negotiation | ▶ |



**How You're Connected**

You

**REDACTED**

John Garland
Get introduced ▶

**In Common with John**

○ You    🧑 John



**2**

Skills & Expertise

**1**

Location

| 16 | Venture Capital | |
| 15 | Start-ups | ▶ |
| 14 | Executive Management | ▶ |
| 14 | Business Strategy | ▶ |

John also knows about...

| 11 | Due Diligence | 10 | Invention | 9 | Strategic Partnerships |
| 9 | Corporate Development | 8 | Strategy | 7 | Mergers & Acquisitions |
| 7 | Joint Ventures | 6 | Patent Litigation | 6 | Semiconductors | 5 | Telecommunications |
| 5 | Cross-functional Team… | 5 | Negotiation | 5 | Strategic Alliances |
| 5 | Entrepreneurship | 4 | Technology Transfer | | See 25+ ❯ |

✏️ Education

**Northwestern University - Kellogg School of Management**
Executive Development Program
1998 – 1998

**Lehigh University**
MBA, Marketing
1986 – 1990

**Lafayette College**
BSEE, Electrical Engineering
1981 – 1985

**Father Judge HS**

🛡️ Organizations

**Additional Organizations**

LES

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

– A553 –





How You're Connected

You

**REDACTED**

john veschi
Get introduced ▸

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



REDACTED

Fine Dining, Music, Quilting



LUGAY C.

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014   | User Agreement   | Privacy Policy   | Community Guidelines   | Cookie Policy   | Copyright Policy   | Send Feedback



Lynn also knows about...

| 1 | Outlook | Executive Administrative | High Level Of... | Microsoft Word |

**Following**

Rockstar

**Rockstar Consortium**
Telecommunications
✚ Follow

**Hamid Ould-Brahim**
Internet Technology Expert at
Rockstar Consortium Inc.

**hamid ziyati**
IP Technology Consultant

**Chad Hilyard**
Chief Intellectual Property Counsel at
Rockstar Consortium US LP

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



Vice President of Licensing at Rockstar
Consortium US LP

**Scott Ouellette**
IP Counsel, Rockstar Consortium US
LP

**Alfi S. Guindi**
Senior IP Counsel at Rockstar
Consortium LLC

**Afzal Dean**
Vice President - Patent Licensing

**In Common with Mark**

You      Mark

1

Skill or Expertise

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account
LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



May 2012 – Present (1 year 10 months) | Ottawa, Canada Area

- Lead new business initiatives and licensing programs through the incubation and early launch cycle.

- Establish operational processes that enhance the companies effectiveness.

- Identify new business opportunities that leverage Rockstar's Intellectual Property.

### Leader - IT And Communications
Rockstar Consortium
August 2011 – April 2012 (9 months) | Ottawa, Canada Area

Build the Rockstar Voice and Data Network

As a founding member I transitioned our team from Nortel's IT infrastructure into the new Rockstar network. I was responsible for all aspects our our business operations as they pertain to information technology and telecommunications.

### Intellectual Property
Nortel
December 2008 – July 2011 (2 years 8 months)

Drive the team's understanding of telecommunications markets and the opportunity they represent.

### Manager - Portfolio Management Board
Nortel
April 2006 – November 2008 (2 years 8 months)

• Key member of Nortel's Business Transformation team that identified significant R&D savings.
• Lead the review of new business casesand recommend investment decisions.
• Lead analyst for investigating underperforming businesses and recommending corrective action using industry best practices and analysis techniques.
•Deliver quarterly financial performance reports to the Senior Executive Leadership on key business health indicators.

### Director - CDMA Global Product Support
Nortel Networks
November 2003 – 2006 (3 years)

• Responsible for driving product performance improvement initiatives within the CDMA product portfolio. Moved all products to "Green" within 8 months of joining the team.
• Managed significant capital investment.
• Established third party support Model for CDMA Evolution Data Only partnership.
• Launched programs to meet and eventually exceed TL9000 performance objectives.
• Built the plan to drive to CMMI Level 3.
• Defined and implemented "Best in Class" support culture within the R&D community. Worked with peers in other business units to help them drive change and deliver improved support services. Mentored successors.
• Lead teams in Calgary, Guangzhou China, Bangalore India and Ottawa.

▾ 1 recommendation

    **Jim Carew**
    Director North America CTM at BlackBerry

View↓

### Director - OAM Development
Nortel
November 1999 – November 2003 (4 years 1 month)

• Delivered large and complex multi-site software programs to support the Operations Administration and Management requirements for Nortel's entire suite of Optical products.
• Reduced the software development cycle from 18 months to 9 months and improved quality by driving down customer complaints by 57%. Initiatives were adopted as new practices within the OAM development community. Drove TL9000 certification.
• Lead a multi-site Research and Development team of over 200 professionals located in Ottawa, Montreal, England, and India with a multi-million dollar budget.

▾ 1 recommendation

    **Anthony Cinicolo, PMP**
    Project Manager - Public Safety at Government of Canada

View↓



### Director Technical Support
Optical GPS
1996 – 2000 (4 years)

### Manager - DMS Product Support
BNR
1992 – 1996 (4 years)

Responsible for the resolution of product related field issues.

### DMS Field Support
Bell Northern Research
1986 – 1988 (2 years)

---

### Skills & Endorsements

Top Skills

| 25 | Telecommunications | ▸ |
| 11 | CDMA | ▸ |
| 8 | SIP | ▸ |
| 7 | Wireless | ▸ |
| 5 | LTE | ▸ |
| 5 | Ethernet | ▸ |
| 4 | VoIP | ▸ |
| 3 | Network Architecture | ▸ |
| 3 | WiMAX | ▸ |
| 3 | Unified Communications | ▸ |

Peter also knows about...

| 2 | Program Management | 2 | Technical Support | 2 | UMTS | 2 | SDH | 2 | 4G |
| 1 | Telephony | 1 | SS7 | 1 | IPTV | | Leadership | | 3GPP | | 3G | | Broadband |
| | Cellular Communications |

---

### Education

### Concordia University
Electrical Engineering, Telecommunications
September 1982 – June 1986

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback



**Board of Directors**

Linda Lowe Daycare

January 2011 – Present (3 years 2 months)

Located in Pakenham the aim at the Linda Lowe Daycare is to provide a stimulating environment and
program that enables each child to develop emotionally, creatively, socially, physically and intellectually.
A child is entitled to opportunities to satisfy these needs and to develop these abilities in an environment,
which fosters co-operation and a sense of responsibility and order.

**Dollars and Sense Steering Committee**

OCRI

September 2010 – May 2012 (1 year 9 months)

**CFO**

Renaissance Repair & Supply

November 2009 – March 2012 (2 years 5 months)

**Senior Associate**

CFO4Results

March 2005 – March 2010 (5 years 1 month)

**CFO**

Objectworld

April 2004 – October 2009 (5 years 7 months)

▼ 1 recommendation

   **David Levy**
   President & CEO at Objectworld

   Ross, has been CFO since 1997 of 4 companies for which I was CEO, viz.- Loran, Peregrine (Ross
   reported to Peregrine's CFO), Mobile-Knowledge, and Objectworld. His judgement, knowledge,
   expertise and guidance have been invaluable. Ross brings the... View↓

**CFO**

Intelligent Photonics Control

March 2004 – February 2005 (1 year)

▼ 1 recommendation

   **Gary Weiner**
   OptoElectronic Business Development, Sales & Marketing Management

   Ross is a terrific team player with solid skill set all the way around. He could scale the top line issues
   and needs down stream to device unit prices if needed and help financially model deals and strategies.
   We worked closely together up through... View↓

**Director of Finance, Canada**

Peregrine Systems

September 2000 – March 2002 (1 year 7 months)

**Director of Finance**

Loran International Technologies Inc

January 1999 – September 2000 (1 year 9 months)

**Director of Finance**

Plaintree Systems

June 1998 – January 1999 (8 months)

**Senior Manager**

Ernst & Young

September 1993 – June 1998 (4 years 10 months)

 Skills & Endorsements

**How You're Connected**



You

**REDACTED**

Ross M.

Top Skills

| 25 | Finance | ▶ |
| 21 | Mergers & Acquisitions | ▶ |
| 17 | Financial Reporting | ▶ |
| 14 | Mergers | ▶ |
| 11 | Financial Modeling | ▶ |
| 11 | Management | ▶ |
| 9 | Start-ups | ▶ |
| 9 | Managerial Finance | ▶ |
| 6 | Strategic Planning | ▶ |
| 6 | Due Diligence | ▶ |

Ross also knows about...

| 5 Strategic Financial... | 4 Venture Capital | 4 Corporate Finance |
| 3 Executive Management | 3 Business Strategy | 3 Business Development |
| 3 Private Equity | 3 Management Consulting | 3 Risk Management | 2 Budgets |
| 2 Cash Flow | 2 Negotiation | 2 Financial Analysis | 2 Forecasting |
| 2 Accounting | See 7+ ❯ |

Education

**Canadian Institute of Chartered Accountants**
Chartered Accountant

**University of Waterloo**
Masters of Accounting

– A571 –



Education

**Suffolk University Law School**
JD
1993 – 1996

**University of Massachusetts Dartmouth**
BS, Electrical Engineering
1985 – 1990

**Shival Virmani**
Patent/Licensing Attorney at Rockstar
Consortium US LP

**Michelle Lee**
Technology & IP Commercial Lawyer

**Alfi S. Guindi**
Senior IP Counsel at Rockstar
Consortium LLC

**Dave Smith**
Patent Acquisition and Sales at
Rockstar Consortium Inc.

**In Common with Scott**

You      Scott

1

Skill or Expertise

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback





| 55 | Licensing |
| 39 | Intellectual Property |
| 36 | Patents |
| 18 | Litigation |
| 17 | Corporate Law |
| 15 | Patent Litigation |
| 9 | Patent Prosecution |
| 8 | Software Licensing |
| 4 | Trade Secrets |
| 3 | Due Diligence |

Shival also knows about...

| 3 | Patentability | 2 | Trademarks | 2 | IP | 2 | Legal Research | 2 | Semiconductors |
| 2 | Contract Negotiation | 1 | Mergers & Acquisitions | 1 | Joint Ventures |

Education

**Wharton School, University of Pennsylvania**
Executive Education (Certificate), Accounting and Finance
2010 – 2012

**George Mason University**
M.S., Electrical Engineering
1997 – 1999

**Tulane University**
J.D., Law
1993 – 1996

**Virginia Polytechnic Institute and State University**
B.S., Mechanical Engineering
1988 – 1992



4  Unix Shell Scripting

4  Shell Scripting

4  Unix

4  Windows

4  System Administration

4  Solaris

3  Software Development

3  Integration

Terry also knows about...

3  System Deployment    3  Operating Systems    3  Software Configuration...

2  Teamwork    2  UCM    2  Perl    2  Telecommunications    2  Linux

2  Testing    1  Problem Solving    1  Team Building    1  Build Automation

1  Release Engineering    1  Engineering    Deployment    See 2+ ›

Education

Algonquin College of Applied Arts and Technology
Business Adminstration, Business
1996 – 1997

General Panet

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014    User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback







**Rockstar Consortium**
Telecommunications
➕ Follow

## Schools

**Hanken Svenska han…**
Finland
➕ Follow

Help Center | About | Press | Blog | Careers | Advertising | Talent Solutions | Tools | Mobile | Developers | Publishers | Language | Upgrade Your Account

LinkedIn Corporation © 2014 | User Agreement | Privacy Policy | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

**– A580 –**



### Vicki Carver
Director, Human Resources
Ottawa, Canada Area | Telecommunications

Current   Rockstar Consortium
Previous  Cactus Commerce, Gowling Lafleur Henderson LLP, IKEA Canada Limited

**Connect**   **Send Vicki InMail**

500+
connections

ca.linkedin.com/in/1004230

**Background**

#### Experience

**Director, Human Resources**
Rockstar Consortium
October 2011 – Present (2 years 5 months) | Ottawa, Canada Area

**Human Resources Advisor ( Contract)**
Cactus Commerce
March 2011 – November 2011 (9 months)

Cactus Commerce delivers dynamic cross channel B2C and B2B e-commerce solutions offering unique user experiences with flexible deployment options. Since1995 Cactus has delivered e-commerce solutions to clients in the retail, consumer goods, manufacturing, media & entertainment and hospitality industries. Clients include GameStop, Church & Dwight, Sam's Club, PowerBar and many more.

**HR ( contract)**
Gowling Lafleur Henderson LLP
2011 – 2011 (less than a year)

**Ottawa - Manager Human Resources**
IKEA Canada Limited
January 2009 – December 2010 (2 years)

is a popular home furnishings retailer that operates 10 stores across the country. IKEA Canada is part of Sweden-based Inter IKEA Systems BV, which operates the familiar blue-and-yellow IKEA stores around the world

Developed and implemented talent management and succession planning strategies to strengthen the store's leadership
Managed programs and processes related to resource planning, employee relations, performance reviews, learning and development, recruitment, payroll and benefits and annual employee engagement surveys
Coached 40 managers on effective employee relation practices
Established and maintained collaborative partnerships with matrix partners during the implementation of a HR shared services model ( SAP and ADP Globalview)
Participated as a key management member, steering the store's sales and operational KPI ( key performance indicators) and efficiencies
Managed and developed an HR team

**HR Professional**
Self Employed
September 2003 – January 2009 (5 years 5 months)

A performance-driven HR professional who provided contracted Human Resources Management, Recruiting and Program development and Implementation services to private and public organizations.

How You're Connected

You

REDACTED

Vicki  3rd
Send Vicki InMail

Ads You May Be Interested In

**107 New CA Clients**
107 new legal clients seeking a CA attorney. View their cases today.

**Keller MBA Bus. Admin.**
Earn Your Master's of Business Admin at Keller Grad School

**West Start Smart℠ Trial**
See how engaging our courses can be. Learn about our 2-course trial.

People Also Viewed

**Gillian McColgan**
CTO at Rockstar

**Dave Smith**
Patent Acquisition and Sales at Rockstar Consortium Inc.

**Chris Briggs**
Senior Program Manager at Rockstar Consortium

**john veschi**
--

**Lynn Wilson**
Office Manager and Executive Assistant to CEO at Rockstar Consortium

**David Sasso**
Senior Licensing Counsel at Rockstar Consortium

Clients included Bell Canada, Alcatel-Lucent, Halogen Software, and Corel Corporation.

## Manager, Talent Acquisition ( Contract)
Corel Corporation
April 2007 – November 2008 (1 year 8 months)

2007 - 2009
Corel Corporation - Talent Acquisition Manager
Corel is a office productivity and digital media software development company whose products are sold in more than 75 countries through a well-established network of international resellers, retailers, original equipment manufacturers, online providers and Corel's global websites.

My main project was to source and implement a replacement (ATS) applicant tracking system.
Successfully implemented Njoyn across North America
Provided full-cycle recruiting services including sourcing, assessment and selection services for positions ranging from administrative to Senior Vice President level

▼ 1 recommendation

**Philip Wilson CHRP, SHRP**
HR & Biz Exec.,30 yrs Governance,OD,Leadership,Talent Mgt, Rewards,Exec Coach,Career ...

Vicki is a superb HR professional who is both creative and innovative in how she resolves for clients. She is a very experienced recruiter and is extremely customer centric. She loves a challenge. I would strongly recommend Vicki  View↓

## HR Specialist ( contract)
Halogen Software
2006 – 2007 (1 year)

▼ 2 recommendations

**Christian Beauchesne**
Experienced Software Leader, Team Le...

Vicki is very talented and resourceful recruiter. She has a very good grasp of the market and was key in our recruitment... View↓

**Stanley Janas**
Director, Human Resources at The Sta...

Vicki is a very effective recruiter who also has a very good generalist HR background as well. Give her a project and let... View↓

## Senior Recruitment Specialist ( Contractor)
Alcatel-Lucent
2006 – 2006 (less than a year)

▼ 1 recommendation

**Todd Luckasavitch**
Head of Global Recruitment /Global HR Business Partner - IP Platforms Business at Alcatel-...

Vicki demonstrated true professionalism and in-depth market knowledge in every recruitment project she managed. Her ability to dig deep to discover the true resourcing needs of the clients and with that gain knowledge and understanding of their... View↓

## Student
Algonquin College
2000 – 2002 (2 years)

## Director Professional Services
Workstream Inc
January 1998 – January 2002 (4 years 1 month)

Workstream provides enterprise and mid-market talent management solutions and services that help companies manage the entire employee lifecycle - from recruitment to retirement.

Developed and managed a cross functional Professional Services team who project managed and delivered software implementation and training services
Developed classroom and Web based training and implementation programs to ensure clients and users were maximizing the full functionality of the software; ensuring renewals
Managed client relationships for retention and up-sell purposes
Created and delivered client focus groups sessions to obtain feedback on product evolution and services
Created pricing strategy for training, implementation and consulting services
Built and maintained collaborative relationships across the organization, ensuring a common goal and focus on providing outstanding customer service
Performed some components of a product marketing role; writing product features enhancements and researching competition and best practice trends

**Terry Doggett**
Senior IT Specialist at Rockstar Consortium Inc.

**Ross Morgan, CPA, CA, MAcc**
Managing Director - CFO4Results

**Megan Paterson**
Director, Human Resources at Kinaxis

**Tracey Clements, CHRP**
Director, People Services at TITUS



Skills & Endorsements

Top Skills

| 38 | Recruiting | ▸ |
| 28 | Employee Relations | ▸ |
| 24 | Human Resources | ▸ |
| 18 | Employee Engagement | ▸ |
| 14 | Succession Planning | ▸ |
| 8 | Team Leadership | ▸ |
| 7 | Strategic Planning | ▸ |
| 7 | Customer Service | ▸ |
| 4 | Contract Negotiation | ▸ |
| 4 | Corporate Communications | ▸ |

Vicki also knows about...

| 3 | Start-ups | 2 | Success Driven |

Additional Info

**Advice for Contacting Vicki**

vickic@xplornet.com

– A583 –